# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **CHARLES L. BURTON, JR.,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | )   **Case No. 4:05-cv-308-CLS-PWG** |
| | ) |
| **DONAL CAMPBELL, Commissioner** | ) |
| **of the Alabama Department of** | ) |
| **Corrections,** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM OPINION

This opinion addresses the petition filed by Charles L. Burton pursuant to 28 U.S.C. § 2254, seeking habeas corpus relief from his state court conviction on a charge of capital murder and resulting death sentence.

## <u>Table of Contents</u>

I.   **The Offense Conduct** .................................................................................. 8

II.  **Procedural History** .................................................................................. 10

III. **Introduction to Discussion of Burton's Substantive Claims:** *The Scope of Federal Habeas Review* .................................................................................. 12

    **A.** Exhaustion of State Court Remedies: *the first condition precedent to federal habeas review* .................................................................................. 12

    **B.** The Procedural Default Doctrine: *the second condition precedent to federal habeas review* .................................................................................. 14

        **1.** *Overcoming procedural defaults* .................................................................................. 16

   **a**. *The "cause and prejudice" standard* ............................................................. 18

   **b**. *The "fundamental miscarriage of justice" standard* ..................................... 19

 **C**. The Statutory Overlay: *the effect of the Antiterrorism and Effective Death Penalty Act of 1996 on habeas appeals* .......................................................... 20

  **1**. *The meaning of § 2254(d)(1)'s "contrary to" clause* ............................. 23

  **2**. *The meaning of § 2254(d)(1)'s "unreasonable application" clause* ...................... 25

   **a**. *Mixed questions of law and fact* ............................................... 26-27

  **3**. *Evaluating factual determinations by state courts under § 2254(d)(2)* ................. 27

 **D**. The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions .................................................................................. 28

**IV.** **Discussion of Burton's Substantive Claims** ........................................................ 32

 **A.** *The prosecutor used his peremptory challenges in a discriminatory manner to exclude African-Americans from the jury* ......................................................... 32

 **B.** *Witness Larry McCardle's identification of Burton was tainted, unreliable, and inadmissible* .................................................................................. 49

 **C.** *The trial court erred when it failed to find any statutory and non-statutory mitigating circumstances* ................................................................... 57

 **D.** *Improper prosecutorial remarks during the guilt phase of trial* ........................................ 66

  **1.** *Consideration of lesser included offenses amounted to sympathy* ........................ 66

  **2.** *Use of leading questions with key witnesses* ........................................... 68

  **3.** *Expression of personal opinion concerning Burton's guilt* ................................... 74

  **4.** *Argument of facts not in evidence* ......................................................... 78

  **5.** *Vouching for the innocence of key state witness LuJuan McCants* ...................... 85

  **6.** *Engaged in impermissible burden shifting* .............................................. 87

**E.**   *Improper prosecutorial remarks during the penalty phase of trial* .......................... 90-91

    **1.**   *Argument of facts not in evidence* .......................................................... 91

    **2.**   *Urged the jury not to consider all evidence presented* ........................... 97

**F.**   *Improper prosecutorial use of Burton's prior convictions to rebut a mitigating circumstance that was not offered* ............................................. 104

**G.**   *The trial court erred when it failed to give an instruction on the need for evidence to corroborate accomplice testimony* ...................................... 108

**H.**   *The trial court erred when it failed to instruct the jury to determine whether Barbara Spencer Long was an accomplice* ...................................... 108

    **1.**   *Ms. Long was an accomplice.* ............................................................... 108

    **2.**   *The trial court should have given a corroboration instruction.* ........................... 108

**I.**   *The trial court erred when it failed to properly instruct the jury to find a "particularized intent to kill"* ...................................................... 115

    **1.**   *The trial court never defined key terms* .............................................. 115

    **2.**   *The evidence was insufficient to find that Burton possessed the intent to kill* .................. 121

**J.**   *The trial court erred when it denied Burton's motion for new trial premised on juror misconduct* ........................................................................ 127

**K.**   *The trial court's "beyond a reasonable doubt" instruction was contrary to the Supreme Court's decision in* Cage v. Louisiana ....................................... 136

**L.**   *The trial court's other improper jury instructions*:

    **1.**   *The jury had a duty to convict* ..............................................................140

    **2.**   *Failure to clarify the difference between capital murder and robbery/murder* ...................................................................... 142

    **3.**   *Informing the jury that its sentencing verdict was merely a recommendation* ........ 150

    **4.**   *A legal presumption existed against a witness who testified falsely* ................... 153

3

**M.**  *The trial court failed to instruct the jury at the penalty phase that they could not consider Burton's prior convictions as substantive evidence and erred when instructing the jury to double count the capital conviction as an aggravating factor* ........................................................................ 156

**N.**  *The trial court judge harmed defense counsel's mitigation strategy when he forced defense counsel to call two of Burton's co-defendants as witnesses* .......................... 160

**O.**  *The trial court erred when it admitted and considered inadmissible evidence at sentencing, including nine felony convictions that did not satisfy the requirements of the capital statute, and a prejudicial presentence investigation report* ................................................................ 172

**P.**  *The trial court erred when it held proceedings outside Burton's presence* ............... 173

**Q.**  *The trial court erred when it denied defense counsel's challenges for cause against venire members Carolyn Bussey and Victor Stringer* .............................. 178-79

**R.**  *The trial court erred when it denied Burton's motion for a change of venue* ............ 181

    **1.**  *A habeas petitioner's burden of proof* .................................................... 186

**S.**  *The trial court failed to ensure individual, sequestered voir dire* ............................... 188

**V.  Introduction to Discussion of Burton's Ineffective Assistance of Counsel Claims** ...... 190

**A.**  *The Performance Prong* ........................................................................... 192

**B.**  *The Prejudice Prong* ............................................................................... 195

**C.**  *Deference Accorded State Court Findings of Historical Fact When Evaluating Ineffective Assistance of Counsel Claims* .................................................. 197

**VI.  Discussion of Burton's Ineffective Assistance of Counsel Claims** ................................ 197

**A.**  *Trial counsel failed to adequately investigate, develop, and present defenses* ............. 197

    **1.**  *The private investigator retained by trial counsel failed to conduct an adequate pretrial investigation* ......................................................... 197

        **a.**  *Failure to investigate co-defendant LuJuan McCants* ................................ 203

        **b.**  *Failure to investigate Barbara Spencer Long* ................................ 208

4

**2.** *Trial counsel failed to investigate all available defenses* ..................................... 211

    **a**. *Pursuit of an uncorroborated alibi defense* ................................... 211

    **b**. *Failure to investigate and pursue a lack of intent to kill defense* ................. 214

**B.** *Trial counsel failed to prepare and present evidence for pretrial hearings and did not fully present evidence in support of motions filed* .......................................... 217

    **1.** *Failed to support motion for change of venue.* ................................... 217

    **2.** *Failed to ensure full recordation of proceedings* ................................ 220

    **3.** *Failed to support motions for voir dire* .............................................. 223

    **4.** *Failed to limit the state's arguments on aggravating circumstances* ................................................................................ 226

    **5.** *Failed to request individual sequestered voir dire* ............................... 229

    **6.** *Failed to submit a jury questionnaire* .................................................. 231

    **7.** *Failed to file motions challenging Alabama's Death Penalty Statute* ................. 233

    **8.** *Failed to file a motion challenging identification testimony* ................... 234

**C.** *Trial counsel failed to challenge the State's failure to arraign Burton* ........................ 236

**D.** *Trial counsel failed to request the appointment of experts necessary to the defense* ................................................................................................. 238

    **1.** *Eyewitness identification and "memory" experts* ....................................... 239

    **2.** *Jury selection consultant* ....................................................................... 241

    **3.** *Fingerprint identification experts* ........................................................ 241

    **4.** *The relevance of* Ake *and* Griffin ........................................................ 243

**E.** *Trial counsel were ineffective in the preparation and presentation of mitigating evidence for the sentencing hearing* ................................................................... 245-46

**F.** *Trial counsel failed to object to discrimination in the selection of grand jury*

*forepersons in Talladega County* ............................................................ 254

**G.** *Trial counsel failed to object to under-representation of minorities and women on the venire from which Burton's grand and petit jurors were drawn* ...................... 256

**H.** *Trial counsel failed to ask venire members the kinds of questions necessary to elicit bias and to secure a fair trial* ........................................................ 259-60

**I.** *Trial counsel were ineffective for inadequately pleading and arguing challenges for cause* ................................................................... 260

**J.** *Trial counsel failed to object to the prosecutor's misstatements of the law during opening statement, the trial, and closing argument* ......................... 262

**K.** *Trial counsels' opening and closing arguments at both phases of trial fell below the standard of effective assistance required in a death penalty case* ........................ 265

**L.** *Trial counsel failed to investigate adequately and cross-examine critical witnesses for the prosecution, including LuJuan McCants and Barbara Spencer* ...................... 267

**M.** *Trial counsel failed to investigate or present a defense to the charges of capital murder or to locate, interview and present witnesses to testify on Mr. Burton's behalf at the guilt-innocence phase* ........................................ 269

**N.** *Trial counsel failed to object to erroneous instructions given by the trial court at the guilt/innocence phase* ............................................................. 269-70

**O.** *Trial counsel did not object to the prosecution's use of misdemeanors and nonviolent felonies [during the penalty phase of trial]* .................................. 271

**P.** *Trial counsel allowed the court and prosecution to interfere with the presentation of penalty-phase evidence to the prejudice of Mr. Burton* ............................ 273

**Q.** *Trial counsel failed to object to the state's strategy of bringing in damaging and inadmissible evidence about Mr. Burton's co-defendants* ........................... 276

**R.** *Trial counsel failed to object to the improper argument made by the prosecutor at the penalty phase in which he converted mitigating factors not presented by Mr. Burton into aggravating factors* ...................................................... 278

**S.** *Trial counsel failed to advocate at all at the sentencing hearing before the trial judge* ................................................................................. 280

6

**T.**   *Trial counsel failed to object properly to the imposition of the death penalty in this case pursuant to a pattern evincing racial bias* ................................................. 283

**U.**   *Trial counsel failed to object to inadequate funding and lack of resources provided in Alabama capital cases generally and in this case in particular* ............................... 284

**V.**   *Trial counsel failed to provide effective assistance in Mr. Burton's motions for new trial* ................................................................................................................... 288

**W.**   *Trial counsel violated their ethical duties, the attorney/client privilege, and constitutional law by testifying against their client at the hearing on the motion for new trial* ............................................................................................. 290

**X.**   *Trial counsel failed to object to improper cross-examination of Mr. Burton at the motion for new trial* .......................................................................................... 293

**Y.**   *Trial counsel failed to object adequately to the absence of meaningful appellate review of Alabama death sentences* ............................................................... 294

## VII. Discussion of Miscellaneous Claims

**Claim VI.**   *The State failed to provide Burton's counsel with favorable evidence* .......... 297

**Claim VII.**   *Ineffective assistance of counsel if the tape of Mr. McCants was provided to trial counsel prior to trial and they either chose not to watch or watched it and did not use it* ........................................................................ 298

    **1.**   *The* Brady *rule* ........................................................................................ 299

        **a.**   *Evidence favorable to the accused* .................................................. 301

            **(i)**   *evidence that is* "material" *to either guilt or punishment* ......... 302

    **2.**   *Burton's evidence* ................................................................................ 304

**Claim VIII.**   *Burton was denied his rights to grand and traverse jury pools representative of the community* .................................................................... 307

**Claim IX.**   *Burton was denied his rights due to racial discrimination in the selection of grand jury forepersons in Talladega County* ............................................. 308

**Claim X.**   *The trial court violated Burton's rights when it refused to dismiss his attorney after Burton's expression of dissatisfaction and*

*failed to hold a hearing on the matter* ............................................................ 309

**Claim XI.**   *The failure to transcribe fully all trial court proceedings deprived*
*petitioner of a full appeal and the statutorily mandated review*
*of his capital sentence and conviction* ............................................................ 309

**Claim XII.**   *The Alabama Death Penalty Statute fails to provide meaningful*
*appellate review and meaningful comparative review for*
*those under sentence of death* ...................................................................... 310

**VIII. Conclusion** ..................................................................................................... 311

_____

## I.  THE OFFENSE CONDUCT

The following summary of the evidence of the offense of conviction is taken
from the opinion of the Alabama Court of Criminal Appeals on direct appeal.  *See*
*Burton v. State*, 651 So. 2d 641 (Ala. Crim. App. 1993).

The appellant, Charles Lee Burton, was convicted of murder made
capital because it was committed during the course of a robbery in the
first degree.  § 13A-5-40(a)(2), Code of Alabama 1975.  The jury
unanimously voted for the death penalty.  The trial court accepted the
jury's recommendation and sentenced the appellant to death by
electrocution.

The state's evidence tended to show that on August 16, 1991, six
men — the appellant, Derrick DeBruce, Deon Long, LuJuan  McCants,
Willie Brantley, and Andre Jones — robbed the occupants of the Auto
Zone automobile parts store in Talladega, Alabama.  During the course
of the robbery, a customer, Doug Battle, was shot.  He died as a result of
a gunshot wound to the lower back, which pierced his chest.  The trigger
man was Derrick DeBruce.

The manager of the store, Larry McCardle, was at the cash register
when an individual he identified as the appellant entered the store,
purchased some items, and asked him for the location of the restroom.

8

McCardle testified that at this time another customer, whom he identified as DeBruce, was in the store. After the appellant started walking to the restroom, DeBruce pulled a gun and told everyone in the store to get on the floor. At this point, the appellant grabbed McCardle, pointed a gun at him and told him to take him to the safe. McCardle complied. Moments later McCardle heard yelling and gunshots.

One of the appellant's codefendant's [sic], LuJuan McCants, testified that the six men involved in the robbery were at Barbara Spencer's house in Montgomery on April 16 talking about committing a robbery. He said that Deon Long, Charles Burton, and Derrick DeBruce left the Spencer house to get some guns. They agreed to meet at the appellant's house. They left the appellant's house in two cars and headed toward Birmingham. They exited the interstate at Sylacauga and proceeded to Talladega. In Talladega, they went to a carwash and discussed robbing the Auto Zone store. They left one car at the carwash and they all proceeded in the other car to the Auto Zone.

McCants testified that the appellant organized the criminal activity and that he told the others what to do during the robbery. The appellant told McCants and Long to watch the door and told them that if he left the store that they should forget the robbery plans. McCants testified that the appellant also told them that if anyone caused any trouble in the store to let him handle the situation. McCants also testified that everyone who went into the store had a gun except Deon Long. McCants said that they forced everyone in the store to get on the floor and that they then took their valuables. The victim, Battle, walked in while the robbery was in progress and McCants told him to get on the floor. Battle was having some difficulty getting on the floor and an argument ensued between DeBruce and Battle. DeBruce hit Battle and he fell to the ground. DeBruce then shot Battle in the back while he was laying face-down on the floor. McCants testified that all of the robbers had either left the store or were about to leave when DeBruce shot Battle. He said that the appellant was among those who had already left the store at the time of the shooting. After all six left the store, they jumped in their car, picked up the other car at the carwash where they had left it, went to Barbara Spencer's house and divided the money.

A forensic examination of the Auto Zone store revealed 17 of the appellant's fingerprints. These prints were found on the items that McCardle had said that the appellant purchased before the robbery and on various other items in the store.

Barbara Spencer testified that before the robbery, the six men had been at her house discussing how to commit a robbery. She said that they left her house in separate cars and that the appellant and Derrick DeBruce were riding together. She testified that they returned to her house later and appeared to be upset. They had a large amount of money and the appellant was telling the others how to divide it. Spencer said that they gave her $100 but that she gave the money to McCants.

*Burton v. State*, 651 So. 2d at 643-44 (footnotes omitted).

## II. PROCEDURAL HISTORY

Burton was found guilty of capital murder during the course of a robbery in violation of Alabama Code § 13A-5-40(a)(2) (1975) on April 16, 1992. A penalty hearing before the same jury followed, and the jury, by unanimous vote, recommended that Burton be sentenced to death. A formal sentencing hearing, separately conducted before the trial judge as required by Alabama Code § 13A-5-47, was held on May 8, 1992, and the trial court judge sentenced Burton to death.

Burton appealed his conviction and sentence to the Alabama Court of Criminal Appeals, which entered a published opinion affirming Burton's conviction and death sentence on December 30, 1993. *See Burton v. State*, 651 So. 2d 641 (Ala. Crim. App. 1993). The Supreme Court of Alabama affirmed the conviction and sentence on

September 16, 1994, finding no reversible error, plain or otherwise.  *See Ex parte Burton*, 651 So. 2d 659 (Ala. 1994).  The United States Supreme Court denied Burton's petition for writ of *certiorari* on May 15, 1995.  *See Burton v. Alabama*, 514 U.S. 1115 (1995).

On December 4, 1996, Burton filed a petition seeking relief from his judgment of conviction and death sentence in accordance with Rule 32 of the Alabama Rules of Criminal Procedure.  (*See* Rule 32 C.R., Vol. 12, Tab. 40, at 1-38).[1]  Following an evidentiary hearing, the circuit court denied the petition on July 17, 2001.  *Id.*, Vol. 25, Tab. 58, at 1-69.  The Alabama Court of Criminal Appeals affirmed the trial court's decision on February 20, 2004.  *See Burton v. State*, CR-00-2472, slip op. (Ala. Crim. App.  Feb. 20, 2004).  The Supreme Court of Alabama denied certiorari review on September 24, 2004.  *Ex parte Burton*, CR-00-2472, writ denied (Ala. Sept. 24, 2004).  This habeas petition followed.

---

[1]  ***Nota bene***:  The court will utilize the following method of citation to the record.  References to specific pages of the court record on direct appeal are designated "**C.R.**___", and references to the transcript on direct appeal are designated "**R.**___."  References to the court record of the Rule 32 proceedings are designated "**Rule 32 C.R.** __", and references to the transcript on collateral appeal are designated "**Rule 32 R.**___."  The court will strive to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document, if those numbers are the most readily discoverable for purposes of expedient examination of that part of the record.  Otherwise, the page numbers that are referenced will correspond to those printed in the upper right hand corner of the record.  Additionally, if there is an easily identifiable tab number close to any cited material, the court has made reference to that for the reader's benefit.

## III.  INTRODUCTION TO DISCUSSION OF
## BURTON'S SUBSTANTIVE CLAIMS:
### *The Scope of Federal Habeas Review*

**A**.    **Exhaustion of State Court Remedies**: *the first condition precedent to federal habeas review*

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court.  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) (citing 28 U.S.C. § 2254(b)(1);[2] *Ex parte Royal*, 117 U.S. 241, 251 (1886)).  *See also Duncan v. Henry*, 513 U.S. 364, 365 (1995) (observing that the exhaustion-of-state-remedies doctrine requires a state prisoner to initially present federal constitutional claims to the state courts, in order to give the state an opportunity to pass upon and

_____

[2] The cited statutory provision reads as follows:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

correct alleged violations of its prisoners' federal rights); *Snowden v. Singletary*, 135

F.3d 732, 735 (11th Cir. 1998) (same).

> When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence.  The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials.   . . .

*Barefoot v. Estelle*, 463 U.S. 880, 887 (1983); *see also Smith v. Newsome*, 876 F.2d

1461, 1463 (11th Cir. 1989) (same).

Further, the state prisoner must present the state courts with *the same federal*

*constitutional claim* he later alleges in his habeas petition.

> We emphasize that the federal claim must be fairly presented to the state courts.  If the exhaustion doctrine is to prevent unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution, it is not sufficient merely that the federal habeas applicant has been through the state courts.  The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts.  Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.

*Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (citations and internal quotation marks

omitted).

The dispositive question is "whether any of petitioner's claims is so clearly

distinct from the claims he has already presented to the state courts that it may fairly

be said that the state courts have had no opportunity to pass on the claim." *Humphrey v. Cady*, 405 U.S. 504, 516 n.18 (1972).

B.   **The Procedural Default Doctrine**: *the second condition precedent to federal habeas review*

It also is well settled that, when a state prisoner fails to present a federal constitutional claim in the state courts in a timely and proper manner, and the state courts refuse to address the merits of the claim based upon state law or procedural rules, a federal habeas court also is precluded from addressing the claim *unless* the habeas petitioner shows *both* cause for his failure to present the claim in the state court system *and* actual prejudice as a result of the default, *or* he presents evidence establishing that the federal court's failure to consider the defaulted claim will result in a fundamental miscarriage of justice. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001); *Presnell v. Kemp*, 835 F.2d 1567, 1567-68 (11th Cir. 1988).

This so-called "procedural default doctrine" bars habeas review of state court rejections of a state prisoner's federal constitutional claims when three circumstances converge:  *i.e.*, (*i*) the last state court to review the claim (*ii*) states clearly and expressly that its disposition of the claim rests upon either a procedural rule or

14

substantive principle of state law;[3] and (*iii*) the state-law ground "is *independent* of the federal question and *adequate* to support the judgment." *Coleman*, 501 U.S. at 729-30 (emphasis supplied); *see also*, *e.g.*, *Harris*, 489 U.S. at 262-63; *Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).

A state-law bar is "*independent* of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of federal law." *Judd*, 250 F.3d at 1313 (emphasis supplied) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).

A state-law bar is deemed to be "*adequate* to support the judgment" when (*a*) it is "firmly established and regularly followed," *Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir. 2005) (emphasis supplied),[4] *and* (*b*) it is not "applied in an arbitrary or unprecedented fashion" that is "'manifestly unfair' in its treatment of the petitioner's federal constitutional claim." *Judd*, 250 F.3d at 1313 (quoting *Card*, 911 F.2d at 1517).

"'[T]he adequacy of state procedural bars to the assertion of federal questions' . . . is not within the State's prerogative finally to decide; rather adequacy 'is itself a

---

[3] In other words, the procedural default doctrine applies with equal force "regardless of 'whether the state-law ground is substantive or procedural.'" *Lee v. Kemna*, 534 U.S. 362, 374 (2002) (quoting *Coleman*, 501 U.S. at 729); *see also id.* at 375 (same).

[4] *See also*, *e.g.*, *Lee*, 534 U.S. at 376; *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996); *Cochran v. Herring*, 43 F.3d 1404, 1408, *modified on reh'g*, 61 F.3d 20 (11th Cir. 1995).

federal question.'"   *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Douglas v.*

*Alabama*, 380 U.S. 415, 422 (1965)).  Nevertheless, federal deference to a state court's

clear finding of a procedural default under its own rules is so strong that a state court

> need not fear reaching the merits of a federal claim in an *alternative*
> holding.  By its very definition, the adequate and independent state
> ground doctrine requires the federal court to honor a state holding that is
> a sufficient basis for the state court's judgment, even when the state court
> also relies on federal law.

*Harris*, 489 U.S. at 264 n.10 (emphasis in original).[5]  *See also*, *e.g.*, *Bailey v. Nagle*,

172 F.3d 1299, 1305 (11th Cir. 1999) (same); *Hall v. Wainwright*, 733 F.2d 766, 777

(11th Cir. 1984) ("A state court is entitled to express its views on federal constitutional

issues without waiving its procedural default rules.").

    However, when a state court does rule "in the in the alternative, addressing both

the independent state procedural ground and the merits of the federal claim, the federal

court should apply the state procedural bar and decline to reach the merits of the

claim."  *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (citing *Harris*, 489

U.S. at 264 n.10).

**1**.   *Overcoming Procedural Defaults*

    There are only three circumstances in which a state-law ground will not bar a

---

[5] Indeed, the fact that a state court may reject a claim on the basis of both a state procedural rule and federal law is of no consequence.  As the Supreme Court observed in *Harris v. Reed*, *supra*, "a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity."  489 U.S. at 264 n.10.

federal court from considering a constitutional claim that was defaulted in state court: (*i*) the habeas petitioner shows both cause for, and actual prejudice as a result of, failing to comply with the state's procedural rules; *or* (*ii*) the petitioner shows that failure to consider his claim will result in a fundamental miscarriage of justice; *or* (*iii*) as discussed in the preceding section in connection with the adequacy of a state bar, the petitioner demonstrates that the state-law ground was not firmly established and regularly followed. *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn

quoting *Murray*, 477 U.S. at 496)).

      a.    *The "cause and prejudice" standard*

The "cause *and* prejudice" standard clearly is framed in the conjunctive and, therefore, a petitioner must prove both parts. To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488. Examples of "objective" impediments to compliance with state-law substantive or procedural rules include, but are not limited to, such factors as: (*i*) the novelty of the claim, *see Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures."); (*ii*) *constitutionally* ineffective assistance of counsel, *see McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) ("Attorney error short of ineffective assistance of counsel . . . does not constitute cause and will not excuse a procedural default."); or (*iii*) some interference by state officials that makes compliance impracticable. *See Murray*, 477 U.S. at 488 (citing *Brown v. Allen*, 344 U.S. 443, 486 (1953)).[6]

---

[6] The Supreme Court elaborated the "cause" prong of the standard in *Amadeo v. Zant*, 486 U.S. 214 (1988), saying:

    In *Wainwright v. Sykes*, 433 U.S. 72 (1977), this Court adopted the "cause and prejudice" requirement of *Francis v. Henderson*, [425 U.S. 536 (1976)], for all petitioners seeking federal habeas relief on constitutional claims defaulted in state

If "cause" for the default is established, a habeas petitioner must also prove

"prejudice."  He must show "not merely that the errors at his trial created a *possibility*

of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting

his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456

U.S. 152, 170 (1982) (emphasis in original).

      **b**.    *The "fundamental miscarriage of justice" standard*

In a rare, extraordinary, and narrow class of cases,[7] federal courts may consider

---

court.  The *Sykes* Court did not elaborate upon this requirement, but rather left open "for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard." 433 U.S. at 87.  Although more recent decisions likewise have not attempted to establish conclusively the contours of the standard, they offer some helpful guidance on the question of cause.  In *Reed v. Ross*, 468 U.S. 1 (1984), the Court explained that although a "tactical" or "intentional" decision to forgo a procedural opportunity normally cannot constitute cause, *id.*, at 13-14, "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met."  *Id.*, at 14.  The Court later elaborated upon *Ross* and stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  We explained that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . would constitute cause under this standard."  *Ibid.*

*Amadeo v. Zant*, 486 U.S. at 221-22.

    [7] *See Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain '*rare*' and would only be applied in the '*extraordinary* case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.") (emphasis supplied); *McClesky v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, *narrow class of cases* despite a petitioner's failure to show cause for a procedural default.  These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.  We have described this class of cases as implicating a fundamental miscarriage of justice.") (emphasis supplied) (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, *but only if* (*i*) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith*, 477 U.S. at 537-38 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray*, 477 U.S. at 496), *or if* (*ii*) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 327 & n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith*, 477 U.S. at 537-38.

**C**.     **The Statutory Overlay**: *The effect of the Antiterrorism and Effective Death Penalty Act of 1996 on habeas appeals*

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That observation is especially true when federal courts are asked to engage in collateral, habeas review of a state court conviction pursuant to 28 U.S.C. § 2254.

> Direct review is the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. *Federal courts are not forums in which to relitigate state trials*."

*Id*. (emphasis supplied) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).

20

"Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-441 (1963).

"Accordingly, it hardly bears repeating that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (citations, quotation marks, and footnote omitted). That is because

> [t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982).[8]

These principles were reinforced by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended preexisting habeas law.[9] In addition

---

[8] "The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991); and *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

[9] The Antiterrorism and Effective Death Penalty Act was signed into law by President Clinton on April 24, 1996. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). The present petition was filed after that date. Accordingly, the habeas statutes as amended by AEDPA apply to the claims asserted in this case. *See id.* § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same). *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254). *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not apply to habeas petitions filed prior to the

to other substantive changes to statutes and caselaw precedents worked by AEDPA, the Act requires federal courts to give greater deference to state court determinations of federal constitutional claims than was accorded such decisions under previous law. For example, 28 U.S.C. § 2254(e)(1) mandates that district courts presume a state court's factual determinations to be correct, unless the habeas petitioner rebuts the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1);[10] *see also*, *e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides "a highly deferential standard of review for factual determinations made by a state court"). Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).

Moreover, when a state court fairly addresses the merits of a federal constitutional claim and adequately explains the basis for its decision, habeas relief

---

Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

[10] The cited statute provides that: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

cannot be granted, *unless* it is determined that the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[11]  The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have been interpreted as "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams v. Taylor*, 529 U.S. 362, 405-07 (2000)).[12]

**1**.     *The meaning of § 2254(d)(1)'s "contrary to" clause*

A state-court determination can be "contrary to" clearly established Supreme

---

[11] Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the Supreme Court of the United States," has been interpreted by the Supreme Court as referring only to "the *holdings*, as opposed to the *dicta*, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion) (emphasis supplied); *see also*, *e.g.*, *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (same); *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

[12] *See also Williams v. Taylor*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States*," or (2) "*involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States*.") (emphasis supplied).

Court precedent in at least two ways:

> *First*, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. *Second*, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (emphasis supplied). *See also*, *e.g.*, *Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).

The Eleventh Circuit has observed that the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above.[13] Instead, the statutory language "simply implies that 'the state court's

---

[13] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency. Two propositions are incompatible with one another if both cannot be true or correct. Thus, a state court decision is contrary to federal law if that decision and the applicable federal law cannot both be true or correct. Given this premise, there appears to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:
>
> • the state court applies the correct federal standard and arrives at a correct outcome;
>
> • the state court applies an incorrect federal standard and arrives at an incorrect outcome;
>
> • the state court applies an incorrect federal standard and arrives at a correct outcome; and,

decision must be substantially different from the relevant precedent of [the Supreme]
Court.'" *Alderman v. Terry*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405).

> 2.   *The meaning of § 2254(d)(1)'s  "unreasonable application" clause*

A state-court's determination of a federal constitutional claim can result in an
"unreasonable application" of clearly established Supreme Court precedent in either
of two ways:

> *First*, a state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing legal
> rule from this Court's cases but unreasonably applies it to the facts of the
> particular state prisoner's case.   *Second*, a state-court decision also
> involves an unreasonable application of this Court's precedent if the state
> court either unreasonably extends a legal principle from our precedent to
> a new context where it should not apply or unreasonably refuses to
> extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407 (emphasis supplied).  *See also*, *e.g., Putman v. Head*, 268
F.3d 1223, 1240-41 (11th Cir. 2001) (same).

As explained by the majority opinion in *Williams*, however, "an *unreasonable*
application of federal law is different from an *incorrect* application."  *Williams*, 529
U.S. at 410 (emphasis in original).  The Court went on to say that a federal habeas
court "may not issue the writ simply because that court concludes in its independent

---

•     the state court applies the correct federal standard and arrives at an incorrect
      outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory
Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id*. at 411.  In other words, the question that should be asked is *not* whether the state court "correctly" applied Supreme Court precedent when deciding the federal constitutional issue, but whether the state court's determination was "reasonable," *even if incorrect*. *Id*. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.").  *See also*, *e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and that "an unreasonable application is different from an incorrect one").[14]

### *a*.    *Mixed question of law and fact*

---

[14] The Eleventh Circuit recently observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id*. (quoting *Williams v. Taylor*, 529 U.S. at 409).

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted).  Mixed questions of constitutional law and fact are those decisions "which require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963).

It is not enough that the reviewing court may disagree with the state court decision.  Relief may be granted "'only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.'" *Neeley*, 138 F.3d at 924 (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)).

**3**.   *Evaluating factual determinations of state courts under §§ 2254(d)(2) and (e)(1)*

Subsection 2254(d)(2) regulates federal court review of state court findings of fact.  That provision limits the availability of relief to decisions that were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

It must be remembered, however, that factual determinations made by a state court are "presumed to be correct," and the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *See* 28

27

U.S.C. § 2254(e)(1).

**D**.      **The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions**

Habeas review "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *see also* 28 U.S.C. § 2254(a).[15] Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Two consequences flow from those fundamental propositions. First, the habeas petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis showing why federal post-conviction relief should be granted. *See*, *e.g.*, 28 U.S.C. §§ 2254(d) and (e)(1);[16] *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir.

---

[15] The cited statute provides that: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody *in violation of the Constitution or laws or treaties of the United States*." 28 U.S.C. § 2254(a) (emphasis supplied). It follows that claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.

[16] As discussed in Part III(C) *supra*, § 2254(d) provides that the state courts' adjudication of a habeas petitioner's claims can be overturned only if the petitioner carries the burden of demonstrating that a particular determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or that the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Further, § 2254(e)(1) provides that, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

28

1983) ("The burden of proof in a habeas proceeding is always on the petitioner.")

(citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)).

Second, the habeas petitioner must meet "heightened pleading requirements."

*McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citations omitted).  The mere assertion

of a ground for relief, without more factual detail, does not satisfy either the

petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or the requirements of Rule

2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*,

which requires a state prisoner to "specify all the grounds for relief available to the

petitioner" and to "*state the facts supporting each ground*."  28 U.S.C. § 2254 app.

Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts*

(emphasis supplied).[17]  *See also* 28 U.S.C. § 2242 (stating that an application for writ

of habeas corpus "shall allege *the facts* concerning the applicant's commitment or

detention") (emphasis supplied).

The instructions for completing the form "Petition for Relief From a Conviction

or Sentence By a Person in State Custody" found in the Appendix of Forms following

the foregoing Rules are even more emphatic:

> <u>**CAUTION**</u>:  **You must include in this petition <u>all</u> the grounds for
> relief from the conviction or sentence that you challenge.  *And you
> must state the facts that support each ground*.  If you fail to set forth**

---

[17] *Accord* Rule 2(b) of the *Rules Governing Section 2255 Proceedings for the United States District Courts*.

**all the grounds in this petition, you may be barred from presenting additional grounds at a later date**.

28 U.S.C. § 2254 app. *Rules Governing Section 2254 Cases in the United States District Courts*, Appendix of Forms, ¶ 9 (boldface and underscored emphasis in original; *italicized* emphasis added).[18]

These requirements for a habeas petitioner to plead "facts" supporting each ground for relief deviate from the "notice pleading" rule that applies in other federal civil actions.  *See* Fed. R. Civ. P. 8; *see also*, *e.g.*, *McFarland v. Scott*, 512 U.S. at 860 (O'Connor, J., concurring in judgment in part) (observing that a "habeas petition, unlike a [civil] complaint, must allege the factual underpinnings of the petitioner's claims"); Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts* ("[N]otice pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'") (quoting *Aubut v. Maine*, 431 F.2d 688 (1st Cir. 1970)).

In short, a habeas petitioner must include in his statement of each claim

---

[18] As originally promulgated, the Rules Governing Section 2254 Cases in the United States District Courts required habeas petitioners to use a form petition that the drafters attached to the Rules as an appendix.  Congress rejected that proposal, and instead required that the petition "be in substantially the form annexed to" the Rules and authorizing district courts to prescribe their own forms by local rule.  *See* Pub. L. 94-426, § 1, Sept. 28, 1976, 90 Stat. 1334 (amending proposed Rule 2(c) of the proposed Rules Governing Section 2254 Cases in the District Courts by "striking out the sentence 'The petition shall follow the prescribed form'" and "inserting 'substantially' immediately after 'The petition shall be in'" and by making equivalent changes in Proposed Rule 2(b) of the Rules Governing Section 2255 Proceedings).

sufficient supporting facts to justify a decision for the petitioner if the alleged facts are proven.  *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (petition must "state facts that point to a 'real possibility of constitutional error'") (quoting advisory Committee Note 4, *supra*).  *Cf. Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (holding in a § 2255 case that, despite the liberal construction due a *pro se* movant's allegations, dismissal was appropriate because the movant did not allege "facts that, if proven, would entitle him to relief").[19]  "Citation of the controlling constitutional, statutory, or other bases for relief for each claim also should be stated." 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005).  As another district judge has stated:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners.  Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

These heightened pleading requirements are especially forceful when, as in the present case, the petitioner is represented by counsel.

---

[19] *Cf. Hill v. Lockart*, 474 U.S. 52, 60 (1986) ("Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial.  *He alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty.*") (emphasis supplied).

# IV.  DISCUSSION OF BURTON'S SUBSTANTIVE CLAIMS

**A.**   *The prosecutor used his peremptory challenges in a discriminatory manner to exclude African-Americans from the jury, violating Mr. Burton's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  See* doc. no. 9, ¶¶ 15-26, at 5-11.

An attempt was made to follow Burton's organization of this claim, but the endeavor proved too unwieldy for analytical purposes.[20]  For that reason, the court will rely on its own method of addressing each facet of Burton's claim, beginning with

---

[20] Burton divides this claim into five categories:

1.   The prosecutor's explanation for striking African-American venire members without adequate voir dire, his history of striking venire members on the basis of race, and insufficient reasons evidence discrimination.

2.   The prosecutor's strikes of African-American venire members were clearly discriminatory.

3.   The prosecutor did not strike other jurors who possessed similar characteristics as those allegedly used to challenge African-American venire members.

4.   The prosecutor considered Annie Cox's occupation and religion in striking her.

5.   The prosecutor's stated reasons were a pretext for discrimination.

*See* doc. no. 9, ¶¶ 15-26, at 5-11.  Petitioner provided no evidentiary support for the accusation in the title of his first subcategory above (*i.e.*, that the prosecutor had a history of striking prospective jurors on the basis of race).  Further, there are allegations in the body of the petition about historical discrimination in the patterns of peremptory strikes exercised in other cases by the District Attorney who prosecuted Burton, but no proof of such.  Moreover, Burton never raised or supported such an allegation prior to the present habeas petition.  Accordingly, as discussed in Part III(B) *supra*, the accusation is procedurally defaulted.  Even if it were not, such a conclusory allegation fails to meet the pleading specificity requirements for habeas petitions discussed in Part III(D) *supra*, and the allegation is due to be dismissed on that basis as well.

Burton's contention that *Batson v. Kentucky* and its progeny entitle him to relief under 28 U.S.C. §§ 2254(d)(1) and (d)(2).

Burton, who is black, alleges that the opinion of the Alabama Court of Criminal Appeals on direct appeal, affirming the trial court's rejection of his attorneys' objection to the prosecutor's alleged use of purposeful, racially-discriminatory, peremptory strikes, was both contrary to and an unreasonable application of clearly established Supreme Court precedent, as well as an unreasonable determination of the facts in light of the evidence before the state courts. (*See* doc. no. 9 at 11, and doc. no. 21 at 67-71).

The Alabama Court of Criminal Appeals entered the following findings of fact and conclusions of law on direct appeal:

> The appellant, who is black, also argues that the trial court erred in denying his *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), motion. The United States Supreme Court in *Batson* held that the Equal Protection Clause prohibits the removal of blacks from a black defendant's jury solely on the basis of their race. This ruling was later extended to white defendants in *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), and to civil litigants in *Edmondson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991). The jury selection standards in *Batson* have also been applied to defense counsel. *Georgia v. McCollum*, 505 U.S. 42, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992); *Lemley v. State*, 599 So. 2d 64 (Ala. Cr. App. 1992). Recently the Alabama Supreme Court held that the protections of *Batson* apply to the striking of white prospective jurors. *White Consolidated Industries, Inc. v. American Liberty Insurance Co.*, 617 So. 2d 657 (Ala. 1993).

The party making the *Batson* objection must first establish a prima facie case of discrimination. Here, the prosecutor used 6 of his 14 peremptory strikes to remove 6 of the 12 blacks in the jury venire. After jury selection was complete, defense counsel made a *Batson* motion.[21] The trial court, without specifically finding that the appellant had established a prima facie case of racial discrimination,[22] requested that the state give its reasons for striking black members of the jury venire.

> "Once the prosecution responds to a *Batson* motion and offers race-neutral explanations for its peremptory challenges, the issue of whether a prima facie showing of intentional discrimination was made by the appellant becomes moot. *Hernandez v. New York*, [500] U.S. [352], 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). This court has also concluded that where the trial court has made no express finding of a prima facie case of intentional discrimination, but the prosecution nonetheless explains its peremptory challenges, then such a finding will be implied and we will proceed directly to the evaluation of the prosecutor's explanations. *Williams v. State*, 548 So. 2d 501 (Ala. Cr. App. 1988), cert. denied, 489 U.S. 1028, 109 S. Ct. 1159, 103 L. Ed. 2d 218 (1989); *Currin v. State*, 535 So. 2d 221

---

[21] The substance of defense counsel's motion reads as follows:

> MR. WILLINGHAM: Judge, we would make a Batson motion that the strikes that the State made were racially motivated. There were, I believe, of the 39 potential jurors on the venire, there were 12 blacks, which make up approximately 31 percent of the venire. And 6 of the State's 14 strikes were black . . . . And the State used those strikes to strike 50% of the blacks from the venire, those being number 23, Annie Cox; number 38, Roy Farrior; number 75, Marie Moore[;] . . . . [n]umber 71 Glenda Leonard; number 88, George Richardson; and number 59, Annie Jenkins. And we would point out that the Defendant in this case is black.

(R. Vol. 4, at 232-33).

[22] The Alabama Court of Criminal Appeals observed, in a footnote inserted at this point in the text of its opinion, that: "There is some question as to whether the defense established a prima facie case of discrimination here. Approximately 33% of the prospective jurors were black and the 12-member jury contained 50% blacks. The two alternates were white." *Burton v. State*, 651 So. 2d 641, 648 n.4 (Ala. Crim. App. 1993).

34

(Ala.Cr.App.), cert. denied, 535 So. 2d 225 (Ala. 1988)."

*Hart v. State*, 612 So. 2d at 523-24.  Therefore, this court will not consider the question of whether defense counsel established a prima facie case of discrimination.  We will proceed directly to review the reasons given by the prosecutor.  *Hart.*

The prosecutor gave the following reasons for striking the black prospective jurors:

1. Prospective juror 23 [Annie Cox] — She indicated during voir dire that she was opposed to the death penalty.  She also answered on voir dire that her niece had been charged with writing bad checks.[23]

2. Prospective juror 38 [Roy Farrior] — This juror had prior misdemeanor convictions. He also had three contempt attachments for child support.  He also answered on voir dire that the district attorney had prosecuted one of his family members.[24]

---

[23] The record shows that the prosecutor gave the following reasons for striking Cox:

Number 23, would have been the State's second strike, [and she] is a lady by the name of Annie Cox.  She is a retired teacher.  Without question [she] is a good person, but she is real religious.  She said she didn't like the death penalty.  She could consider it, but she just didn't like it, period.  And also in talking to some black investigators, Frank Strickland said — who used to be a black investigator, who is now county commissioner here.  Frank said she would be weak on the death sentence, and I struck her based upon her answers and what Strickland said.  And her answer is that she didn't like the death penalty.  She could consider it, but she still just didn't like it.

(R. Vol. 4, at 234-35).  The prosecutor's characterization of Ms. Cox's testimony regarding her feelings about the death penalty is correct.  (R. Vol. 1, Tab. 4, at 21-23).  The appellate court also correctly found that, during voir dire, Cox responded that her niece had been charged with writing bad checks.  (R. Vol. 1, Tab. 4, at 12).  While the prosecutor did not specifically offer the niece's alleged criminal conduct as a reason for striking Ms. Cox, he did state elsewhere that the prosecution attempted to peremptorily strike all black and white venirepersons whose relatives had pending charges or prior convictions.  *Id.* at 244-45.

[24] The appellate court's characterization of the prosecutor's explanations for the peremptory strike against Farrior is correct.  (R. Vol. 4, at 235-36).  The prosecutor also stated that there were

3. Prospective juror 75 [Marie Moore] — She had served on two prior juries in the past.  She answered during voir dire that she was related to someone who had a prior conviction.  "What she didn't answer up to is that R.H. — and Sabrina Hall, who is a black female who is the victim service officer in my office, came up and told me that R.H. and K.H. are brothers . . . .  We've prosecuted and convicted [K.H.] on a crack sale, and even after jury trial, which is almost unheard of, he was placed on probation.  And then caught again with crack within the last two or three weeks."[25]

4. Prospective juror 71 [Glenda Leonard] — "Archie McNeal says that — he is a black deputy in the south end of Talladega County, said that she has real bad feelings towards Talladega County and towards law enforcement, that D.P. [Doug Powell] is related to her.  A deputy by the name of Johnny — Donnie Green couple of years ago in trying to stop him for speeding, Donnie Green, the deputy, said that he shot at the tire of the car. The bullet actually entered the car and hit him, talking about Doug Powell, in the leg.  There is a lawsuit that was — that was filed in that matter, in that matter, against Talladega County.  And I think that lawsuit may still be pending, but he said that she would not be a good juror.  She did not like law enforcement and had bad feelings towards the county and the sheriff's department."[26]

---

"bad feelings" between the county drug enforcement unit and the Farrior family because of the conviction of their relative, and that two named law enforcement officers (one black and one white) told the prosecutor that the son of prospective juror Roy Farrior sold drugs in Farrior's own home for the family member Roy Farrior admitted had been prosecuted, but the officers were not certain whether Roy Farrior was aware of his son's drug activities.  *Id.* at 236-37.

[25] The prosecutor also stated another reason for striking Ms. Moore: she neglected to tell him about her relative with the pending charges.  *See* R. Vol. 4, at 238-39.

[26] This is a direct quote from the prosecutor.  (R. Vol. 4, at 239-41).  The prosecutor also added, although it is not quoted by the appellate court:

And Alvin, who is the assistant chief of Sylacauga, Alvin Kidd who also is a black officer said, no, that she would not make a good juror.  That she had bad feelings and ill will towards law enforcement.  And the same with Billy Joe Pope, who is [a black] Lieutenant in charge of the Sheriff's department in the south end of Talladega

5. Prospective juror 88 [George Richardson]— This juror was struck based on information from Frank Strickland that this juror had prior arrests. Strickland told the prosecutor that he had to serve warrants on him in the past.[27]

---

County.

*Id.* at 240-41.

[27] The prosecutor also said that Richardson worked for Larry Morris, one of Burton's two trial attorneys, at Cheaha Mental Health Center, but that he was not "totally" using that as the reason for striking Richardson. *See* R. Vol. 4, at 241-43.

Elsewhere, Burton states that the prosecutor treated Richardson in a fashion dissimilar to white venire members, but supports this argument by alleging that the prosecutor "summarily concluded" that Richardson knew Morris — without offering any comparative scenarios to white veniremembers. (Doc. no. 9 at 9). Such an argument fails to state a claim upon which relief can be granted.

Moreover, even if petitioner is attempting to argue that the employment aspect of this claim is factually unsupported, the record reflects that the prosecutor explained that Richardson's employment was not the main reason he struck him. Additionally, the prosecutor considered striking venireperson Prescilla Townsend (who is black) as well because she was employed at Cheaha Mental Health Center, where defense counsel Larry Morris was Director. Specifically, after individual voir dire of the third and final panel of jurors was completed, the prosecutor stated:

MR. RUMSEY: Judge, I don't — maybe I just woke up, but I had two people on that panel — as I remember my question, I asked if anyone knew Larry Morris. Ms. Townsend did not answer up. She works for Cheaha Mental Health out of Sylacauga in the Hanover division.

THE COURT: No wonder she doesn't know him.

MR. RUMSEY: Well, Larry, is head of Cheaha Mental Health, and I think he may have hired her. And then also, Mr. Richardson works for the Talladega County Board of Education, I believe, as a maintenance man or painter, which is a little more removed, but Larry, of course, is on the County Board of Education too or Board of Education. And, of course, [I] think those are mutual reasons.

THE COURT: Are we getting into that right now?

MR. RUMSEY: No, sir, but [it] probably will be coming.

37

The appellant does not challenge the use of one of the state's peremptory strikes against juror number 59 [Ann Jenkins], a black venireperson, who stated that the state was currently prosecuting someone related to her.  However, this court has held this [ground to be] a race-neutral reason for striking a prospective juror.  *Leonard v. State*, 551 So. 2d 1143 (Ala. Cr. App. 1989); *Powell v. State*, 548 So. 2d 590 (Ala. Cr. App. 1988), aff'd, 548 So. 2d 605 (Ala. 1989).  This was also the reason given for striking prospective juror 75 [Marie Moore, discussed above in ¶ 3].  Thus, the striking of prospective juror 75 was also race-neutral.

The appellant first challenges the state's striking of juror number 23 [Annie Cox, ¶ 1 *supra*].  Upon review of the record, we find that the juror did indeed state she was opposed to the death penalty.  A veniremember's expression of reservations concerning the death penalty may be a valid race-neutral reasons [sic] for striking a prospective juror.  *Fisher*, 587 So. 2d at 1036.  We find that the striking of juror number 23 did not violate *Batson*.

---

(R. Vol. 3, at 203-04 (bracketed alterations added)).

The prosecutor did not move to strike Richardson or Townsend for cause.  He also did not exercise a peremptory strike against Townsend.  After all peremptory strikes were completed, and following Burton's *Batson* motion, the prosecutor made the following comment:

> As I said earlier, there are six blacks serving.  There are six blacks that are struck.  Number 108, Prescilla Townsend, we left her.  I thought it would be a race neutral reason, but was not sure.  In that when I asked on the voir dire, she said she did not know Larry Morris.  When Larry Morris, who is defending Mr. Burton, is head of Cheaha Mental Health Center.  And that's where she works. But being question whether or not it might be a race neutral reasons, I went ahead and left her.  But I felt — even though I felt like that it would be race neutral.

(R. Vol. 4, at 234-350).  The combined effect of the prosecutor's consistent concern about employment and the use of that as a race-neutral reason to exercise a peremptory strike against both Richardson and Townsend gives even greater credibility to the prosecutor's explanation that he mainly struck juror Richardson for the reasons he was given by other law enforcement officials.  For the foregoing reasons, Burton has failed to show that the state court's adjudication of this aspect of his claim is an unreasonable determination of the facts based upon the evidence before it.

38

The main reason that the appellant challenges the striking of the prospective jurors is that the reasons given for striking several of the jurors were based on information from law enforcement that these individuals had been convicted or had relatives involved in illegal activities.  We realize that strikes based primarily on reasons provided by law enforcement have in the past presented problems, *Ex parte Thomas*, 601 So. 2d 56 (Ala. 1992), *Walker v. State*, 611 So. 2d 1133 (Ala. Cr. App. 1992).  However, we find no *Batson* violation here.

As this court stated in *Naismith v. State*, 615 So. 2d 1323 (Ala. Cr. App. 1993):

> "In *Walker v. State*, 611 So. 2d 1133, 1140 (Ala. Cr. App. 1992), this Court held that '[a] prosecutor cannot simply presume, without further questioning to "dispel any doubt," that a veniremember, who is under oath, did not answer a question truthfully merely because the prosecutor has hearsay evidence to the contrary.'  In *Williams v. State*, [Ms. 90-557, November 13, 1992] [620] So. 2d [82, 85] (Ala. Cr. App. 1992), this Court held that 'the reason given for striking prospective juror number 24, because a narcotics officer had informed the district attorney's office that he 'knew this juror through his drug work,''' without saying more, is not a sufficient ground for a strike, and so is not considered to be a race neutral reason.'  Both *Walker* and *Williams* support the principle that a prosecutor, in exercising a peremptory strike, may not always rely on hearsay information obtained from a law enforcement officer.

> "Here, the information from the police department was that the particular veniremember had either been *arrested or convicted*, so that the information obtained from the police department is not susceptible to the same objection as that obtained in *Walker* . . . .

> "In *Jones v. State*, 611 So. 2d 466 (Ala. Cr. App. 1992), this Court addressed a factual situation very similar to that presented here and held that '[u]nder the circumstances presented here, the

prosecutor's strike of veniremember # 14 on the ground that the sheriff's department had had "drug problems" with that person was racially-neutral.

" 'Our holding in *Walker* does not apply here because in this case the prosecutor had information from the sheriff's department concerning the basis for each peremptory strike and because the prosecutor did not "simply presume, without further questioning to 'dispel and doubt,' that a veniremember who is under oath, did not answer a question truthfully merely because the prosecutor has hearsay evidence to the contrary." *Walker, supra.*

" 'Here, the prosecutor did not exercise a "same name" strike. There is no indication that the sheriff's department was having drug problems with someone named "Carter" as opposed to this particular veniremember. Here, there was more than the "mere suspicion" of relationship. See *Ex parte Bird*, 594 So. 2d 676, 683 (Ala. 1991) (a "prosecutor's self-imposed ignorance [should not] preclude a *Batson* claim." *Id.* quoting Note, *Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection*, 74 Va.L.Rev. 811, 827 (1988)). *Compare Smith v. State*, 590 So. 2d 388, 390 (Ala. Cr. App. 1991) (wherein the court, in holding that the defendant may not cross-examine jurors or go behind the prosecutor's information to determine if such information was true, stated that a "prosecutor may strike from mistake, as long as the assumptions involved are based on an honest belief and are racially neutral").'

"*Jones*, 611 So. 2d at 470."

615 So. 2d at 1326. (Emphasis in original.) *Cf. Williams v. State*, 620 So. 2d 82 (Ala. Cr. App. 1992).

40

Here, the reasons given by the prosecution were not based on hunches but were based on very specific reasons related to them by named law enforcement officials.  We find no violation of *Ex parte Thomas* or of *Walker*.  Striking a person with a prior conviction is a race-neutral reason.  *Leonard*, supra.  Also, striking a prospective juror because he or she has relatives who have prior convictions is a race-neutral reason and does not violate *Batson*.  *Leonard*.

The prosecutor also gave a separate reason for striking prospective jurors 38 [Roy Farrior] and 75 [Marie Moore] that was unquestionably race-neutral.  They answered on voir dire that they had relatives with prior convictions.

We will reverse a trial court's ruling on a *Batson* motion only "[i]f that determination is *clearly erroneous*."  *Hart*, 612 So. 2d at 525.  The court's ruling was not clearly erroneous here.

*Burton v. State*, 651 So. 2d 641, 647-50 (Ala. Crim. App. 1993) (emphasis in original, some bracketed alterations added).

In *Batson v. Kentucky*, 476 U.S. 79 (1986), *overruling in part Swain v. Alabama*, 380 U.S. 202 (1965), the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment forbids a state prosecutor from striking potential jurors solely on the basis of their race, or on the assumption that black jurors as a group will be unable to impartially consider the state's case against a black defendant.[28]  The Supreme Court recently summarized the three-step framework for

---

[28] *See also*, *e.g.*, *Ford v. Georgia*, 498 U.S. 411, 420 (1991) (observing that "*Batson* did not change the nature of the violation recognized in *Swain*, but merely the quantum of proof necessary to substantiate a particular claim").

Both *Swain* and *Batson* recognized that a purposeful exclusion of members of the

reviewing a *Batson* challenge in the first instance, at the trial court level, in *Rice v.*

*Collins*, 546 U.S. 333 (2006).  There, the Court said:

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry.  First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.  476 U.S., at 96-97.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  *Id.*, at 97-98.  Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices.  *Purkett v. Elem*, 514 U.S. 765, 767-768 (1995) (*per curiam*).  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  *Batson*, *supra*, at 98; *Miller-El v. Dretke*, 545 U.S. —, —, 125 S. Ct. 2317, 2331-2332 (2005).  This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Purkett*, *supra*, at 768.

*Rice*, 546 U.S. at 338.  *See also*, *e.g.*, *Hernandez v. New York*, 500 U.S. 352, 358-59

(1991) (discussing *Batson* in the context of a criminal trial in which the defendant was

---

defendant's race from the jury selected to try him would work a denial of equal protection.  To prevail on such an equal protection claim under *Swain*, . . . this Court indicated that a defendant must show a pattern of racial discrimination in prior cases as well as in his own.  Because the petitioner in *Swain* had failed to prove purposeful racial discrimination in prior instances of jury selection, we held that he had "not laid the proper predicate for attacking the peremptory strikes as they were used in [his] case." 380 U.S., at 226.  *Batson* dropped the *Swain* requirement of proof of prior discrimination, holding it possible for a defendant to make out a prima facie equal protection violation entirely by reference to the prosecution's use of peremptory challenges in the circumstances of the defendant's own case.  476 U.S., at 92-98.

*Ford*, 498 U.S. at 420.

Hispanic and the state prosecutor used four peremptory strikes to remove Hispanic persons); *Ford v. Georgia*, 498 U.S. 411 (1991) (addressing the state prosecutor's use of nine of ten strikes to remove black jurors in a case against a black defendant accused of raping and murdering a white woman).

When the Alabama Court of Criminal Appeals examined the first step of the three-step *Batson* analytical framework on direct appeal from Burton's conviction, the Court observed that the trial judge had *implicitly* determined that defense counsel had made a prima facie showing of purposeful discrimination by the prosecutor, thus rendering consideration of this step of the *Batson* analytical framework moot. *See Burton v. State*, 651 So. 2d at 647-48. Burton does not suggest the state appellate court's holding regarding *Batson's* first step offends any precept of federal constitutional law. As such, it is presumed that Burton established a prima facie case of purposeful discrimination, such that the burden shifted to the prosecutor to express the reasons for his exercise of peremptory strikes.

The state appellate court's conclusion in the second step of analysis, that the prosecutor's explanations for his peremptory strikes were race-neutral, was not an unreasonable determination of the facts. Burton argues, however, that the Alabama Court of Criminal Appeals prematurely ended its analysis at the second step of the *Batson* test, when it should have continued to the third step and determined whether

43

the prosecutor's explanations were credible.  Burton requests *de novo* review of that issue.  Burton's request is rejected.

The opinion of the Alabama Court of Criminal Appeals shows that the Court did evaluate the prosecutor's explanation for credibility.  The mere fact that the written opinion does not contain a separate subject-heading, clearly delineating the third step of the analytical framework, does not mean the court's application of the third prong was not articulated adequately.

Juror Annie Cox *did* express a dislike for the death penalty during voir dire, and jurors Roy Farrior and Marie Moore *did* admit that each had relatives who had been prosecuted by the Talladega County District Attorney's office.  Thus, the prosecutor's stated reasons for striking those jurors were race-neutral and credible, because the jurors themselves conveyed the information during voir dire,[29] and the state appellate court's decision to credit the prosecutor's race-neutral explanations for striking those jurors was not an unreasonable determination of the facts in light of the evidence before it.  Accordingly, this aspect of Burton's claim is due to be denied.

Admittedly, none of the information that jurors Glenda Leonard and George

---

[29] The court recognizes that Burton believes the prosecutor's explanation was pretextual because, even though the prosecutor claimed Ms. Cox was very religious and a retired teacher, he did not strike any white jurors based upon religious belief or occupation.  (*See* doc no. 9 at 10).  Regardless, both of these concerns played into the prosecutor's overall concern that Ms. Cox was opposed to the death penalty.  Thus, the state trial and appellate courts' credibility determinations still were not unreasonable in light of all of the circumstances.

Richardson revealed about themselves during voir dire formed the basis for the prosecutor's explanations for striking them.  Moreover, the prosecutor did not attempt to pose any questions to those jurors that would have elicited the information he gave for his strikes.  Instead, the prosecutor relied on information provided to him by law enforcement officers.  Thus, Burton argues that, because the prosecutor could have, but did not, ask jurors Leonard and Richardson questions about the derogatory information he allegedly received from law enforcement officers, he had no legitimate evidentiary support to exercise a peremptory strike against those jurors, particularly when both individuals answered that they could be fair and impartial.  (*See* doc. no. 9 at 6-7, and doc. no. 21 at 61-63).  However, as the Supreme Court has observed, while "[r]easonable minds reviewing the record might disagree about the . . . credibility" of a prosecutor's stated reasons for challenged strikes, "on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice*, 546 U.S. at 334-35.  Instead,

> a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Thus, a federal habeas court can only grant [a habeas] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge.  State-court factual findings, moreover, are presumed correct; [and] the petitioner has the burden of rebutting the presumption by "clear and convincing evidence."  § 2254(e)(1). . . .

45

*Id.* at 338-39 (citing *Miller-El v. Dretke*, 545 U.S. at —, 125 S. Ct., at 2325).  After carefully reviewing the opinion of the Alabama Court of Criminal Appeals on direct appeal, this court cannot say that its decision was an unreasonable determination of the facts in light of the record before it.  Accordingly, this aspect of Burton's claim is due to be denied.

As additional support for his contention that the prosecutor's strike of juror George Richardson was discriminatory, Burton declares that the prosecutor "did not strike other jurors who possessed similar characteristics as those allegedly used to challenge [black] venire members."  (Doc. no. 9 at 7).[30]  Specifically, one of the reasons stated by the prosecutor for striking Richardson was that he had been arrested for five traffic violations;  yet, the prosecutor allowed white prospective juror James Cottingim to sit on the jury, even though Cottingim admitted that he had been arrested for driving under the influence of alcohol and running over mailboxes in Coosa County.  (*See* doc. no. 9 at 8 (citing R. 13)).  The prosecutor also allowed white venireman Jerry Culver to remain on the venire, and never raised the specter of whether Culver harbored ill will toward law enforcement, even though Culver also had a family member who was a crime victim.  *Id.*[31]

---

[30] See also note 27 *supra* and accompanying text.

[31] Respondent contends that portion of the claim pertaining to Jerry Culver is procedurally defaulted because it was not raised at trial, on direct appeal, or during Rule 32 proceedings.  (*See*

Beginning with juror James Cottingim, the trial records reflects that the following colloquy occurred during the *Batson* inquiry:

>    MR. RUMSEY: Yes, sir, and I would merely point out to the Court on the ones, to the best of my knowledge, and it is hard to keep up with them, but to the best of my knowledge, on the people that we had — we had prosecuted them or a member of their family or one was pending, whether they be black or white, we struck them. And I say that and I will just read out, Angela Bowman, whatever her number was, she was a white female juror. She said that we had prosecuted somebody kin to her in her family.

>    MR. KING: She's number 9 for the record.

>    MR. RUMSEY: All right. Mr. Duncan, a white male, had said we had prosecuted somebody kin to him. I believe he said his brother.

>    MR. CONOVER: Uh-huh, for bad checks.

---

doc. no. 17 at 11-14, and doc. no. 18 at 23-24). Burton did not raise this claim at trial, but he did raise it in his brief on direct appeal. In his appellate brief, Burton complained that juror George Richardson had been struck by the prosecutor for allegedly having ill feelings toward law enforcement, but the prosecutor neither questioned nor struck juror Jerry Culver for that reason, even though Culver also had a family member who was a homicide victim. (C.R. Vol. 10, Tab. 30, at 12-13). The Alabama Court of Criminal Appeals ruled on the merits of Burton's claim and did not explicitly find any aspect of that claim procedurally defaulted, although it did not mention Mr. Culver in its analysis.

   Regardless of whether petitioner's claim concerning juror Jerry Culver is procedurally defaulted, this court still finds the state court's decision is entitled to deference because defense counsel asked several questions of Mr. Culver from which the prosecutor could have concluded that Culver was impartial and pro-punishment. For instance, defense counsel asked if his crime victim status would cause him "to give more weight or credibility to the State's evidence or whatever testimony they put on because you have been a victim before?," to which Culver answered, "No, Sir." (R. Vol. 2, at 31-32). Additionally, Culver indicated that he felt people charged with crimes got off "too easy" and did not receive appropriate punishment. *Id.* at 36. This, combined with the fact that trial counsel could have, but did not, point to Mr. Culver as a pretextual example (as he did Mr. Cottingim) in his *Batson* argument affirms that Burton failed to carry his burden of persuasion, and therefore he is not entitled to relief.

47

MR. RUMSEY: And then, I believe, the three black people —
those were two white. And then three black people was Mr. Farrior, who
we had prosecuted Willie Davis or Juke, and also information about his
son. Ms. Jenkins,[32] which I just explained, and Marie Moore on the
Harvey people that was kin to her. And to the best of my knowledge, to
the best of my knowledge, I struck people black and white that had been
convicted of — the family members had been convicted.

THE COURT: Okay.

MR. WILLINGHAM: Judge, in response to that, my notes, I had
number 22 had been prosecuted for criminal mischief, and I believe he
answered up something to that effect. And he's a white male, and he was
not struck.

MR. RUMSEY: Wait a minute now. Oh, [Mr. Cottingim] said he
was drunk in Coosa County and ran into a mailbox. He didn't say he
was prosecuted for criminal mischief. I assumed it was drunk driving. *But
that was in Coosa County, and I took it to be some time ago. But* [that
is] *certainly different than me prosecuting him.*

(R. Vol. 4, at 243-46 (emphasis supplied)). The state court's decision to credit the

prosecutor's race-neutral explanations for striking juror Richardson, but not juror

Cottingim, was not an unreasonable determination of the facts in light of the evidence

before the court. The prosecutor struck prospective jurors with family members who

had been prosecuted by the *Talladega* County District Attorney's office, such as juror

Richardson. Mr. Cottingim's contact with law enforcement, on the other hand, had

occurred in *Coosa* County.

---

[32] The prosecutor stated that he struck Ms. Jenkins because she revealed during voir dire that
the Talladega County District Attorney's office was prosecuting a case against a relative of hers. (R.
Vol. 4, at 243).

48

In conclusion, Burton has failed to show that the state court's adjudication of his *Batson* claim was an unreasonable determination of the facts in light of the evidence before it, and he also has not demonstrated that the decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, this claim is due to be denied.

**B**.     *Witness Larry McCardle's identification of Mr. Burton was tainted, unreliable, and its admission violated Mr. Burton's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution*.  *See* doc. no. 9, ¶¶ 27-31, at 11-13.

Burton alleges that the in-court identification of him as one of the persons who committed the armed robbery at the Auto Zone store by the store manager, Larry McCardle, was tainted and unreliable for the following reasons:   "Although [McCardle] gave brief descriptions of the perpetrators to the police immediately following the crime, he did not identify any persons until after viewing all of the co-defendants' pictures in the newspaper and after repeated exposure to mug shot photographs." (Doc. no. 9 at 12 (citing R. 621-623; 627; 625)).  Burton also contends that the photo array was unduly suggestive, because Burton was "by far the oldest of the six alleged perpetrators."  *Id.*  Burton thus argues that McCardle's exposure to "suggestive photos tainted his identification," and that admission of McCardle's identification violated the Constitution.  *Id.* (citing *Manson v. Braithwaite*, 432 U.S.

98, 114 (1977); *Simmons v. United States*, 390 U.S. 377, 383-84 (1968)).  To bolster

his contention that the reliability of McCardle's identification was suspect, Burton

alleges that, with the sole exception of McCardle, no one in the Auto Zone store at the

time of the robbery identified him as an offender.  *Id*.  Instead, the witnesses testified

that the robbers appeared to be in their 20's.  *Id.*

The Alabama Court of Criminal Appeals addressed this claim on direct appeal

in the following manner:

> The appellant next argues that the trial court erred in allowing
> Larry McCardle to identify him as one of the robbers.  Specifically, he
> contends that the identification was tainted because, he says, McCardle
> did not identify the appellant until after he had seen his picture in the
> newspaper.  There was no objection to McCardle's identification of the
> appellant.  Thus, we must determine whether plain error exists here.
>
> Here, Larry McCardle testified that before the robbery the
> appellant purchased some items in the store and asked him where the
> restroom was located.  McCardle said that the appellant then held a gun
> to him and forced him to take him to the safe.  They were together several
> minutes.  McCardle also testified that he identified the appellant before
> seeing any picture in the newspaper.  He further stated that he had no
> doubt that the appellant was the robber who held a gun to him. There is
> no evidence that McCardle's identification of the appellant was tainted
> in any way.  *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d
> 401 (1972).  A similar issue was addressed and upheld in *DeBruce*,
> supra.

*Burton v. State*, 651 So. 2d at 650.

Burton does not dispute that the state appellate court properly identified *Neil v.*

*Biggers*, 409 U.S. 188 (1972), as precedential Supreme Court authority on the constitutional standard for determining the reliability and admissibility of witness identification testimony.  (*See* doc. no. 21 at 114-15).  He argues, nevertheless, that the ultimate determination of the admissibility of such testimony is a "mixed question of law and fact" and, as such, demands *de novo* review.  Burton also contends that the state court's factual findings are not entitled to a presumption of correctness.  *Id.* Alternatively, Burton urges this court to find that the state court's adjudication of the claim is an "objectively unreasonable application of *Neil v. Biggers* to the facts of [his] case."  *Id.* at 116 n.23 (citing *Penry v. Johnson*, 532 U.S. 782, 783 (2001)).

As a preliminary matter, it does not matter whether a witness's out-of-court statement identifying a criminal suspect, prior to the trial of the case, was made:  (*i*) immediately following the crime; (*ii*) upon encountering the accused several weeks later, in a police line-up; (*iii*) while viewing a "photographic line-up" ("array" or "pack"); (*iv*) from a surveillance photograph; (*v*) in a previous court proceeding; or (*vi*) by mere happenstance (such as looking through a window in a courtroom door),[33] *provided* the encounter with the suspect was not an impermissible "show-up" arranged or deliberately staged by the government,[34] *and also provided* the circumstances of the

---

[33] *United States v. Famulari*, 447 F.2d 1377 (2d Cir. 1971).

[34] *See United States v. Wade*, 388 U.S. 218 (1967) (requiring the presence of counsel at pre-trial identification proceedings); *Gilbert v. California*, 388 U.S. 263 (1967).

out-of-court identification were not unduly suggestive.[35]

Furthermore, "reliability" is the linchpin in determining the admissibility of identification testimony in a criminal prosecution. *Manson*, 432 U.S. at 114; *see also*, *e.g.*, *United States v. Cueto*, 611 F.2d 1056, 1063 (5th Cir. 1980) (same). Regardless of whether the identification was made out-of-court, prior to trial, or on the stand, the factors to be considered in determining whether it is "reliable," and therefore admissible, or the product of "undue suggestion," and therefore not admissible, were outlined by the Supreme Court's opinion in *Neil v. Biggers*, 409 U.S. 188 (1972), as follows:

> We turn, then, to the central question, whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include [*i*] the opportunity of the witness to view the criminal at the time of the crime, [*ii*] the witness' degree of attention, [*iii*] the accuracy of the witness' prior description of the criminal, [*iv*] the level of certainty

---

[35] *See Marsden v. Moore*, 847 F.2d 1536, 1545 (11th Cir. 1988) (holding that a pretrial photographic identification procedure in which defendant was the only male in two of the three photographs shown to a prosecution witness — *i.e.*, "one of Marsden alone in a police mug shot, one of Marsden and his wife, and another of Marsden's wife alone" — "was unduly suggestive"); *Dobbs v. Kemp*, 790 F.2d 1499, 1506 (11th Cir. 1986) (procedure unduly suggestive where witness was shown four photographs, all of the defendant); *O'Brien v. Wainwright*, 738 F.2d 1139, 1140-41 (11th Cir. 1984) (procedure unduly suggestive where witness was shown all black and white mug shots except for one color photograph of the defendant); *United States v. Cueto*, 611 F.2d 1056, 1063 (5th Cir. 1980) (procedure unduly suggestive where witness was shown one photograph of the defendant); *Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979) (procedure unduly suggestive where the only eyewitness was shown two photographs the day before trial, one of the defendant and one of a co-defendant). *See generally* 2 Michael H. Graham, *Handbook of Federal Evidence* § 801.14.

demonstrated by the witness at the confrontation, and [*v*] the length of time between the crime and the confrontation.

*Id*. at 199-200 (bracketed alterations added).  Stated differently,

> [t]he "central question," . . . [is] "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." [*Biggers*, 409 U.S.] 199, 93 S. Ct., at 382.  Applying that test, "the Court [must determine whether there was a] . . . "substantial likelihood of misidentification.  [If not,] the evidence was properly allowed to go to the jury." *Id.,* at 201, 93 S. Ct., at 383.

*Manson*, 432 U.S. at 106.

At trial, McCardle testified that he identified Burton approximately one week *after* the robbery, *but before* seeing Burton's photograph in a newspaper account of the crime.  (R. Vol. 5 at 625-26).  Therefore, Burton's claim that McCardle saw his photograph in the newspaper before identifying him is not factually accurate.  The state appellate court's findings regarding this matter are entitled to a presumption of correctness, and Burton has failed to provide clear and convincing evidence to overcome that presumption.  The fact, *if it be a fact*, that newspaper photographs were unduly suggestive is of no consequence, because the evidence establishes that McCardle identified Burton before reading newspaper accounts of his arrest.

On the other hand, the state appellate court's opinion makes no mention of any "photographic line-ups" (photo arrays) containing "mug shots."  The record shows that

53

McCardle's out-of-court identification of Burton did arise from a photographic array,

as evidenced by the following exchange at trial:

Q: [D.A. Rumsey]:   Now, you said that — Mr. Willingham asked you, he asked you if you saw the Defendant's picture in the newspaper or on TV; is that correct?

A: [McCardle]: Uh-huh.

Q: [Rumsey]: And you did, didn't you?

A: [McCardle]: I saw — I saw the newspaper.

Q:[Rumsey]: Newspaper.  Okay.  Let me ask you if prior to that time, in fact, on or about August the —

(Following discussion was held at the side bar:)

MR. RUMSEY: What he's done, he's made a reference to him seeing the pictures.  He is going to argue later that it was tainted.  I assume that's what you are going to do.

MR. WILLINGHAM: Yeah.

MR. RUMSEY: That his identification is tainted by seeing the picture in the newspaper.  The problem I've got is that Bill knows, I know, that *he made an identification prior to the Defendant being arrested from a photo pack*.  And I don't — I don't think I can go into the *photo pack*, *per se*.  But I think I'm able to ask him a question as to whether or not he had previously made an identification prior to the time that he sees it in the newspaper, and that's all I'm going to probe into. Okay?

MR. WILLINGHAM: Okay.

(R. Vol. 5 at 624-25 (emphasis supplied)).  There is no other mention of a "photo

54

pack" in the trial transcript. This side-bar conversation, standing alone, fails to provide the facts necessary to show that McCardle's out-of-court identification arose from being shown even one unduly suggestive photographic array, much less repeated showings. Burton's failure to establish that the single photo pack mentioned in the record was unduly suggestive means that this claim must fail, because the need to apply the *Biggers* totality of the circumstances test does not even arise until there has been a suggestive out-of-court identification to be weighed against it.

On the other hand, the state appellate court found, and the historical trial record supports, that McCardle testified he first saw Burton when Burton "was directly in front of [him] at the cash register" in the Auto Zone store prior to the beginning of the armed robbery. *Id*. at 604. Burton asked McCardle where the store's restroom was located, and left items he had just purchased from McCardle at the check-out counter while he walked in the direction of the restroom. (R. Vol. 5 at 605-06). Burton's fingerprints "were found on the items that McCardle had said that [Burton] purchased and on various other items in the store." *Burton v. State*, 651 So. 2d at 644. As McCardle began to check-out his next customer, another person (who McCardle later identified as Derrick DeBruce) stepped from behind the customer with a gun, announced the robbery, and told everyone to "get on the floor." *Id*. at 606-07. McCardle began to comply when Burton, also armed with a gun, grabbed him from

behind and directed him to open the safe and bag money.  *Id.* at 607-11.  Once McCardle had done so, Burton instructed him to lie face-down on the floor, where he was bound by another unknown assailant.  *Id.* at 611-15.  Thus, as the appellate court found from the record, Burton and McCardle were in close proximity to one another on more than one occasion during the course of the robbery, and, for several minutes altogether.

McCardle testified that he gave a brief description of the robbers after the attack, but he "was very, very upset at that time." (R. Vol. 5 at 622).  When asked how he would describe the ages of the perpetrators, McCardle testified that Derrick DeBruce appeared to be quite young, and that Burton "appeared to be the older of the ones I saw."  *Id.*  McCardle was also "absolutely" positive in his identification of Burton as the robber who held a gun on him.  *Id.* at 604.

Therefore, the record shows that McCardle had an opportunity to view Burton face-to-face during the commission of the crime, and spent more than just a few moments in close proximity to, and in direct verbal communication with, Burton.  He also identified Burton as the oldest of the perpetrators (and it appears he did so in the brief description provided immediately after the robbery), and by face from a photographic array approximately one week after the event.  Finally, McCardle's level of certainty that Burton was a robber was absolute.

56

When all of these factors are weighed against an *allegedly* suggestive photographic line-up, it is clear that McCardle's in-court identification was not tainted and, as such, its admissibility was constitutionally sound pursuant to the factors enumerated in *Neil v. Biggers*, *supra*. This claim is due to be denied.

C.    *The trial court violated Mr. Burton's constitutional rights in refusing to find any statutory and non-statutory mitigating circumstances, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. See* doc. no. 9, ¶¶ 32-35, at 13-16.

Burton alleges that, even though he presented "inherently" mitigating evidence to the jury during the penalty phase of trial — *e.g.*, that his "father was an abusive alcoholic," that he "was taken from his mother at a very young age," that he "was an accomplice whose role in the killing was minimal," that he earned a General Educational Development (G.E.D.) certificate while in custody, and that he "had been a good father and husband" — the trial court judge ignored that evidence in his sentencing order and "refused to find any mitigating circumstances." (Doc. no. 9 at 13-14). Burton declares the trial judge's failure to find these facts to be mitigating violated his right to "due process of law, a fair trial, and an individualized sentencing determination." *Id.* at 14.

Respondent argues that this claim is procedurally defaulted, because it was "raised for the first time in the Alabama Supreme Court on direct appeal *and the Court*

*chose not to rule on it*."  (Doc. no. 18 at 30-31 (emphasis supplied) (citing *McNair v. Campbell*, 307 F. Supp. 2d 1277, 1319 (M.D. Ala. 2004)).[36]

Burton does not deny that he first raised this claim in the Alabama Supreme Court, but argues that "a plain reading of" the Middle District's opinion in *McNair* does not support respondent's position.  (Doc. no. 21 at 172).

The parties' debate over the import of the Middle District's opinion in *McNair v. Campbell*, *supra*, is digressive and misguided.  It is digressive because the *McNair* decision turns upon facts that are not present here.[37]  The debate is fundamentally misguided because, even if the facts of the *McNair* case were on "all fours" with those presented here, the Middle District's decision is not binding on this court; at best, it

---

[36] Respondent also contends the claim is without merit, because "[t]he law does not require that the trial judge find statutory and non-statutory mitigating circumstances."  (Doc. no. 18 at 30-31.)

[37] The habeas petitioner in *McNair*, like Burton here, failed to raise a federal constitutional claim — *i.e.*, that no black person had served as foreman of a Henry County grand jury during the preceding twenty years — in both the trial court and on the first step of direct appeal to the Alabama Court of Criminal Appeals.  Like Burton, he belatedly asserted the claim in the Alabama Supreme Court.  The similarity ends there, however, because McNair sought to support his tardy claim with an affidavit obtained *after the conclusion of trial* from the Circuit Clerk of Henry County, listing the race and gender of grand jury forepersons between 1973 and 1993.  The Alabama Supreme Court refused to consider the Clerk's affidavit because it was "outside the record," and denied the claim after "plain error" review.  *Ex parte McNair*, 653 So. 2d 353, 360 (Ala. 1994).  When McNair again raised the claim in the habeas petition filed in the Middle District of Alabama, that court also refused to consider the affidavit under Rule 7(a) of the Rules Governing § 2254 Cases, which allows the court to direct the parties to expand the record available for review "by the inclusion of additional materials relevant to the determination of the merits of the petition."  Burton did not attempt to support the present claim when he first raised it before the Alabama Supreme Court with affidavits or other evidence outside the trial court record.

amounts only to persuasive authority.

The important questions that neither party addresses squarely are these:  Did the Alabama Supreme Court's opinion in Burton's case:

(*i*)    fail to acknowledge the present claim and generically state that the Court had searched the record for plain errors prejudicial to the rights of the accused and found none — *a non-merits disposition that does not preclude a finding that the claim was procedurally defaulted*;[38] *or*

(*ii*)   acknowledge the claim, but refuse to consider it because it had been procedurally defaulted under state procedural rules; *or*

(*iii*)  identify the claim, ignore the fact that it had been procedurally defaulted, and deny it on the merits — *a merits disposition that precludes a finding that the claim was procedurally defaulted?*[39]

---

[38] The Eleventh Circuit addressed this circumstance in *Julius v. Johnson*, 840 F.2d 1533 (11th Cir. 1988), and held that "the mere existence of a 'plain error' rule does not preclude a finding of procedural default; moreover, the assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court or in any court below." *Id.* at 1546.

[39] The Eleventh Circuit recently observed in *Peoples v. Campbell*, 377 F.3d 1208 (11th Cir. 2004), that:

> We think it important at this juncture to reiterate a well-established principle that a state appellate court's routine plain error review of a conviction or sentence does not, standing alone, excuse a procedural default.  *See Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir.1988); *cf. Paprocki v. Foltz*, 869 F.2d 281, 284 (6th Cir.1989). *When, however*, . . . the appellate court, in conducting plain error review, identifies a specific *constitutional claim, ignores the fact that the claim has been defaulted, and decides the claim on the merits, we treat the claim on habeas review*

The answer to these questions, of course, focuses consideration upon the language of the Alabama Supreme Court's opinion, which reads as follows:

> Burton raises 18 issues before this Court.  Sixteen of these issues are the same as those argued before the Court of Criminal Appeals.
>
> Having thoroughly and carefully read and considered the record, together with the briefs and arguments of counsel, the applicable case law, and the opinion of the Court of Criminal Appeals, we conclude that the judgment of the Court of Criminal Appeals must be affirmed. . . .  *As to the two issues raised for the first time on appeal, we conclude that there was no error.  The trial court properly considered the mitigating circumstances in the context of whether they outweighed the aggravating circumstances.  Morrison v. State*, 500 So. 2d 36 (Ala. Crim. App. 1985). . . .

*Ex parte Burton*, 651 So. 2d at 660 (emphasis supplied).  The emphasized text clearly indicates that the Court identified the present claim, ignored the fact that it had been procedurally defaulted, and denied it on the merits.  *See*, *e.g.*, *Peoples v. Campbell*, 377 F.3d 1208, 1235 n.55 (11th Cir. 2004); *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir. 1988).  Accordingly, respondent's procedural default argument is rejected, and the remaining discussion of the present claim will be devoted to a § 2254(d) analysis.

Burton cannot show that the trial court judge's failure to weigh in his sentencing

---

*as if the petitioner had not defaulted the claim and pass on its merits*.

*Id*. at 1235 n.55 (emphasis supplied).  *See also Julius v. Johnson*, 840 F.2d at 1546 ("Unless there is some indication that the state court was aware of this issue, we cannot say that the court rejected the merits of petitioner's constitutional claim.").

order the allegedly mitigating circumstances presented during the penalty phase of trial before the jury amounted to a decision that was either contrary to, or an unreasonable application of, clearly established Supreme Court precedent, because the constitution only requires the trial court to *consider* evidence offered as mitigating factor by a capital defendant, not *accept* it.

The verb "consider" is not synonymous with "accept." There are important legal distinctions between "consideration" of evidence offered as a basis for a sentence less than death, and "acceptance" of that evidence — a term here used in the sense of finding that the evidence proffered in mitigation of sentence *establishes*, or *proves* the "existence of" the factual proposition for which it is offered. *Acceptance* "is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) (emphasis in original).[40]

Indeed, the Supreme Court's seminal decision in *Lockett v. Ohio*, 438 U.S. 586

---

[40] The full context of the statement from *Atkins* that is quoted in text reads as follows:

> Although [petitioner] argues that the trial judge did not *consider* non-statutory factors, it is more correct to say that the trial judge did not *accept* — that is, give much weight to — [petitioner's] nonstatutory mitigating factors. Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors.

*Atkins*, 965 F.2d at 962 (emphasis in original) (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 308, (1990)).

(1978), and its progeny, requires only that sentencing authorities not be precluded by law from "considering" a broad range of evidence offered by a defendant as a basis for a sentence less than death.  *See id*. at 604 ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from **considering**, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (italics in original, boldface emphasis added, footnotes omitted); *see also*, *e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (reiterating that *Lockett* held only that "the sentencer in capital cases must be permitted to *consider* any relevant mitigating factor") (emphasis supplied).[41]  However, neither *Lockett* nor its progeny say anything about "acceptance" of evidence offered in mitigation of the sentence to be imposed, in the sense of finding that the evidence *establishes*, or *proves* the "existence" of, the factual proposition for which it is offered. *See*, *e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006) ("The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is

---

[41] *Eddings* also added this consideration:  "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence."  *Id*. at 113-14 (emphasis in original).

mitigating or to give it any particular weight.").

In summary, all that the Constitution requires is "a full hearing" at which "defense counsel is given a fair opportunity to present mitigating evidence"; and, when that is done, federal habeas review "becomes highly deferential." *Atkins*, 965 F.2d at 962 (citing *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)). In other words, the state trial judge's "findings on mitigating factors are presumed to be correct, and will be upheld if they are supported by the record." *Id.* (citing 28 U.S.C. § 2254(d), and *Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir. 1986)).

The pertinent portion of the state trial court judge's May 8, 1992 sentencing opinion — which follows the heading "Consideration, Findings and Determination of Sentence as Required by Section 13A-5-47(B)" — reads as follows:

> The Court finds that there are no mitigating circumstances as defined in Section 13A-5-51 [enumerating the statutory mitigating circumstances]. The court has made a diligent search under the provisions of Section 13A-5-52 [stating, *e.g.*, that mitigating circumstances also "shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death"], the evidence offered by the defendant, and aspects of the presentence report favorable to the defendant on mitigation to determine if there is any aspect of the defendant's character or record or any other circumstance of the offense for which he has been convicted that would constitute a mitigating circumstance and finds that there is no mitigating circumstance, statutory or non-statutory.

(C.R. Vol. 1, Tab. 1, at 101-02). The trial court also entered a separate order

contemporaneously with the foregoing, entitled "Finding of Fact in Regard to Punishment Phase," and reading as follows:

> The defendant offered little evidence of mitigating circumstances as provided in 13A-5-51 and 13A-5-52.[42]  At the conclusion of the sentence [*penalty phase*] hearing, the jury returned a verdict recommending that the defendant be punished by death.  The vote was 12 for death and 0 for life without parole.

> The Court finds that the conduct of the defendant constituted a brutal, aggravated, merciless, and intentional killing of a man, and that the recommendation of punishment to be imposed was fully justified by the facts and circumstances of the case and the aggravating circumstances outweighed the mitigating circumstances offered for proof by the defendant.  In fact, the court finds no mitigating circumstances.

*Id.* at 104-06.

The foregoing paragraphs from the trial court's sentencing orders reflect that the trial court judge *considered* evidence presented by Burton as it bore upon statutory and non-statutory mitigating circumstances; he just did not *accept* Burton's argument that such evidence mitigated the heinousness of the crime that had been committed. Therefore, to the extent that Burton contends the trial court's findings concerning mitigating circumstances are based upon incorrect findings of fact, he has not carried his § 2254(e)(1) burden of showing, by clear and convincing evidence, that the trial judge's decisions were "based on an unreasonable determination of the facts in light

---

[42] Alabama Code § 13A-5-51 defines the State's statutory mitigating circumstances, and § 13A-5-52 performs the same function with regard to non-statutory mitigating circumstances.

of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). *See*,

*e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006).

When it is shown, as in this case, that "a full hearing has been held in which the

defense counsel is given a fair opportunity to present mitigating evidence, [federal

habeas] review becomes highly deferential." *Atkins v. Singletary*, 965 F.2d at 962

(citing *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)). The Eleventh

Circuit's recent decision in *Schwab*, *supra*, made that quite clear when holding that,

> while sentencing courts may not refuse to consider evidence offered in
> mitigation, they need not decide that the facts established by that
> evidence have mitigating force in the context of the case.  The
> Constitution requires that the sentencer be allowed to consider and give
> effect to evidence offered in mitigation, *but it does not dictate the effect
> that must be given once the evidence is considered*; *it does not require
> the sentencer to conclude that a particular fact is mitigating or to give
> it any particular weight.*

451 F.3d at 1329 (emphasis supplied). *See also Harich v. Wainwright*, 813 F.2d 1082,

1101 (11th Cir. 1987) (observing that the Supreme Court's decisions in *Skipper v.*

*South Carolina*, 476 U.S. 1 (1986), *Eddings v. Oklahoma*, *supra*, and *Lockett v. Ohio*,

*supra*, require *only* "that the defendant be allowed to *present* all relevant mitigating

evidence to the sentencing jury or court . . . .  These cases do not require that the

sentencing body *accept* the conclusion that the evidence constitutes a mitigating

circumstance  or  that  the  mitigating  circumstances  outweigh  the  aggravating

circumstances."), *adopted in relevant part sub nom.  Harich v. Dugger*, 844 F.2d 1464, 1468-69 (1988) (*en banc*), *partially abrogated on other grounds by Davis v. Singletary*, 119 F.3d 1471, 1481-82 (11th Cir. 1997).

For the foregoing reasons, this claim is due to be denied.

**D.**     *The prosecutor's improper remarks during the guilt phase of trial violated Mr. Burton's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See* doc. no. 9, ¶¶ 36-51, at 16-22.

   **1.**     *The District Attorney argued that consideration of lesser included offenses amounted to sympathy.  Id.,* ¶¶ 37-38, at 16-17.

Burton alleges that, during guilt phase closing arguments, the prosecutor said: "I will tell you this, when you start talking about lesser included crimes under the evidence in this case, it ain't nothing but asking for sympathy."  (Doc. no. 9 at 17 (citing R. 883-84)).   Defense counsel immediately objected, but the trial court overruled the objection — a decision that Burton contends violated his right to a fair trial and due process of law.  *Id.* (citing R. 884).

Burton opposes (doc. no. 21 at 139-40) respondent's assertion (doc. no. 18 at 31-33) that this claim is subject to § 2254(d) review on the basis that the Alabama Court of Criminal Appeals denied the claim on the merits.  He supports his position by correctly pointing out that the state's intermediate appellate court only addressed the prosecutor's sympathy remarks in the context of the *penalty phase* of trial, and

failed to make any ruling concerning the propriety of the comment at the conclusion

of the *guilt phase* of trial.  (*See* doc. no. 18 at 31-33).[43]  Since there is no dispute that

Burton attempted to exhaust this particular claim in state court, but the appellate court

failed to make any ruling regarding it, Burton is indeed entitled to *de novo* review in

this court.

Ironically, after correctly identifying that this claim pertains only to a sympathy

comment made at the conclusion of the *guilt phase* of trial, and winning *de novo*

review, Burton himself renders the claim meritless by supporting it with federal cases

pertaining to a prosecutor's closing arguments in the *penalty phase* of trial, urging

jurors to reject sympathy for the defendant as a consideration during their

deliberations.[44]  Regardless, the prosecutor's sympathy comment at the guilt phase of

---

[43] The pertinent portion of the appellate court's opinion reads:

> The appellant also argues that the prosecutor incorrectly stated that the jury was not to let sympathy affect its decision to vote for death or life imprisonment without parole.  "A prosecutor's argument 'in telling the jury not to let sympathy, emotions, or compassion affect its decision . . . did not result in any error.'" *DeBruce*, 651 So. 2d at 613; quoting *Stewart v. State*, 601 So. 2d 491, 506 (Ala. Cr. App. 1992). *See California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987).

*Burton v. State*, 651 So. 2d 641, 657 (Ala. Crim. App. 1993).  Clearly, the jury "vote[s] for death or life imprisonment without parole" only at the conclusion of the *penalty phase* of trial.

[44] Burton cites the following authorities:

> The United States Supreme Court has held that "precisely the opposite [of the trial court's ruling] is true."  *See Lockett v. Ohio*, 438 U.S. 536, 605 (1978).  Indeed, courts have required explicit instruction to the jurors on their obligation to consider

trial was not improper.  When taken in context, District Attorney Rumsey's argument was that the evidence supported a capital murder conviction and did not support a conviction for a lesser included offense.  Therefore, if the jury were to find Burton guilty of a lesser included offense of capital murder, it would be doing so on the basis of sympathy, rather than the evidence before it.  In short, Rumsey was arguing that the jury should exclude sympathy as a factor in its guilt deliberations and only rely on the evidence which, Rumsey contended, supported a conviction for the capital offense. That was a proper argument. Accordingly, this claim is due to be denied.

2.  *The prosecutor's use of leading questions with key witnesses prejudiced Mr. Burton's right to a fair trial.  See* doc. no. 9, ¶¶ 39-41, at 17-18.

Burton next alleges that his right to a fair trial was violated because the prosecutor undermined his ability to confront and cross-examine co-defendant LuJuan McCants, who became a State's witness against him.  (*See* doc. no. 9 at 17-18).  He argues that McCants's testimony is "riddled with examples of [improper] prosecutorial leading," in that, "[o]n direct examination, the prosecutor's questions only elicited responses of 'yes sir,' 'yeah,' or 'no.'" (Doc. no. 21 at 141-42 (citing R. 340 *et.*

---

mercy for the capital defendant. *Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982); *Spivey v. Zant*, 661 F.2d 464, 471 (5th Cir. 1981) (constitution requires clear instruction on mercy option); *Chenault v. Stynchcombe*, 581 F.2d 444, 448 (5th Cir. 1978).

(Doc. no. 21 at 140 (bracketed alteration added)).

*seq.*)).[45]

Burton does not dispute respondent's assertion that, until the filing of the present habeas petition, he had raised only two instances of improper prosecutorial leading as error.  (*See* doc. 18 at 34 n.3).  Thus, the bulk of this claim is procedurally defaulted.[46]  The two examples discussed in Burton's brief on direct appeal read:

> Q [Rumsey]:  All right. So, you head towards Birmingham, or heading, and then you exit off and head toward Sylacauga.  Now, what happened when — what was the next thing that happened?

> A [McCants]:  Well, we came into Sylacauga, and then we met up at a parking lot.  Willie had got talked to Charles.

> Q:  Now, that's Bubba?

> A:  Yeah.

---

[45] Burton also adds that "McCants admitted to going over his testimony at least five times with law enforcement and the prosecution in preparation for trial.  Thus, his testimony was initially suspect."  (Doc. no. 21 at 142 (citing R. 375-378)).  McCants's admission was brought out by defense counsel on cross-examination before the jury.  This assertion has nothing to do with the claim that the prosecutor improperly engaged in leading questions during direct examination at trial.  In any event, defense counsel prompted McCants's admission, and the action afforded the jury the opportunity to determine whether McCants's testimony was credible, and, the weight (if any) they assigned to it.

[46] Moreover, Burton's reference to "R. 340, *et. seq.*" is not sufficiently precise.  McCants's testimony continues for an additional 42 pages:  *see id.* at 341-82.  In essence, Burton alleges the prosecutor impermissibly led McCants's testimony and then asks the court to discern the factual support for the claim by pointing to McCants's trial testimony as a whole.  Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c."  *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted)).  Thus, even if the bulk of the claim were not procedurally defaulted, an 'et. seq.' citation is insufficient to satisfy the specificity requirements of federal pleadings and would require dismissal.

Q: And he talks to Charles Burton, the Defendant here?

A: Yes, sir.

Q: All right. Was you up there where they talked?

A: No.

Q: Okay. You still in the car?

A: Yeah."

* * * *

"Q: Did you park — you say you went to park the car. Which car did you park?

A: Charley Burton's car.

Q: All right. Did ya'll get into the car then?

A: Yes.

Q: All right. And then ya'll went somewhere?

A: Yes.

Q: And then after you went somewhere, did you come back to where the red Lincoln was?

A: Yes.

Q: Okay. Then did ya'll separate back up again?

A: Yes.

(C.R. Vol. 10, Tab. 30, at 24-25 (quoting R. 347-48)).

70

The Alabama Court of Criminal Appeals addressed these lines of questioning in the following manner:

> The appellant further contends that the prosecutors' actions in the guilt phase amounted to reversible error. First the appellant argues that the jury's findings were tainted because of, he said, the prosecutor used leading questions during LuJuan McCants's testimony. No objection was made at the time of McCants's testimony. Thus, we must review this issue under the plain error doctrine.
>
> We have evaluated the two instances referred to in McCants's testimony. Each instance of leading questions was an attempt by the prosecutor to clarify testimony that had already been given by McCants. This did not affect the "substantial right[s] of the appellant." Rule 45, A. R. App. P.

*Burton v. State*, 651 So. 2d at 651.

Respondent declares that the appellate court's factual findings are entitled to deference, and that Burton cannot show the appellate court's denial of the claim is contrary to, or an unreasonable application of, clearly established federal law. (*See* doc. no. 17 at 31-33, and doc. no. 18 at 33-34).

Burton counters that prosecutorial misconduct claims are "mixed question[s] of law and fact" and, as such, 28 U.S.C. § 2254(d) does not govern this court's standard of review. (Doc. no. 21 at 143). He cites three Supreme Court opinions to support his argument: *Thompson v. Keohane*, 516 U.S. 99, 99 (1995); *Darden v. Wainwright*, 477 U.S. 168, 178-83 (1985); and *Cuyler v. Sullivan,* 446 U.S 335, 342 (1980). However,

these cases were decided prior to the enactment of AEDPA. Moreover, *Thompson* and *Culyer* involve *Miranda* issues and attorney conflict claims, not prosecutorial misconduct claims. *Thompson* did discuss the various types of constitutional claims that the Court had traditionally considered to be mixed questions of law and fact,[47] but prosecutorial misconduct claims were not among them. While *Darden* involved a prosecutorial misconduct claim on habeas review, it did not hold that such claims are always mixed questions of law and fact.[48]

Regardless, and even assuming that Burton is correct when asserting that prosecutorial misconduct claims are *per se* mixed questions of law and fact, such a conclusion does not make 28 U.S.C. § 2254 irrelevant. A presumption of correctness always attaches to the historical factual findings of a state's appellate courts pursuant to 28 U.S.C. § 2254(e), and here the Alabama Court of Criminal Appeals made such a finding: *i.e.*, "Each instance of leading questions was an attempt by the prosecutor to clarify *testimony that had already been given by McCants*." *Burton v. State*, 651

_____

[47] Namely, the voluntariness of confessions, in custody determinations, and ineffective assistance of counsel claims.

[48] Burton states the Supreme Court used an "independent[] review[]" to examine *Darden*, but he fails to explain how such a review necessarily translates into a "mixed question of law and fact" for purposes of all prosecutorial misconduct claims.

This court notes that the Eleventh Circuit has ruled that a mixed question framework of analysis is to be applied to prosecutorial misconduct claims when the underlying allegations are improper argument *and* defense counsel timely objected to the prosecutor's comments. *See Sexton v. Howard,* 55 F.3d 1557, 1559 (11th Cir. 1995); *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991).

So. 2d at 651 (emphasis supplied).

Burton also contends the "state court's analysis is an unreasonable application of federal law because the decision 'fail[s] to consider the totality of the evidence,' *Williams v. Taylor*, 529 U.S. [362,] 416 [(2000)], and it 'fail[s] to accord appropriate weight' to the evidence. *Id.* at 397." (Doc. no. 21 at 143).  However, Burton bears the burden of pointing this court to specific facts in the record to overcome the presumption of correctness that attends the state court's factual findings.  Conclusory assertions that the state court did not consider "the totality of the evidence," or "accord appropriate weight" to it, do not satisfy that burden.  Additionally, neither the *Williams* opinion cited by Burton, nor the quotations lifted from it, have anything to do with the legal standard applicable to prosecutorial misconduct claims.  The issue addressed by the Supreme Court in *Williams* was whether the Fourth Circuit erred when it "declared that it could not say that the Virginia Supreme Court's decision on prejudice was an unreasonable application of the *Strickland* . . . standard." 529 U.S. at 362.

In addition, to the extent that this claim is a wholesale indictment of the prosecutor's direct examination of co-defendant McCants, it is procedurally defaulted. Even if it were not, those aspects of the present claim that are raised for the first time in the present proceeding are due to be dismissed for failure to comply with the

specificity requirements of federal pleading statutes and rules.[49]  The two examples of prosecutorial misconduct that were not procedurally defaulted are due to be denied because Burton has failed to show that the adjudication of the claim by the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Moreover, Burton has not shown that the state court's decision was based on an unreasonable determination of the facts in light of the evidence before it.  Therefore, to the extent this claim is not procedurally defaulted, it is due to be denied.

**3.**     *The prosecutor offered his personal opinion about Mr. Burton's guilt. See* doc. no. 9, ¶¶ 42-45, at 18-20.

Burton next alleges that Larry McCardle — the only witness to identify him as one of the persons who committed the robbery at the Auto Zone store — testified on cross-examination that he could not recall describing Burton's facial tattoo when questioned by police immediately after the robbery.  (*See* doc. no. 9 at 18-20, and doc. no. 21 at 144).  Burton argues that such a distinguishing mark, and McCardle's failure to describe it shortly after the offense, raised questions regarding the reliability of his eyewitness testimony.  Burton asserts that the prosecutor improperly attempted to bolster McCardle's credibility during closing arguments with the following

---

[49] *See supra* note 46.

74

statements:  "I've been in here in the courtroom with [Burton] for a week.  I didn't notice the tattoo.  I didn't notice it in the courtroom.  But I sure wouldn't have noticed it with that right there [a gun] pointing at me."  (Doc. no. 21 at 144 (quoting R. 874-75) (bracketed alterations added by Burton)).

Burton argues that the prosecutor's remarks were not legitimate inferences from the evidence, and they constitute an improper injection of his personal belief in (and endorsement of) McCardle's credibility, and that the prejudice resulting from such bolstering of a key state witness rendered his trial fundamentally unfair.  *Id.* at 144-45 (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("[T]he prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."); *Berger v. United States*, 295 U.S. 78 (1934) (A prosecutor's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *United States v. Cano*, 289 F.3d 1354, 1365 (11th Cir. 2002) ("[T]he jury could reasonably believe that the prosecutor was indicating a personal belief in the witness's credibility."); *United States  v. Diaz*, 190 F. 3d 1247, 1253 (11th Cir. 1999) ("[I]t is improper for the prosecution to vouch for the credibility of a government witness."); *Brooks v. Kemp*, 762 F.2d 1383, 1399 (11th Cir. 1985) ("It has long been recognized that misconduct by a prosecuting attorney in closing argument may be grounds for reversing a conviction."); and *United States v. Sims*, 719 F.2d 375,

377 (11th Cir. 1983) (vouching for the credibility of a government witness is improper)).

The Alabama Court of Criminal Appeals rejected this claim on direct appeal, saying:

> The appellant argues that the following comment made by the prosecutor in his closing argument was a statement of his personal opinion concerning the appellant's guilt.
>
> > "Even though a bunch of people were there. McCardle, several of the witnesses said, well, as far as being — I'm not positive on that. Only McCardle says 'I'm positive on this one.' He probably wasn't looking at a tattoo. I've been in here in the courtroom with him for a week. I didn't notice the tattoo. If it is there today, if it was there on August 16th, I don't know. But I tell you this, I didn't notice it in the courtroom. But I sure wouldn't have noticed it with that right there pointing at me."
>
> As the United States Supreme Court stated in *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986):
>
> > "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)."
>
> (Citation omitted.)
>
> We must evaluate the comment in the context of the entire proceedings.
>
> > " 'Whatever is in evidence is considered subject to legitimate

76

comment by counsel.' *Bankhead v. State*, 585 So. 2d 97 (Ala. Cr. App. 1989), *aff'd*, 585 So. 2d 112 (Ala. 1991). See also *Ward v. State*, 440 So. 2d 1227 (Ala. Cr. App. 1983). 'The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way.' . . . *Donahoo v. State*, 505 So. 2d 1067, 1072 (Ala. Cr. App. 1986)."

*Williams*, 601 So. 2d at 1072-73. "'[C]ounsel in the trial of any lawsuit has the unbridled right (to be sure, duty) to argue the reasonable inferences from the evidence most favorable to his client.'" *Kuenzel*, 577 So. 2d at 492, quoting *Ex parte Ainsworth*, 501 So. 2d 1269, 1270 (Ala. 1986). (Footnote omitted.) During the cross-examination of McCardle the defense asked him if the person holding a gun on him had any scars or tattoos. The comment made during closing was clearly based on the cross-examination of McCardle and was a legitimate inference from the evidence presented. "'Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence.'" *Kuenzel*, 577 So. 2d at 493, quoting *Arant v. State*, 232 Ala. 275, 279, 167 So. 540, 543 (1936). No plain error exists here.

*Burton v. State*, 651 So. 2d 641, 651-52 (Ala. Crim. App. 1993).

Nevertheless, Burton attempts to convince this court that it must conduct a *de novo* review of his claim because prosecutorial misconduct claims are mixed questions of law and fact, and that, in any event, the "state court's analysis is an unreasonable application of federal law because the decision 'failed to consider the totality of the evidence,' *Williams v. Taylor*, 529 U.S. at 416, and it 'failed to accord appropriate weight' to the evidence. *Id.* at 397." (Doc. no. 21 at 143). For reasons already detailed in this court's discussion in Part IV(D)(2) of this opinion *supra*, these

arguments are not persuasive.

Examination of Burton's prosecutorial misconduct claim in the context of a habeas proceeding requires this court to accord the state appellate court's factual findings a presumption of correctness, and Burton has not shown that the state court's determination of the evidentiary facts was unreasonable. Burton also does not explain why the state court's denial of the claim either was contrary to, or an unreasonable application of, federal law to the particular facts before it. The prosecutor's comments were legitimate inferences from the evidence; they also were not an obvious and incontrovertible attempt to infect the jury with the prosecutor's personal belief in and endorsement of McCardle's credibility. The state court's decision relied on clearly established federal precedent concerning the subject, and reasonably applied that precedent to the facts before it. This claim is due to be denied.

**4**.    *The prosecutor argued facts not in evidence. See* doc. no. 9, ¶ 46, at 20-21.

Burton alleges the prosecutor repeatedly argued facts not in evidence by attributing actions committed by Burton's co-defendant, Derrick DeBruce (who shot the victim), to Burton. (*See* doc. no. 21 at 147). He believes this action was particularly egregious because, *in pre-trial statements*, co-defendant McCants allegedly "confirm[ed] Burton never intended to kill anyone." *Id.* However, Burton

does not provide a quote or citation from any pre-trial statements in the record. Moreover, at trial, there were no questions from the State or the defense regarding the substance of any information contained within a pre-trial statement made by McCants. (*See* R. Vol. 4, Tab 6, at 340-383). Therefore, Burton's assertion about McCants's pre-trial statements is a mere conclusion having no basis in the record.

Additionally, Burton contends the prosecutor "referred to Mr. Burton's involvement in a gang, a highly prejudicial mis-characterization." *Id*. (citing R. 831).

Finally, in a footnote, Burton adds that the "prosecutor also repeatedly read the indictment to the jury throughout the trial," which gave the indictment evidentiary force. (*See* doc. no. 21 at 147 n.30). According to Burton, "[m]isleading prosecutorial comment which negatively impacts 'the need for reliable sentencing in capital cases'" offends the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Doc. no. 9 at 20-21 (quoting *Sawyer v. Smith*, 497 U.S. 227, 235 (1990), and citing *Enmund v. Florida*, 458 U.S. 782, 797 (1982); *Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir. 1995)).

Respondent answers that Burton's footnoted complaint about the prosecutor "repeatedly reading" the indictment in front of the jury is procedurally defaulted, because he failed to raise the claim at trial, on direct appeal, or during Rule 32 collateral review proceedings. Burton does not dispute that assertion. Accordingly,

79

this aspect of his claim will not be discussed further.

As for the remainder of Burton's claim, respondent contends that petitioner cannot show that the denial of the claim by the intermediate state appellate court on direct appeal was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts before that court.  (*See* doc. no. 17 at 35-36).

The relevant portions of the opinion of the Alabama Court of Criminal Appeals on direct appeal read as follows:

> Next the appellant argues that in the following argument . . . the prosecutor stated facts not in evidence:
>
> > "I think the Judge will tell you that a person commits the crime of manslaughter if he recklessly causes the death of another person, and I submit to you that pointing a gun at somebody, hitting them in the back of the neck, knocking them down, pointing the gun at them, and loading it before you get in there and then pulling that trigger, there is nothing reckless about that, folks.  That is an intentional act.  You know when you load it.  You know when you walk in there, and you know when you use it.  And you know when you pull that trigger that you intended to do something."
>
> We must view the argument in relation to the whole trial.  Before making the above statement the prosecutor told the jury that the state "does not contend that the Defendant was actually the person that pulled the trigger on this occasion."  The prosecutor then went on in his argument to discuss the concept of complicity and then made the above argument.  The above comment was a comment on the law on which the court was going to instruct the jury.  A prosecutor can argue his

80

> interpretation of the applicable law in his closing argument. *Middleton v. State*, 495 So. 2d 726 (Ala. Cr. App. 1986); *Orr v. State*, 462 So. 2d 1013 (Ala. Cr. App. 1984); *Lewis v. State*, 456 So. 2d 413 (Ala. Cr. App. 1984). "A trial judge may properly allow a district attorney to comment in his . . . closing argument on the principles of conspiracy, aiding and abetting, and principal and accessory." *Lewis*, 456 So. 2d at 416. No plain error occurred here.

*Burton v. State*, 651 So. 2d 641, 652 (Ala. Crim. App. 1993).

Burton contends that the state court's factual findings are not entitled to a presumption of correctness because the decision to deny the claim rested entirely on state law grounds. (*See* doc. no. 21 at 148). Alternatively, Burton attempts to convince this court that it must conduct a *de novo* review of his claim because prosecutorial misconduct claims are mixed questions of law and fact, and that, in any event, the "state court's analysis is an unreasonable application of federal law because the decision 'failed to consider the totality of the evidence,' *Williams v. Taylor*, 529 U.S. at 416, and it 'failed to accord appropriate weight' to the evidence. *Id.* at 397." (Doc. no. 21 at 143). For reasons already detailed in this court's discussion in Part IV(D)(2) of this opinion *supra*, these arguments are not persuasive.

This leaves the court with the question of whether the state court's decision relied exclusively on state law. After careful examination of the opinion, this court rejects such a contention. While the appellate court did not cite a Supreme Court case in making its determination, it began the inquiry with the following statement, "We

81

must view the argument in relation to the whole trial."  Such a comment is the

hallmark of the Supreme Court's fundamental fairness standard in *Donnelly v.*

*DeChristofero*, 416 U.S. 637, 643 (1974).  Thus, even if the state appellate court did

not specifically cite federal law as the basis for its opinion, its reasoning was based

upon federal standards, and that is sufficient for this court to apply § 2254(d) analysis.

To begin, it is understood that

arguments of counsel generally carry less weight with a jury than do
instructions from the court.  The former are usually billed in advance to
the jury as matters of argument, not evidence . . . and are likely viewed
as the statements of advocates; the latter, we have often recognized, are
viewed as definitive and binding statements of the law.  See *Carter v.
Kentucky*, 450 U.S. 288, 302-304, and n. 20, 101 S.Ct. 1112, 1120-1121,
and n. 20, 67 L.Ed.2d 241 (1981); *Quercia v. United States*, 289 U.S.
466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *Starr v. United
States*, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894).
Arguments of counsel which misstate the law are subject to objection and
to correction by the court. *E.g., Greer v. Miller*, 483 U.S. 756, 765-766,
and n. 8, 107 S.Ct. 3102, 3109, and n. 8, 97 L.Ed.2d 618 (1987).  This is
not to say that prosecutorial misrepresentations may never have a
decisive effect on the jury, but only that they are not to be judged as
having the same force as an instruction from the court.  And the
arguments of counsel, like the instructions of the court, must be judged
in the context in which they are made.  *Greer*, *supra*, at 766, 107 S.Ct.,
at 3109; *Darden v. Wainwright*, 477 U.S. 168, 179, 106 S.Ct. 2464, 2470,
91 L.Ed.2d 144 (1986); *United States v. Young*, 470 U.S. 1, 11-12, 105
S.Ct. 1038, 1044-1045, 84 L.Ed.2d 1 (1985); see also *Donnelly v.
DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431
(1974) ("[A] court should not lightly infer that a prosecutor intends an
ambiguous remark to have its most damaging meaning or that a jury,
sitting through lengthy exhortation, will draw that meaning from the
plethora of less damaging interpretations").

82

*Boyde v. California*, 494 U.S. 370, 384-385 (1990) (bracketed alteration in original).

Thus, it follows that, for federal law purposes, a prosecutor's interpretation of the law during argument is treated in much the same manner as any other type of statement or argument made by counsel. In other words, a prosecutor's comment on the law is only improper if it "misrepresent[s] the law to the jury." *Spivey v. Head*, 207 F.3d 1263, 1277 (11th Cir. 2000). Burton does not and has never argued that the prosecutor misrepresented the elements of complicity under Alabama law, or that the prosecutor did not explicitly tell the jury that the trial judge would provide the legal instructions for complicity.

Moreover, contrary to Burton's assertion, there was evidence presented at trial to support the prosecutor's argument that the death of the victim was the result of an intentional act. LuJuan McCants testified at trial that Derrick DeBruce carried a loaded gun into the Auto Zone store, but did not pull the trigger until after he had hit the victim in back of the neck and knocked him down. (*See* R. Vol. 4, Tab. 6 at 357-61). Other evidence showed the victim was lying face down on the floor when he was shot. McCants's testimony at trial also established that Burton was the mastermind of the robbery, in that he organized the individuals participating in the robbery (all but one were armed with guns), chose the location to be robbed, delegated specific tasks for each co-defendant to perform, and directed the distribution of stolen money among

the participants.  *Id.* at 343-68.  Finally, McCants testified that Burton made a statement to the effect that if any of the victims caused trouble, he (Burton) would take care of it, or if anyone needed to be hurt, he would handle it.  *Id.* at 351, 380-81.

Burton has not provided any support in his petition or the trial record for his assertion that McCants made a pretrial statement that Burton did not intend for anyone to be killed during the robbery.  There was evidence before the jury that Burton had led members of the gang[50] to believe that if necessary, he would take care of any troublemakers.  A prosecutor is entitled to argue reasonable inferences from the evidence.

Finally, Burton's citation to case law pertaining to prejudice at the penalty phase of trial cannot support this claim as the remark by the prosecutor was made during the guilt phase of trial.  (*See* doc. no. 9 at 20-21).  For the foregoing reasons, this claim is due to be denied.

---

[50] Although respondent did not address the point in its answer, the court notes that Burton's claim that the prosecutor's reference to the Auto Zone robbers as a "gang" was a prejudicial mischaracterization is procedurally defaulted.  This claim was not raised at trial or on direct appeal, but presented for the first time in Burton's Rule 32 petition.  The trial court dismissed it as procedurally defaulted under Alabama Rules of Criminal Procedure 32.2(a)(3) and (5).  *See* Rule 32 C.R. Vol. 12, Tab. 41 at 17; *see also id.* Vol. 25, Tab 58 (trial court order) at 5.  The Alabama Court of Criminal Appeals affirmed.  *See Burton v. State*, No. CR-00-2472, slip op. at 6 (Ala. Crim. App. Feb. 20, 2004); *see also* C.R. Vol. 25, Tab. 59, at 6.  Even if the claim were not defaulted, it still is due to be denied because the actions of Burton and the other co-defendants could be seen as:  "(1) a group of persons working together (2): a group of persons working to unlawful or antisocial ends; *esp.*: a band of antisocial adolescents."  *Webster's New Collegiate Dictionary* 468 (1981) (defining "gang").  Thus, the prosecutor's comment was not an improper characterization.

84

**5**.   *The prosecutor improperly vouched for LuJuan McCants's innocence.*
*See* doc. no. 9, ¶¶ 47-48, at 21.

Burton alleges the prosecutor misstated and manipulated the evidence by trying

to portray Burton's co-defendant (and the State's cooperating witness), LuJuan

McCants, as "an impressionable child" when making the following statements during

closing argument:   "But he's still 16 years old, and he's still following around and

doing what somebody like Charles Burton told him . . . .  McCants didn't have the

heart to be bad to that guy, certainly to shoot that guy."  (Doc. no. 9 at 21 (citing (R.

877)).[51]

---

[51] The prosecutor in Burton's case could not be characterized as a great orator.  His jury
arguments were a jumble of disconnected thoughts and, often, incomplete sentences.  The statements
quoted in text were clipped from the following, representative passage:

> Now, we talk about, and Mr. Willingham talked about McCants and he talks
> about DeBruce, who did the killing.  He talks about Barbara Spencer.  Look, those
> people are not my buddies.  They are not Doug Battle's buddies.  Those people are
> running buddies with the Defendant.  But I tell you what, a 16 year-old kid — and I
> believe that he described it about as good as anybody.  And you think about it.  And
> whether he's the leader.  He's deciding what's going to be hit and makes that
> decision that Autozone up there is going to be okay.  As I said before, if anybody has
> to be hurt, I will handle it.  I will go in and purchase.  Y'all, come in.  If I come out,
> there is no robbery.  If I stay, there is a robbery.  McCants, a 16 year-old kid, I don't
> care any way — and you observed his demeanor on the witness stand, and you think
> of him what you want.  But he's still 16 years old, and he's still following around and
> doing what somebody like Charles Burton told him.  He told him to walk out of the
> store and he walked out of the store.  And it is further — the fact of it is, is McCants
> didn't have the heart to be bad to that guy, certainly to shoot that guy.  When they got
> back to Montgomery, as in the words of that man over there, you don't deserve no
> money.

(R. Vol. 7, Tab. 12, at 876-77).

Burton argues that those statements could not be legitimately inferred from the evidence for the following reasons:  McCants was living with a woman at her mother's house when the incident occurred; he testified he wanted to shoot Burton during an argument; the murder weapon was found behind McCants's residence; he was an active participant in the robbery; and he never expressed any fear of Burton.  (*See* doc. no. 21 at 149).  According to Burton, such "manipulat[ions] or misstatement[s of] the evidence" run counter to Supreme Court precedent addressing proper prosecutorial argument.  (*See* doc. no. 21 at 149 (quoting *Darden v. Wainwright*, 477 U.S 168, 181-82 (1986)).

This court's standard of review is governed by 28 U.S.C. §§ 2254(d) and (e).  As such, the analysis begins with the intermediate state appellate court's adjudication of the claim on direct appeal:

> Last, the appellant argues that the prosecutor attempted to portray LuJuan McCants as an "impressionable child."  The prosecutor stated in closing that McCants was just 16 years old and was following the appellant, who was 41 years old at the time of the robbery-murder.  Again this argument was a legitimate inference from the evidence presented.  No plain error occurred here.
>
> Furthermore, the court went to great lengths in its oral charge to instruct the jury that statements of counsel are not evidence.

*Burton v. State*, 651 So. 2d 641, 652 (Ala. Crim. App. 1993).

Burton has not demonstrated that the state court's adjudication of this claim was

86

either contrary to, or an unreasonable application of, clearly established federal law,

nor has he shown that the state court's decision was an unreasonable determination of

the facts in light of the evidence before it.  The appellate court correctly found that the

prosecutor was juxtaposing the age of McCants with that of Burton in support of his

argument that Burton was the leader of those persons who participated in the Auto

Zone robbery.  Thus, the prosecutor's remarks were not a misstatement of, or an

attempt to misrepresent, the evidence; and, they did not encourage the jury to believe

the prosecutor knew something about the facts of the case that had not been presented

to the jury in open court.  This claim is due to be denied.

      **6**.     *The prosecutor engaged in impermissible burden shifting.  See* doc. no. 9, ¶¶ 49-51, at 22.

Burton alleges that the state prosecutor impermissibly shifted the burden of

proof to the defense when stating during closing argument that:

> "There is not one shred of evidence, ladies and gentlemen, that there wasn't a robbery in the first degree . . . .  Not one shred of evidence will prove otherwise.  There is not one shred of evidence to prove otherwise than that there was an intentional killing of a human being.  There is not any legal defense to what was done to Doug Battle on that occasion.  He didn't deserve to die."

(Doc. no. 9 at 22 (quoting R. 844 and citing *Sandstrom v. Montana*, 442 U.S. 510, 524

(1979) (holding that a burden-shifting instruction requiring the accused to disprove

an element of the offense charged was unconstitutional), and *In re Winship*, 397 U.S.

358, 364 (1970) ("The due process clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")).

That portion of the Alabama Court of Criminal Appeals' opinion pertaining to this claim reads as follows:

> The appellant further argues that the following argument impermissibly shifted the burden of proof to him.
>
> > "There is not one shred of evidence, ladies and gentlemen, that there wasn't a robbery in the first degree committed at the Auto Zone on April — on August 16, 1991, in Talladega County, Alabama. They were armed, they took property, they threatened force, and they caused serious physical injury. Not one shred of evidence will prove otherwise. There is not one shred of evidence to prove otherwise than that there was an intentional killing of a human being. There is not any legal defense to what was done to Doug Battle on that occasion. He didn't deserve to die."
>
> Again, the above comment was a legitimate inference from the evidence presented. *Williams*, supra. No plain error occurred in the above comment made in closing argument.

*Burton v. State*, 651 So. 2d 641, 652 (Ala. Crim. App. 1993).

Certainly, the prosecutor's assertions that there was "not one shred of evidence . . . that there wasn't a robbery in the first degree," and "[t]here is not one shred of evidence *to prove otherwise than* that there was an intentional killing of a human

being," and "[t]here is not any legal defense to what was done to Doug Battle," amount to, at least, a very poor choice of words. However, when taken in the context of all of the evidence at trial, which included numerous eyewitnesses who testified to the events that occurred during the robbery, the State's evidence of a robbery in the first degree and an intentional murder was virtually undisputed.

Moreover, Burton's choice of an alibi defense — alibi is a Latin noun meaning "elsewhere"[52] — weighs against any prejudicial effect the remarks could have had on his defense. If Burton had been elsewhere when the offense was committed, then he would have had no factual or legal basis for disputing the evidence of those events that occurred during the course of the robbery. Stated differently, Burton's reliance on an alibi defense necessarily meant that he had to forego some attacks against the State's evidence, or run the risk of weakening his theory of defense by taking inconsistent positions.

The Eleventh Circuit examined the line between proper prosecutorial comment on the evidence, and improper arguments that shift the burden of proof to the defendant, in *United States v. Simon*, 964 F.2d 1082 (11th Cir. 1992), saying:

> This court, in recognizing the government's burden and obligation

---

[52] The word has been defined as "**1**. A defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time. . . . **2**. The fact or state of having been elsewhere when an offense was committed. *Black's Law Dictionary* 79 (Bryan A. Garner ed., 8th ed. 2004).

of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. *See Duncan v. Stynchcombe*, 704 F.2d 1213, 1216 (11th Cir. 1983). Such prosecutorial misconduct, if "so pronounced and persistent that it permeates the entire atmosphere of the trial," requires reversal. *United States v. Alanis*, 611 F.2d 123, 126 (5th Cir.), *cert. denied*, 445 U.S. 955, 100 S. Ct. 1607, 63 L. Ed. 2d 791 (1980) (quoting *United States v. Blevins*, 555 F.2d 1236 (5th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S. Ct. 733, 54 L. Ed. 2d 761 (1978)). Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). Additionally, prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence. *See Winship*, 397 U.S. at 364, 90 S. Ct. at 1072.

*Simon*, 964 F.2d at 1086. In the opinion of this court, the prosecutor in Burton's case did not cross that line. Further, Burton has not carried his burden of establishing that the decision of the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in the light of the evidence presented in the trial court. This claim is due to be denied.[53]

E.  *The prosecutor's penalty-phase closing argument was improper, misleading, inflammatory and prejudicial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. See doc. no. 9, ¶¶ 52-60, at 23-27.*

---

[53] As a post-script, Burton alleges that the cumulative impact of the prosecutor's errors denied him a fair trial. (*See* doc. no. 9, ¶ 51, at 22 (citing *Berger v. United States*, 295 U.S. 78 (1934)). Since this court has found that Burton is not entitled to habeas relief with regard to any of the instances of alleged prosecutorial misconduct that is not procedurally defaulted, the court rejects this contention.

1.    *The prosecutor argued facts not in evidence.  Id.*, ¶¶ 53-55, at 23-24.

Burton alleges that the prosecutor improperly argued against a mitigating circumstance that he never raised,[54] and suggested that three persons involved in the robbery were dominated by Burton, even though "the State presented no evidence that Willie Brantley, Andre Jones, or LuJuan McCants acted contrary to their own will . . . or that they feared" Burton.  The specific remarks to which Burton takes exception read as follows:

> There is no evidence [of duress or substantial domination].  In fact, that is exactly — who that's in there for is exactly in there for the Willie Brantleys of this world, for the Andre Jones of this world, or the LuJuan McCants of this world.  That's what that's in there for.  Because I submit to you, they did act under substantial domination of another person.  And I submit to you that Andre Jones and Willie Brantley are still acting under that domination.

(Doc. no. 9 at 23 (quoting R. 1114)).[55]  These remarks obviously were addressing the

---

[54] It is not necessarily improper for a prosecutor to disprove a statutory mitigating factor not raised by a defendant.  An in-depth discussion of this issue may be found in Part IV(F) of this opinion *infra*.

[55] Once again, the prosecutor's statements are jumbled and, often, incoherent.  For that reason alone, it is hard to believe that he could have had a persuasive effect, much less a prejudicial effect, upon the minds of reasonably intelligent jurors.  In any event, the prosecutor's closing remarks leading into that portion of the argument that Burton alleges to have been unacceptable obviously were addressing the statutory mitigating circumstances prescribed by Ala. Code § 13A-5-51 (1975), and they read as follows:

> ["]Under the influence of extreme mental or emotional disturbance.[" § 13A-5-51(2)]  There is just no evidence of that.  ["]That he was a participant in the defendant's . . . conduct or consented to it.[" § 13A-5-51(3)]  Obviously the victim didn't consent to it.  ["]That he was an accomplice in the capital offense and his participation was relatively minor.[" § 13A-5-51(4)]  *That's for you ladies and*

statutory mitigating circumstance found in Alabama Code § 13A-5-51(5):  *i.e.*, "The

defendant acted under extreme duress or under the substantial domination of another

person."

Burton raised this same claim on direct appeal, and that portion of the opinion

of the Alabama Court of Criminal Appeals addressing it reads as follows:

> The appellant next argues that the prosecutor committed error in his closing argument in the penalty phase.  Initially, we observe that no objection was made to this during trial.  "[T]he failure to object will weigh against any claim of prejudice."  *Ex parte Hart*, 612 So. 2d at 537.

> Initially, the appellant contends that the prosecutor argued facts not in evidence.  *Specifically, he argues that the prosecutor incorrectly stated that the appellant was the leader.  However, this was an inference that could have been drawn from McCants's testimony*.  McCants testified that the appellant told the others what to do before they entered the Auto Zone.  Any argument that the prosecutor made that was a legitimate inference that could have been drawn from testimony presented at trial is not error.  *Kuenzel*, supra.

*Burton v. State*  651 So. 2d 641, 656 (Ala. Crim. App. 1993) (emphasis supplied).

Burton initially argues that the appellate court's decision is "a summary

conclusion [that] is not entitled to a presumption of correctness because it does not

---

> *gentlemen to decide*.  But I submit this to you, as Mr. King said earlier, that [Burton] was leading the whole way, and I submit to you he's leading today.  Brantley and Jones are a prime example of it.  I mean, he still has control over them today.  It is the darnedest thing.

(R. Vol. 8, at 1113-14 (emphasis and bracketed alterations supplied)).

rely on federal law or purport to decide the federal constitutional question presented by the claim." (Doc. no. 21 at 156-57). Burton also requests either *de novo* review, or a finding that the state court's decision was an unreasonable application of *Strickland*. *Id.* at 157.

The Eleventh Circuit's opinion in *Johnson v. Wainwright*, 778 F.2d 623 (11th Cir. 1985), examined the constitutional standards that apply to claims of improper prosecutorial argument during the penalty phase of a capital trial, and observed that the Circuit's opinions in four *en banc* decisions — *i.e.*, *Tucker (Richard) v. Kemp*, 762 F.2d 1496 (11th Cir. 1985) (*en banc*); *Tucker (William) v. Kemp*, 762 F.2d 1480 (11th Cir. 1985) (*en banc*); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (*en banc*); and *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) (*en banc*) — all underscored the following principles:

> [P]rosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements. First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations. *Brooks*, 762 F.2d at 1403. Second, they must have been so prejudicial, when viewed in the context of the entire sentencing proceeding, as to have rendered that proceeding "fundamentally unfair." *Id.* at 1400 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S. Ct. 1868, 1872, 40 L. Ed. 2d 431 (1974)). The test for fundamental unfairness is whether "there is a reasonable probability that [the errors] changed the outcome of a case." *Brooks*, 762 F.2d at 1402; *see also Drake*, 762 F.2d at 1460.

*Johnson*, 778 F.2d at 630 (footnote omitted). In the omitted footnote, the *Johnson*

Court observed that:

> In *Brooks* and its companion cases we identified a number of matters which have been recognized as legitimate sentencing considerations. *These include the character and background of the defendant* (including future dangerousness and possible rehabilitation), *the circumstances of his offense*, and accepted penological justifications such as deterrence and retribution.

*Johnson*, 778 F.2d at 630 n.8 (citing *Brooks*, 762 F.2d at 1406-08; *Drake*, 762 F.2d at 1458) (emphasis supplied).

Since a defendant's character and background, as well as the circumstances of the offense, are constitutionally legitimate matters for jury consideration when determining the appropriate sentence to recommend to the trial judge, it was not improper for the prosecutor to stress during his penalty phase closing argument that Burton was the ringleader of the crime — *assuming*, of course, that there was evidence to support such an argument. Here, LuJuan McCants's testimony tended to show that Burton designed, directed, and exercised authority over the actions of all other participants in the robbery before, during, and after the offense. Moreover, McCants's testimony concerning Burton's leadership role was corroborated by two other witnesses, store manager Larry McCardle and Barbara Spencer.

At Burton's personal insistence,[56] co-defendants Willie Brantley and Andre

---

[56] Before the penalty phase of trial began and outside the presence of the jury, defense counsel advised the court that Burton desired to call co-defendants Willie Brantley and Andre Jones as witnesses. (R. Vol. 7, Tab. 14, at 919-20). Defense counsel also informed the court he did not

Jones testified during the penalty phase of trial, and both denied knowing Burton, as well as any involvement in the robbery.  (*See* R. Vol. 7, Tab. 19 at 994-1005). Immediately after their testimony, Burton took the stand and testified that he had never been to the Auto Zone store in Talladega, and that he did not know any of the persons who had been arrested for the robbery.  *Id.* at 1015-16.

During the state's case in rebuttal, and while eyewitness Leonard Jones was on the stand, the prosecutor had co-defendants Willie Brantley, Andre Jones, and LuJuan McCants brought into the courtroom; and Leonard Jones identified Brantley and Jones as being two of the participants in the Auto Zone robbery.  (*See* R. Vol. 8, Tab. 20, at 1042-47).   Eyewitness David Walton also identified Andre Jones as one of the robbers.  *Id*.  The prosecutor called Willie Brantley back to the stand, and questioned him about the execution of the search warrant at his home — the location at which the murder weapon was found, and where other persons that Brantley previously had denied knowing were arrested along with him.  *Id.* at 1051-54.  Brantley was also shown a videotape taken at the City National Bank in Sylacauga, Alabama, and denied being able to recognize any individual or vehicle in the tape.  *Id.* at 1067-71.  Two police officers subsequently testified that Andre Jones had confessed his involvement

---

believe Brantley and Jones could provide any mitigating evidence and that defense counsel would not call them as witnesses.  *Id.*  Thus, Burton himself is responsible for calling Brantley and Jones as witnesses.

in the crime to them. *Id.* at 1073-79.  Thus, the prosecution's rebuttal case cast doubt upon the credibility of Willie Brantley and Andre Jones, both of whom had denied their involvement in the robbery, and knowing any of the other co-defendants.

In other words, there *was* evidence from which the prosecutor could properly make an argument that Burton exercised influence over the other co-defendants.  It was not improper for the prosecutor to use this juxtaposition to argue that Burton could not avail himself of the statutory mitigating factors of duress or undue influence. *See* Ala. Code § 13A-5-51(5) ("*The defendant* acted under extreme duress or under the substantial domination of another person.") (emphasis added).  Additionally, as the Eleventh Circuit explained in *Cargill v. Turpin*, 120 F.3d 1366 (11th Cir. 1997), when attempting to determine whether the prosecutor's challenged remarks were so prejudicial as to have rendered the trial court proceeding "fundamentally unfair,"

> we remain aware of the primary importance of examining the entire context of the trial proceeding. *Brooks*, 762 F.2d at 1413.  Thus, a reviewing court should not assess prosecutorial comments in isolation, shorn of their context. *See Johnson v. Wainwright*, 778 F.2d 623, 631 (11th Cir. 1985) (evaluating challenged comments in light of "the rest of the prosecutor's speech"), *cert. denied*, 484 U.S. 872, 108 S. Ct. 201, 98 L. Ed. 2d 152 (1987).  "In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity." *Brooks*, 762 F.2d at 1400.  We also consider the lack of an objection in examining the impact of a prosecutor's closing argument, as the omission "may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." *Brooks*, 762 F.2d at 1397 n.19; *see also Davis v. Zant*, 36 F.3d 1538, 1551 n.20 (11th Cir. 1994) ("The

> failure to object can sometimes serve to clarify an ambiguous record as to whether a particular argument was in fact misleading or prejudicial."). This court also evaluates whether "defense counsel's closing argument . . . ameliorate[d] the damage done to the defense by the prosecutor's [statements]."  *Davis*, 36 F.3d at 1551; *see also Brooks*, 762 F.2d at 1397-98.  Moreover, we consider the trial court's instructions to the jury, as they "may remedy effects of improper comments."  *Brooks*, 762 F.2d at 1400.  And, of course, we consider the evidence of guilt and the weight of aggravating and mitigating factors.  See *Brooks*, 762 F.2d at 1415-16. "A court need not determine whether specific arguments are proper or improper if, taken as a whole, they would not require relief." *Brooks*, 762 F.2d at 1403 n. 31.

*Cargill v. Turpin*, 120 F.3d at 1379.  Based upon the foregoing, and even assuming the prosecutor's remark was improper (which, as previously explained, it was not), when viewed in the light of all of the other evidence presented, there is no reasonable probability that the outcome of the trial would have been different, had the comment not been made.  This claim, therefore, is due to be denied.

   **2**.   *The prosecutor improperly told the jury not to consider all the presented evidence.  See doc. no. 9, ¶¶ 56-60, at 25-27.*

   Burton alleges the prosecutor made three comments that encouraged the jury to ignore testimony presented by his family members during the penalty phase of trial. (*See* doc. no. 9 at 25).   He complains that, during the State's rebuttal,

> "[t]he prosecutor . . . declared 'I know that's tough on you.  It ought to be tough.  But it still is a necessary decision that has to be made, and it should not be made based on lumping something on you that doesn't have anything to do with the evidence." (R. 1112).[57]  The prosecutor

---

   [57] The context in which this comment was made reads as follows:

then told the jury that testimony from Mr. Burton's parents was "really not evidence." (R. 1112-13).[58] The prosecutor persisted by suggesting to the jury that the mitigating testimony should not be considered as evidence stating, "He came from a broken home. When are we going to stop blaming mamas and daddys and grandmothers and granddaddys for something that somebody like him [did] . . . .?[59] I just ask you to do this, and I know that [you] will, the heart is what you have to leave. You forget that in here." (R. 1115).[60]

---

And I know that you ladies and gentlemen — I always refer to it as this, when you walk inside that rail, you shed what as normal everyday human beings carry around with you, sympathy, feelings about this or that, personal feelings. . . . But when you come into that jury box, you say, I am going to judge this case based upon evidence and based upon law. And when we — when you do that — and I know you will do it, and I know that it is awful when a sister gets up here and a mother gets up here and asks things. I know that's tough on you. It ought to be tough. But it still is a necessary decision that has to be made, *and it should be made not based on lumping something on you that doesn't have anything to do with the evidence. It should be made on the evidence, and that's the only way it should be made.*

(*See* R. Vol. 8, Tab. 23, at 1111-12 (emphasis supplied)).

   [58] The context in which this comment was made reads as follows:

I would not call Battle's family up here and put them through anymore than they've been through. Just wouldn't do it. But I will tell you this, I asked [Burton's] sister, Ms. Ellison — and I wasn't trying to be smart, and I wasn't trying to pry into her personal affairs. And I am not going to ask [Burton's] daddy and . . . mother a bunch of questions, because I know that they care about him. *But that is really not evidence.* I asked the sister, how many brothers and sisters have you got? Got several. Any of them ever been in the penitentiary? I wasn't trying to be cute, trying to be smart. There ain't nothing in his upbringing that caused everybody else to get in trouble. There is nothing in his upbringing that caused — that caused those others to be in trouble.

(*See* R. Vol. 8, Tab. 23, at 1112-13 (emphasis supplied)).

   [59] Burton omits from this quotation the following statement:   "My gracious, he's 40 something years old." (R. Vol. 8, Tab. 23, at 1115).

   [60] The context in which this comment was made reads as follows:

I just ask you to do this, and I know that you will without question I know you will, the heart is what you have to leave. You forget that in here. You decide with your

*Id.* Burton then concludes that the prosecutor's comments were "unconstitutional," because he "argued that sympathy" has no place in a capital proceeding. *Id.*

Respondent answers that Burton cannot show the denial of this claim by the Alabama Court of Criminal Appeals on direct appeal entitles him to § 2254(d) relief. (*See* doc. no. 17 at 42-44, and doc. no. 18 at 44-46). Burton replies that the appellate court's decision relies primarily on Alabama case law; and, in any event, since prosecutorial misconduct claims are always mixed questions of law and fact, he is entitled to *de novo* review of this claim. (*See* doc. no. 21 at 160). For reasons explained in earlier Parts of this opinion, the latter argument is not persuasive.

That portion of the opinion of the Alabama Court of Criminal Appeals on direct appeal addressing the present claim reads as follows:

> The appellant also argues that the prosecutor incorrectly stated that

---

mind right and wrong, aggravating and mitigating. You know, one of the hallmarks of this country and what's . . . made this country great, is doing what is necessary for the protection of our society. We ask young people in this country to give their life in defense of this country. I asked you at the beginning were you opposed to capital punishment. Each of you said you weren't. Would you consider it, and that's all I ask you as I stand here today. Because I know you say, you think, who is this guy Rumsey that gets up here and asks these things. I want you to consider capital punishment. I want you to consider life without parole, but I don't want you to consider it based upon what Mr. Morris was up here talking about that there is absolutely no evidence. And he is — he is preying on you about on things that are not evidence in the case. You consider it based upon the law as the judge gives you, and then you make — leave your personal feelings out, and do it on that basis. And then you have rendered that true and just verdict based upon evidence, based upon law.

(*See* R. Vol. 8, Tab. 23, at 1115-17).

the jury was not to let sympathy affect its decision to vote for death or life imprisonment without parole.  "A prosecutor's argument 'in telling the jury not to let sympathy, emotions, or compassion affect its decision . . . did not result in any error.'"  *DeBruce*, 651 So. 2d at 613; quoting *Stewart v. State*, 601 So. 2d 491, 506 (Ala. Cr. App. 1992).  *See California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987).[61]

*Burton v. State,* 651 So. 2d 641, 657 (Ala. Crim. App. 1993).

The Supreme Court held in *California v. Brown*, 479 U.S. 538 (1987), that "an

---

[61] The pertinent portion of the Alabama Supreme Court's *DeBruce* opinion reads as follows:

In his closing argument, the district attorney urged the jury to "do what you think is right and just under the law. . . .  That's all anybody has got a right to ask.  But it is not right to come up here and put a guilt trip on you like that's just been done. [Defense counsel] says— . . . [i]f anything tugs at your heart, just do it.  In effect, just disregard the law.  Just disregard your oath to this Court."  R. 1176-77.  The district attorney's argument was a proper and legitimate response to defense counsel's previous statement:

"When you g[e]t back there and make your decision, if there's anything in this case that really tugs on your heart, then go with it.  Go with it.  Because that's what this is all about.  If you've got something that is really bothering you on the inside about killing him, then go with that.  You are entitled to your own opinion.  You don't do it if you don't want to.  If you don't feel like he needs to die, then don't kill him."  R. 1172-73.

"[I]n *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987), the Supreme Court decided that 'an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.' 479 U.S. at 539, 107 S. Ct. at 838 (emphasis added)."  *Kuenzel*, 577 So. 2d at 496.  A prosecutor's argument "in telling the jury not to let sympathy, emotions, or compassion affect its decision . . . did not result in any error."  *Stewart v. State*, 601 So. 2d 491, 506 (Ala. Cr. App. 1992).

*DeBruce v. State*, 651 So. 2d 599, 613 (Ala. Crim. App. 1993) (alterations in original).

instruction informing jurors that they 'must not be swayed by *mere* sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution." *Id*. at 539 (emphasis supplied).

There is a clear constitutional distinction between "mere" sympathy and "genuine" sympathy that is based upon evidence of mitigating circumstances. "Mere sympathy" — defined as the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase of trial — is not an appropriate consideration in the sentencing process, whereas "genuine sympathy" derived from evidence of a defendant's background, character, and any other mitigating fact must be considered. The distinction may be subtle, but the Supreme Court attempted to draw the line in the following portion of its *Brown* opinion:

> By concentrating on the noun "sympathy," respondent ignores the crucial fact that the jury was instructed to avoid basing its decision on *mere sympathy*. Even a juror who insisted on focusing on this one phrase in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase. While strained in the abstract, respondent's interpretation is simply untenable when viewed in light of the surrounding circumstances. This instruction was given at the end of the penalty phase, only after respondent had produced 13 witnesses in his favor. Yet respondent's interpretation would have these two words transform three days of favorable testimony into a virtual charade. We think a reasonable juror would reject that interpretation, and instead understand the instruction not to rely on "mere

sympathy" as a directive to ignore only *the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase*.

*Brown*, 479 U.S. at 542 (emphasis supplied).  Although this issue arose in *Brown* in the context of a jury instruction, the Supreme Court's holding with regard to the distinction between "mere sympathy," on the one hand, and sympathy that is rooted in the evidence of aggravating and mitigating circumstances presented during the penalty phase of trial, on the other hand, controls the disposition of the present issue.

The prosecutor's comments of which Burton complains, when read in conjunction with the argument surrounding them and the prosecutor's rebuttal argument as a whole, are not improper.  The prosecutor did argue that the jury should not decide Burton's fate based on sympathy and personal feelings alone.  He also asked the jury to determine the existence of aggravating and mitigating circumstances based on the evidence.  Thus, he directed the jury away from the type of sympathy that is not appropriate, and in the direction of sympathy that is appropriately rooted in the evidence.

The evidence pertaining to this claim also leads the court to the following conclusions.  First, the prosecutor did not tell the jury that the testimony of Burton's family was not evidence; instead, he was attempting, in his obviously awkward and typically incoherent manner to tell the jury that speculation on the reasons why he (as

102

a prosecutor) did or did not question members of the victim's family, or members of

Burton's family, during the penalty phase of trial was not evidence.  Second, the

prosecutor argued that the jury should not give great weight to the evidence of

Burton's troubled childhood, because Burton was forty years old when he committed

the crime, and his siblings had not engaged in similar criminal conduct.  In this, the

prosecutor was not telling the jurors that they could not take evidence of Burton's

background into consideration as a mitigating factor; instead, he was arguing that the

jurors should not accord such evidence great weight.[62]  Thus, the prosecutor's

comments were not improper.  Regardless, there is no reasonable probability that the

---

[62] In his reply brief, Burton argues that the prosecutor's statements are tantamount to improper *Eberhart*, and Biblical "eye for an eye," remarks.  (*See* doc. no. 21 at 157-60).  Such arguments were discussed by the Eleventh Circuit's opinion in *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), where the Court said:

> The prosecutor's [argument that the Bible commands the death penalty when a child kills his parents] is improper for the same reason it is improper for prosecutors to use the now-infamous *Eberhart* quotation, which we have condemned on at least seven occasions.  *See Nelson v. Nagle*, 995 F.2d 1549, 1555-58 (11th Cir.1993) (holding the use of the *Eberhart* quotation in sentence-stage closing argument improper and citing six other decisions reaching the same conclusion).  *Eberhart v. State*, 47 Ga. 598 (1873), is a Reconstruction-era Georgia Supreme Court opinion in a capital murder case which contains a tirade against mercy.  The opinion rails against "that sickly sentimentality that springs into action whenever a criminal is at length about to suffer for crime," complains that "[w]e have had too much of this mercy," which "is not true mercy," because "[i]t only looks to the criminal," and so forth.

*Romine v. Head*, 253 F.3d at 1366-67 (footnote omitted).  *Eberhart* arguments, and misuse of Biblical scripture, are improper because they attempt to persuade jurors that the death penalty is required for a capital offense, and mitigating circumstances are irrelevant.  The prosecutor did neither in Burton's case.  Accordingly, this aspect of Burton's argument is rejected.

103

outcome of the penalty phase hearing would have been different if the comments complained of had not been made.  For these reasons, this claim is due to be denied.

**F.**    *The prosecutor improperly introduced evidence of prior convictions to rebut a mitigating circumstance that was never offered, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See* doc. no. 9, ¶¶ 61-66, at 27-30.

    **1**.    *The prosecutor could not present evidence of prior convictions to rebut a statutory mitigating factor that Mr. Burton never offered. Id.*, ¶ 62, at 28.

    **2**.    *The manner in which the prosecutor presented this evidence was highly inflammatory and prejudicial. Id.*, ¶¶ 63-64, at 28-29.

    **3**.    *The prosecutor's tactics improperly and unconstitutionally made aggravating factors out of prior convictions and out of the absence of certain mitigating factors. Id.*, ¶¶ 65-66, at 29-30.

The three arguments identified above will be addressed together, as parts of the same claim.  Burton alleges that, because he did not offer evidence tending to show that he lacked a significant criminal history — a statutory mitigating factor[63] — his rights were violated when the prosecutor elicited testimony about his criminal history from clerks and law enforcement officers, and offered documentary evidence of his prior convictions.  According to Burton, the prosecutor acted improperly when he "disprove[d] an irrelevant mitigator."  (Doc. no. 9 at 28-29).  Burton additionally declares that the prosecutor's actions improperly converted evidence of his prior

---

    [63] Alabama Code § 13A-5-51(1) provides that: "Mitigating circumstances shall include, but not be limited to, the following:  (1) The defendant has no significant history of prior criminal activity; . . . ."

criminal history into a non-statutory *aggravating* factor.  *Id.* at 29-30.

The pertinent portion of the opinion of the Alabama Court of Criminal Appeals

addressing these contentions on direct appeal reads as follows:

> The appellant next argues that the prosecutor committed error in his
> closing argument in the penalty phase.  Initially, we observe that no
> objection was made to this during trial.  "[T]he failure to object will
> weigh against any claim of prejudice."  *Ex parte Hart*, 612 So. 2d at 537.
>
> . . . .
>
> The appellant . . . contends that he was prejudiced by the prosecutor's
> argument concerning his history of criminal conduct.  The appellant
> argues that the following argument presented nonstatutory aggravating
> factors for the jury to consider.
>
> > "The mitigating circumstances, I would like to go over each
> > of those with you because it's [sic] matters for y'all to consider.
> > The mitigating circumstances, but they are not limited to just
> > these.  And there will be another Code section.  They are limited
> > to anything that this jury wishes to consider relative to character
> > or other matters.  Number one, the defendant has no significant
> > history of prior criminal activity.   The State is allowed to
> > introduce into evidence documents, and you have heard the
> > witnesses.  And I know it took a long time, but we have to prove
> > that this man is the same man that was convicted in these cases
> > that go back to 1970 or 1971. . . .
> >
> > "So, I would submit to you that the Defendant in this
> > particular case does not have that. . . .  He has a significant
> > history of criminal activity.  So, he would not meet that first
> > mitigating circumstance that says the defendant has no
> > significant history of prior criminal activity when, in fact, he's
> > got, I submit to you, a substantial record.  And, in fact, going
> > back probably 20 years of criminal activity.

"....

"Six, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Impaired by some mental defect or something like that.  There is no evidence to that.  *And certainly if anybody knows the criminal justice system and the criminal laws, it is the defendant.  Because he certainly had plenty of experience with the court system and plenty experience with the police and criminal justice system.*"

(Emphasis added.)  This was not an inappropriate argument.  The prosecutor was going down the list of statutory mitigating circumstances. This court in *McWilliams v. State*, 640 So. 2d 982 (Ala. Cr. App. 1991), *aff'd in part*, *remanded on other grounds*, 640 So. 2d 1015 (Ala. 1993), found that the prosecutor did not err when during his closing argument he went down the list of statutory mitigating circumstances and argued that none applied.

*Burton v. State*, 651 So. 2d at 656-57 (emphasis in original).

Burton contends the appellate court's decision is both contrary to, and an

unreasonable application of, clearly established federal law.  He argues that

the Supreme Court specifically pronounced a rule that mitigating circumstances are to be presented by the defense, whereas aggravating circumstances are to be presented by the State.  *See i.e., Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Dawson v. Delaware*, 503 U.S. 159, 167 (1992); *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987).  In a state such as Alabama where the sentencer is required to weigh the mitigating factors against the aggravating factors, there is Eighth Amendment error when the sentencer weighs an invalid aggravating circumstance in reaching the ultimate decision to impose a death sentence.  *Sochor v. Florida*, 504 U.S. 527, 533 (1992).

(Doc. no. 21 at 131-32).  Nothing in the opinions cited by Burton supports his

contention that "the Supreme Court specifically pronounced a rule that mitigating circumstances are to be presented by the defense, whereas aggravating circumstances are to be presented by the State," or his argument that the prosecutor's actions transposed the evidence of Burton's criminal history into an "invalid non-statutory aggravating circumstance."[64]

Burton's real argument is that the prosecution should be constitutionally prohibited from presenting evidence to *negate* a statutory mitigating circumstance *unless* the defense proffers evidence to *prove* that circumstance.  Burton fails,

---

[64] For example, the Supreme Court's opinion in *Lockett v. Ohio*, 438 U.S. 586 (1978), holds only that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604.

In the portions of *McCleskey v. Kemp,* 481 U.S. 279 (1987), upon which Burton relies, the Supreme Court was simply analyzing whether Georgia's capital punishment statute violated the equal protection clause because it was applied in a racially discriminatory manner. *See id*. at 306-07.

Burton's reliance on *Dawson v. Delaware*, 503 U.S. 159 (1992), also misses the point. Dawson, a member of the Aryan Brotherhood, was convicted of capital murder while on escape from a Delaware prison.  Prior to the sentencing phase of trial, the prosecutor and defense stipulated that evidence concerning the group would be limited to the following: "that an Aryan Brotherhood prison gang originated in California in the 1960's, that it entertains white racist beliefs, and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood." *Id.* at 165.  The Supreme Court found the stipulation was so narrowly tailored that it rendered the information irrelevant to Dawson's sentencing hearing. *Id*. at 165-68.  The Brotherhood was also deemed to be irrelevant because the murder had no racial overtones, and the prosecution presented no evidence showing that the Brotherhood had committed or endorsed violent acts that would pertain to future dangerousness.  Because of these two factors, the Court found that the prosecutor could not use Dawson's membership in the Aryan Brotherhood as evidence of bad character in order to rebut mitigating evidence presented by Dawson of his good character. *Id*. at 167-68.

Finally, the Supreme Court's opinion in *Sochor v. Florida*, 504 U.S. 527 (1992), only questioned whether Florida's statutory aggravating factor pertaining to the heinousness of the crime that had been committed was unconstitutionally vague on its face, and whether the trial court's jury instruction regarding the heinousness factor was impermissibly vague.

107

however, to cite *any* Supreme Court precedent to that effect, or holding that:  (*a*) a defendant's criminal history is *per se* irrelevant to the question of individualized sentencing; or (*b*) holding that a defendant's criminal history is irrelevant when the absence of a significant criminal history is a statutory mitigating factor, *and*, the defense makes no effort to prove the factor; or (*c*) holding that a defendant's criminal history is irrelevant even when the defendant has presented background evidence of his good character.  Thus, Burton has failed to show that the state court's adjudication of the claim is contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, the claim is due to be denied.

**G.**   *The trial court violated Mr. Burton's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments when it did not give an accomplice corroboration instruction.  See* doc. no. 9, ¶¶ 67-71, at 30-32.

**H.**   *The trial court violated Mr. Burton's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments when it neglected to instruct the jury to determine whether Barbara Spencer Long was an accomplice.  Id.,* ¶¶ 72-79, at 32-35.

    **1**.   *Ms. Long was an accomplice.  Id.,* ¶¶ 73-75, at 33-34.

    **2**.   *The trial court should have given a corroboration instruction.  Id.,* ¶¶ 76-79, at 34-35.

Claims G and both sub-parts of Claim H, will be addressed as one, because all involve the concept of complicity, accomplice culpability, and jury instructions addressing those issues.  Burton argues that LuJuan McCants's testimony clearly made

him an accomplice as a matter of Alabama law; and, the testimony of Barbara Spencer[65] created a question of fact as to whether she was an accomplice under Alabama's definition of complicity — an issue for jury determination.  (*See* doc. no. 9 at 31-33).  Burton further contends that Alabama law required the testimony of McCants and Barbara Spencer to be "independently corroborated" before it could be considered by the jury, and that corroboration was nonexistent in his case.  *Id.* at 31 (citing, *e.g.*, *Hodges v. State*, 500 So. 2d 1273, 1275 (Ala. Crim. App. 1986) ("[A] witness is an accomplice 'and his testimony must be corroborated if he admits knowledge of and participation in the offense.'")).[66]  Burton therefore  claims that the

---

[65] Burton refers to this individual as "Barbara Long."  At trial, she identified herself as Barbara Jean Spencer, but admitted on cross-examination that she also was sometimes known as Barbara Long.  (R. Vol. 5, at 575, 589).  The Alabama Court of Criminal Appeals identified her as Barbara Spencer; therefore, to avoid confusion, this court will do so as well.

[66] The holding of the Alabama Court of Criminal Appeals in the *Hodges* case is captured in the following extract:

> An accomplice's testimony must be supported by evidence connecting the defendant with the commission of the offense rather than merely showing that the offense occurred or the circumstances thereof.  *Code of Alabama* 1975, § 12-21-222; *Miles v. State*, 476 So. 2d 1228 (Ala. Cr. App. 1985); *Jackson v. State*, 451 So. 2d 435 (Ala. Cr. App. 1984).  "The burden of proving a witness is an accomplice for the purposes of invoking the rule of § 12-21-222 is on the defendant." *Moon v. State*, 460 So. 2d 287, 290 (Ala. Cr. App. 1984).  "Whether a witness is an accomplice may be a question of law or fact, depending on the circumstances.  Where there is a doubt or dispute concerning the complicity of a witness and the testimony is susceptible to different inferences on that point, the question is for the jury.  See *Jacks v. State*, 364 So. 2d 397 (Ala. Crim. App.), *cert. denied*, 364 So. 2d 406 (Ala. 1978)." *Ex parte Bell*, 475 So. 2d 609, 611-12 (Ala. 1985), *cert. denied*, *Bell v. Alabama*, 474 U.S. 1038, 106 S. Ct. 607, 88 L. Ed. 2d 585 (1985).  "The mere fact that a witness is indicted for the same crime as the defendant does not per se raise a presumption that he was an accomplice.  *Jacks, supra.*" *Washington v. State*, 401 So. 2d 236, 239 (Ala. Cr. App. 1981), *writ denied*, *Ex parte Washington*, 401 So. 2d 241 (1981).  A

trial court judge violated his constitutional rights by failing to instruct the jury to determine whether witness Barbara Spencer was an accomplice, and failing to instruct the jury that the testimony of LuJuan McCants and Barbara Spencer (if she were determined by the jury to have been an accomplice) required independent corroboration before it could be considered by the jury.

The relevant portions of the opinion of the Alabama Court of Criminal Appeals on direct appeal reads as follows:

> The appellant next argues that the trial court committed reversible error in failing to instruct the jury on the law relating to accomplice corroboration. § 12-21-222, Code of Alabama 1975. Again no objection was made to the lack of this instruction.
>
> The appellant maintains that Barbara Spencer and LuJuan McCants were accomplices and that, therefore, any testimony by them had to be, according to law, corroborated. § 12-21-222.
>
> From the record *it is clear that Barbara Spencer was not an accomplice*, *as a matter of law*. There was absolutely no evidence that she took part in any discussions concerning the robbery or the actual crime. She testified that she did receive $100 from the proceeds, which she said she gave to McCants. *However*, *this action alone would not make her an accomplice*. "An accomplice is defined as '"an associate in

---

witness may be an accomplice as a matter of law and his testimony must be corroborated if he admits knowledge of and participation in the offense. *Peoples v. State*, 418 So. 2d 935, 938 (Ala. Cr. App. 1982). "The classic test to determine whether a witness is an accomplice is whether he could be indicted and convicted for the same offense for which the accused is then being tried." *Lewis v. State*, 414 So. 2d 135, 138 (Ala. Cr. App. 1982), *writ denied*, *Ex parte Lewis*, 414 So. 2d 140 (Ala. 1982).

*Hodges v. State*, 500 So. 2d 1273, 1275 (Ala. Crim. App. 1986).

110

crime; a partner or partaker in guilt.'" *Darden v. State*, 12 Ala. App. 165, 167, 68 So. 550, 551 (1915)." *Jacks v. State*, 364 So. 2d 397, 401-402 (Ala. Cr. App.), *cert. denied*, 364 So. 2d 406 (Ala. 1978).

McCants, however, freely admitted to participating in the crime and was clearly an accomplice to the robbery-murder. *The court should have instructed the jury concerning the need for corroborative evidence of McCants's testimony. However, the failure to do so does not mean that this cause must automatically be reversed. Automatic reversal exists only when the error* "*necessarily render*[s] *a trial fundamentally unfair.*" *Rose v. Clark*, 478 U.S. 570, 3105 [sic: correct point cite is 577], 106 S. Ct. 3101, 3106, 92 L. Ed. 2d 460 (1986). Alabama has applied the harmless error analysis in a case involving the death penalty to the failure of the court to instruct the jury on the principle of accomplice corroboration. *Gurley v. State*, 639 So. 2d 557 (Ala. Cr. App. 1993); *Frazier v. State*, 562 So. 2d 543, 558 (Ala. Cr. App.), *rev'd on other grounds*, 562 So. 2d 560 (Ala. 1989).

As Judge Bowen stated in *Gurley*:

"[T]*he error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of an accomplice has in fact been corroborated. Frazier v. State*, 562 So. 2d 543, 558 (Ala. Cr. App.), *reversed on other grounds*, 562 So. 2d 560 (Ala. 1989). *Accord People v. Brunner*, 797 P.2d 788, 790 (Colo.App.1990); *State v. Brown* [187 Conn. 602], 447 A.2d 734, 740 (Conn.1982); *Ali v. United States*, 581 A.2d 368, 377-78 (D.C.App.1990), cert. denied, 502 U.S. 893, 112 S. Ct. 259 [116 L. Ed. 2d 213] (1991); *Strong v. State* [261 Md. 371], 275 A.2d 491, 495 (Md.1971), *vacated on other grounds*, 408 U.S. 939 [92 S. Ct. 2872, 33 L. Ed. 2d 760] (1972); *State v. England*, 409 N.W.2d 262, 265 (Minn. App. 1987).

"'Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice.' *Andrews v. State*, 370 So. 2d 320, 322 (Ala. Cr. App.), *cert. denied*, 370 So. 2d 323 (Ala. 1979) . . . .

"In *Hood v. State*, [598 So. 2d 1022 (Ala. Cr. App. 1991) ] this Court observed:

> "'The appellant . . . insists that because the "for hire" element of the capital offense was not independently corroborated, the State did not establish a prima facie of capital murder.  That is not the law in Alabama.
>
> "'As early as 1867, our Supreme Court held that a charge requiring corroboration of "every material part" of an accomplices's testimony "went beyond the requirements of the statutory rule, or any rule recognized by the common law." *Montgomery v. State*, 40 Ala. 684, 688 (1867).  More recently, in *Ex parte Bell*, 475 So. 2d 609, 613 (Ala. 1985), a capital case, the court held that Ala.Code 1975, § 12-21-222, "does not require corroborative testimony as to material elements of the crime; it only requires other evidence 'tending to connect the defendant with the commission of the offense.' "  See also *Andrews v. State*, 370 So. 2d 320 (Ala. Cr. App.), cert. denied, 370 So. 2d 323 (Ala. 1979), wherein this court observed:
>
>> " ' "The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice.  'Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' . . . Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice.'

"*Hood v. State*, 598 So. 2d at 1024-25."

> *Gurley*, 639 So. 2d at 561-62.  See also *Solis v. State*, 792
> S.W.2d 95 (Tex.Cr.App.1990).
>
> Here, there was absolutely no doubt that McCants's testimony was
> corroborated by other evidence presented at trial.  No plain error exists
> here.

*Burton v. State*, 651 So. 2d at 653-54 (emphasis supplied).

Burton argues the foregoing decision is contrary to Supreme Court precedent because the failure of the trial court to give an accomplice liability instruction to the jury in connection with the testimony of Barbara Spencer, and a corroboration instruction in connection with the testimony of both Spencer and McCants, "created a 'reasonable likelihood that the jury . . . applied the challenged instruction in a way that violates the constitution.'"  (Doc. no. 21 at 106 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

As noted above, the Alabama Court of Criminal Appeals concluded, on the basis of the evidence before that court, that Barbara Spencer was not an accomplice as a matter of Alabama law.  "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)).

Moreover, the United States Supreme Court has made it clear that, in the context of jury instructions,

[t]he only question for [the habeas court] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973); see also *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 1736-37, 52 L. Ed. 2d 203 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L. Ed. 2d 431 (1974) (" '[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]' "). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147, 94 S. Ct., at 400-01. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 1198, 108 L. Ed. 2d 316 (1990). And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 674, 107 L. Ed. 2d 708 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid*.

*Estelle v. McGuire*, 502 U.S. 62, 73 (1991) (footnote omitted). *See also Jones v. United States*, 527 U.S. 373, 389-90 (1999) (reaffirming the standards set out in *Estelle*, particularly in the context of an instruction to which there had been no objection).

The absence of the instructions about which Burton complains did not render his trial fundamentally unfair. Burton's assertion that corroboration was nonexistent is not correct: the record is replete with it, as evidenced by the Alabama Court of Criminal Appeals' encapsulation of the facts surrounding the offense. *See Burton v.*

114

*State*, 651 So. 2d 641, 643-44 (Ala. Crim. App. 1993).   There is no reasonable likelihood that Burton's trial was rendered fundamentally unfair by the trial court's failure to give the jury instructions about which Burton complains.   These claims are due to be denied.

I.    *The trial court's failure to properly instruct the jury to find a "particularized intent to kill" violated Mr. Burton's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See doc. no. 9, ¶¶ 80-86, at 36-38.*

   1.    *The trial court never defined key terms in its instruction.  Thus, the court failed to properly charge the jury on intent to kill.  Id., ¶¶ 81-83, at 36-37.*

Burton alleges that the trial court "never adequately defined 'a murder of intentional type' or 'specific intent[,]' " and that the "deficient instructions allowed the jury to find him guilty based solely on accomplice liability."  (Doc. no. 9 at 36; *see also* doc. no. 21 at 79 (quoting R. 894-95, 900-01)).  Since a specific intent to kill is a required element of capital murder, Burton argues there is a "'reasonable likelihood that the jury . . . applied the challenged instruction in a way that violates the Constitution.'"  (Doc. no. 9 at 36 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).  Specifically, Burton argues that, if the jury found the murder occurred during the course of a robbery, and that he participated in the robbery, there was nothing in the instructions of the trial court to foreclose the possibility that the jury would convict him of capital murder without ever finding that he *individually* possessed a

115

particularized intent to kill, nor would the instructions "account for [Burton's] major

participation plus reckless indifference necessary to convict him with the requirements

of *Tison* [*v. Arizona*, 481 U.S. 137 (1986)]."  (Doc. no. 21 at 79-80).

The Alabama Court of Criminal Appeals addressed this claim in the following

manner on direct appeal:

> The appellant next argues that the trial court erred in its instructions
> to the jury at the guilt phase.  Initially we observe that after the court
> gave its charge to the jury, defense counsel announced that he was
> satisfied.  Thus[,] because no objections were made to any instructions,
> either those given or those not given by the trial court, this court must
> apply the plain error rule.  Rule 45A,  A. R. App. P.

> We must view the entire instructions as a whole.  "[T]he entire
> charge must be construed as a whole and . . . the language of the charge
> must be given a reasonable construction, and not a strained and
> unreasonable one."  *Carroll v. State*, 599 So. 2d 1253, 1270 (Ala. Cr.
> App. 1992), aff'd, 627 So. 2d 874 (1993).  See also *Kuenzel,* supra.

> Initially, the appellant argues that the court's instruction on the
> element of intent was erroneous.

> To be convicted and sentenced to death in Alabama, the individual
> must have a  "particularized intent to kill."  *Kennedy v. State*, 472 So. 2d
> 1092 (Ala. Cr. App. 1984), aff'd, 472 So. 2d 1106 (Ala.), cert. denied,
> 474 U.S. 975, 106 S. Ct. 340, 88 L. Ed. 2d 325 (1985).  See also §§
> 13A-2-23, 13A-5-40(a)(2),(b),(c),(d), 13A-6-2(a)(1), Code of Alabama
> 1975.  The jury must be charged on specific intent.  *Kennedy*.

> Here the trial court gave the following instruction:

> > "This indictment charges the Defendant with a capital
> > murder, being murder during robbery.  If you are convinced
> > beyond a reasonable doubt that the Defendant committed the

116

crime of murder of the intentional killing type during a robbery in the first degree as alleged in the indictment, it would be your duty to find the Defendant guilty of a capital offense.

"The two components of a capital offense are robbery in the first degree and murder of the intentional killing type committed during the robbery in the first degree.

". . . .

". . . Now, a defendant commits the crime of murder of the intentional killing type if, with intent to cause the death of another person, he causes the death of that person or another person. A person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct.

"The Defendant must **intentionally, as opposed to negligently, accidentally, or recklessly, cause the death of the deceased** in order to invoke the capital offense. *The fact that someone dies or is killed during the course of a robbery does not automatically provide that intent. The intent to kill must be real and specific in order to invoke the capital statute*."

(Emphasis added.)

The court thoroughly instructed the jury on intent and gave the following instruction concerning complicity:

"Now, the following law of complicity would **only** apply **relative to the intentional killing element of capital murder. If you find that a murder of the intentional killing type of Doug Battle was committed by some person or persons other than the Defendant, the Defendant is guilty of that intentional killing type of murder if, but only if, you find beyond a reasonable doubt either that the Defendant intentionally procured, induced, or caused the other person or persons to commit the crime or that the Defendant**

117

> **intentionally aided or abetted the other person or persons in the commission of the murder.**
>
> The trial court correctly charged the jury on the element of intent applicable to capital cases. No plain error occurred here.

*Burton v. State,* 651 So. 2d at 652-53 (italicized emphasis in original, boldface emphasis supplied).

Burton argues that the appellate court's adjudication of this claim is contrary to, and an unreasonable application of, the rule "clearly established" by the Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 784 (1982), because his "case is closely analogous" to *Enmund*. (Doc. no. 21 at 77, 82). Burton also suggests that it is not clear whether this court is bound by the statutory presumptions of § 2254(d), "because the state did not purport to address the federal constitutional questions presented by the claim," and the state appellate court "did not resort to any federal law in its analysis. Moreover, the United States Supreme Court has declared that *de novo* review is appropriate for *Tison/Enmund* claims." (Doc. no. 21 at 80-81 (citing *Tison v. California*, 481 U.S. 137, 155-56 n.11 (1987)).

Even if this court examines Burton's claim *de novo*, it is without merit. The manner in which the trial court judge defined specific intent as an element of capital murder in Burton's case is not contrary to, or an unreasonable application of, Supreme Court precedent as established in the *Enmund* opinion. Indeed, *Enmund permits* the

jury instructions given in Burton's case.  On the date *Enmund* was decided, Florida did

not require a specific intent to kill as an element of capital murder when the homicide

occurred during the course of a robbery.  The Supreme Court recounted the underlying

facts as follows:

> [T]he Florida Supreme Court held that the record supported no more than
> the inference that Enmund was the person in the car by the side of the
> road at the time of the killings, waiting to help the robbers escape.  This
> was enough under Florida law to make Enmund a constructive aider and
> abettor and hence a principal in first-degree murder upon whom the death
> penalty could be imposed.  It was thus irrelevant to Enmund's challenge
> to the death sentence that he did not himself kill and was not present at
> the killings; also beside the point was whether he intended that the
> Kerseys be killed or anticipated that lethal force would or might be used
> if necessary to effectuate the robbery or escape.

*Enmund*, 458 U.S. at 788.  The Supreme Court concluded, on the basis of those facts,

"that imposition of the death penalty in these circumstances is inconsistent with the

Eighth and Fourteenth Amendments," because the punishment exceeded the crime.

*Id.* at 788, 797.  Stated differently, the Court held that "imposition of the death penalty

on one such as Enmund who aids and abets a felony in the course of which a murder

is committed by others *but who does not himself* kill, attempt to kill, or [individually]

*intend that a killing take place or that lethal force will be employed*," violates the

Eighth Amendment.  *Id.* at 797 (emphasis supplied).

Interestingly, the Court arrived at its conclusion in *Enmund*, in part, by

examining how thirty-six other states viewed the matter, and in so doing noted that

Alabama made "knowing intentional, purposeful or premeditated killing an element of capital murder." *Id.* at 789-90 (footnote omitted). Therefore, Alabama "actors in a felony murder are not subject to the death penalty without proof of their mental state." *Id.* at 790-91.[67] The Supreme Court subsequently characterized its holding in *Enmund* as "explicitly permitting the death penalty in at least those cases where the felony murderer intended to kill and forbidding it in the case of a minor actor not shown to have had any culpable mental state." *Tison v. Arizona*, 481 U.S. 137, 156 (1987).

The jury instructions given by the trial court judge in Burton's case were neither contrary to, nor an unreasonable application of, the Supreme Court's holding in *Enmund*. Burton's argument that the court's complicity instruction failed "to indicate to which crime it was referring" (doc. no. 21 at 81) is contradicted by the record. For additional reasons that will be set out in more detail in the following section, Burton's assertion that the trial court invited the jury to convict him of capital murder, "[a]bsent any proof that [he] actually killed or intended to kill anyone," lacks foundation. *Id.*

**2**.     *The evidence was insufficient to find that Mr. Burton had the intent to*

---

[67] Elsewhere, the *Enmund* Court observed that Alabama does not "allow the death penalty to be imposed solely because the defendant participated in a robbery in the course of which a murder was committed . . . [or] for an unintended felony murder if sufficient aggravating circumstances are present to outweigh mitigating circumstances." *Enmund*, 458 U.S. at 792 n.14.

*kill*.  *See* doc. no. 9, ¶¶ 84-86, at 37-38.

Burton alleges that he was "deprived of due process, a fair trial, and a reliable

sentencing determination" because "the State did not come close to meeting its burden

of proving beyond a reasonable doubt that [he, individually,] had the intent to kill."

(Doc. no. 9 at 37-38).  As support for this contention, Burton argues that the State did

not produce any witnesses who testified he intended to kill anyone; that the State's

evidence established, at best, that he merely intended to rob the Auto Zone store; and

that he had no knowledge that DeBruce shot anyone, because he was outside the store

when the victim was killed.  *Id.*

The relevant portions of the opinion of the Alabama Court of Criminal Appeals

addressing this contention on direct appeal read as follows:

> Under § 13A-5-53(b)(3), this court must address whether the
> appellant's sentence to death was disproportionate to or excessive when
> compared to the sentences imposed in similar cases.  It was neither.  *The
> appellant argues that because he was not the triggerman and did not
> intend to kill he should not be sentenced to death.*
>
> "In *Enmund v. Florida*, 458 U.S. 782, 797 [102 S. Ct. 3368,
> 3368, 73 L. Ed. 2d 1140] (1982), the Court held that the death
> penalty is unconstitutional for one who 'does not himself kill,
> attempt to kill, or intend that a killing take place or that lethal
> force will be employed.'  In *Tison v. Arizona*, 481 U.S. 137 [107
> S. Ct. 1676, 95 L. Ed. 2d 127] (1987), the Court held that it was
> not cruel and unusual punishment to impose the death penalty
> upon a defendant who played a significant role in the felony that
> resulted in murder and who acted with reckless indifference to
> human life.  The rule that has evolved from *Enmund* and *Tison*

is that the death sentence is disproportionate under the Eighth Amendment for the non-triggerman who was not present at the scene and did not intend that anyone be killed; *however*, *it is permissible under the Eighth Amendment for felony murderers who* actually killed, attempted to kill, or *intended that a killing take place or that lethal force be used*.

"....

"Applying the *Enmund* test to the instant case, we find that appellant was sufficiently involved in the killing to constitutionally authorize the application of the death penalty to her, even though she was an accomplice non-triggerman."

*Haney*, 603 So. 2d at 386.

The appellant played a significant part in the robbery-murder. Although he was not the actual person to pull the trigger, the appellant's degree of participation in the robbery-murder makes the application of the death sentence constitutional in this case.

*Burton v. State*, 651 So. 2d at 658-59 (emphasis supplied) (bracketed alterations in original).

The Alabama Court of Criminal Appeals correctly identified the Supreme Court decisions addressing the constitutionality of imposing death as a penalty upon a person who participated in a robbery, but who neither killed anyone during the course of the robbery, nor possessed the individualized intent "that a killing take place or that lethal force be used." In *Tison v. Arizona*, 481 U.S. 137 (1987), for example, the Court observed that its prior opinion in *Enmund* held that

when "intent to kill" results in its logical though not inevitable

consequence — the taking of human life — the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances.  Similarly, we hold that *the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death* represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Tison*, 481 U.S. at 157-58 (emphasis supplied).  The *Tison* Court also observed that Alabama is among "a small minority of those jurisdictions imposing punishment for felony murder [that] have rejected the possibility of a capital sentence absent an intent to kill, *and we do not find this minority position constitutionally required*."  *Id*. at 154 n.10 (emphasis supplied).  The Court reiterated this observation later in the *Tison* opinion, by again observing that

> [o]nly a small minority of those jurisdictions imposing capital punishment for felony murder have rejected the possibility of a capital sentence absent an intent to kill, *and we do not find this minority position constitutionally required*.  We will not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here.  Rather, *we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement*.

*Id*. at 158 (emphasis supplied) (footnote omitted).[68]

---

[68] In the omitted footnote, the Court said:

> Although we state these two requirements separately, they often overlap.  For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life.  Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that

In determining whether Burton's death sentence is constitutionally sound, it must be remembered that all factual determinations made by the state courts in the process of determining Burton's degree of culpability are entitled to a presumption of correctness; and, of equal importance, Burton bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); *see also*, *e.g.*, *Smith v. Dugger,* 840 F.2d 787, 792-93 (11th Cir. 1988) (observing that the Supreme Court had "determined that the requisite culpability finding should be made at some level in state court . . . [and] such a finding is entitled to a presumption of correctness in federal court") (citing *Cabana v. Bullock*, 474 U.S. 376, 387-88 (1986)).

Findings of fact addressing the question of whether the evidence adduced in Burton's trial established that he possessed the requisite, individualized intent to kill can be found in the opinion of the Alabama Court of Criminal Appeals on direct appeal, and, by the orders entered by the trial court judge at the time of sentencing. For example, the appellate court made the following findings with regard to Burton's culpability: "The appellant played a significant part in the robbery-murder.  Although he was not the actual person to pull the trigger, the appellant's degree of participation

---

fact would still often provide significant support for such a finding.

*Tison*, 481 U.S. at 158 n.12.

in the robbery-murder makes the application of the death sentence constitutional in this case." *Burton v. State*, 651 So. 2d 641, 658-59 (Ala. Crim. App. 1993).

Moreover, the trial court judge made the following findings regarding Burton's involvement in the offense:

[On the morning of August 16, 1991,] as Mr. Battle was traveling to Talladega, the Defendant Charles Burton [and the other co-defendants] were at a place in Montgomery, Alabama, called Gaylord's Place in a home occupied by Barbara Spencer. At about lunch on this day all of these people left Montgomery, Alabama in two cars. Charles Burton left in a red Lincoln and Derrick Anthony DeBruce left in a Blue Chevrolet. Each car had three men in it. They first went to Sylacauga, and were in this city for a period of time. During this time, all of these individuals got into the blue Chevrolet and left the red Lincoln on the south side of Noble Park. Then all of these men go into the Mignon Branch of the City National Bank. All of these men leave the bank and divide back up and the red Lincoln and the Blue Chevrolet left for Childersburg, Alabama and then on to Talladega, Alabama. They arrived in Talladega at about 6:00 or 7:00 p.m. When they arrive in Talladega, they first go to a car wash. At the car wash these men, *led by Charles Burton*, make plans to rob the Auto Zone. *Charles Burton told these individuals that if there was trouble, he would take care of it.* They take the red Lincoln and park it off the by-pass in Talladega and all of these men again get into the blue Chevrolet. Then the defendant and the other individuals go by the Auto Zone to the Dairy Queen and then they move on to the Auto Zone and they park on the right side. The Defendant, Charles Burton, is the first to [g]o into the store and the rest of the individuals . . . go in individually and they mill around throughout the store. Charles Burton gets a can of Freon and some other items and he goes up to the counter to pay for said items. At this time, there were several customers in the store other than the defendant and his accomplices. While Charles Burton is at the counter, his accomplices come out with guns and announce that this is a robbery and everyone hit the floor. *Charles Burton put a gun to Larry McCardle's head* and took him to an area where the safe is located and ordered McCardle to open the safe and turn over all of the money. While

this is taking place the other men are robbing the customers of the store. At about this time, the victim, Doug Battle, comes into the store, where he realized that a robbery is in progress.  At this point, co-defendant LuJuan McCants ordered the victim to go to the floor, but he did not go down.  McCants ordered him to the floor a second time, but he did not go down.  At this time Derrick Anthony DeBruce comes up on Mr. Doug Battle and hits him in the head knocking him down.  While Mr. Battle was lying face down on the floor Derrick DeBruce shot Mr. Battle in the back, which ultimately killed him.  Then the Defendant, Charles Burton, and the other co-defendants go back to Gaylord's Place in Montgomery, Alabama, where they divide up the money.

The murder of the victim, Doug Battle, was of the intentional killing type while the defendant was committing robbery in the first degree.  *The defendant possessed all of the requisite intent to sustain a conviction as charged in the indictment.  Further, the defendant was forty-one years of age at this time* and had been convicted of eight prior felonies including one robbery.  *He was the head of the gang and made plans for the robbery.*  All of the other defendants were either juveniles or young adults.

(R. Vol. 1, Tab. 1, at 107-09 (emphasis supplied)).

These facts — (*i*) the State did not produce a witness who testified that Burton possessed the individualized, particularized intent to kill anyone, (*ii*) Burton did not shoot anyone, and (*iii*) Burton was outside the Auto Zone store when the victim was shot — are not facts that, either individually or collectively, satisfy Burton's burden to overcome, with clear and convincing evidence, the presumption of correctness that attaches to the state courts' factual findings addressing the extent of his culpability for the robbery-murder, even though it is undisputed that he did not physically pull a trigger.  In short, Burton's death sentence is constitutionally sound under the Supreme

126

Court's holdings in *Enmund* and its progeny, and this claim is due to be denied.

**J.**   *The trial court violated Mr. Burton's constitutional rights when it denied Mr. Burton's motion for new trial premised on juror misconduct, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See* doc. no. 9, ¶¶ 87-90, at 38-40.*

Burton alleges that the trial court violated his constitutional rights by denying his motion for new trial, premised upon juror Steven Embry's alleged "failure to respond truthfully to questions on voir dire."  (Doc. no. 9 at 38 (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 554 (1984) (holding that it is necessary for jurors to be truthful during voir dire.); and *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (holding that the right to jury trial guarantees the criminally accused a fair trial by a panel of impartial, indifferent jurors)).

As factual support for this claim, Burton points to two instances in which, he alleges, juror Embry was untruthful.  Burton first alleges that, during voir dire of the venire, juror Embry did not respond to defense counsel's questions asking whether any member of the panel then worked, or had at any time in the past worked, in law enforcement;[69] and yet, at the post-trial hearing on Burton's motion for new trial,

---

[69] One of Burton's defense attorneys asked the following questions to members of the panel of prospective jurors that included Steven Embry during voir dire:

> MR. WILLINGHAM:  [Do] Any of you work as a law enforcement or police officer at this time?
>
> Have any of you ever worked at law enforcement or police officer?

Embry testified that his work in the Talladega Street Department required him to supervise work-release inmates in the performance of lawn maintenance services on city property.  (Doc. no. 9 at 38-39).  Second, when asked during the hearing on the motion for new trial whether he knew that Burton was incarcerated in the Talladega jail during the period between arrest and trial, Embry stated:  "I knew he was there." *Id.* at 39 (quoting R. Vol 9, Tab 28, at 16).  Based upon Embry's responses during the post-trial hearing, Burton argues that Embry had a "substantial connection with law enforcement" and, therefore, committed juror misconduct when he failed to respond affirmatively to defense counsel's voir dire questions asking whether any member of the venire then worked, or had at any time in the past worked, in law enforcement. (Doc. no. 21 at 109-110).  He declares that Embry's failure to answer deprived him of a challenge for cause or peremptory strike to remove Embry from the venire.  *Id.* at 110.

The parties present a number of arguments concerning procedural default issues.

---

[Do] Any of you have any family members that are currently or previously [have] been police officers or law enforcement officers?  Mr. Cottongim.  Who would that be?

JUROR [Cottingim]:  My cousin is chief of police in Sylacauga.

MR. WILLINGHAM:  Anyone else? . . . .

[No answer.]

 (R. Vol. 2 at 32).

Rather than engage in an exhaustive discussion of those arguments, each of which lacks merit, the court has examined the record and, beginning with Burton's presentation of this claim in his post-trial motion for new trial, moves directly to those arguments that are relevant to a resolution of this claim.

Contrary to the allegations contained in Burton's habeas petition and supporting briefs that are summarized in the preceding paragraphs, Burton's actual allegation in his post-trial motion for new trial was that juror Steven Embry had "failed to notify the Court *that he knew the Defendant* and *that he worked at the Talladega City Jail*." (C.R. Vol. 1, Tab. 1, at 85 (emphasis supplied)).

The trial judge conducted an evidentiary hearing at which Burton testified that he had seen Embry at the jail nine or ten times *before trial*, because Embry "was up front.  He checked inmates out." (R. Vol. 8, Tab 28, at 3-4).  He also testified that Embry would come to the window in front of his cell with some detectives and look at him.  He indicated that Embry previously had worn a small mustache.  *Id*. at 4-5.

Embry was called to the stand by Burton's attorney.  (R. Vol. 9, Tab. 29, at 13-19).  Embry testified that he was employed by the City of Talladega Street Department, and that he had gone to the city jail on a date *after Burton's trial* to pick-up some work-release inmates, because his job in the Street Department required him to supervise such persons in the performance of lawn maintenance services on city

property.  *Id.* at 14-15.  Embry added that it was not a customary part of his job to pick-up inmates at the jail, but the street department employee who normally performed that function was off work on the date that he drove to the jail.  Embry admitted that he saw Burton while he was in the jail on that date, and that Burton spoke to him, saying: "I know you.  I know you from somewhere.  You was on my jury."  *Id*. at 15.  Embry testified that, to his knowledge, he had never seen Charles Burton at the City Jail before that incident, and he had not been inside the city jail during the period Burton was incarcerated there prior to trial.  *Id.* at 16.

On cross-examination by the State's attorney, Embry testified that he had worked in the Street Department for nine years.  Twice he testified that his duties did not require him to go to the jail between the date of the Auto Zone robbery in August of 1991 through (and including) his service on the jury that convicted Burton during April of 1992.  *Id.* at 17.

Embry also testified that he had not talked to jailors about Burton, and that he was not allowed to go into that area of the jail where persons involved in the Auto Zone robbery had been incarcerated.  *Id.* at 18.  On the day he and Burton spoke to one another, the hallway door was open, and Burton was only about eight to ten feet from him in the bullpen.  (R. Vol. 9, Tab. 29, at 18-19).

Burton's attorney then rested his case without any argument, so there was no

expansion on the issue as it was framed in the written motion for new trial.  *Id.* at 20.

The state trial judge subsequently entered an order denying the motion for new trial.

He found Embry's testimony to be more credible than Burton's.  His factual findings

read as follows:

> There were several matters presented to the Court alleging grounds for
> a New Trial.  The first matter the Court will speak to is the allegation that
> Juror Steven Embry failed to notify the Court during voir dire
> examination that *he knew the defendant*, and that *he worked at the
> Talladega County Jail*.  In this regard, the Court heard testimony from
> the defendant and juror Steven Embry.  The Court finds that Mr. Embry
> is employed by the Talladega Street Department; that he did supervise
> work release prisoners from the City Jail;[70] that these prisoners were
> normally picked up by a fellow employee; that he did observe the
> defendant at the City Jail, but only after the conviction of the defendant
> and his service as a juror had been concluded; that Mr. Embry never saw,
> conferred with or had personal knowledge of the defendant prior to his
> service as a juror on the defendant's case; and that he had never seen the
> defendant, except in Court prior to defendant's conviction.  Further, the
> Court finds that during voir dire examination Juror Embry answered up
> that he knew the victim's family, that he worked for the City Street
> Department, and that he had heard or read about the case,[71] but could put
> this knowledge out of his mind and render a fair and impartial verdict if
> selected to serve as a juror.  The Court therefore finds Juror Embry was
> a disinterested juror and had no prior knowledge or fixed opinion as to
> the guilt or innocence of the defendant prior to being selected as a juror.
> This ground for a new trial is found to be without merit and is denied.

(R. Vol. 1, Tab. 1, at 88-89 (emphasis supplied, footnotes added)).

---

[70] Embry testified that his normal duties with the city street department were to "[c]ut grass
up in the cemetery and places around town.  I have some Childersberg community work, and take
them around and let them cut grass and stuff."  (R. Vol. 9, Tab. 28, at 18).

[71] Although unmentioned by the trial court, Embry also expressed that he disliked co-
defendants testifying against one another.  (R. Vol. 1, Tab. 2, at 17).

Burton's attorneys then, inexplicably, failed to assert the juror misconduct claim and the trial judge's denial of the motion for new trial on the first step of direct appeal to the Alabama Court of Criminal Appeals.

Even so, Burton raised a juror misconduct claim in the petition for *certiorari* filed in the Alabama Supreme Court. (*See* doc. no. 17 at 60-63, and doc. no. 18 at 60-61). On that occasion, however, Burton's brief framed the claim centering on Embry's alleged juror misconduct in the following manner:

> The Sixth Amendment guarantees an accused the right to be tried by an impartial jury. "In Alabama, a defendant has the right to strike a petit jury from a panel of fair-minded, impartial prospective jurors." *Hunter v. State*, 585 So. 2d 220, n.1 (Ala. Cr. App. 1991). Indeed, this precise issue has recently been addressed by the Alabama Court of Criminal Appeals in *State v. Freeman*, 605 So. 2d 1258 (Ala. Cr. App. 1992)[,] where it held that Mr. Freeman, a death row prisoner, was entitled to a new trial after establishing that the jury foreman failed to disclose during voir dire that he was a former police officer when defense counsel asked all veniremembers with law enforcement backgrounds to identify themselves.

(R. Vol. 11, Tab. 35 at 68). The first sentence of this argument placed the Court on notice that Burton was grounding his claim in the United States Constitution.

As in the case of the substantive claim discussed in Part IV(C) of this opinion *supra*, the Alabama Supreme Court ignored the procedural default worked by the failure of Burton's appellate counsel to assert the juror misconduct claim and the trial judge's denial of the motion for new trial on appeal to the Alabama Court of Criminal

132

Appeals, and addressed the claim as follows:

> As to the two issues raised for the first time on appeal, we conclude there
> was no error. . . . The trial judge did not abuse his discretion in denying
> Burton a new trial.  Burton's motion for a new trial alleged that one juror
> had failed to inform the trial court during voir dire that he worked at the
> city jail.  The trial judge held a hearing on this motion and determined
> that the juror in question had answered honestly during voir dire and that
> this juror had testified that he could render a fair and impartial verdict.
> *Ashley v. State*, 606 So. 2d 187 (Ala. Crim. App. 1992).

*Ex parte Burton*, 651 So. 2d at 660.  That language constitutes a denial of the claim

on its merits.  *See*, *e.g.*, *Peoples v. Campbell*, 377 F.3d 1208, 1235 n.55 (11th Cir.

2004); *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir. 1988).  It also constitutes a

denial based solely upon state law authority.

Burton argues, nevertheless, that:  he fairly presented a federal claim to the

Alabama Supreme Court; that Court failed to rule upon it; and the claim accordingly

is ripe for *de novo* review in this court.  *See Dye v. Hofbauer*, 546 U.S. 1, 2 (2005) (a

federal claim is considered raised in a state court brief even if appellate opinion

incorrectly states otherwise).  Burton concedes the state trial court's factual findings

on his motion for new trial are entitled to a presumption of correctness, but argues that

> he has rebutted any such presumption because he has shown, with clear
> and convincing evidence, that the state court's finding is "objectively
> unreasonable" in light of the record and is an "unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceedings under § 2254(d)-(e)(1).  *See Miller-El v. Cockrell*, 537
> U.S. 322, 340 (2003) (stating that "[d]eference does not by definition
> preclude relief").

133

(Doc. no. 21 at 112).

Burton has not shown by clear and convincing evidence that the state court's factual findings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(2). During voir dire, defense counsel asked if any juror was then working, or had ever worked, as a police officer or law enforcement officer. Juror Embry clearly did not work as a police officer or law enforcement officer. For the previous nine years he had been a civilian employee of the City Street Department who supervised work-release inmates in the performance of lawn maintenance services on city property.

Burton's claim boils down to nothing more than an assertion that Embry should have answered a question that defense counsel never asked during voir dire, or that he should have considered himself to be a "law enforcement officer" simply because he supervised work-release inmates in lawn maintenance. Additionally, it is of no consequence that Embry knew Burton was at the city jail "when the trial started," because a good many people undoubtedly were aware of that fact. Moreover, Embry admitted during voir dire that he had read or heard about the case. (R. Vol. 9, Tab. 28, at 18).

"In order to obtain a new trial . . . a party must first demonstrate that a juror

failed to answer honestly a material question on voir dire, and then further show that

a correct response would have provided a valid basis for a challenge for cause.  The

motives for concealing information may vary, but only those reasons that affect a

juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*

*Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 555-56 (1984).  The state trial

judge examined Embry's responses to the voir dire questions focused upon by Burton,

as well as all other questions asked and answered by Embry, before reaching a

decision that juror Embry had honestly answered the questions asked of him.  Burton

has not shown by clear and convincing evidence that the state court's factual finding

is not entitled the deference it is due.  *See* 28 U.S.C. § 2254(e)(1);[72] *see also*, *e.g.*, *Bell*

*v. Cone*, 535 U.S. 685, 693 (2002) (observing that § 2254(e)(1) "modified a federal

habeas court's role in reviewing state prisoner applications in order to prevent federal

habeas 'retrials' and to ensure that state-court convictions are given effect to the extent

possible under law") (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)); *Fugate*

*v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides

"a highly deferential standard of review for factual determinations made by a state

---

[72] The cited statute provides that:  "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

court"). As such, the state court's decision is neither contrary to, or an unreasonable application of, clearly established federal law. This claim is due to be denied.

**K.** *The trial court's "beyond a reasonable doubt" instruction violated* Cage v. Louisiana, *in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. See* doc. no. 9, ¶¶ 91-94, at 40-42.

Burton alleges that the similarity between the trial judge's instructions on "reasonable doubt," and those found to violate the due process clause in *Cage v. Louisiana*, 498 U.S. 39 (1990), entitle him to habeas relief. (*See* doc. no. 9 at 41). He complains that, as in the *Cage* case, his trial judge "impermissibly lessened the state's burden of proof with its inclusion of terms such as, 'moral certainty,' 'actual doubt,' and 'doubt for which a reason can be assigned.'" *Id.* (quoting R. 905-06, and citing *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)). While Burton concedes that the trial court's description of "moral certainty" as being equivalent to "reasonable doubt" is not *per se* unconstitutional, he argues the problems with the trial judge's reasonable doubt instruction caused the phrase "moral certainty" to "conflict[] with the *Winship* standard." (Doc. no. 9 at 41).[73] Specifically, Burton declares the trial judge's "reasonable doubt instruction, when taken as a whole, created a reasonable likelihood

---

[73] Burton is referring to the Supreme Court's decision styled *In re Winship*, 397 U.S. 358, 364 (1970), and holding — in the context of a New York case finding, on the basis of a preponderance of the evidence, a twelve-year-old boy guilty of a criminal act that, if committed by an adult, would have constituted larceny, and committing the juvenile to a "training school" — that the Due Process Clause of the Fourteenth Amendment mandates that state governments, in *all* criminal cases, prove each and every element of an offense by the historical standard of "proof beyond a reasonable doubt."

136

that the jury would understand the instruction to permit conviction based on proof

insufficient to meet the *Winship* standard." *Id.*

That portion of the opinion of the Alabama Court of Criminal Appeals on direct

appeal discussing this issue reads as follows:

> The appellant further argues that the trial court's reasonable doubt
> instruction was flawed because, he says, the court failed to define the
> phrase "to a moral certainty." The court gave the following instruction
> on reasonable doubt:
>
>> "Now, what is a reasonable doubt? When I say that the
>> State is under the burden of proving guilt beyond a reasonable
>> doubt and to a moral certainty, that does not mean that the State
>> must prove an alleged crime beyond every imaginable or
>> speculative doubt or beyond all possibility of mistake, because
>> that would be impossible. A reasonable doubt means an actual
>> doubt. Could arise out of the testimony in a case or it could arise
>> from a lack of testimony in a case. It is a doubt for which a
>> reason can be assigned, and the expression 'to a moral certainty'
>> means practically the same thing as beyond a reasonable doubt.
>> Because if you are convinced to the point where you no longer
>> have a reasonable doubt, then you are convinced to a moral
>> certainty."
>
> This reasonable doubt instruction given by the court is similar to the
> instruction given in *Smith v. State*, 588 So. 2d 561 (Ala. Cr. App. 1991),
> and found not to violate *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328,
> 112 L. Ed. 2d 339 (1990), and to be a permissible instruction on
> reasonable doubt.

*Burton v. State,* 651 So. 2d 641, 654-55 (Ala. Crim. App. 1993).

It is well known that "[t]he government must prove beyond a reasonable doubt

every element of the charged offense." *Victor v. Nebraska*, 511 U.S. 1, 3 (1994)

137

(citing *In re Winship*, 397 U.S. 358 (1970)).  Even so, the constitution neither requires nor prohibits courts from defining reasonable doubt to juries.  *Id.* at 5.  "Rather, 'taken as a whole, the instruction [must] correctly conve[y] the concept of reasonable doubt to the jury.'"  *Id.* (quoting *Holland v. United States,* 348 U.S. 121, 140 (1954)).  In reviewing the constitutionality of such an instruction, "the appropriate standard is whether there exists a 'reasonable likelihood' that the jury read [or understood] the instruction to lower the required threshold."  *Johnson v. Alabama*, 256 F.3d 1156, 1192 (11th Cir. 2001) (citing, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)) (bracketed alteration added).

Burton relies solely upon the alleged similarity between the reasonable doubt instruction given in his case and the reasonable doubt instruction given in *Cage* to support his contention that the state appellate court's adjudication of this claim was contrary to, and an unreasonable application of, clearly established federal law.  His claim is without merit.

As shown in the following extract from the Supreme Court's opinion, the Louisiana trial judge in the *Cage* case defined the evidentiary standard of "proof beyond a reasonable doubt" as tantamount to "a *grave* uncertainty" and "an actual *substantial* doubt":

> "If you entertain a reasonable doubt as to any fact or element
> necessary to constitute the defendant's guilt, it is your duty to give him

the benefit of that doubt and return a verdict of not guilty.  Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused.  This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture.  *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.  A reasonable doubt is not a mere possible doubt.  *It is an actual substantial doubt*.  It is a doubt that a reasonable man can seriously entertain.  What is required is not an absolute or mathematical certainty, but a moral certainty."

*Cage v. Louisiana*, 498 U.S. 39, 40 (1990) (quoting 554 So. 2d 39, 41 (La. 1989)) (emphasis in original).

In Burton's case, however, the trial judge defined "beyond a reasonable doubt" as simply an "actual doubt" (omitting the objectionable adjective "substantial"), and a "doubt for which reason can be assigned."  He then told the jury that the phrase "moral certainty" meant "practically the same thing as beyond a reasonable doubt," "[b]ecause if you are convinced to the point where you no longer have a reasonable doubt, then you are convinced to a moral certainty."  (R. Vol. 7, Tab. 13, at 906).

This court finds nothing problematic in the trial judge's explanation of reasonable doubt as an actual doubt, and a doubt based on reason.  Moreover, the trial court judge's explanation that the phrase "moral certainty" was a synonym for (*i.e.*, "practically the same thing" as) proof beyond a reasonable doubt was a clarification that comports with the Supreme Court's holding in *Victor v. Nebraska*, 511 U.S. 1, 13-

17 (1994).  There thus is no reasonable likelihood that Burton's jury interpreted the trial judge's instructions as lowering the prosecution's burden of proof.  Burton has failed to show the state court's adjudication of this claim is contrary to, or involved an unreasonable application of, clearly established law, or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court.  Accordingly, the claim is due to be denied.

**L.**   *The trial court improperly instructed the jury, violating Mr. Burton's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See doc. no. 9, ¶¶ 95-104, at 42-45.*

    **1.**   *The trial court improperly instructed the jury that it had a duty to convict.  Id., ¶¶ 96-97, at 42.*

Burton alleges the trial court "told the jury it had a duty to find [him] guilty." (Doc. no. 9 at 42 (citing R. 890, 895)).  He argues that it was unconstitutional to exhort the jury to "'do its job'" by finding him guilty, regardless of the evidence and the court's instructions.  *Id.* (quoting *United States v. Young*, 479 U.S. 1, 18 (1985)).

The relevant portion of the Alabama Court of Criminal Appeals' opinion reads as follows:

> The appellant next argues that the trial court erred in instructing the jury that it had a duty to find the appellant guilty.  However, this argument fails to look at the complete charge that was given to the jury. The court stated the following:
>
> > "This indictment charges the Defendant with a capital murder, being murder during robbery.  If you are convinced

beyond a reasonable doubt that the Defendant committed the crime of murder of the intentional killing type during a robbery in the first degree as alleged in the indictment, it would be your duty to find the Defendant guilty of a capital offense."

Initially, we observe that no objection was made to this instruction. Thus we apply the plain error rule. Rule 45A, A. R. App. P. This instruction was not erroneous. As Judge Bowen stated in *Kuenzel*:

> "In a real sense, a jury does have the 'duty' to convict the accused of the offense charged in the indictment if it finds the accused guilty of that offense beyond a reasonable doubt. 'A jury is not empowered to waive the law or any of its rules — its only power is to take the law of the case as given by the trial judge and apply it to the facts as developed on the trial. Out of this process comes the verdict.' *Patterson v. State*, 45 Ala.App. 229, 236, 228 So. 2d 843, 849 (1969). 'Admonition of the high and sacred duty resting upon juries by nisi prius judges should be encouraged rather than condemned.' *Hope v. State*, 21 Ala.App. 491, 492-93, 109 So. 521, 522 (1926). See also *Dolan v. State*, 81 Ala. 11, 16-17, 1 So. 707, 711 (1887). The trial judge did not violate the principle that '[c]ourts may instruct the jury as to the law of the case, but they may not instruct a jury as to what verdict they shall render in a criminal case on a given statement of facts.' *Woodham v. State*, 28 Ala.App. 62, 64, 178 So. 464, 466 (1938)."

577 So. 2d at 517.

*Burton v. State*, 651 So. 2d 641, 655 (Ala. Crim. App. 1993).

This court has carefully examined the pages of the record upon which Burton bases this claim. Not only did the trial judge clearly link the concept of "duty" to the jury's unanimous conclusion that the defendant's guilt had been proven beyond a reasonable doubt — "If you are convinced beyond a reasonable doubt that the

Defendant committed the crime of murder of the intentional killing type during a robbery in the first degree as alleged in the indictment, it would be your duty to find the Defendant guilty of a capital offense"— he also immediately instructed the jury on the converse circumstances:

> On the other hand, if you are not convinced by the evidence beyond a reasonable doubt that the Defendant committed the crime of murder of the intentional killing type of Doug Battle by the means alleged in the indictment, or if you are not convinced by the evidence beyond a reasonable doubt that said murder of the intentional killing type was committed during a robbery in the first degree, as previously defined for you, committed by the Defendant, then the Defendant cannot be convicted of a capital offense charged in the indictment.

(R. Vol. 7, at 896). The state court's adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the claim is due to be denied.

> **2**.     *The trial court did not clarify the difference between capital murder and robbery/murder.  See* do. no. 9, ¶¶ 98-99, at 43.

Burton alleges that the following instruction given by the trial court regarding the charged offense of capital murder and the lesser included offenses of murder and robbery in the first degree "essentially told the jury that these two [lesser-included] offenses are identical [to the charged offense]":

> The first two lesser included offenses that I want to instruct you relative to are robbery in the first degree and intentional murder.  Both of these charges have been previously defined for you, because they are, in fact, the two components of capital murder which I have defined for

you.  So, I will not further instruct you relative to these particular lesser
included charges and only instruct you to recall these instructions that I
have previously given you.  Therefore, I won't further instruct you
relative to the lesser included charge of intentional murder and robbery
in the first degree.

(Doc. no. 9 at 43 (quoting R. 897)).  Burton argues that his Fifth, Sixth, Eighth, and

Fourteenth Amendment rights were violated because "'[t]he jury is permitted to

consider a verdict of guilt of a non-capital offense 'in every case' in which 'the

evidence would have supported such a verdict.'"  *Id.* (quoting *Hopper v. Evans*, 456

U.S. 605, 610 (1982)).  He asserts that the trial court's instruction informed the jury

that, if it "found [him] guilty of robbery and murder, it in essence found him guilty of

capital murder."  (Doc. no. 21 at 95).  This allegedly deprived the jury of "the 'third

option' of convicting [Burton] of a lesser included offense" as required by *Beck v.*

*Alabama*, 447 U.S. 625 (1980).  *Id.* at 94-95.

Respondent answers that Burton cannot show the denial of these claims by the

Alabama Court of Criminal Appeals was contrary to, or an unreasonable application

of federal law, or based upon an unreasonable determination of the facts in light of the

evidence before the state courts.  (*See* doc. no. 17 at 67-68, and doc. no. 18 at 66-67).

The Alabama Court of Criminal Appeals "reviewed the instructions given by

the [trial] court in the guilt phase in their entirety and [found] them [to be] both

143

thorough and accurate." *Burton v. State,* 651 So. 2d 641, 656 (Ala. Crim. App. 1993).

As a general rule, the failure of a state trial judge to instruct the jury on a lesser included offense (or offenses), even when such an omission is incorrect under state law, does not present a federal constitutional question that can be reviewed in a habeas proceeding. *See*, *e.g.*, *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a mere error of state law is not a denial of due process. If the contrary were true, then every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question."); *Grech v. Wainwright*, 492 F.2d 747, 748 (5th Cir. 1974) (holding that a state trial judge's failure to instruct the jury on lesser included offenses "does not present a federal constitutional question") (citing *Alligood v. Wainwright*, 440 F.2d 642, 643 (5th Cir. 1971); *Higgins v. Wainwright*, 424 F.2d 177 (5th Cir. 1970); *Flagler v. Wainwright*, 423 F.2d 1359 (5th Cir. 1970)).[74]

Rather, a state conviction will be set aside only if the state court's adjudication of a state law issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established *Federal* law," not state law. *See* 28 U.S.C. § 2254(d)(1) (emphasis supplied). *See also*, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-

---

[74] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

court determinations of state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").

Further, this court is not persuaded that the instruction given by the trial judge in Burton's case failed to draw a distinction between the charged offense of capital murder, on the one hand, and, on the other hand, the various lesser-included offenses of murder and robbery in the first degree, among others. Therefore, the trial judge did not deprive the jury of a "non-capital option." Before giving the allegedly deficient instruction, the trial judge already had given a lengthy explanation of the elements of capital murder — an explanation that necessarily included the elements of the offenses of intentional murder and robbery in the first degree. (*See* R. Vol. 7, Tab.13, at 897-98). The trial judge also instructed the jury that,

> in the event you do not find the Defendant guilty of the capital offense as charged in the indictment, you could still nevertheless find the Defendant guilty of a lesser included offense. And I will tell you at this time that there are four lesser included charges embraced in this capital murder indictment.

*Id.* at 896-97. The trial judge then told the jury that two of those four lesser-included-offenses were intentional murder and robbery in the first degree. Rather than repeat the elements of those two lesser-included offenses, the trial judge asked the jury to remember the elements of those offenses when each was defined as a component of the charged offense of capital murder. Then, the trial judge gave the jury explicit

145

instructions on "the *other* two lesser included charges [——] felony murder and manslaughter." *Id.* at 897-98 (emphasis added).  In addition, the separate nature of the four lesser-included-offenses was reiterated to the jury when the trial judge explained the jury verdict forms.  *Id.* at 907-11.  Thus, the trial court judge gave clearly delineated instructions as to capital murder, and each of the four lesser included offenses of capital murder:  intentional murder, felony murder, manslaughter, and robbery in the first degree.

Furthermore, Burton's reliance upon the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980), in an effort to cast doubt on the trial judge's instructions to the jury on lesser included offenses, is misplaced.  *Beck* addressed Alabama's previous capital punishment regimen, under which the trial judge was

> specifically prohibited from giving the jury the option of convicting the defendant of a lesser included offense.  Instead, the jury [was] given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime.  If the defendant [was] convicted and the death penalty imposed, the trial judge [was then required to] hold a hearing with respect to aggravating and mitigating circumstances; after hearing the evidence, the judge [was permitted to] refuse to impose the death penalty, sentencing the defendant to life imprisonment without possibility of parole.

*Beck*, 447 U.S. at 628-29 (footnotes omitted).  The defendant in *Beck* and an accomplice had been charged with the capital offense of an intentional killing during the course of a robbery.  The evidence adduced at trial would have entitled the

defendant in *Beck* to an instruction on "felony murder" as a lesser-included offense, in the absence of the statutory prohibition noted above.

> Because of the statutory prohibition, [however,] the court did not instruct the jury as to the lesser included offense of felony murder. Instead, the jury was told that if petitioner was acquitted of the capital crime of intentional killing in the course of a robbery, he "must be discharged" and "he can never be tried for anything that he ever did to Roy Malone [the victim]." Record 743. The jury subsequently convicted petitioner and imposed the death penalty; after holding a hearing with respect to aggravating and mitigating factors, the trial court refused to overturn that penalty.

*Id*. at 630. Beck appealed, eventually reaching the United States Supreme Court, where he argued that

> the prohibition on giving lesser included offense instructions in capital cases violates both the Eighth Amendment as made applicable to the States by the Fourteenth Amendment and the Due Process Clause of the Fourteenth Amendment by substantially increasing the risk of error in the factfinding process. Petitioner argues that, in a case in which the evidence clearly establishes the defendant's guilt of a serious noncapital crime such as felony murder, forcing the jury to choose between conviction on the capital offense and acquittal creates a danger that it will resolve any doubts in favor of conviction. . . .

*Id*. at 632 (footnote omitted).[75]

---

[75] The Supreme Court granted *certiorari* to decide the following question:

> "May a sentence of death constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict?"

*Beck v. Alabama*, 447 U.S. at 627 (quoting *Beck v. Alabama*, 444 U.S. 897 (1979) (memorandum)).

147

The Supreme Court agreed, and held that Alabama's statutory prohibition on giving lesser-included offense instructions in capital cases was unconstitutional because it substantially increased the risk of prejudicial error in the factfinding process. *See Beck*, 447 U.S. at 637 ("[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense — but leaves some doubt with respect to an element that would justify conviction of a capital offense — the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.").

*Beck* has not been extended by the Supreme Court, however. In fact, the Court has taken pains to explain that *Beck's* holding does not stretch beyond the peculiar facts it addressed. *See id*. at 635 ("Alabama's failure to afford capital defendants the protection provided by lesser included offense instructions is *unique in American criminal law*.") (emphasis supplied) (footnote omitted).

For example, in *Schad v. Arizona*, 501 U.S. 624 (1991), the Court rejected an argument that due process required a jury in a capital case to be instructed on *every* lesser included offense supported by the evidence:

> Petitioner's second contention is that under *Beck v. Alabama*, 447 U.S. 625 (1980), he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery murder. *Beck* held unconstitutional an Alabama statute that prohibited lesser included offense instructions in capital cases. Unlike the jury in *Beck*, the jury here was given the option of finding petitioner guilty of a

lesser included noncapital offense, second-degree murder. While petitioner cannot, therefore, succeed under the strict holding of *Beck*, he contends that the due process principles underlying *Beck* require that the jury in a capital case be instructed on *every lesser included offense supported by the evidence*, and that robbery was such an offense in this case.

Petitioner misapprehends the conceptual underpinnings of *Beck*. Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction *if the only alternative was to set the defendant free with no punishment at all*. We explained:

> "'[O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason — its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason — that, whatever his crime, the defendant does not deserve death . . . . [T]hese two extraneous factors . . . introduce a level of uncertainty and unreliability into the factfinding process that cannot be altered in a capital case." [*Beck*, 447 U.S. at 642-43] (footnote omitted).

We repeatedly stressed *the all-or-nothing nature of the decision* with which the jury was presented. See *id*., at 629, 630. 632, 634, 637, 642-43, and n.19. As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455 (1984), "[t]he absence of a lesser included offense increases the risk that the jury will convict . . . simply to avoid setting the defendant free . . . . The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into *an all-or-nothing choice between capital murder and innocence*." See also, *Hopper v. Evans*, 456 U.S. 605, 609 (1982). The central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.

149

*Schad v. Arizona*, 501 U.S. at 645-47 (emphasis added).

In sum, Burton's assertion that the trial court committed a *Beck* error because his jury was not allowed to consider a non-capital offense as an option when the evidence supported it lacks both merit as a matter of federal law, and, factual support in the record.  For all of these reasons, the claim is due to be denied.

**3**.     *The trial court improperly instructed the jury that its verdict was merely a recommendation.  See* doc. no. 9, ¶¶ 100-101, at 44.

Burton alleges the trial court judge erroneously informed jurors that their verdict during the penalty phase "would be making a 'recommendation concerning what the punishment would be." (Doc. 9 at 44 (quoting R. 1120)).  He argues the state court's denial of the claim on the merits is contrary to, and an unreasonable application of, clearly established federal law because:  "'It is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.'" *Id.* (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985)).

The Alabama Court of Criminal Appeals addressed and rejected this claim in the following manner:

> The appellant next argues that the trial court erred by stating during its instruction in the penalty phase that the jury's decision was a recommendation.  We have previously held that the trial court does not diminish the jury's role or commit error when it states during the jury

150

charge in the penalty phase of a death case that the jury's verdict is a recommendation or an "advisory verdict." *White v. State*, 587 So. 2d 1218 (Ala. Cr. App. 1990), *aff'd*, 587 So. 2d 1236 (Ala. 1991), *cert. denied*, 502 U.S. 1076, 112 S. Ct. 979, 117 L. Ed. 2d 142 (1992).

*Burton v. State*, 651 So. 2d 641, 657 (Ala. Crim. App. 1993).

In his reply brief, Burton demands *de novo* review because this claim allegedly presents a mixed question of law and fact, and because "the Alabama Court of Criminal Appeals [did not address the federal aspect of the claim when it] held only that the trial court gave the correct instruction under Alabama law." (Doc. no. 21 at 99). Alternatively, Burton argues that he is entitled to relief under § 2254(d). *Id.* In any event, Burton asserts that the trial court judge committed error of constitutional proportions by "repeatedly" informing the jurors that their penalty phase verdict was merely a recommendation. *Id.* at 98 (citing R. 1120,1121,1123,1130-33). According to Burton, "[a]bsent correlative language, which stresses the importance of the jury's role in capital sentencing or relevance of the jury's verdict," the trial court's instruction resulted in a *Caldwell* violation. *Id.* at 98-99 (citing *Dugger v. Adams*, 489 U.S. 401, 407 (1989) ("To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.")).

Burton's claim is without merit. The plurality opinion in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), held that remarks by *the prosecutor* in a capital case

151

that misinformed the jury as to the role of *appellate review* violated the Eighth Amendment.  *See id*. at 336 (plurality opinion); *see also id*. at 341-342 (O'Connor, J., concurring in part and concurring in judgment).  In *Dugger v. Adams*, *supra*, the Court addressed the question of whether the principle established in *Caldwell* should be extended to encompass instructions of a state trial judge that informed jurors they were not responsible for the sentence they recommended.[76]  The Court said that its

> decision in "*Caldwell* is relevant only to certain types of comment — those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision."  *Darden v. Wainwright*, 477 U.S. 168, 184, n.15 (1986).  As respondent conceded at oral argument, *if the challenged instructions accurately described the role of the jury under state law, there is no basis for a* Caldwell *claim*.  To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.  See, *e.g.*, Tr. of Oral Arg. 29, 32, 33, and 36-37.  Respondent therefore must be asserting in this case that the trial court's remarks violated state law, and in finding a *Caldwell* violation in this case, the Court of Appeals must have concluded that the remarks in question were error under Florida law.

*Dugger v. Adams*, 489 U.S. 401, 407-08 (1989) (emphasis supplied, footnote omitted).

Since the Alabama Court of Criminal Appeals found that the trial court's instructions were not erroneous under Alabama law, Burton cannot establish a *Caldwell* error.

---

[76] Strictly speaking, the Court's opinion in *Dugger v. Adams*, which arose from a federal habeas case in the Middle District of Florida, addressed the question of whether the Court's decision in *Caldwell v. Mississippi* — which was handed-down after the petitioner's trial in a Florida state court — provided "cause" for excusing the petitioner's procedural default, in failing to challenge the trial court judge's instructions in accordance with state procedures.  *See Dugger*, 489 U.S. at 402.

This claim is due to be denied.

    **4**.   *The trial court improperly instructed the jury that a legal presumption existed against a witness who testified falsely.  See* doc. no. 9, ¶¶ 102-104, at 44-45.

Finally, Burton alleges his right to due process and a fair trial were violated because the trial court gave two instructions that, "singly and in combination . . . destroyed the presumption of innocence to which [he] was entitled throughout the trial." (Doc. no. 9 at 45 (citing, *e.g.*, *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979) (stating that "[a] presumption which, although not conclusive, had the effect of shifting the burden of persuasion to the defendant" would be unconstitutional)).

The first instruction challenged by Burton reads:  "'[I]f a jury believes from the evidence beyond a reasonable doubt that the alibi set up in this case is simulated, false and fraudulent, you may consider this as a circumstance against the Defendant, in connection with the other evidence in the case.'"  (Doc. no. 9 at 44-45 (quoting R. 904)).  The second instruction Burton contends to have been erroneous reads:  "'[If a witness] has corruptly testified falsely to a particular material matter, then you have the right to disregard that witness's entire testimony.'"  *Id.* at 45 (quoting R. 907)).

The Alabama Court of Criminal Appeals addressed these contentions in the following manner:

        The appellant next argues that the trial court erred in instructing the jury that a legal presumption existed against a witness who it [the jury]

153

felt testified falsely.  The court gave the following instruction:

> "Now, it is a duty of a jury to reconcile all of the testimony in the case, and to make it all speak the truth if you can do so.  If you cannot, then, as a juror, you have the right to reject any portion that you believe to be untrue and consider only that which you believe to be true.
>
> "In determining the truth of the testimony in the case, you have the right to do like you would in your ordinary affairs of life; that is, to use your common sense and everyday understanding.
>
> "If you find that any witness in this case has willfully or corruptly testified falsely as to a material matter, then you have the right to take that into consideration in determining just what weight you will give that witness's testimony.  If he or she has corruptly testified falsely to a particular material matter, then you have the right to disregard that witness's entire testimony.  You have the right also to consider any bias, interest, friendship, or relationship or any other matter that might cause the witnesses to depart from the truth."

The appellant argues that this instruction informed the jury that they had to doubt all of the appellant's testimony if they disbelieved any part of it.  We do not agree.  This instruction was not a mandatory instruction that forced the jury to disregard any testimony presented at trial.  The instruction was permissive and this court has found such instruction allowable.  As stated in *Crumpton v. State*, 402 So. 2d 1081 (Ala.Cr.App.), *cert. denied*, 402 So. 2d 1088 (Ala. 1981):

> "Appellant is correct that a *falsus in uno* charge requiring, instead of permitting, the jury to disbelieve a witness is error.  See *Lowe v. State*, 88 Ala. 8, 7 So. 97 (1889); *Watson v. State*, 19 Ala.App. 267, 97 So. 118 (1923); *Butler v. State*, 16 Ala.App. 234, 77 So. 72 (1917).  The charge must be phrased in permissive ('may disregard') rather than mandatory ('must disregard') terms."

402 So. 2d at1087.  See also 4 A.L.R.2d 1077 (1949).

We have reviewed the instructions given by the court in the guilt phase in their entirety and find them both thorough and accurate.

*Burton v. State*, 651 So. 2d at 655-56 (bracketed alteration added).

Burton continues to argue that the instructions effectively told the jury that, if they did not accept any aspect of a witness's testimony, they had to reject all of it, regardless of whether the lack of credibility arose from contradictory factual evidence or a determination that the witness was mistaken or intentionally untruthful.  (*See* doc. no. 21 at 100).  Careful examination of both the trial judge's instruction and the opinion of the state appellate court shows that simply is not the case.  This court concludes that Burton has failed to show that the state appellate court's decision was contrary to, or an unreasonable application of, clearly established federal law,[77] or an

---

[77] Indeed, the instructions of state trial judge quoted in text are somewhat similar to a pattern jury instruction that has been sanctioned by the Judicial Council of the Eleventh Circuit Court of Appeals:  *i.e.*,

Now, in saying that you must *consider* all of the evidence, I do not mean that you must *accept* all of the evidence as true or accurate.  You should decide whether you believe what each witness had to say, and how important that testimony was.  In making that decision you may believe or disbelieve any witness, in whole or in part.  Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions:  Did the witness impress you as one who was telling the truth?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness seem to have a good memory?  Did the witness have the opportunity and ability to observe accurately the things he or she testified about?  Did the witness appear to

155

unreasonable determination of the facts in light of the evidence before the state courts.

This claim is due to be denied.

**M.**  *The trial court not only failed to instruct the jurors at the penalty-phase that they could not consider as substantive evidence the testimony and documentation the state presented on Mr. Burton's prior convictions but also instructed the jury to double count the robbery, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See doc. no. 9, ¶¶ 105-06, at 46.*

Burton alleges the trial court "compounded" prosecutorial error when it instructed the jury to consider "all of the evidence" presented during the penalty phase, but failed to add an instruction informing the jurors that they could not consider Burton's "convictions or any of the related testimony of documentation" as substantive evidence against him.  (Doc. no. 9 at 46 (quoting R. 1134, and citing *Donnelly v. DeChristophero*, 416 U.S. 637, 646-64 (1974)).[78]

---

understand the questions clearly and answer them directly?   Did the witness's testimony differ from other testimony or other evidence?

*Eleventh Circuit Pattern Jury Instructions – Criminal*, Basic Instruction 5, at 11 (2003) (emphasis in original).

[78] The first portion of Burton's argument pertains to the constitutionality of the prosecutor's penalty phase presentation of his prior convictions.  Burton also made these allegations in support of a separate claim, which this court addressed and rejected in Part IV(F) *supra*.

Burton also claims that the trial court erred when it instructed the jury that it could "double-count" the capital offense for which it had convicted Burton as an aggravating factor during penalty phase deliberations.  (*See* doc. no. 9 at 46).  This claim was raised on direct appeal.  (*See* C.R. Vol. 10, Tab. 30, at 63-65).  However, it is without merit.  Dual use of an aggravating circumstance to satisfy an element of the capital offense during the guilt phase and as a factor in the penalty phase is not unconstitutional.  *See Tuilaepa v. California*, 512 U.S. 967, 971 (1994) (citing *Lowenfeld v. Phelps*, 484 U.S. 231, 244-46 (1988) (holding that "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . . .   The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).")).

Respondent contends that this claim was procedurally defaulted, because it was not raised at any time on direct appeal or during Rule 32, collateral review proceedings in the state courts.  (*See* doc. no. 17 at 73-76, and doc. no. 18 at 71).

Burton disagrees that the claim was procedurally defaulted, saying that the Alabama Court of Criminal Appeals denied it on direct appeal by "framing [it] narrowly."  He supports this contention by quoting a portion of the appellate opinion finding that the testimony of two of Burton's co-defendants rendered evidence pertaining to events occurring at the Sylacauga bank admissible at the penalty phase.  (*See* doc. no. 21 at 137-38 (citing *Burton v. State*, 651 So. 2d at 656)).  Burton alternatively argues in a footnote that, if this claim is deemed to have been procedurally defaulted, "ineffective assistance of counsel constitutes cause for the default and that prejudice is established because there is a reasonable probability of a different outcome at the sentencing phase if the evidence had not been admitted." *Id.* at 137 n.27 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Burton's contention that the state appellate court addressed any portion of this claim on direct appeal is not correct.  The court's opinion cannot be construed as addressing this claim by "framing [it] narrowly" or otherwise.  It reads:

> The appellant also argues that by permitting the two codefendants to testify the trial court allowed collateral evidence to be received into evidence that did not relate to his sentence. The two codefendants were questioned about whether they had been at City National Bank in

> Sylacauga earlier on the day of the robbery-murder. Both witnesses denied knowing the appellant. The prosecution then asked about their being at the bank with the appellant on the same day as the murder. All of this evidence was admissible at the penalty phase. "Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence . . ." § 13A-5-45(d), Code of Alabama 1975. The evidence was relevant to show that the men were together on the day of the robbery-murder.

*Burton v. State,* 651 So.2d 641, 656 (Ala. Crim. App. 1993).

Burton did not raise the allegations underlying this claim at trial, on direct appeal, or during collateral review proceedings.   Accordingly, the claim is procedurally defaulted.

Burton's cause and prejudice argument also is without merit.  The Eleventh Circuit has explained that the failure of appellate counsel to recognize and raise a claim on direct appeal *can* constitute "cause" for a procedural default, but "only if the error rises to the level of constitutionally deficient assistance of counsel under the Sixth Amendment."  *Eagle v. Linahan*, 279 F.3d 926, 937 (11th Cir. 2001) (citation omitted).  Specifically:

> The Supreme Court . . . made clear in *Murray v. Carrier*, 477 U.S. 478, 486-87, 106 S. Ct. 2639, 2644, 91 L. Ed. 2d 397 (1986), that "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."  This is true whether the procedural default resulted from counsel's failure to make a claim at trial or failure to raise a claim on appeal.  *Id.* at 492, 106 S. Ct. at 2647 (holding that "counsel's failure to raise a particular claim on appeal is to be scrutinized

under the cause and prejudice standard when that failure is treated as a procedural default by the state courts"). Moreover, attorney error is cause for procedural default only if the error rises to the level of constitutionally deficient assistance of counsel under the Sixth Amendment. *Id.* at 488, 106 S. Ct. at 2645.

*Eagle v. Linahan*, 279 F.3d at 937.

Moreover, a claim of ineffective assistance of trial or appellate counsel must be *both* exhausted *and* not defaulted in state court before it can be asserted as "cause" for a procedural default in this court. *See Hill v. Jones*, 81 F.3d 1015, 1030-31 (11th Cir. 1996). If the ineffective assistance claim is defaulted, then the habeas petitioner must demonstrate independent cause and prejudice excusing the default of the ineffectiveness of counsel claim before that claim can be asserted as "cause" in relation to a second, substantive claim. *Id.* Burton cannot meet this burden because he has never raised any claim (and does not even do so in his habeas petition) that accuses trial or appellate counsel of ineffectiveness regarding the instructions about which he now desires substantive relief. Burton has defaulted his claim of ineffective assistance of counsel in the Alabama courts as it pertains to the allegations of the present substantive claim, and he has not shown independent cause or prejudice excusing that default. Burton therefore cannot rely on his attorneys' alleged ineffectiveness to excuse the procedural default of this claim. The claim is procedurally defaulted and due to be dismissed.

159

**N.**     *The trial court interfered with and irreparably harmed defense counsel's mitigation strategy when it forced the defense to call two of Mr. Burton's co-defendants as witnesses, in violation of Mr. Burton's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.* *See* doc. no. 9, ¶¶ 107-21, at 47-54.

    **1.**     *Trial strategy dictates that the attorney chooses the witnesses. Id.,* ¶¶ 109-10, at 48-49.

    **2.**     *The co-defendant's testimony was prejudicial to Mr. Burton. Id.,* ¶¶ 111-17, at 49-52.

    **3.**     *The trial court's interference prejudiced Mr. Burton's mitigation case and violated his constitutional rights to a reliable sentencing determination. Id.,* ¶¶ 118-21, at 52-54.

This court groups the preceding claims for purposes of discussion. The core of Burton's claim is this proposition: "Although an 'accused has the ultimate authority to make certain fundamental decisions regarding the case,' an accused does not have a constitutional right to direct matters of strategy." (Doc. no. 9 at 48 (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). Burton complains that the trial court judge interfered with his attorney's trial strategy, and his attorney-client privilege, when the judge disregarded his attorney's recommendation that co-defendants Willie Brantley and Andre Jones *not* be called to testify on Burton's behalf during the penalty phase of trial, and allowed Burton the opportunity to insist that those witnesses be called to the stand. Burton bases this argument upon the following (incomplete) excerpt from the colloquy conducted by the trial judge:

The Court: You have heard the recommendation of your lawyers stated

160

in open court relative to these two witnesses not being called, that they don't desire to call them, and they've indicated that you want to call them.  Is that your desire?

Burton:  Yes, sir.

The Court:  Okay, I am going to allow you to call them.

*Id.* at 48 (quoting R. 991-92).  Burton contends that the trial judge thus "compelled" his attorneys to call co-defendants Brantley and Jones to the stand, and that, in doing so, the judge violated his constitutional rights, because "the accused is entitled to 'the guiding hand of counsel at every step in the proceedings against him.'"  *Id.* at 51 (quoting *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (in turn quoting *Powell v. Alabama*, 287 U.S. 45, 69 (1932)).

The disagreement between Burton and his attorneys first surfaced at the beginning of the penalty phase, when Burton's lead defense attorney, William Willingham, alerted the trial judge to the fact that his client had requested him to call Willie Brantley and Andre Jones as witnesses, but he did not intend to do so.

MR. WILLINGHAM:  . . . .  Judge, and one other matter, Mr. Burton has requested we call some of the co-defendants as witnesses in this stage, and I am not going to call them as witnesses.  And, you know, I don't if he wants to call them.  I don't have anything to ask the co-defendants.

THE COURT:  Well —

MR. WILLINGHAM:  I am not going to call them, but I wanted to make it known to the Court that the Defendant has requested that the

161

co-defendants testify on his behalf.

       MR. RUMSEY:  Which co-defendants does he want to call?

       MR. WILLINGHAM:  Brantley and Jones.

(R. Vol. 7, Tab. 14 at 919-20).

       There was no further discussion of the issue until the conclusion of the State's case.  The trial judge first confirmed that Brantley and Jones were willing to testify on Burton's behalf, if called, *id*., Tab. 18, at 980-91, and then the following colloquy occurred:

       MR. WILLINGHAM:  Judge, I would like to put on the record —

       THE COURT:  Come around here so she can get you real good.

       MR. WILLINGHAM:   — that I have interviewed the witnesses, and it would be my opinion that neither of them can give any testimony that would mitigate my client's guilt in this case.  If he insists on calling them and you instruct me to question them, I will.  But it would be my decision not to call them as witnesses, because they, in my opinion, they would have nothing which would mitigate the Defendant's guilt in this case.

       THE COURT:  You concur?

       MR. MORRIS:  I concur, Your Honor.

       THE COURT:  Okay.  Mr. Burton.

       THE DEFENDANT:  Yes, sir.

       THE COURT:   You have heard the recommendation of your lawyers stated in open court relative to these two witnesses not being

called, that they don't desire to call them, and they've indicated you want
to call them.  Is that your desire?

THE DEFENDANT:  Yes, sir.

THE COURT: Okay, I am going to allow you to call them.

THE DEFENDANT:  It was my desire to call them earlier before
this — before the sentencing became, you know, but they advised me
that, you know, that —

THE COURT:  You answered my question.  That's fine.

. . . .

THE COURT:  . . . .  Mr. Willingham, if you will assist the
Defendant, he wants you to ask questions and he's got some he wants to
ask, you ask them.

*Id.* at 991-94.

The opinion of the Alabama Court of Criminal Appeals addressing this issue

reads as follows:

The appellant next challenges the penalty phase of the
proceedings.  The appellant initially argues that the trial court interfered
with his attorney-client relationship by calling two of his codefendants
to the stand after his attorney had told the court that they could add
nothing that would help the appellant in mitigation.

The record clearly shows that it was the appellant's wish to call
these two witnesses. The court had a lengthy colloquy with the appellant
concerning his desire to have his two codefendants testify at the penalty
phase of the proceedings.  The court, after talking with the appellant,
complied with his wishes.

An attorney represents a criminal defendant and is obliged by Rule

163

1.2, Alabama Rules of Professional Conduct, to "abide by a client's decisions concerning the objectives of representation. . . ."  An attorney can only make recommendations to a client as to how to conduct his defense; the ultimate decision, however, lies with the client.  There was no interference with the attorney-client relationship here, when the trial court was honoring the appellant's wishes.

*Burton v. State*, 651 So. 2d at 656.

This court disagrees with the state appellate court's characterization of the trial judge's colloquy with Burton as "lengthy"; it was anything but that.  If fact, the trial judge cut Burton off in mid-sentence, as Burton began to volunteer an explanation of why he had asked his attorneys to call Brantley and Jones "earlier before this," saying: "You answered my question."  If the trial judge had taken a moment to inquire, he undoubtedly would have learned that Burton expected Brantley and Jones to corroborate his concocted alibi defense:  *hence*, Burton's incompletely-stated "desire to call them earlier before this — before the sentencing became" an issue.  Of course, Burton's alibi defense was no longer relevant during the penalty phase; it had been rejected by the jury's verdict on the issue of Burton's guilt or innocence of the charged offense.  That obviously was the basis for defense attorney William Willingham's stated opinion that neither Brantley nor Jones could provide

> any testimony that would *mitigate* my client's guilt in this case.  If he insists on calling them and you instruct me to question them, I will.  But it would be my decision not to call them as witnesses, because they, in my opinion, *they would have nothing which would mitigate the Defendant's guilt in this case.*

164

(R. Vol. 7, Tab. 14 at 991-94 (emphasis supplied)).

Moreover, as the testimony of Brantley and Jones evolved during the penalty phase, the basis for defense counsel's refusal to honor Burton's request to call those witnesses during the guilt-innocence phase of trial became abundantly clear: their testimony — to the effect that neither Brantley nor Jones knew Burton, and neither of them had been involved in the robbery — was thoroughly discredited by the prosecutor, who impeached both witnesses with their prior inculpatory statements *and* a bank surveillance videotape showing Brantley, Jones, and Burton together, inside the City National Bank of Sylacauga, shortly before the robbery of the Talladega Auto Zone store.

Thus, the ultimate question that must be answered by this court is this: Did the state trial judge's injection of himself into the interstitial legal space between Burton and his court-appointed defense attorney produce an error of constitutional dimensions, mandating that the jury's unanimous verdict recommending a sentence of death be overturned, and the case remanded to the state trial court for additional sentencing procedures?

Burton relies upon the Supreme Court's opinion in *Jones v. Barnes*, 463 U.S. 745 (1983). The question addressed in that case was whether an attorney appointed to prosecute an appeal from a criminal conviction had a constitutional duty to raise

every *nonfrivolous* issue requested by the defendant.  The Second Circuit had held that

there was such a duty, but Chief Justice Burger, speaking for himself and five other

justices, reversed, saying there was no such duty.

> In announcing a new *per se* rule that appellate counsel must raise
> every nonfrivolous issue requested by the client, the Court of Appeals
> relied primarily upon *Anders v. California*, [386 U.S. 738 (1967)
> (holding that an appointed attorney must advocate his client's cause
> vigorously, and may not withdraw from a nonfrivolous appeal)].  There
> is, of course, no constitutional right to an appeal, but in *Griffin v. Illinois*,
> 351 U.S. 12, 18 (1955), and *Douglas v. California*, 372 U.S. 353 (1963),
> the Court held that if an appeal is open to those who can pay for it, an
> appeal must be provided for an indigent.  It is also recognized that the
> accused has the ultimate authority to make *certain fundamental decisions*
> regarding the case, as to whether to plead guilty, waive a jury, testify in
> his or her own behalf, or take an appeal, *see Wainwright v. Sykes*, 433
> U.S. 72, 93 n.1 (1977) (BURGER, C.J., concurring); ABA Standards for
> Criminal Justice 4-5.2, 21-2.2 (2d ed. 1980).  In addition, we have held
> that, with some limitations, a defendant may elect to act as his or her own
> advocate, *Faretta v. California*, 422 U.S. 806 (1975).  *Neither Anders
> nor any other decision of this Court suggests*, *however*, *that the indigent
> defendant has a constitutional right to compel appointed counsel to press
> nonfrivolous points requested by the client*, if counsel, as a matter of
> professional judgment, decides not to present those points.

*Jones v. Barnes*, 463 U.S. at 750-51 (emphasis and bracketed alteration added)

(footnote omitted).  The *Jones* decision does not address issues of "trial strategy."

Even so, this court has not found Supreme Court precedent holding that the decision

to call, or not to call, certain witnesses at trial is materially distinguishable from the

analogous appellate issue addressed in *Jones*:  that is, and paraphrasing the Court's

holding in *Jones*, *if* an indigent defendant does *not have* "a constitutional right to

compel appointed counsel to press *nonfrivolous* points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points," then certainly an indigent defendant has *no right* to compel appointed counsel to press *frivolous* points, or worse, *damaging* points, such as calling witnesses whose testimony cannot benefit the client's defense in the guilt-innocence phase, or mitigate his guilt in the penalty phase, of a capital trial. *Cf. id.* at 754 ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*. *Nothing in the Constitution or our interpretation of that document requires such a standard*.") (emphasis added, footnote omitted).[79]

Burton points to one Eleventh Circuit case, *Blanco v. Singletary,* 943 F.2d 1477 (11th Cir. 1991), in support of his argument. The facts of that case are similar to those presented here. During the guilt phase of trial in *Blanco*, the trial judge ordered

---

[79] The omitted footnote reads as follows:

The only question presented by this case is whether a criminal defendant has a constitutional right to have appellate counsel raise every nonfrivolous issue that the defendant requests. The availability of federal habeas corpus to review claims that counsel declined to raise is not before us, and we have no occasion to decide whether counsel's refusal to raise requested claims would constitute "cause" for a petitioner's default within the meaning of *Wainwright v. Sykes*, 433 U.S. 72 (1977). *See also Engle v. Isaac*, 456 U.S. 107, 128 (1982).

*Jones v. Barnes*, 463 U.S. at 754 n.7.

defense counsel to call two witnesses requested by the defendant, even though counsel had refused to call the witnesses, and had explained during an extensive colloquy with the judge that the defense team thought the witnesses would be detrimental to the defendant. *Id.* at 1481-86. After examining the factual circumstances, the Eleventh Circuit wrote:

> Although Blanco contends at times that he was denied altogether the assistance of counsel, our interpretation of the interaction between the trial court, the attorneys, and Blanco indicates that Blanco had the advice of counsel at all times but that *Blanco at one point was allowed by the trial court to make decisions traditionally reserved for counsel.*
>
> . . . .
>
> Under [the *Strickland*] standard, we conclude that the trial court's actions and defense counsels' responses did not prejudice Blanco during the guilt phase of his death penalty trial. *While attempting to be helpful to Blanco the trial court overreached its authority and infringed upon the relationship between Blanco and his attorneys by requiring defense counsel to call two additional witnesses.* Generally, trial tactics are for defense counsel to formulate. *The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel.*

*Blanco,* 943 F.2d at 1494-95 (emphasis supplied, footnotes omitted). Following his conviction, Blanco argued on appeal that he had been prejudiced by the testimony of the two witnesses he had insisted upon at trial, because each had criminal records and the other defense witnesses did not. The Eleventh Circuit ultimately found that Blanco had not been prejudiced, because the testimony of the two witnesses was cumulative to the testimony already given by other defense witnesses. *Id.* at 1495. The Eleventh

Circuit held that, "in light of all the testimony presented, especially that offered by [the state] in its case-in-chief, the evidence so overwhelmingly established Blanco's guilt that any contradiction presented by these witnesses had a *de minimis* impact upon the guilt-innocence portion of Blanco's trial." *Id.* (bracketed alteration added).

The Eleventh Circuit also rejected Blanco's assertion that the trial judge's interference should be considered presumptively prejudicial. *Id.* at 1496 (citing *United States v. Cronic*, 466 U.S. 648, 659-660 (1984)). The Court held:

> This case does not involve circumstances appropriate for a presumption of prejudice. While the trial court did interfere with the conduct of the defense during the guilt phase to some degree, this interference was not great, and the particular prejudice flowing from it is easily discernible and therefore not costly to litigate. . . . The interference amounted to countermanding the attorneys' strategic decision not to call two witnesses, nothing more. Blanco's attorneys were not otherwise hampered in their conduct of the guilt phase defense. Blanco's attorneys examined the witnesses on the stand. And Blanco was not prevented from consulting with his attorneys for any period of time. "Basic concepts of due process" were not offended by the trial court's actions. We refuse Blanco's invitation to presume prejudice.

*Id.* at 1497 (footnote omitted).

In summary, the Eleventh Circuit in *Blanco* recognized the trial court "overreached its authority and infringed upon the relationship between Blanco and his attorneys by requiring defense counsel to call two additional witnesses" desired by Blanco, but not by counsel — a trial tactical decision "normally entrusted to counsel." *Id.* at 1495. Even so, the Court found that the trial judge's actions did not prejudice

the defendant to an extent cognizable under the United States Constitution.

The resolution of the present claim lies elsewhere, however.  The Sixth Amendment, as made applicable to the states by the Fourteenth Amendment, provides in the part that is here pertinent:  "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const., amend VI (1791).  The Constitution does not explicitly define the phrase "assistance of counsel," but the Supreme Court placed a gloss upon it in *Faretta v. California*, 422 U.S. 806 (1975), when holding that the Sixth Amendment requires that defendants be allowed to represent themselves.

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training can be realized, if at all, only imperfectly.  To force a lawyer on a defendant can only lead him to believe that the law contrives against him. . . .  Personal liberties are not rooted in the law of averages.  *The right to defend is personal.* The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction.  *It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage.  And although he may conduct his own defense ultimately to his own detriment, his choice must be honored* out of "that respect for the individual which is the lifeblood of the law."

*Id*. at 834 (emphasis supplied) (quoting *Illinois v. Allen*, 397 U.S. 337, 350-351 (1970)).  In other words, the right to the assistance of counsel that is guaranteed by the Sixth Amendment is "more than a right to have one's case presented competently and

170

effectively"; it also includes the duty of counsel "to protect the dignity and autonomy of a person on trial by *assisting* **him in making choices that are his to make**, **not to make choices for him**, although counsel may be better able to decide which tactics will be most effective for the defendant." *Jones*, 463 U.S. at 759 (Brennan, J., dissenting) (italicized emphasis in original, boldface emphasis added).

In summary, therefore, even though the state trial judge in this case interfered with defense counsel's presentation of a mitigation case, and overreached his authority by infringing upon the relationship between Burton and his attorneys when requiring counsel to call witnesses desired by Burton, but not by counsel — a trial tactical decision normally entrusted to counsel[80] — that error was not of constitutional proportions, because the choice of which witnesses to call, and which not to call, ultimately belongs to the defendant. Counsel could *assist* Burton in making choices that were his to make, but could not *insist* upon making choices for him.

Burton therefore was not deprived, or denied the assistance of counsel by the trial judge; to the contrary, Burton chose not to heed counsel's advice — a choice that was his to make. For all of these reasons, Burton has failed to establish that he is entitled to habeas relief on this claim, and it will be denied.[81]

_____

[80] *See Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir. 1991).

[81] This court also is of the opinion that there was no "reasonable probability that, absent the [state trial judge's] errors, the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Secretary, Department of Corrections*,

**O.**   *The trial court's admission and consideration of inadmissible evidence at sentencing, including nine felony convictions that did not satisfy the requirements of the capital statute and a prejudicial presentence report, deprived Mr. Burton of a reliable determination of punishment.  See* doc. no. 9, ¶¶ 122-24, at 54-55.

Burton alleges that, prior to sentencing him to death, the trial judge considered a presentence investigative report that contained "inadmissible evidence and hearsay as well as statements purportedly made by [him] during an un-counseled interview." (Doc. no. 9 at 54-55).  He contends the information was prejudicial, and "deprived him of due process, a fair trial, and a reliable sentencing determination."  *Id.* at 55 (citing *Gardner v. Florida*, 430 U.S. 349 (1977)).  Burton also complains that the trial court's consideration of nine convictions presented during the penalty phase was not proper because the "convictions were obtained improperly and did not satisfy the requirements for admissibility of other crimes evidence under state and federal law." *Id.*  He concludes that, "singly and collectively," these errors deprived him of rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.  *Id.*

This claim was procedurally defaulted, because it was not raised on direct appeal or during Rule 32, collateral review proceedings in state court.  (*See* doc. no. 17 at 82-85, and doc. no. 18 at 75).  Accordingly, it is due to be dismissed.

**P.**   *The trial court's conduct of proceedings outside Mr. Burton's presence violated his rights to a fair trial and determination of punishment under the Fifth, Sixth,*

---

476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland v. Washington*, 466 U.S. 668, 695 (1984)).

*Eighth, and Fourteenth Amendments to the United States Constitution*. *See* doc. no. 9, ¶¶ 125-28, at 55-57.

Burton alleges that he was deprived of the opportunity to be present at critical stages of his trial. (*See* doc. no. 9 at 55). Specifically, he declares that the trial court denied him the opportunity to be present "during a January 31, 1992 motions hearing" at which the following issues were discussed: the taping of his initial appearance; the provision of state funds to hire an investigator and a presentence expert; the names of witnesses who might be called at trial; and, whether Burton's fingerprints were found inside the Auto Zone store. *Id.* at 56. During that hearing, the prosecutor disclosed that co-defendant Deon Long had made an incriminating statement and was willing to testify against Burton in exchange for a life sentence. *Id.* The prosecutor also disclosed that co-defendant Andre Jones had made an incriminating statement, and that Barbara Spencer would testify about the events that had occurred at her home following the robbery. *Id.* Finally, the prosecutor disclosed videotapes made by a local television station and surveillance cameras inside the City National Bank of Sylacauga. *Id.*

Burton argues that this motion hearing was a critical stage of his trial, because he could have given assistance to appointed defense counsel in "pretrial preparation." *Id.* at 56-57 (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934) (holding that the Fourteenth Amendment guarantees the defendant a right to be present whenever

his "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," including the right to confront and cross-examine one's accusers); *United States v. Gagnon*, 470 U.S. 522, 526 (1986) (holding that a defendant's right to be present at all critical stages of trial is grounded in the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments)).

Burton raised this claim on direct appeal, but respondent contends that it is, nevertheless, procedurally defaulted because Burton based it upon state law only, and failed to present it as a federal claim.  Respondent also argues, in the alternative, that the claim does not merit § 2254(d) relief.  (*See* doc. no. 17 at 85-87, and doc. no. 18 at 76-77).

Burton replies that he specifically raised federal grounds as a basis for this claim in his appellate briefs — a contention that is substantiated by a review of the  briefs filed in the Alabama Court of Criminal Appeals and Alabama Supreme Court on direct appeal.  (*See* C.R. Vol. 10, Tab. 30, at 20-23, and C.R. Vol. 11, Tab. 35, at 38-40).

The Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law on direct appeal:

> The appellant next contends that the trial court erred in holding a hearing on pre-trial motions in his absence.  He contends that this action denied him his constitutional right to a fair trial.  The appellant did not object to the court's holding of the hearing without him present.  Thus we must determine whether plain error exists.

174

It appears from the record that motions on behalf of one of the appellant's co-defendants, DeBruce, were also argued at this pre-trial hearing. The motion hearing was brief and concerned certain evidentiary questions. Defense counsel discussed obtaining a videotape of an initial appearance hearing and requested an investigator, a pre-sentence expert, and information on the criminal backgrounds of McCants, Long, and Barbara Spencer. Defense counsel also asked the state if co-defendants McCants and Long had been offered life in prison in exchange for their testimony. No testimony was taken at this hearing. The hearing concerned only evidence that defense counsel wished to obtain from the state.

Judge Bowen addressed this very issue in his opinion affirming DeBruce's conviction and sentence. Judge Bowen stated:

"In *Harris v. State*, [Ms. 3 Div. 332, June 12, 1992] [632] So. 2d [503, 512] (Ala. Cr. App. 1992), this Court held that in a capital case, 'if the appellant's presence, in the present case, would have been useless to her defense and if the [pretrial] hearing was not considered to be a "critical stage" of her trial, then we can find no error in the appellant's absence from the hearing.' Here, as in *Harris*, '[t]he appellant has been unable to suggest or demonstrate any possibility of prejudice resulting from [his] absence.' *Id.*

"Furthermore, although the case of *Ex parte Stout*, 547 So. 2d 901 (Ala. 1989), was a noncapital case, we find it relevant to the extent that, if error were committed in this case, that error was harmless.

"'Violations of some constitutional rights may be considered harmless error. . . .

"'Moreover even improper exclusion of a defendant from a 'critical' portion of the trial does not automatically require reversal, if in the particular case the defendant's absence was harmless beyond a reasonable doubt.'"

175

'*Polizzi v. United States*, 550 F.2d 1133, 1138 (9th Cir. 1976).'

"*Stout*, 547 So. 2d at 904.  Although this Court is extremely reluctant to make a finding of harmless error in any case in which the death penalty has been imposed, here it is clear beyond any reasonable doubt that the appellant's absence at the pretrial hearing on various legal motions in no way prejudiced him. Here, as in *Ex parte King*, 564 So. 2d 928, 931 (Ala. 1990), the 'hearing necessitated only arguments of law.' "

*DeBruce v. State*, 651 So. 2d 599, 620 (Ala. Cr. App. 1993).  For the reasons discussed in *DeBruc*e, we find no plain error here.

*Burton v. State*, 651 So. 2d at 646 (bracketed alterations in original).

The Alabama Supreme Court affirmed the Court of Criminal Appeals' disposition of the present issue in a brief, *per curiam* opinion:

Having thoroughly and carefully read and considered the record, together with the briefs and arguments of counsel, the applicable case law, and the opinion of the Court of Criminal Appeals, we conclude that the judgment of the Court of Criminal Appeals must be affirmed.  On the authority of *DeBruce v. State*, 651 So. 2d 599 (Ala. Crim. App.1993), *affirmed*, *Ex parte DeBruce*, 651 So. 2d 624 (Ala. 1994), we hold that the trial court did not err in holding a hearing on pretrial motions without the defendant being present.

*Ex parte Burton*, 651 So. 2d 659, 660 (Ala. 1994) (*per curiam*).  An examination of the Alabama Supreme Court's opinion in *Ex parte DeBruce*, 651 So. 2d at 625-35, shows that the Court did not rely extensively on federal law when affirming the Court of Criminal Appeals' denial of DeBruce's claim.[82]

---

[82] Among other federal cases, the Alabama Supreme Court relied upon *Kentucky v. Stincer*,

176

Burton alleges that the state court's decision to deny this claim is contrary to clearly established federal law because "Supreme Court precedent provides that 'after indictment . . . nothing shall be done in the absence of the prisoner.' " (Doc. no. 21, at 76 (quoting *Hopt v. Utah*, 110 U.S. 574, 579 (1884)).  He additionally argues that his Sixth Amendment right to be present at every stage of the trial extends "to all hearings that are an essential part of the trial — *i.e.*, to all proceedings at which the defendant's presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Id.* at 72 (citations and internal quotation marks omitted).

Burton contends that he was prejudiced because his absence from the motion hearing "denied him access to pertinent strategies, discussions, information and decisions critical to his defense." (Doc. no. 21 at 73).  However, Burton does not specifically describe the "strategies, discussions, information and decisions critical to his defense" to which he makes reference; he does not allege that trial counsel subsequently failed to discuss the subjects addressed at the pre-trial motion hearing; and, he does not inform this court how his presence at the hearing would, could, might, or may have benefitted his case.

A pertinent case is *Hodges v. Attorney General, State of Florida*, 506 F.3d 1337

---

482 U.S. 730 (1987).  *See Ex parte DeBruce*, 651 So. 2d at 631-33.

(11th Cir. 2007), in which the Eleventh Circuit held that,

> [w]hile a criminal defendant has a constitutional right to be present at trial, that right is not unlimited in its scope.  A defendant is only "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667, 96 L. Ed. 2d 631 (1987).  In *Stincer*, the Court held that the defendant's right to be present was not violated by his exclusion from a hearing to determine the competency of two children who later testified against him.  *Id.*  In reaching that holding, the Supreme Court noted that the defendant had "presented no evidence that his relationship with the children, or his knowledge of facts regarding their background, could have assisted either his counsel or the judge in asking questions that would have resulted in a more assured determination of competency." *Id.* at 747, 107 S. Ct. at 2668.

*Hodges*, 506 F.3d at 1348.

Burton's claim fails for similar reasons because Burton does not specify why or how his presence at the hearing would have assisted counsel.  Furthermore, and unlike the facts of the *Stincer* case, no testimony was taken at Burton's motions hearing; accordingly, there is no concern that Burton's rights to confrontation and cross-examination were affected by his absence.  (R. Vol. 1, Tab. 3, at 4).  This claim is due to be denied.

**Q**.   *The trial court violated Mr. Burton's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution when it denied defense counsel's challenges for cause against venire members Carolyn Bussey and Victor Stringer.  See* doc. no. 9, ¶¶ 129-35, at 57-59.

Burton alleges that venire persons Carolyn Bussey and Victor Stringer were

prejudiced against him before hearing any evidence in the case, that their bias should have been obvious, and that the trial judge's refusal to strike those jurors for cause (and, thereby, their inclusion in the pool of prospective jurors subject to peremptory strikes) deprived him of a fair and impartial jury.  (*See* doc. no. 9 at 58).

However, neither of those individuals actually sat as jurors during Burton's trial.[83]  A habeas petitioner may raise the denial of a challenge for cause as error only when the challenged venireperson actually sat on his jury.  *See*, *e.g*., *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) ("Any claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat.").[84]

Further, the fact that Burton was forced to exercise two peremptory strikes to ensure that neither Bussey nor Stringer sat on his jury does not constitute a violation of the Sixth Amendment right to a fair and impartial jury.  That principle also is supported by the Supreme Court's opinion in *Ross v. Oklahoma*, *supra*, where the defendant was forced to use one of his peremptory strikes during the selection of a jury in his capital murder trial to remove a juror (Darrell Huling) whom the trial court

---

[83] The twelve jurors who actually deliberated on verdicts were James Cottingim, May Denson, Steven Embry, Charles Johnson, Gloria Ford, Jonnie Parton, Bobbye Thompson, Prescilla Townsend, Christopher Watson, Ola Williams, Jesse Wright and William Gooch.  *See* R. Vol. 4, at 259.  The alternate jurors were Jerry Culver and Nellie Ward.  *Id.* and R. Vol. 7, at 912.

[84] *See also*, *e.g*., *Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000) ("Claims that the jury was not impartial must focus upon the jurors who actually sat."); *Heath v. Jones*, 941 F.2d 1126, 1133 (11th Cir. 1991) (holding that a habeas petitioner can only raise the trial court's denial of challenges for cause when the challenged jurors actually sat on his jury).

judge should have excused for cause under *Witherspoon v. Illinois*, 391 U.S. 510

(1968).  The Supreme Court granted certiorari to "to consider the Sixth and Fourteenth

Amendment implications of the trial court's failure to remove Huling for cause and

petitioner's subsequent use of a peremptory challenge to strike Huling," *Ross*, 487

U.S. at 85, and held that no constitutional violation occurred.  In part, the Court wrote

as follows:

> It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury.  [*Wainwright v. Witt*, 469 U.S. 412, 424 (1985)]; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Had Huling sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove Huling for cause, the sentence would have to be overturned.  *Adams* [*v. Texas*, 448 U.S. 38, 45 (1980)].  But Huling did not sit.  Petitioner exercised a peremptory challenge to remove  him, and Huling was thereby removed from the jury as effectively as if the trial court had excused him for cause.

> Any claim that the jury was not impartial, therefore, must focus not on Huling, but on the jurors who ultimately sat.  None of those 12 jurors, however, was challenged for cause by petitioner, and he has never suggested that any of the 12 was not impartial.  . . . .

> * * * *

> Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error.  *But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury*.  We have long recognized that peremptory challenges are not of constitutional dimension. *Gray* [*v. Mississippi*, 481 U.S. 648, 663 (1987)]; *Swain v. Alabama*, 380 U.S. 202, 219 (1965); *Stilson v. United States*, 250 U.S. 583, 586 (1919).  They are a means to achieve the end of an impartial jury.  So long as the jury that

180

sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. S*ee Hopt v. Utah*, 120 U.S. 430, 436 (1887); *Spies v. Illinois*, 123 U.S. 131 (1887).

*Ross v. Oklahoma*, 487 U.S. at 85-88 (emphasis and bracketed alterations added) (footnotes omitted).  For all of these reasons, Burton's claim is due to be denied.

**R.**    *The trial court erred in denying Mr. Burton's motion for a change of venue, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  See* doc. no. 9, ¶¶ 136-41, at 60-61.

Burton alleges that "[a] criminal defendant is entitled to a trial by an impartial jury and violation of due process results when a trial court refuses to change venue in the face of  "pervasive, inflammatory pretrial publicity."  (Doc. no. 9 at 60 (citing *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)).  He argues that the trial court erred when it denied his motion for change of venue, because

> [t]he crime in this case drew widespread attention in Talladega County.  At trial, 30 of the 45 venire members admitted hearing about this case through a number of means including the local newspaper, *The Daily Home*.  (R. 21-22; 46-57).  The crime and Mr. Burton's trial took place in Talladega County only nine months after the murder and two months after a Talladega County jury found Derrick DeBruce guilty of murdering Mr. Battle during the Auto Zone robbery.  The close proximity of the crime and Mr. DeBruce's recent conviction explained the large number of venire members who knew about the crime.

> The court conducted voir dire of the venire in three panels of fifteen persons each.  In panel one, eight persons admitted to having some prior knowledge of the offense.  Juror Embry responded that he went to school

with Mr. Battle's sisters. (R. 29). The daughter of one potential juror, Carolyn Bussey, dated a young man who worked at the Auto Zone and was good friend [sic] of Tim Calhoun, who was scheduled to serve as a state's witness. (R. 61). Further, Ms. Bussey's daughter and boyfriend "went to the emergency room with Tim that night, met him up there, and went home with him. [They] [s]tayed with him after it was over for a long time." (R. 61). Another potential juror, Mary Denson, remembered reading about the case in the Talladega *Daily Home*. She stated, "I remember reading something about this . . . I just thought it was a tragedy thing." (R. 77 - 78). Juror after juror admitted to having heard or read about the case.

Eleven of the twelve persons selected to serve as jurors in Mr. Burton's case knew something about the case before being selected. (R. 21-22). Some jurors and potential jurors knew and spoke with victims and their families. (R. 34, 49, 100, 109, 121, 140, 150, 173).

(Doc. no 9 at 60-61).

The pertinent portion of the Alabama Court of Criminal Appeals' opinion addressing this claim on direct appeal reads as follows:

The appellant initially argues that the trial court erred in denying his motion for a change of venue. He contends that because of the extensive pretrial publicity he was unable to obtain a fair trial in Talladega County.

"In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, the appellant must show more than the fact 'that a case generates even widespread publicity.'" *Oryang v. State*, 642 So. 2d 979, 983 (Ala. Cr. App. 1993).

"Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. *Patten v. State*, 246 Ala. 639, 21 So. 2d 844

182

[1945]."

*Thompson v. State*, 581 So. 2d 1216, 1233 (Ala. Cr. App. 1991), cert. denied, 502 U.S. 1030, 112 S. Ct. 868, 116 L. Ed. 2d 774 (1992).

This court has stated that "the appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors." *Hart v. State*, 612 So. 2d 520, 527 (Ala.Cr.App.), *aff'd*, 612 So. 2d 536 (Ala. 1992), *cert. denied*, 508 U.S. 953, 113 S. Ct. 2450, 124 L. Ed. 2d 666 (1993).

In this case the court questioned the prospective jurors in groups of 15. At least one-half of the members of each group were at least aware of the facts surrounding the robbery and murder. Each veniremember who had heard anything about the case was individually questioned. The majority of the prospective jurors could not cite any specifics concerning the murder. All but one said that what they had heard would not affect their ability to decide the case impartially upon the evidence presented at trial. The one prospective juror who did respond that she had been biased by what she had heard was excused for cause. The appellant has failed to show that the venire was so tainted that he was unable to obtain a fair trial.

The Supreme Court, in *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961), explained:

"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

Jurors are not required to be "totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799-800, 95 S. Ct. 2031, 2035-2036, 44 L. Ed. 2d 589 (1975).

"[T]he determination of whether or not to grant a motion for

> a change of venue is generally left to the sound discretion of the
> trial judge, because he has the best opportunity to assess any
> prejudicial publicity against the defendant and any prejudicial
> feeling against the defendant in the community which would
> make it difficult for the defendant to receive a fair and impartial
> trial."
>
> *Nelson v. State*, 440 So. 2d 1130, 1132 (Ala. Cr. App. 1983).  See also
> *Trahan v. State*, 450 So. 2d 1102 (Ala. Cr. App. 1984).  The trial court
> committed no error in denying appellant's motion for a change of venue.

*Burton v. State*, 651 So. 2d 641, 645-46 (Ala. Crim. App. 1993) (footnote omitted).

Burton contends that the state appellate court's denial of this claim was contrary to, and an unreasonable application of, *Irvin v. Dowd*, 366 U.S. 717 (1961), because "the evidence presented by [Burton] demonstrated presumptive community prejudice through facts similar to those presented to the trial court in *Irvin*." (Doc. no. 21, at 170).  However, Burton does not describe the facts in *Irvin*, nor does he explain the factual similarities between his case and those forming the basis for the Supreme Court's opinion in *Irvin*.  He also does not dispute that the factual findings made by the Alabama Court of Criminal Appeals should be accorded a presumption of correctness.

Nevertheless, this court acknowledges that Burton's right to a fair and impartial jury, free from the prejudicial influence of external factors like inflammatory publicity, is clearly established.  The Supreme Court has recognized that publicity of a criminal case, either before or during a trial, can prejudice jurors and, thereby, deprive a

184

defendant of the right to a fair trial by an impartial jury.  *See*, *e.g.*, *Chandler v. Florida*, 449 U.S. 560, 574 (1981) (observing that any highly publicized criminal trial presents a risk of compromising a defendant's right to a fair trial); *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (holding that a jury's deliberations should be based upon evidence presented in open court, not on external publicity).

The standards governing the question of whether a defendant's motion for a change of venue should be granted because of extensive publicity, prejudicial to the interests of the accused, derive from the Fourteenth Amendment's Due Process Clause, "which safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial, indifferent jurors."  *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985) (internal citations and quotation marks omitted); *see also*, *e.g.*, *United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978) ("A fundamental principle of due process requires that the jury's verdict be based on evidence received in open court, not from outside sources.").

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process.  "A fair trial in a fair tribunal is a basic requirement of due process."  *In re Murchison*, 349 U.S. 133, 136.  In the ultimate analysis, only the jury can strip a man of his liberty or his life.  In the language of Lord Coke, a juror must be as "indifferent as he stands unsworn."  Co. Litt. 155b.  His verdict must be based upon the evidence developed at the trial.  This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.  It

> was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). "The theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145, 155.

*Irvin*, 366 U.S. at 722 (some citations omitted).

**1**.   *A habeas petitioner's burden of proof*

A habeas petitioner must prove the coexistence of at least two circumstances in order to establish juror bias that rises to the level of a constitutional violation:  *first*, he must establish that pretrial publicity was "inflammatory [and] prejudicial," *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir. 1985) (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980)); *and second*, he must demonstrate that such publicity either (*a*) *actually prejudiced* an individual juror who deliberated on verdicts, *see*, *e.g.*, *Murphy v. Florida*, 421 U.S. 794, 800-03 (1975); *Mills v. Singletary*, 63 F.3d at 1009, *or* (*b*) so saturated the community from which jurors were summoned, and so pervaded the trial proceedings, that it gives rise to *a presumption of prejudice*. *See*, *e.g.*, *Sheppard*, 384 U.S. at 355-57 (prejudice presumed because trial judge allowed reporters free reign in the courtroom, and failed to take protective measures); *Estes v. Texas*, 381 U.S. 532, 544 (1965) (prejudice presumed, despite no identifiable showing of prejudice to any defendant, because the trial court proceedings were televised); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) (prejudice presumed because defendant's confession was televised prior to trial); *Woods v. Dugger*, 923 F.2d 1454,

186

1460 (11th Cir. 1991) (prejudice presumed due to the hostile atmosphere pervading the small, rural community in which defendant's capital murder trial for the killing of a prison guard occurred, and, a number of prison guards attended the trial in full uniform to show solidarity with the deceased); *Coleman v. Kemp*, 778 F.2d 1487, 1540 (11th Cir. 1985) (prejudice presumed because of "inflammatory and prejudicial pretrial publicity that so pervaded the [small town in which the murders occurred] as to render virtually impossible a fair trial before an impartial jury"); *Isaacs v. Kemp*, 778 F.2d 1482, 1484-86 (11th Cir. 1985) (same).

After review of the record and briefs, this court concludes that Burton has failed to carry the burden of proof outlined in the preceding paragraph. He has not shown that the publicity leading up to his trial was inflammatory and prejudicial. Furthermore, he has not demonstrated that any of the publicity actually prejudiced an individual juror who deliberated on verdicts — much less that the publicity so saturated the community from which jurors were summoned as to give rise to a presumption of prejudice. Accordingly, this claim is due to be denied.

**S.**   *The trial court violated Mr. Burton's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments*, *in not having individual, sequestered voir dire. See* doc. no. 9, ¶¶ 142-46, at 62-63.

Burton argues that, "[b]ecause of the large number of venire members with extrajudicial knowledge" about the Auto Zone robbery, the trial court violated his

right to due process of law when it did not allow individual, sequestered voir dire. (Doc. no. 9 at 62-63).  Respondent answers that the claim is procedurally defaulted, because it was not properly raised on direct appeal, nor was it raised during collateral review proceedings in state court.  (*See* doc. no. 17 at 91-94, and doc. no. 18 at 84-86).

The issue of individual voir dire was raised only once on direct appeal, and that lone reference is found in *one sentence* of a *footnote* to Burton's argument concerning the denial of his motion for change of venue.  The sentence reads:  "The court should have allowed individual, sequestered voir dire."  (C.R. Vol 10, Tab. 30, at 17 n.3). There is no other mention of voir dire throughout appellant's brief.

During its discussion of Burton's change of venue claim, the Alabama Court of Criminal Appeals addressed the question of individualized voir dire in the same, "oh-by-the-way" manner that Burton had raised it — by dropping a marginal note reading as follows:

> The appellant also argues in a footnote in his brief to this court that he should have been allowed to conduct individual voir dire.  However, the trial court is not compelled to allow individual voir dire of prospective jurors even in a case involving the death penalty.  Whether to allow individual voir dire is generally within the discretion of the trial court.  *Bell v. State*, 475 So. 2d 601 (Ala. Cr. App. 1984), *aff'd*, 475 So. 2d 609 (Ala.), *cert. denied*, 474 U.S. 1038, 106 S. Ct. 607, 88 L. Ed. 2d 585 (1985).

*Burton v. State*, 651 So. 2d at 645 n.3.

In the petition for writ of certiorari filed by Burton in the Alabama Supreme

188

Court, he converted the footnoted sentence into a separate claim, one that bears some resemblance to the present habeas claim.  (*See* C.R. Vol. 11, Tab. 35, at 44-45).  The Alabama Supreme Court did not acknowledge it as a new claim, however, and it affirmed the Alabama Court of Criminal Appeals after reviewing the record, the briefs of the parties, and the intermediate appellate court's opinion.  *See Ex parte Burton*, 651 So. 2d 659 (Ala. 1994).

Assuming for the sake of discussion that this claim was not procedurally defaulted, Burton still has not shown that the trial court violated his right to a trial by a fair and impartial jury when it did not allow individual, sequestered voir dire.  First, there is no *per se* constitutional right to individually voir dire each member of the venire in a death penalty case.  Additionally, as discussed in the immediately preceding Part of this opinion, Burton failed to demonstrate that his trial was the subject of pervasive, pre-trial publicity prejudicial to the interests of the accused.  Burton also had not shown that questioning prospective jurors regarding their knowledge of the facts of the case in panels (or groups) of fifteen was not adequate, particularly because the record reflects that whenever any member of a panel answered that he or she had heard or read about the case, they were separated from all other jurors and individually questioned by counsel.  (*See* R. Vol. 2, at 46-116, 117-175, 176-98).  As such, Burton's assertion that members of the third panel heard a

189

prospective juror on the venire state that he had spoken to a victim of the robbery, and discussed the substance of the conversation, is without merit.  Burton alleges that "[m]embers of the third panel heard Victor Stringer say that he spoke with witness Larry McCardle about the case and that Mr. McCardle went so far as to talk about what he experienced during the incident."  (Doc. no. 9 at 62 (citing R. 179)).  However, Burton fails to inform the court that his citation to the record of Embry's revelation took place *after* Mr. Stringer had been separated from other jurors for the express purpose of individual questioning.  (See R. Vol. 2, at 179).  Burton also does not allege, nor does he offer proof, that Victor Stringer reiterated to other jurors the substance of Larry McCardle's alleged statements "about what he experienced during the incident."  Furthermore, as discussed in Part IV(Q) of this opinion *supra*, Victor Stringer was not among those jurors who actually sat and deliberated on verdicts.  For all of these reasons, therefore, this claim is due to be denied.

## V.  INTRODUCTION TO DISCUSSION OF BURTON'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

The Supreme Court's "benchmark" for judging any claim that trial or appellate counsel provided ineffective assistance is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The Court's opinion in *Strickland* established a two-pronged standard for

judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal.[85]

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First*, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second*, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis supplied); *see also*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 390 (2000) (same); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001) (same).

As clearly stated in the preceding quotation, the two parts of the *Strickland* standard are conjunctive, and a petitioner accordingly bears the burden of proving *both* "deficient performance" *and* "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Thus, a court is not required to address both aspects of the *Strickland* standard when a habeas

---

[85] Ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represent a defendant at trial or on direct appeal from the conviction. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). *See also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

191

petitioner makes an insufficient showing on one of the prongs. *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

**A.**   *The Performance Prong*

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313).   To satisfy the performance prong of the *Strickland* test, a defendant must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.   The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688; *see also*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 390-81 (2000) (same); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (same); *Chandler*, 218 F.3d at 1313 (same).   "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance"; furthermore, courts must "recognize that 'omissions are inevitable.   But, the issue is not what is

192

possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'"  *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1313 (in turn quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987))).

The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and, in light of all circumstances.  *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317.  Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions."  *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005).

Judicial scrutiny of counsel's performance is required to be "highly deferential," because representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.  *See Strickland*, 466 U.S. at 697. Indeed, reviewing courts are instructed that they "must indulge a strong presumption

193

that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy*. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis supplied) (citations and internal quotation marks omitted); *see also*, *e.g.*, *Rogers*, 13 F.3d 384, 386 (11th Cir. 1994) (holding that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate") (internal quotation marks omitted)).

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315). "Even if many reasonable lawyers would

not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d at 386.

**B.**     *The Prejudice Prong*

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir.2002). *See also*, *e.g.*, *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (holding that a habeas petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'") (quoting *Strickland*, 466 U.S. at 693)).

"It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. "Instead, when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

Stated somewhat differently, to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional

195

errors, the results of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391 (same).  The fact that counsel's error may have "had some conceivable effect on the outcome of the proceeding" is not sufficient to prove prejudice.  *Strickland*, 466 U.S. at 693; *see also Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (same); *Tompkins v. Moore*, 193 F.3d 1327, 1336 (11th Cir. 1999) (same).  Instead, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'"  *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687).  In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986))) (internal quotation marks omitted); *see also*, *e.g.*, *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (holding that, to show prejudice, "a defendant must show that counsel's errors were so serious that they rendered the defendant's trial unfair or unreliable, not merely that the outcome would have been different").

**C**.    *Deference Accorded State Court Findings of Historical Fact When Evaluating Ineffective Assistance of Counsel Claims*

196

State court findings of historical facts made in the course of evaluating a claim

of ineffective assistance of counsel are subject to a presumption of correctness under

28 U.S.C. § 2254(d)(2) and (e)(1).  *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297

(11th Cir. 2001).

## VI.  DISCUSSION OF BURTON'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

The following Parts of this opinion, designated "A" through "Y," address each

act or failure to act that, Burton alleges, constituted ineffective assistance of counsel

in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution.  (*See* doc. no. 9, Claim V, ¶¶ 147-268, at 63-119).

A.   *Trial counsel failed to adequately investigate, develop, and present available defenses.  See doc. no. 9, ¶¶ 153-73, at 66-75.*

1.   *The private investigator retained by trial counsel failed to conduct an adequate pretrial investigation.  Id., ¶¶ 155-57, at 67-68.*

Burton alleges that his trial attorneys hired a private investigator, Bobby

Watson, with funds provided by the trial court, but that "Watson's efforts were less

than stellar" because his entire investigative effort allegedly consisted of twelve hours

of interviews with a dozen witnesses who had been present at the scene of the crime.

(*See* doc. no. 9 at 67-68).[86]  The reports produced as a result of Watson's investigation

---

[86] During the Rule 32 evidentiary hearing, William Willingham, lead trial defense attorney, testified that he had directed Watson to speak only with the witnesses who were present in the Auto Zone store at the time of the armed robbery.  (*See* Rule 32 R., Vol. 14 at 48, 50).

allegedly were "cursory," and they included no "background checks" of the persons who had been interviewed. *Id.* Finally, Burton contends Watson failed to interview and conduct extensive background checks on co-defendant LuJuan McCants and witness Barbara Spencer. *Id.* at 68-73.

Respondent answers that the private investigator's alleged ineptitude was raised for the first time in Burton's habeas petition and, thus, the issue is procedurally defaulted. (*See* doc. no. 17 at 96-97, and doc. no. 18 at 90-91).

Burton does not deny that this specific contention is being raised for the first time in this court. Instead, he contends that he presented "the substance" of the claim in state court, where he argued that trial counsel had been ineffective for failing to properly investigate his case. (Doc. no. 21 at 42 (citing *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986) (holding that submission of supplemental evidence *at the request of the district court* did not fundamentally alter the legal claim already presented in state court)).[87] He argues that, "[u]nder governing law," it is "perfectly appropriate" for him to "amplif[y]" the claim pled in state court by specifically focusing upon the deficiencies of the private investigator retained by counsel. (Doc. no. 21 at 41-42).

---

[87] *See also Spiegel v. Sandstrom*, 637 F.2d 405, 407 (5th Cir. 1981) (observing that "'[a] habeas petitioner need not spell out each syllable of his claim before the state courts in order to satisfy the exhaustion requirement of § 2254(b). It suffices that the substantial equivalent of a petitioner's federal habeas claim has been argued in the state proceedings.'") (quoting *Lamberti v. Wainwright*, 513 F.2d 277, 282 (5th Cir. 1975)) (bracketed alteration in original).

Further, Burton asserts that "the exhaustion doctrine does not preclude consideration of a claim supported by different factual bases than presented in state court unless the claim is 'fundamentally' altered by the change.'" *Id.* (quoting *Vasquez*, 474 U.S. at 260).

Burton's argument is incorrect for several reasons. First, the facts and legal questions addressed in *Vasquez* are distinguishable from this case. The differences begin with the Supreme Court's summary of the procedural history in *Vasquez*:

> In 1962, the grand jury of Kings County, California, indicted respondent, Booker T. Hillery, for a brutal murder. Before trial in Superior Court, respondent moved to quash the indictment on the ground that it had been issued by a grand jury from which blacks had been systematically excluded. A hearing on respondent's motion was held by Judge Meredith Wingrove, who was the sole Superior Court Judge in the county and had personally selected all grand juries, including the one that indicted respondent, for the previous seven years. Absolving himself of any discriminatory intent, Judge Wingrove refused to quash the indictment. Respondent was subsequently convicted of first-degree murder.

> For the next 16 years, respondent pursued appeals and collateral relief in the state courts, raising at every opportunity his equal protection challenge to the grand jury that indicted him.

*Vasquez,* 474 U.S. at 256-57 (footnotes omitted). Hillery then raised the same claim before the United States district court in a habeas petition. *The district court requested*, and Hillery submitted, "a computer analysis . . . [that] assessed the mathematical probability that chance or accident could have accounted for the

exclusion of blacks from the Kings County grand jury over the years at issue." *Id.* at 259. After an evidentiary hearing, the district court concluded that Hillery had established discrimination, because the probability of the exclusion of blacks from the grand jury during Judge Wingrove's tenure as a matter of chance was only two out of a thousand. *Id.* at n.3.

When the case reached the Supreme Court, the Court framed "[t]he sole question [as] whether this valid exercise of *the* [district] *court's power to expand the record* had the effect of undermining the policies of the exhaustion requirement." *Id.* at 257 (emphasis and alteration supplied). Ultimately, the Court held that Hillery

> had initially submitted only the evidence that had been considered in state court, and subsequently complied with the [district] court's request by furnishing materials no broader than necessary to meet the needs of the court. Accordingly, the circumstances present[ed] no occasion for the Court to consider a case in which the prisoner has attempted to expedite federal review by deliberately withholding essential facts from the state courts. We hold merely that the supplemental evidence presented by respondent did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that respondent be remitted to state court for consideration of that evidence.

*Vasquez*, 474 U.S. at 260.

Burton admits he did not identify the alleged ineffectiveness of the private investigator as a specific claim during post-conviction proceedings in state court. This alone distinguishes his case from *Vasquez*. As an additional distinction, there has been

no request for expansion of the record *by this court*.   Finally, Burton clearly

misinterpreted[88] the holding in *Vasquez* when asserting that "the exhaustion doctrine

does not preclude consideration of a claim supported by different factual bases than

presented in state court unless the claim is 'fundamentally' altered by the change."

(Doc. no. 21 at 41-42 (quoting *Vasquez*, 474 U.S. at 260).

This claim was framed in the Rule 32 petition Burton filed in state court as

follows:

> Trial counsel did not properly prepare or investigate in order to present
> an appropriate defense and a proper case against the imposition of the
> death penalty.  Counsel's ineffectiveness included the failure to interview
> critical witnesses, to develop an appropriate theory of the defense, and
> the failure to conduct sensitive and in-depth interviews with family
> members and other witnesses who would have provided excellent
> mitigation evidence.  In addition, trial counsel neglected to investigate
> any and all records of Petitioner's background.  Trial counsel failed to
> include mental health professionals and other experts in the defense of
> Petitioner.  This lack of effort failed to provide evidence relevant to an
> appropriate verdict or punishment for Petitioner.

(Rule 32 C.R. Vol. 13, Tab. 43 at 230).   This language clearly shows that Burton

neither raised his specific complaint concerning the private investigator nor, as he now

argues, "the substance" of that claim during collateral review in state court.  Burton's

failure to specifically identify the private investigator's alleged failings as part of the

ineffective assistance of counsel claim argued in state court "means that [he] deprived

---

[88]This court deliberately selected the word "misinterpreted" in lieu of holding an evidentiary
hearing to determine whether counsel intentionally *misrepresented* the *Vasquez* holding.

the state courts of 'the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding.'" *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (quoting *Picard v. Connor*, 404 U.S. 270, 276 (1971)).[89]  Therefore, the present claim is "procedurally defaulted, even absent a state court determination to that effect, [because] it is clear from state law that any future attempts at exhaustion would be futile."  *Id.* (citing *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

If Burton were to attempt to raise this specific claim in a second Rule 32 petition filed in state court, it would be defaulted on numerous grounds: *e.g.*, as an impermissible, successive petition filed outside the statute of limitations applicable to post-conviction proceedings; and, as a claim that Burton was required to, but failed to, raise during the original collateral review proceedings.  *See* Alabama Rules of Criminal Procedure 32.2(b), (c), and (d).  For the foregoing reasons, the present claim is procedurally defaulted to the extent that it focuses upon the alleged investigative deficiencies of Bobby Watson, the private investigator retained by trial counsel.

> **a**.     *Failure to investigate co-defendant LuJuan McCants.  See* doc. no. 9, ¶¶ 158-65, at 68-72.

Burton also alleges that his trial attorneys failed to investigate co-defendant

---

[89]*Picard v. Connor* held that the substance of a federal habeas corpus claim must first be presented to the state courts, 404 U.S. at 277-78, and that "once the federal claim has been *fairly presented* to the state courts, the exhaustion requirement is satisfied."  *Id*. at 275 (emphasis supplied).

LuJuan McCants, one of "the most important [witnesses] called by the State," even though they were aware that McCants's testimony would be used to promote the State's theories that Burton was the ring leader of the robbery, and that Burton possessed an intent to kill if necessary to facilitate the robbery.  (Doc. no. 9 at 68). Burton alleges that, other than filing a standard motion for discovery, and relying on the information obtained *via* the District Attorney's "open file" discovery policy, his defense attorneys conducted no independent investigation of McCants.  *Id.* at 69.

Burton also complains that, even though it was known that McCants was sixteen years old on the date of the Auto Zone robbery, defense counsel did not obtain a copy of McCants's juvenile record, or a transcript of the juvenile court proceedings in which McCants was transferred to the circuit court for trial as an adult.  (*See* doc. no. 9 at 70).  Burton argues that, if his attorneys had investigated, obtained, and utilized this information at trial, the jury:  would have been provided "a procedural understanding" of McCants's "legal predicament at the time of his testimony"; would have learned that McCants used the aliases "Carl Williams, Juan Williams, and Juan Carl Williams"; and, would have become aware of the fact that other criminal charges were pending against McCants on the date of his arrest for felony murder — charges that appeared to have been dismissed in return for his cooperation.  *Id.* at 70-71.

Further, even though McCants testified at co-defendant Derrick DeBruce's trial

some two months before the beginning of Burton's trial, defense counsel, "who was present for only part of the DeBruce trial, did not ask for or receive a transcript of Mr. McCants' testimony." *Id.* at 71. Had defense counsel done so, Burton argues, counsel would have discovered that McCants's "testimony *at the two trials* was significantly *different* from what McCants told the police *in a videotaped interview* given on August 24, 1991." *Id.* (emphasis added). This portion of Burton's claim, however, is both procedurally defaulted and meritless.[90]

Finally, Burton alleges that counsel failed to adequately cross-examine McCants about his plea bargain, which allowed him to receive a sentence of life in exchange for his testimony against Burton. *Id.* at 70. In particular, Burton contends that counsel failed to illustrate how McCants's plea bargain allowed him to avoid the death penalty. According to Burton, one of his trial attorneys admitted during the Rule 32 evidentiary hearing that he was not familiar "with state law on parole eligibility," which will allow McCants to "be paroled after serving only one-third of his sentence." *Id.* Moreover, even though counsel admitted during the Rule 32 hearing that the "disclosure" of

---

[90] Respondent correctly answers that Burton failed to raise this aspect of the claim during collateral review proceedings. (*See* doc. no. 17 at 98 n.2). As such, it is procedurally defaulted. The claim is also without merit. Burton *does not* contend that McCants's testimony varied *between the two trials*; accordingly, he cannot show that possession of a copy of the transcript of *McCants's testimony* during *DeBruce's trial* would have assisted his case in any manner. There is a separate habeas claim in which it is alleged that trial counsel were ineffective if they were provided a copy of McCants's videotaped testimony and then failed to properly utilize it to adequately cross-examine McCants during Burton's trial. (*See infra*, Claim VII).

McCants's plea agreement to the jury was very important, "he failed to use it to

optimal benefit on cross-examination," when that entire examination consisted of only

three questions. *Id.* at 71-72.

The trial court's written opinion denying this claim on collateral review was

adopted by the Alabama Court of Criminal Appeals as its own.[91] (*See* Rule 32 C.R.

Vol. 25, Tab 58, at 18-29;[92] *see also* Rule 32 C.R. Vol. 25, Tab. 59, at 19-28 (quoting

*id.*)).[93]

After examining the state court's decision denying this claim on the merits, this

court finds that Burton has failed to show that the decision is contrary to, or an

unreasonable application of, clearly established federal law.  Burton also has not

demonstrated that the state court's adjudication of this claim resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.  At Burton's trial, McCants testified that he

was sixteen years old on the date of the offense, and admitted that he was initially

---

[91] Due to the length of the relevant portion of the trial court's opinion that was adopted by the state appellate court (more than nine pages), it is cited at the end of this sentence, but not spread at length in this opinion.

[92] ***Nota bene***:  From this point forward, the trial court's opinion and judgment on each of the issues raised by Burton during collateral review proceedings in the state court will be designated by the citation "**Tab. 58, at ___.**"

[93] ***Nota bene***:  From this point forward, the unpublished opinion of the Alabama Court of Criminal Appeals on collateral review will be designated by the citation "**Tab. 59, at ___.**"  This short form citation is chosen for the sake of efficient review, because the state appellate court adopted and incorporated much of the state trial court's judgment within its opinion.

charged in juvenile court, but was subsequently certified for trial as an adult. (*See* R.

Vol. 4, Tab. 7 at 341).  He also admitted that, in exchange for his testimony, the State

had agreed to recommend that he be allowed to plead guilty to the lesser offense of

Robbery in the first degree and receive a life sentence.  *Id.* at 369-70.  On cross-

examination, defense counsel asked McCants: "And for you to be eligible for parole,

you made a deal to come up here and testify, didn't you?"  *Id.* at 371.  McCants

answered "Yes"; he later repeated that he had agreed to testify in exchange for a

sentence offering an opportunity for parole.  *Id.* at 317, 376.  As such, the jury was

well aware of the important terms of McCants's plea bargain.  The state court took that

fact into account when denying Burton's claim on the merits, and pointed out that the

jury had been consistently informed during voir dire that a co-defendant had been

offered (and had accepted) a plea bargain in which he would testify in order to receive

a sentence less than death.  (*See* Tab 59 at 19-22 (quoting Tab. 58 at 20-24)).  Burton

cannot show that he was prejudiced by the manner in which trial counsel cross-

examined McCants about his plea agreement.

Burton is correct when asserting that his trial counsel was not aware of, and

therefore did not "elicit . . . damaging information" about, McCants's use of a number

of aliases, or pending drug charges, so the jury could have been afforded the

opportunity to conclude that McCants might receive the additional benefit of a

206

favorable disposition of those charges in exchange for his testimony.  *Id.* at 70-71.
Yet, Burton does not argue that the state trial and appellate courts erred on collateral
review when each ruled that defense counsel could not have obtained this information
for confidentiality reasons.  Burton also does not allege that the state confidentiality
rules pertaining to juvenile court records violated his right to due process.  (*See* Tab.
59 at 22-24 (quoting Tab. 58 at 24-25)).  Burton has produced little to persuade this
court that the addition of McCants's aliases and juvenile court charges would have
diminished his credibility in the eyes of the jury any more than the terms of the plea
agreement given in exchange for his testimony.  Stated differently, in light of all of the
evidence presented against Burton at trial, there is no reasonable probability that the
outcome of the proceeding would have been different, had the jury been informed of
McCants's juvenile record.

     For the foregoing reasons, Burton has failed to show that his trial counsel
provided constitutionally ineffective assistance, or that the state appellate court's
decision is contrary to, or an unreasonable application of, clearly established Supreme
Court precedent.  This claim, therefore, is due to be denied.

          **b**.          *Failure to investigate Barbara Spencer*.  *See* doc. no. 9, ¶¶ 166-67,
                    at 72-73.

Burton initially begins this claim by alleging that his trial attorneys made no

207

effort to speak to, or gather background information about, witness Barbara Spencer;
he then goes on to assert that, if counsel had done so, "they would have learned a great
deal" about Spencer that "could have been used to impeach her credibility." (Doc. no.
9 at 72). However, Burton is really complaining about the fact that, even though his
attorneys had in their possession an audiotape recording and typewritten transcript of
Spencer's grand jury testimony, detailing her "criminal history of at least seven prior
felony incarcerations," "nothing in the trial record reflects" that counsel used these
items to cross-examine her at trial. *Id.* at 72-73. He contends that counsel admitted
during the post-conviction hearing in the trial court that "he was unaware of the
specifics of [Spencer's] record [and] agreed that presenting testimony showing that she
was avoiding possible exposure to Habitual Offender status would have been
beneficial to the jury weighing her credibility." *Id.* at 73.

The decision of the Rule 32 trial court on collateral review, which was adopted
by the Alabama Court of Criminal Appeals, reads as follows:

> "Burton next contends that counsel was ineffective in failing to
> adequately investigate Barbara Spencer and in failing to use her criminal
> history for purposes of impeachment. The record, however, plainly
> demonstrates that Spencer's criminal history was made known to the jury
> during her testimony. For that reason, and those that follow, this claim
> is denied.
>
> "Barbara Spencer was not called to testify during the evidentiary
> hearing. Moreover, there has been no contention that she was

208

unavailable. Burton has failed to meet the burden of proof placed squarely upon him by Rule 32.3 of the Alabama Rules of Criminal Procedure. In order to be entitled to relief, he must demonstrate that, had Spencer been cross-examined in the manner he deems appropriate, there is a reasonable probability that the outcome of the trial would have been different. He has made no such showing.

"In addition, as noted above, the record demonstrates that the jury was well aware of Spencer's criminal history and, therefore, was able to consider it in accessing [sic] her credibility. In addition to the nature of the charges and prior convictions involved,[94] the jury was aware — pursuant to the questions of Mr. Willingham — that Spencer had 'been on probation, parole, or in prison most of the last 10 years.' Moreover, it was plain that Spencer was in custody at the time of her testimony. Any claim that Spencer's criminal background was not brought to the attention of the jury is simply belied by the trial record.

"Burton additionally makes two very specific assertions in relation to Barbara Spencer. The first arises out of a letter Spencer allegedly wrote to a 'sentencing judge declaring herself a non-violent person who would never hurt anyone.' Burton contends that counsel should have impeached her on the basis that '[h]er involvement in the present case, a conspiracy to commit robbery, debunks her missive to her previous trial judge.' The second claim is that counsel were ineffective for not pointing out that, if Spencer was 'indicted for complicity in the robbery charge, she would have been eligible for 10 to 99 years or life in prison'

---

[94] The appellate court inserted a footnote at this juncture in the quotation from the trial court's opinion, reading as follows:

> The prosecutor questioned Spencer on direct examination about her prior forgery and robbery convictions, as well as a pending robbery charge she had against her at the time of her testimony. In addition, during a break in Burton's cross-examination of Spencer, the prosecutor informed the jury that Spencer had the following criminal record: a 1980 forgery conviction; a 1981 narcotics conviction . . .; a 1984 theft conviction; three 1986 forgery convictions; and two pending charged for possession of marijuana and robbery. (Record on Direct Appeal, R. 598-99).

Tab 59 at 27 n.9.

[under the Habitual Felony Offender Act.] Both of these claims are without merit.  As was noted by the Court of Criminal Appeals, '[f]rom the record it is clear that Barbara Spencer was not an accomplice, as a matter of law.  There was absolutely no evidence that [Spencer] took part in any discussions concerning the robbery or the actual crime.'  *Burton v. State*, 651 So. 2d 641, 653 (Ala. Crim. App. 1997), *aff'd*, 651 So. 2d 659 (Ala. 1994), *cert. denied*, 514 U.S. 1115 (1995).  Burton presented no evidence in these proceedings that would contradict the relevant finding of the Court of Criminal Appeals.

"Moreover, the record demonstrates that Spencer was not testifying as the result of a plea bargain or any other deal made with the State.  She was never charged in relation to the Auto Zone murder and when asked if she had 'been promised any help on [her] cases to testify in this case,' she responded, 'no.'  The prosecutor then reiterated this point on redirect.[95]  Burton has not presented any evidence in these proceedings that contradicts Spencer's testimony in this regard.

"For all of the foregoing reasons, Burton has failed to demonstrate either deficient performance or prejudice in relation to counsel's treatment of Barbara Spencer.  This claim is, therefore, denied."

(Tab 59 at 26-28 (quoting Tab 58 at 29-31) (footnote omitted)).[96]

Burton has not demonstrated that the state trial and appellate courts' adjudication of this claim was contrary to, or an unreasonable application of, clearly

---

[95] The appellate court inserted another footnote in the trial court's opinion, reading as follows:

The prosecutor also pointed out on redirect examination that Spencer was facing a sentence of life imprisonment without the possibility of parole pursuant to the Habitual Felony Offender Act for the pending robbery charge. (Record on Direct Appeal, R. 600).

Tab 59 at 28 n.11.

[96] *See supra* notes 93 and 94 for an explanation of these short-form citations.

210

established federal law.  The information that he contends should have been presented

to the jury *was* before the jury.  This claim is due to be denied.

> **2**.  *Trial counsel failed to investigate all available defenses.*  *See* doc. no. 9, ¶¶ 168-73, at 73-75.

Burton alleges that his trial counsel rendered constitutionally ineffective

assistance when they chose to pursue an uncorroborated alibi defense, rather than the

more plausible defense that Burton lacked the requisite, individualized intent to kill

during the course of the robbery.  (*See* doc. no. 9 at 73-75).  Each aspect of this claim

is addressed below.

> **a**.   *Pursuit of an uncorroborated alibi defense*

The Alabama Court of Criminal Appeals addressed this claim on collateral

review and concluded that it was "not unreasonable" for counsel to present an alibi

defense, because it was pursued *as a result of what Burton told his attorneys prior to

trial*, and, *at Burton's direction*.  Further, as noted in that portion of the appellate

court's opinion set-out below (adopting, by quotation, the judgment entered by the

trial court following the Rule 32 hearing), *four witnesses testified in support of the

alibi defense*.  Hence, while the jury obviously did not find either their testimony or

the defense to be credible, it is not accurate to describe the defense as

"uncorroborated."

"At the time of his appointment, Mr. Willingham [Burton's lead defense attorney] had been continuously practicing law for 13 years and had participated in approximately 150 jury trials.  Part of his experience resulted from a three-year tenure with the Talladega County District Attorney's Office.  In addition, he spent a year working part time in that office.  Following his service as an assistant district attorney, Mr. Willingham went into private practice, where he remains to this day.  At the time of Burton's trial, half of Willingham's practice was criminal and he had been involved in at least three capital cases.  Based upon his background, experience, and [this] Court's personal knowledge of him as an attorney, the Court finds that Mr. Willingham was more than qualified to represent Burton.

"Regarding trial counsel's specific representation of Burton, the record plainly reveals that the chosen theory of defense was alibi.  Four witnesses were presented in support of this defense. *The court concludes that trial counsel pursued an alibi defense based upon what they were told by Burton and at Burton's direction*.  Although there was little testimony regarding trial counsel's interaction with their client, Willingham specifically testified that *Burton provided two explanations for the fact that his fingerprints were found at the scene — both were consistent with a claim of no involvement*.  [Willingham testified at the Rule 32 hearing that Burton had told him that "there was a police officer in Montgomery that was out to get him and had planted his fingerprints in the Auto Zone store," and that "he had previously been shopping at that specific Auto Zone prior to the date of the robbery and may have picked up some items and left his fingerprints on items he had picked up while he was there shopping." [Rule 32 R. Vol. 14, Tab. 47 at 136-37] Moreover, . . . this Court is required to presume that trial counsel's conduct was reasonable.  Applying such presumption requires a finding that *the alibi defense was pursued as a result of what Burton told his attorneys about the offense.  Counsel's determination to pursue the alibi defense was not unreasonable.*

"For obvious reasons, however, the decision placed significant restrictions on the manner in which counsel could credibly represent Burton.  For example, an aggressive attempt to convince the jury that

> Burton did not intend to commit murder would require an admission of participation and, therefore, would directly conflict with the claim of no involvement."

(Tab. 59 at 15-16 (quoting Tab 58 at 13-15)[97] (emphasis and bracketed alteration added) (footnote and citations to record omitted)); *see also id*. at 16-17 ("[T]his Court finds that counsel's presentation of the alibi defense was reasonable and did not constitute deficient performance.  Burton presented no evidence that would support a finding to the contrary.") (quoting Tab 58 at 17)).

This court agrees with respondent that Burton has not demonstrated that the state appellate court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law.  (*See* doc. no. 17 at 102-03, and doc. no. 18 at 94-95).[98]

Further, Burton has not demonstrated that the performance of his trial counsel was either unreasonable, or constitutionally deficient.   The Eleventh Circuit specifically addressed many of the considerations that are relevant to the present claim in its *en banc* decision in *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000). Among  other  things,  the  Court  said  that,  "[w]hen  courts  are  examining  the

---

[97] *See supra* notes 93 and 94 for an explanation of these short-form citations.

[98] Respondent also contends that, to the extent Burton may be asserting that his trial counsel was ineffective for pursuing an alibi defense, the claim is procedurally defaulted, because it was not raised during the Rule 32 proceedings in the trial court.  (*See* doc. no. 17 at 98 n.2).  In any event, this defense is without merit because, as the quotation set out above clearly shows, both the trial and appellate courts addressed this construction of Burton's claim on collateral review.

performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." *Id*. at 1316 (citing *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (stating that the "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel," and that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable)) (footnotes omitted).

> **b**.      *Failure to investigate and pursue a lack of intent to kill defense*

In support of his claim that trial counsel were ineffective for failing to investigate and present the "more plausible" defense that Burton lacked an individualized intent to kill, Burton alleges that McCants testified that he (Burton) "was angry and upset upon learning of the shooting of Mr. Battle." (Doc. no. 9 at 73 (citing R. 360-361)).   According to Burton, his attorneys' failure to properly investigate the case in advance of trial "left counsel unprepared to cross-examine State's witnesses LuJuan McCants and Barbara Spencer," and "led [defense counsel] to ignore the viable theory that Burton had no 'intent' to commit the murder."  (Tab. 59 at 16 (quoting Burton's brief at 10 and 15)).

Burton did not correctly characterize the tenor of McCants's testimony, however.  That portion of the record cited by Burton reveals that McCants actually

testified that Burton asked DeBruce why "he had to do th[at]" (shoot the storekeeper)? (R. Vol. 4, Tab. 6, at 360-61). DeBruce replied that the victim had a gun, and McCants needed protection, but McCants denied that was true. *Id*. Burton then allegedly "shook his head and said, come on, let's get out of here." *Id*. Burton directed DeBruce to ride with him. Contrary to Burton's contention, these comments do not undermine McCants's earlier testimony on direct examination, relating Burton's statement he would "take care of" any problems that arose during the robbery. *Id*. at 74.

Further, Burton has not denied that he directed his attorneys to pursue an alibi defense. Indeed, Burton testified during the penalty phase that he did not even know any of the other persons who had been arrested and charged for their participation in the Auto Zone robbery. (*See* R. Vol. 7, Tab. 19 at 1015-1016). Finally, as the state appellate court correctly observed, the decision of counsel to pursue, *at Burton's direction*, an alibi defense "placed significant restrictions on the manner in which counsel could credibly represent Burton. For example, an aggressive attempt to convince the jury that Burton did not intend to commit murder would require an admission of participation and, therefore, would directly conflict with the claim of no involvement." (Tab. 59 at 15-16 (quoting Tab. 58 at 13-15)).

Thus, Burton has not demonstrated that the state courts' adjudication of this

215

claim was contrary to, or an unreasonable application of, clearly established federal law, nor has he shown that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  It also should be noted that the Eleventh Circuit has held that "no absolute duty exists to investigate particular facts or a certain line of defense." *Chandler*, 218 F.3d at 1317.  Indeed,

> *counsel need not always investigate before pursuing or not pursuing a line of defense.*  Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly.  *See Strickland*, 104 S. Ct. at 2066 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *id.* ("In any ineffectiveness case, a particular decision *not* to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (emphasis added)); *Williams*, 185 F.3d at 1236-37 (noting that this circuit has rejected idea that "strategic decisions can be considered reasonable only if they are preceded by a 'thorough investigation'" and stating that, to be effective, counsel is not "required to 'pursue every path until it bears fruit or until all hope withers'"); *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) ("By its nature, 'strategy' can include a decision not to investigate . . . [and] a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course."); *see also Holladay v. Haley*, 209 F.3d 1243, 1252 (11th Cir. 2000) (noting that our circuit has rejected "a *per se* rule of ineffective assistance where counsel does not consult family members").  For example, counsel's reliance on particular lines of defense to the exclusion of others — whether or not he investigated those other defenses-is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable.

216

*Chandler*, 218 F.3d at 1317-18 (emphasis added); *see also id*. at 1319 ("Counsel is not

required to present every nonfrivolous defense."); *Waters v. Thomas*, 46 F.3d 1506,

1511 (11th Cir. 1995) (*en banc*) ("Stacking defenses can hurt a case.").

For all of the reasons discussed above, both aspects of this claim are due to be

denied.

**B.**     *Trial counsel failed to prepare and present evidence for pretrial hearings and did not fully present evidence in support of motions filed, including but not limited to the motion for change of venue, in violation of the Sixth, Eighth, and Fourteenth Amendments.  See doc. no. 9, ¶¶ 174-91, at 76-84.*

Burton identifies eight instances in which, he alleges, his trial attorneys either

failed to file motions, failed to prepare and present evidence in support of motions that

were filed, or failed to ensure that the motion hearings were not recorded.  (*See* doc.

no. 9 at 76-84).  Each is addressed in turn.

**1**.   *Trial counsel failed to present all necessary evidence for change of venue. Id*., ¶ 174, at 76.

Burton alleges his trial counsel were ineffective because they "failed to present

necessary and existing evidence of [pretrial publicity], and failed to ask questions of

the venire adequate to determine foreknowledge and bias of the jury pool."  (Doc. no.

9 at 76).  Burton contends that publicity leading up to his trial was extensive because

"[a] co-defendant had been tried and convicted in Talladega several weeks before" his

own trial, and "[j]ury selection revealed that many jurors were familiar with the case,

217

knew the deceased or his family, and were aware that a co-defendant had been tried, convicted and sentenced to death before the start" of his trial.  *Id.*  Burton declares "[p]retrial publicity can be so great that it inflames the community and prejudices the accused."  *Id.* (citing *Isaacs v. Kemp*, 778 F.2d 1482 (11th Cir. 1985); *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) and *Coleman v. Zant*, 708 F.2d 541 (11th Cir. 1983)).

Respondent answers that Burton cannot show the state appellate court's adjudication of this claim on collateral appeal was contrary to, or an unreasonable application of, clearly established federal law.  (*See* doc. no. 17 at 104-06, and doc. no. 18 at 96-97).

The Alabama Court of Criminal Appeals rejected this claim by quoting (and thereby adopting) the trial court's judgment on collateral review:

> "Regarding the change of venue claim, Burton has failed to meet his burden of proof.  The record plainly demonstrates that trial counsel moved for a change of venue.  The motion was based upon the percentage of the venire that had knowledge of the case and the publicity resulting from the trial of one of Burton's co-defendants, Derrick DeBruce.  This Court denied the motion and that determination was upheld on direct appeal.  Specifically, the Court of Criminal Appeals held as follows:
>
> " 'At least one-half of the members of each group [of fifteen prospective jurors] were at least aware of the facts surrounding the robbery and murder.  Each veniremember who had heard anything about the case was individually questioned.  The

218

> majority of the prospective jurors could not cite any specifics concerning the murder. All but one said that what they had heard would not affect their ability to decide the case impartially upon the evidence presented at trial. The one prospective juror who did respond that she had been biased was excused for cause. The appellant has failed to show the venire was so tainted that he was unable to obtain a fair trial.'

"*Burton v. State*, 651 So.2d 641, 645 (Ala. Crim. App. 1993), *aff'd*, 651 So.2d 659 (Ala. 1994), *cert. denied*, 514 U.S. 1115 (1995).

> "Burton has not presented anything during these proceedings to demonstrate that the original determination of this Court and the appellate courts was erroneous. He contends that trial counsel failed to present evidence warranting a change of venue, yet he produces no such evidence himself. Burton has proved neither deficient performance nor prejudice relevant to this claim. It is, therefore, denied."

(C. 384-85).

> The circuit court's findings are correct and we adopt them as part of this memorandum. Burton presented no evidence at the Rule 32 hearing tending to indicate that a change of venue was warranted in his case. Rather, Burton merely alleges that "[p]retrial publicity can be so great that it inflames the community and prejudices the accused." (Burton's brief at p. 17.) However, contrary to Burton's contention, "the existence of widespread publicity does not require a change of venue." *McGahee v. State*, [Ms. CR-00-2017, May 30, 2003] __ So.2d__, __ (Ala. Crim. App. 2003). Rather, "the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity." *Ex parte Grayson*, 479 So.2d 76, 80 (Ala. 1985). Burton presented no evidence at the Rule 32 hearing of actual prejudice or of community saturation. Thus, he failed to prove that his counsel's performance was deficient or that he was prejudiced by counsel's performance.

(Tab. 59, at 29-30 (quoting Tab. 58 at 32-33)).

Burton has not provided this court evidence of pretrial publicity — much less evidence of *prejudicial* pretrial publicity that actually biased even a single juror who deliberated on verdicts, or that was so pervasive that it could be said to have pervaded the community from which jurors were summoned and, thereby, given rise to a presumption of prejudice.   Therefore, Burton has failed to establish that the performance of his attorneys was constitutionally deficient.   Even if counsel's performance had been deficient, Burton has not shown prejudice that warrants habeas relief.   Finally, Burton has not shown that the adjudication of this claim in the state court system was contrary to, or an unreasonable application of, clearly established federal law, nor has he demonstrated that the decision was based upon an unreasonable determination of the facts in light of the evidence before the state courts.   Accordingly, this aspect of his claim is due to be denied.

    **2**.   *Trial counsel failed to obtain full recordation of the trial proceedings.   See* doc. no. 9, ¶ 175, at 77.

Burton concedes that his trial counsel filed a motion requesting full recordation of all proceedings conducted in the trial court, but alleges that counsel were ineffective for failing to *ensure* that all aspects of the trial were, in fact, recorded.   (*See* doc. no. 9 at 77).   He declares the trial court "had an in camera conversation with [a] juror that was not transcribed."   *Id.* (citing R. 320).   He also alleges that "the court proposed to

excuse a female African-American juror over the objection of defense counsel," but does not explain why or how this exchange was not fully recorded. *Id.* (citing R. 260, 317-319).  Finally, Burton alleges that, as a result of counsel's failure to ensure the recordation of rulings on pre-trial motions, "it is not evident what evidence or argument that trial counsel proffered in support of the change of venue motion." *Id.* Burton alleges these failures deprived him of complete appellate review and counsel accordingly was ineffective.  *Id.* (citing *Zant v. Stephens*, 462 U.S. 862 (1983); *Gray v. Lucas*, 677 F.2d 1086 (5th Cir. 1978); *Buckelew v. United States*, 572 F.2d 515 (5th Cir. 1978)).

Respondent answers that Burton cannot show that the state appellate court's adjudication of this claim on collateral appeal was contrary to, or an unreasonable application of, clearly established federal law.  (*See* doc. no. 17 at 106-07, and doc. no. 18 at 97-99).[99]

The pertinent portion of the Alabama Court of Criminal Appeals' opinion addressing this claim on collateral review reads as follows:

> Burton did not allege in his petition or in any of the amendments to his petition what occurred during the off-the-record discussions he claims should have been transcribed, and he did not present any evidence at the

---

[99] The Respondent also contends this claim is "procedurally defaulted because the Rule 32 court and/or the Alabama Court of Criminal Appeals found that Burton failed to present any evidence in support of this claim during the post-conviction evidentiary hearing."  (Doc. no. 18 at 97).

Rule 32 hearing as to this allegation.  *In fact, Burton did not even question Willingham about the off-the-record discussions at the Rule 32 hearing.  With no evidence of what occurred during the off-the-record discussions, Burton has failed to prove that he did not receive a full and fair appellate review of his conviction and sentence.*  Therefore, as the circuit court correctly found, Burton failed to prove either that his counsel's performance was deficient in this regard or that he was prejudiced.

(Tab. 59 at 30-31 (emphasis supplied)).

Burton does not dispute the appellate court's factual findings.  During the evidentiary hearing held in conjunction with his Rule 32 petition, Burton had the opportunity to question trial counsel about unrecorded discussions with jurors, as well as any evidence that might support the motion for change of venue discussed in the previous section, but he did not do so.  He does not challenge the state court's findings that the post-conviction record is devoid of a factual basis for this claim.  Accordingly, Burton cannot show either that the performance of his trial counsel was constitutionally deficient, or that the state appellate court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law.  This aspect of Burton's claim also is due to be denied.

**3**.  *Trial counsel failed to file all necessary motions for voir dire.  See* doc. no. 9, ¶¶ 176-78, at 77-79.

Burton next argues that trial counsel was ineffective for failing to file a motion requesting permission to examine prospective jurors about their death penalty views.

222

(*See* doc. no. 9 at 77).  He alleges that trial counsel failed to adequately "life qualify the jury, beyond asking general questions about the automatic imposition of the death penalty."  *Id.* at 78-79.  Respondent says that Burton cannot show that the state appellate court's adjudication of this claim on collateral appeal was contrary to, or an unreasonable application of, clearly established federal law.  (*See* doc. no. 17 at 108-09, and doc. no. 18 at 99-100).[100]

The Alabama Court of Criminal Appeals adopted by quotation the findings of fact and conclusions of law entered by the Rule 32 trial-court judge, reading as follows:

> "Although this claim is asserted as a failure to file a particular motion, its substance is plainly the contention that 'trial counsel did nothing to "life qualify" [the] jury.'  This claim is without merit.  The record reveals that trial counsel did question members of the venire in an effort to identify those that might be biased in favor of the death penalty.  For example, trial counsel asked one panel of potential jurors the following:
>
> " 'Are there any of you that have a fixed opinion or conscientiously [sic] in favor of the death penalty?
>
> " 'Any of you think the death penalty is not meted out often enough to criminals?'"
>
> " 'Any of you think the death penalty should — that more

---

[100] Respondent also contends that the claim is "procedurally defaulted because the Rule 32 court and/or the Alabama Court of Criminal Appeals found that Burton failed to present any evidence in support of this claim during the post-conviction evidentiary hearing."  (Doc. no. 18 at 97).

people should be sentenced to the death penalty than are now being sentenced to the death penalty?'"

" '. . . .

" 'Are there any of you that feel that if you had already found Mr. Burton guilty of a capital offense, would automatically vote to sentence him to the electric chair without hearing any other evidence? *Do any of you think you would totally disregard any evidence at the punishment phase and just automatically vote for the electric chair?*

" '. . . .

" ' Are there any of you that don't think that life without parole is real punishment?

" 'Are there any of you [who] think the penitentiary punishment or life without parole is too easy of a punishment?'

"The record reveals that counsel asked similar questions to each of the panels. Burton's claim — that counsel failed to "life qualify" the jury — is premised on an inaccurate portrayal of the record.  It is therefore denied."

(C. 34-35). (Citations to record omitted).  The circuit court's findings are correct.  We have reviewed the trial record, including the voir dire examination, and, contrary to Burton's contention, his counsel did, in fact, "life qualify" each panel of jurors.  Therefore, trial counsel were not ineffective in this regard.

(Tab. 59 at 31-32 (quoting Tab. 58 at 34-35) (emphasis in original)).

After examination of the record, it is apparent that Burton did not argue on

collateral appeal in the state court system — as he does here — that his trial counsel

failed to *adequately qualify* prospective jurors regarding their individual attitudes about the imposition of a penalty of life imprisonment without parole *versus* death by execution; instead, he claimed in state court that his "trial counsel did *nothing* to 'life qualify' [the] jury."  (Rule 32 C.R. Vol. 23, Tab. 48, at 20 (emphasis and alteration supplied)).  Thus, the claim raised in this court may be viewed as either unexhausted, *see*, *e.g.*, *Picard v. Connor*, 404 U.S. 270, 276 (1971) (holding that a state prisoner must "present the state courts with *the same claim* he urges upon the federal courts") (emphasis supplied), or as procedurally defaulted, for failing to present the same contention and argument in the state courts.  Alternatively, the claim, as framed in the habeas pleadings filed in this court, is without merit.  While Burton alleges here that his counsel's life-qualifying questions were not *adequate*, he does not specifically describe the deficiencies of counsel's question, *or* state *what other questions* counsel should have asked prospective jurors that would have elicited a different response — a response that would, could, might, or may have supported a challenge for cause.

In other words, regardless of what else might be said about exhaustion or procedural defaults, Burton still has not demonstrated that the performance of his counsel was deficient.  Moreover, he has failed to show that the state court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Finally, he has not explained why the state courts' disposition

of the claim resulted in a decision based on an unreasonable determination of the facts in light of evidence presented in the state courts.  Accordingly, this aspect of Burton's claim also is due to be denied.

**4**.  *Trial counsel failed to limit the state's arguments on aggravating circumstances.  See* doc. no. 9, ¶¶ 179-80, at 79-80.

Burton alleges that his right to a fair trial was violated because "counsel failed to file a motion to limit the prosecution's arguments to proven and indicted aggravating facts during the penalty phase of trial [and, as such], the prosecutor recited to the jury a laundry list of aggravating factors not applicable to [him.]"  (Doc. no. 9 at 79 (citing R. 917-926)).  Burton argues that, "[t]o allow consideration of unproven and unindicted aggravating circumstances promotes the infliction of an arbitrary and capricious death sentence."  *Id.* (citing *Gregg v. Georgia*, 428 U.S. 153 (1976)).

Respondent answers that this claim is procedurally defaulted, because it was dismissed by the state court pursuant to an adequate and independent state procedural rule:  Alabama Rule of Criminal Procedure 32.6(b).  (*See* doc. no. 17 at 110-11, and doc. no. 18 at 100-01).[101]

The pertinent portion of the opinion of the Alabama Court of Criminal Appeals on appeal from the judgment of the Rule 32 trial court read as follows:

> Mere citations to the record are not sufficient to satisfy a Rule 32

_____

[101] Ala. R. Crim. P. 32.6(b) is quoted in text on the following page.

226

petitioner's burden of pleading under Rule 32.6(b).  Moreover, as the
circuit court correctly noted in its order:

> "The basis for this claim is unclear.  The Court is unaware of
> any legal support for such a motion.  While the State is plainly
> limited to arguing the existence of the aggravating circumstances
> delineated in the *Alabama Code*, nothing limits the State to
> arguing only those proved during the guilt phase.  In fact, the
> evidence necessary to prove some aggravating circumstances is
> often inadmissible during the guilt phase."

(C. 388-89.)   The circuit court is correct.   Contrary to Burton's
contention, during the penalty phase of a capital trial in Alabama, a
prosecutor may argue, and may present evidence of, aggravating
circumstances under § 13A-5-49, Ala. Code 1975, even if those
circumstances were not proven at the guilt phase of trial.  A motion to
prohibit such an argument would have no legal basis.  "Counsel is not
ineffective for failing to file a motion for which there is no legal basis."
*Yarborough v. State*, 841 So. 2d 306, 309 (Ala. Crim. App. 2002).

(Tab. 59, at 33 (quoting Tab. 58, at 37)).   The first sentence of the foregoing

discussion by the last state court to review this claim *does* state, clearly and expressly,

that Burton had not complied with the specificity requirements of Alabama Rule of

Criminal Procedure 32.6(b) when pleading the present claim.  That Rule provides that:

> The petition must contain a clear and specific statement of the grounds
> upon which relief is sought, including full disclosure of the factual basis
> of those grounds.  A bare allegation that a constitutional right has been
> violated and mere conclusions of law shall not be sufficient to warrant
> any further proceedings.

Ala. R. Crim. P. 32.6(b).  Further, those specificity requirements are "independent" of

federal law, and Alabama courts have regularly followed and applied the requirements

for many years.  *See*, *e.g.*, *Duncan v. State*, 925 So. 2d 245, 255-57 (Ala. Crim. App. 2005); *Thomas v. State*, 908 So. 2d 308, 309-10 (Ala. Crim. App. 2004); *Taylor v. State*, 879 So. 2d 1210, 1211-12 (Ala. Crim. App. 2003); *Burgin v. State*, 857 So. 2d 162, 163-64 (Ala. Crim. App. 2002); *Bryant v. State*, 739 So. 2d 1138, 1139-40 (Ala. Crim. App. 1998); *McNair v. State*, 706 So. 2d 828, 839-43 (Ala. Crim. App. 1997); *Johnson v. State*, 675 So. 2d 85, 86 (Ala. Crim. App. 1995); *Wilson v. State*, 650 So. 2d 587, 589-90 (Ala. Crim. App. 1994).  Thus, the rule appears to be "firmly established and regularly followed."

Even so, both of the state courts — trial and appellate — stepped beyond the procedural bar and addressed the substance of Burton's claim, but still found it wanting.  Thus, construing the opinions of the state courts as rulings upon the merits, Burton's habeas claim still fails here.  First, it does not satisfy the specificity requirements for habeas pleadings:  see the discussion in Part III(D) of this opinion *supra*.

Alternatively, Burton has not shown that the state courts' adjudication of the claim was contrary to, or an unreasonable application of, clearly established federal law.  There were two statutory aggravating factors presented by the prosecution, one of which had been proven beyond a reasonable doubt during the guilt phase of trial by virtue of the fact that the jury had returned a verdict pronouncing Burton guilty of the

228

capital offense of murder during the course of a robbery.  For purposes of federal habeas review, once a proper statutory aggravating factor is proven, the prosecution can introduce evidence of any non-statutory aggravating factor.  *See Zant v. Stephens*, 462 U.S. 862, 878-79 (1983) ("Statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty.  But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.").  Therefore, examination of non-statutory aggravating circumstances and any mitigating circumstances arising from the evidence proffered at each phase of the trial was proper in the determination of whether Burton should be sentenced to death.

   **5**.  *Trial counsel did not request individual sequestered voir dire.  See* doc. no. 9, ¶¶ 181-83, at 80.

Burton alleges that, "[d]uring voir dire, the pattern of questions asked by the court and counsel were enough to prejudice any groups which heard them repeatedly." (Doc. no. 9 at 80).  He also contends that, due to extensive pretrial publicity associated with the case, he was "entitled to individual voir dire."  *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717 (1961)).

With regard to the first of these assertions, Burton failed to identify the

questions that were "repeatedly" asked by "the court and counsel," or to explain why those questions (if any) prejudiced the venire members who heard them.  He thus failed to satisfy the specificity requirements for habeas pleadings discussed in Part III(D) *supra*, and this aspect of his claim is due to be dismissed for failure to state a claim on which relief can be granted.

The second aspect of the present claim — Burton's assertion that he was "entitled to individual voir dire" due to extensive pretrial publicity — was addressed and rejected by the Rule 32 trial court, as follows:

> The record reveals that the voir dire of the venire was conducted in panels of 15 and, when the need for individual voir dire arose, it was allowed.  In addition, the veniremembers were repeatedly informed that, if they preferred not to answer a particular question in front of the group, they could approach the bench and respond privately.  Burton has failed to demonstrate either deficient performance or prejudice relevant to this claim.  Moreover, any allegation of prejudice is directly refuted by the fact that the method of voir dire employed in this case was upheld on direct appeal.

(Tab 58 at 37-38).  The Alabama Court of Criminal Appeals affirmed the trial court on collateral appeal, saying:  "We agree with the circuit court and adopt its findings as part of this memorandum; counsel were not ineffective for not requesting individually sequestered voir dire examination."  (Tab 59 at 35 (quoting C. 389-90 (Tab 58 at 37-38 in the habeas record)).  Further, as discussed in Part IV(R) *supra*, Burton has not shown that his trial was rendered fundamentally unfair by extensive,

prejudicial, pretrial publicity.  For all of these reasons, Burton cannot show that the state courts' adjudication of this aspect of his claim was contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, it is due to be denied.

**6**.  *Trial counsel failed to submit a jury questionnaire.  See* doc. no. 9, ¶¶ 184-86, at 81-82.

Burton alleges that extensive pretrial publicity made it essential for trial counsel to submit a jury questionnaire to ensure the selection of a fair and impartial jury, but counsel failed to do so.  (*See* doc. no. 9 at 81 (citing, *e.g.*, *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (citing the need for heightened reliability in capital proceedings); *Turner v. Murray*, 476 U.S. 28, 35-37 (1986) (holding that the questioning of prospective jurors must be extraordinarily careful and thorough in a capital case); *Coleman v. Kemp*, 778 F.2d 1487, 1541-43 (11th Cir. 1985) (observing that it is vital for information elicited from jurors in a capital case to be accurate and thorough)).

The Alabama Court of Criminal Appeals denied this claim on collateral review, reasoning as follows:

> Burton contends that his trial counsel were ineffective for not submitting a juror questionnaire for use during voir dire examination. . . . He argues that his counsel's failure to submit a juror questionnaire "prevented [him] from eliciting information from veniremembers that was essential to obtaining an impartial, uncorrupted, and unbiased jury." (Burton's brief at p. 22.)  However, Burton did not allege — in his

petition, in any of the amendments to his petition, or even in his brief on appeal — what questions he believes should have been included in the juror questionnaire, or what information he believes he could have received through the use of a juror questionnaire that he did not receive through voir dire examination. He likewise presented no evidence at the Rule 32 hearing that had a questionnaire been submitted by his counsel and used during voir dire that the outcome of his trial would have been different. Therefore, Burton failed to satisfy both his burden of pleading and his burden of proof with respect to this allegation.

(Tab 59 at 35).

Burton's habeas claim suffers from the same deficiencies noted by the state appellate court. First, he failed to identify any questions that allegedly should have been included in a juror questionnaire, or what information he believes he could have received through the use of such a questionnaire that his trial counsel did not elicit through voir dire examination. He also presented no evidence in either the state court or here tending to support the proposition that, *if* a questionnaire had been submitted and used during voir dire and the jury selection process, the outcome of his trial probably would have been different.

Thus, this claim is due to be denied for three independent reasons: (*i*) Burton's general allegation is not sufficient to satisfy the specificity requirements for habeas pleadings discussed in Part III(D) *supra*.; (*ii*) Burton has not shown that the performance of his trial counsel was constitutionally deficient, *see* Part VI(B)(1) *supra*; and (*iii*) he has not demonstrated that the state court's disposition of this claim

232

was contrary to, or an unreasonable application of, clearly established federal law.

    **7**.   *Trial counsel failed to file motions challenging Alabama's Death Penalty Statute*.  *See* doc. no. 9, ¶¶ 187-89, at 82-83.

Burton next alleges that "the method by which Alabama executes condemned prisoners[,] and the process by which it is accomplished[,] is cruel, torturous," and violates the Eighth Amendment.  (Doc. no. 9 at 82).  He contends that "[n]umerous design flaws" and a lack of adequate training for those personnel involved in execution procedures make the process "unreliable and unnecessarily cruel to individuals condemned to die."  *Id.* at 83.

Respondent correctly answers that, to the extent this claim addresses Alabama's former use of electrocution as the means of execution, it is moot, because electrocution is no longer Alabama's primary, or even preferred, method of capital punishment. (*See* doc. no. 17 at 115 n.4, and doc. no. 18 at 104 n.4).  To the extent the claim pertains to Alabama's current method of lethal injections, respondent is also correct that the claim is procedurally barred, because it was not raised on collateral review in the state courts.  (*See* doc. no. 17 at 115-17, and doc. no. 18 at 104-06).  In addition, Burton's habeas pleadings are devoid of any factual support.  Therefore, for all of these reasons, the claim is due to be denied.

    **8**.   *No motion to challenge identification was filed*.  *See* doc. no. 9, ¶¶ 190-91, at 83-84.

Burton alleges that trial counsel was ineffective for failing to "move to suppress any in-court identification testimony as tainted by out-of-court identification," particularly since his trial attorneys were aware that eyewitness testimony was to be an integral part of the State's case against Burton, and also because they were "aware that several of the defendants were shown on local television in shackles being led into the Talladega County Jail." (Doc. no. 9 at 83-84 (citing Rule 32 R. Vol. 14, at 44-45; and *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (disapproving suggestive confrontation "because they increase the likelihood of misindentification" in violation of the defendant's right to due process)). Burton declares that any in-court identification should have been excluded, unless the State demonstrated that "the identification had an independent origin or is otherwise reliable." *Id.* at 83 (citing *United States v. Wade*, 388 U.S. 218, 234 (1967) (illustrating suggestive identifications showing unfairness to the accused)). Finally, Burton alleges that trial counsel admitted during the post-conviction hearing that

> the filing of a suppression motion would have been an important tactical decision for a number of reasons. First, the motion may have been granted. Second, it would have given counsel a preview of testimony to come at trial [and, therefore, assisted counsel to prepare for] more effective cross-examination[,] and . . . [it also would have provided] greater insight into the State's case.

*Id.* at 84 (alterations supplied).

234

The Alabama Court of Criminal Appeals denied this claim on collateral review,

holding as follows:

> On direct appeal, Burton challenged McCardle's identification of him on this same ground. This Court held that there was "no evidence that McCardle's identification of the appellant was tainted in any way." *Burton*, 651 So. 2d at 650. The record from Burton's direct appeal supports that conclusion. The record reveals the following questioning of McCardle on direct examination by the prosecutor:

> > "[Prosecutor]: Prior to the time of you seeing the defendant, Charles Burton's picture in the newspaper, had you made an identification of him prior to that date?

> > "[McCardle]: Yes.

> > "[Prosecutor]: Would it have been on or about August the 22nd or August the 21st, which would have been less than a week after the robbery?

> > "[McCardle]: That's possible. I mean, that's you know, the time frame. That's very feasible.

> > "[Prosecutor]: But you know that you had made an identification before any pictures were circulated that you saw in a newspaper?

> > "[McCardle]: Yes. Yes."

> (Record on Direct Appeal, R. 625-26.)

> Because it is clear from the record that McCardle had positively identified Burton in a line-up before he saw Burton's picture in the newspaper, the identification was clearly not tainted as Burton alleges. Any motion on that ground, therefore, would have been baseless. Counsel cannot be ineffective for not filing a baseless motion.

(Tab 59 at 36-37).

This court agrees with respondent:  Burton has not demonstrated that the state court's adjudication of this claim on collateral appeal was contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  (*See* 28 U.S.C. § 2254(d) and doc. no. 17 at 117-19; *see also* doc. no. 18 at 106-07).  Accordingly, the claim is due to be denied.

**C.** *Trial counsel failed to challenge adequately the State's failure to arraign Mr. Burton, in violation of Mr. Burton's Sixth, Eighth, and Fourteenth Amendment rights.  See doc. no. 9, ¶ 192, at 84-85.*

Burton was arraigned on the original capital indictment returned by the grand jury, but he alleges that he was "subsequently re-indicted" and never re-arraigned. (Doc. 9 at 84).  He contends that "counsels' failure to insure [that he] was arraigned was ineffective and violated his right to be made aware of the charges against him." *Id.* at 84-85 (citing *Hamilton v. Alabama*, 368 U.S. 52, 54 (1961) (holding that, in Alabama, an arraignment is a critical stage of criminal proceedings)).

The Alabama Court of Criminal Appeals addressed this claim on collateral review in the following manner:

> Burton has not shown how he was prejudiced by the lack of arraignment on the substituted indictment.  Although Burton alleges that the lack of arraignment "violated his right to be made aware of the

charges against him," the record clearly shows that Burton was, in fact, aware of the charges against him. *The substituted indictment was identical to the first indictment, on which Burton was arraigned, in all respects except the amount of money alleged to have been taken during the robbery*, and Burton was well aware of the substituted indictment — the substituted indictment was read to the petit jury during the prosecutor's opening statement.[102]

Thus, even assuming that counsel's decision not to object to the lack of arraignment on the substituted indictment constituted deficient performance, it is clear to us that Burton was not prejudiced. Therefore, counsel was not ineffective in this regard.

(Tab 59 at 40 (emphasis supplied, and citations to trial record omitted)).

Burton's reliance on *Hamilton* affords him no relief. The defendant in that case alleged that he was not represented by counsel at arraignment, and there was no admissible evidence in the record showing that counsel had been present. The Supreme Court held that, under Alabama law, an arraignment is a "critical stage" of the proceedings; accordingly, the defendant was entitled to representation of counsel, and the failure of the state to provide counsel at the arraignment was presumptively prejudicial. *Id.* at 54. Hence, the conviction was reversed.

In this case, however, it is undisputed that Burton was represented by counsel at the initial arraignment and throughout the remainder of the proceedings at the trial

---

[102] At this point in the opinion, the Alabama Court of Criminal Appeals placed a footnote reading as follows: "We also note that, at the hearing on the motion for new trial, Burton's counsel testified that the lack of arraignment did not prejudice them [the two defense attorneys] in their preparation for trial and presentation of a defense." Tab 59 at 40 n.13 (alteration added).

court level.  Thus, Burton's circumstances are not similar to those addressed in *Hamilton*.  Moreover, "it is well established that formal arraignment is not constitutionally required if it is shown that the defendant knew what he was accused of and is able to defend himself adequately."  *Dell v. State of Louisiana*, 468 F.2d 324, 325 (5th Cir. 1972) (citing *Garland v. Washington*, 232 U.S. 642 (1914) (other citations omitted)).  Finally, the state appellate court on collateral review found that the record showed that Burton was well aware of the substituted indictment which, with the exception of the amount of money taken during the robbery, was identical to the first indictment upon which he had been formally arraigned.  The appellate court's factual findings are entitled to a presumption of correctness.  Burton has produced no facts to overcome these findings by clear and convincing evidence.  He also has not demonstrated that the state appellate court's decision is contrary to, or an unreasonable application of, clearly established federal law.  This claim is due to be denied.

**D.**  *Trial counsel failed to request the appointment of experts necessary to the defense, in violation of the Sixth, Eighth, and Fourteenth Amendments. See* doc. no. 9, ¶¶ 193-97, at 85-87.

Burton alleges that he was entitled to expert assistance pursuant to *Ake v. Oklahoma,* 470 U.S. 68 (1985), and *Griffin v. Illinois*, 351 U.S. 12 (1956), yet trial counsel failed to request funds to retain a "juristic psychologist" — *i.e.*, an expert jury selection consultant — failed to adequately challenge the state's fingerprint evidence,

238

and failed to request funds to retain an expert on memory and eyewitness testimony, as well as a mitigation expert. (Doc. no. 9 at 86-87). Burton alleges that, as a result of these failures: the jury selected in his case was unfair and partial; trial counsel was unable to adequately cross-examine the state's fingerprint expert; the testimony of memory and eyewitness experts "would have been relevant and instructive to the jury"; and, a mitigation expert could have investigated and presented important information concerning Burton's "difficult childhood and positive attributes." *Id.*

**1**.  *Eyewitness identification and "memory" experts*

Respondent argues that Burton's claim that his trial attorneys were ineffective for failing to request funds to retain the assistance of "memory" and eyewitness identification experts is procedurally defaulted, because it was not raised in state court. (*See* doc. no. 17 at 125-26, and doc. no. 18 at 112). Respondent's contention is factually inaccurate. As the following quotation from the opinion of the Alabama Court of Criminal Appeals on collateral review shows, that court addressed this claim:

> We note that within this issue [*i.e.*, Burton's claim that trial counsel was ineffective for failing to file a motion to suppress the identification testimony of Larry McCardle], *Burton also contends that his counsel were ineffective for not seeking the assistance of "experts on memory and eyewitness testimony*." (Burton's brief at p. 47). However, the extent of this allegation is that such expert assistance "would have been relevant and instructive to the jury." (Burton's brief at p. 47, C. 152.) Burton alleged no other facts to support this allegation, nor did he present any evidence at the Rule 32 hearing. Therefore, Burton failed to satisfy

239

> both his burden of pleading and his burden of proof with respect to this
> allegation.

(Tab. 59 at 37 (emphasis supplied)).  Even though the state appellate court neglected

to cite any portions of Alabama Rule of Criminal Procedure 32 in its opinion, the

following rules undoubtedly were the basis for its conclusion that "Burton failed to

satisfy both his burden of pleading and his burden of proof with respect to this

allegation": *see* Ala. R. Crim. P. 32.3,[103] and 32.6(b).[104]  If the state appellate court —

as the last court to address the issue — had stated, clearly and expressly, that its

disposition of the claim rested on those state procedural rules, then there would have

been no question about the correctness of respondent's contention that this claim is

procedurally defaulted.  Alabama Rules of Criminal Procedure 32.3 and 32.6(b) are

independent of any federal question and adequate to support the judgment entered.

In any event, and as discussed in Part III(D) *supra*, the same pleading specificity

deficiencies noted by the state court preclude Burton's claim here.

   **2**.   *Jury selection consultant*

---

[103] Alabama Rule of Criminal Procedure 32.3 provides that:  "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.  The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

[104] Alabama Rule of Criminal Procedure 32.6(b) provides that:  "The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.  A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."

The Alabama Court of Criminal Appeals addressed this aspect of Burton's claim — contending that his trial attorneys were constitutionally ineffective for failing to request funds for the assistance of a "juristic psychologist" — in the following manner on collateral review:

> Burton contends that trial counsel were ineffective for not requesting the assistance of a jury selection consultant. . . .   The extent of Burton's argument in this regard is that "[t]rial counsel could have used the assistance of a jury selection consultant to ferret out how [the pretrial publicity] would affect the ability of the jury to be fair and impartial." (Burton's brief at p. 27).  He pleaded no other facts and presented no evidence at the Rule 32 hearing to support this allegation.  Therefore, Burton failed to satisfy his burden of pleading and his burden of proof with respect to this allegation.

(Tab 59 at 40).  Again, if the state appellate court — as the last court to address this issue — had stated, clearly and expressly, that its disposition of the claim rested on state procedural rules, then there would have been no question about the correctness of respondent's contention that this claim is procedurally defaulted.  Even so, and as discussed in Part III(D) *supra*, the same pleading specificity deficiencies noted by the state court preclude Burton's claim here.

### 3. *Fingerprint identification and mitigation experts*

As for Burton's contention that his trial counsel was ineffective for failing to request funds to retain the assistance of experts on fingerprint identification and mitigation issues, respondent answers that the state appellate court deemed these

claims to have been abandoned, because Burton did not argue them on collateral appeal.  (*See* doc. no. 17 at 123-25, 127-28, and doc. no. 18 at 111-13).  Burton does not dispute that he failed to raise these claims on collateral appeal, and the following portion of the appellate opinion reveals that the claims were, in fact, deemed to have been abandoned because they were not pursued on appeal:

> Finally, we note that Burton does not pursue on appeal several of the grounds he raised in his petition and the amendments to his petition in support of his ineffective-assistance-of-trial-counsel claim.   Those grounds are:
>
> 1.      That his trial counsel were ineffective for not seeking appropriate expert assistance, such as a mitigation expert, social workers, a pathologist, and a trace evidence examiner.
>
> . . . .
>
> We will not review these grounds because, as noted previously, "'[a]llegations . . . not expressly argued on . . . appeal . . . are deemed by us to be abandoned.'" *Burks v. State*, 600 So. 2d 374-380 (Ala. Crim. App. 1991), quoting *United States v. Burroughs*, 650 F.2d 595, 598 (5th Cir. 1981).

(*See* Tab. 59, at 78-79).[105]  Accordingly, Burton's ineffective assistance claims in

---

[105] Even if Burton's ineffectiveness claim regarding retention of a mitigation expert were not procedurally defaulted, it would be due to be denied on the merits based on the appellate court's discussion of a separate ineffectiveness claim on collateral appeal; namely, whether or not counsel were ineffective "for not properly investigating and presenting mitigation evidence." (*See* Tab. 59 at 40-41).  Specifically, in its discussion and ultimate determination that trial counsel were not ineffective in the investigation and presentation of mitigation evidence,  the state appellate court adopted and quoted the trial court's merits decision denying the claim, which included, in pertinent part, the following comment:

connection with these experts are procedurally defaulted, and due to be dismissed.

**4**.   *The relevance of* Ake *and* Griffin

The Supreme Court's opinions in *Ake v. Oklahoma*,[106] and *Griffin v. Illinois*,[107]

do not directly support Burton's contention that a defendant is constitutionally entitled

to a "juristic psychologist," a "memory expert," or expert assistance on eyewitness

identification testimony or the comparison of fingerprint exemplars.  Nevertheless, this

court can conceive an argument of how the rationale of those decisions might be

extended to provide that the Due Process Clause of the Fourteenth Amendment

compels a state to provide such assistance to indigent defendants.  For example, in

---

> In addition, the existing record does not support a finding of deficient performance.  As Burton points out, trial counsel petitioned this court to hire a "mitigation expert."  Although the request was denied, it demonstrates that, prior to trial, counsel were considering and preparing for the possibility of a penalty phase.

*Id.*  Thus, even if this court were to determine the appellate court's opinion with regard to the mitigation expert is contradictory and ambiguous in nature, thus justifying a merits habeas review of the claim, it is undisputed that trial counsel requested funds for a mitigation expert, but their motion was denied.  Accordingly, trial counsel could not have been ineffective in this instance.

[106] In *Ake*, the Supreme Court held that, when an indigent criminal defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that the state provide access to a psychiatrist's assistance, for the purpose of adequately preparing and presenting a defense of not guilty by reason of mental disease or defect.  *See* 470 U.S. at 74.  Of course, no such defense was either offered or contemplated in Burton's case.

[107] In *Griffin*, the Court held that, once a state offers to criminal defendants the opportunity to appeal their cases, it must provide a trial transcript to an indigent defendant if the transcript is necessary to a decision on the merits of the appeal.  *See* 351 U.S. at 19 ("There can be no equal justice where the kind of trial a man gets depends on the amount of money he has. Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts.") (Black, J., plurality opinion).  Burton received a free transcript.

speaking for seven members of the *Ake* Court,[108] Justice Marshall observed that:

> This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.  This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.  In recognition of this right, this Court held almost 30 years ago that once a State offers to criminal defendants the opportunity to appeal their cases, it must provide a trial transcript to an indigent defendant if the transcript is necessary to a decision on the merits of the appeal. *Griffin v. Illinois*, 351 U.S. 12 (1956).  Since then, this Court has held that an indigent defendant may not be required to pay a fee before filing a notice of appeal of his conviction, *Burns v. Ohio*, 360 U.S. 252 (1959), that an indigent defendant is entitled to the assistance of counsel at trial, *Gideon v. Wainwright*, 372 U.S. 335 (1963), and on his first direct appeal as of right, *Douglas v. California*, 372 U.S. 353 (1963), and that such assistance must be effective.  *See Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984); *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).  Indeed, in *Little v. Streater*, 452 U.S. 1 (1981), we extended this principle of meaningful participation to a "quasi-criminal" proceeding and held that, in a paternity action, the State cannot deny the putative father blood grouping tests, if he cannot otherwise afford them.

*Ake*, 470 U.S. at 76 (footnote omitted).  Thus, it requires little imagination to conceive that, if the issues raised by Burton here were to be presented to the Supreme Court in the right case, the Court might be persuaded to extend the principles established in the cases cited above.  The Court has not so held, however; and Burton has not fashioned

---

[108] Chief Justice Burger filed a concurring opinion; Justice Rehnquist dissented.

244

a compelling argument persuading this court to do so.  Burton clearly has offered no evidence to establish that he was prejudiced by the absence of such witnesses, and his mere conclusory assertion that such experts would have been "helpful," or "informative," fails to support an argument that, in their absence, he was denied a fundamentally fair trial.  Therefore, two conclusions follow.  First, Burton has not demonstrated that the state appellate court's adjudication of the foregoing claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by [*the holdings*, *as opposed to the dicta*, of] the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (bracketed alteration added).  Second, Burton cannot show that his trial attorneys were objectively deficient for failing to secure funds for such experts.  *See Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990) ("No issue was presented to the Supreme Court in *Ake* concerning the right of an indigent to the appointment of an expert on eyewitness identification.").

For all of these reasons, the foregoing claims are due to be denied.

E.      *Trial counsel were ineffective in the preparation and presentation of mitigating evidence for the sentencing hearing, in violation of the Sixth, Eighth, and Fourteenth Amendments.  See* doc. no. 9,  ¶¶ 198-211, at 87-94.

Burton alleges that co-defense-counsel Larry Morris's failure to prepare a mitigation case caused lead-defense-counsel William Willingham to "elicit[] only

conclusory testimony from [Burton's] relatives, which did not fully disclose his mitigating familial and socioeconomic background," and resulted in the omission of any evidence concerning Burton's school record, social history, and juvenile and adult criminal records (including prior pre-sentence investigation reports). (Doc. no. 9 at 88-89). Burton also contends that his trial attorneys failed to speak to the lawyers who had represented him in prior criminal prosecutions, former employers, and his parole officer. *Id.* at 89-90. Moreover, he alleges that counsel "did not perform comprehensive interviews" with Burton's sisters, and failed altogether to speak to his brother and children. *Id.* at 90.

In fact, Burton contends that his defense attorneys' only effort to support a mitigation case consisted of a hasty assemblage of witnesses, cobbled together immediately following his conviction. "As a consequence," Burton declares, none of the mitigation witnesses possessed an informed understanding of the purposes of evidence normally offered at a penalty phase hearing in mitigation of the sentence to be imposed for the offense of conviction; the witnesses were unprepared to elaborate on Burton's background; and, some even "declined during their testimony to ask the[] jury to spare [Burton's] life." *Id.* at 90.

For example, Burton's sister, Eddie May Ellison, traveled to Talladega at the "urgent request" of Burton's mother immediately after Burton's conviction. *Id.* Ms.

Ellison had never been interviewed by Burton's attorneys, and she testified without counsel speaking to her about the content of her testimony.  *Id.*  Ms. Ellison described Burton as a typical child who was caring and loving to his family.  *Id.* at 90-91.

Burton's wife testified that he was a good father who tried to teach the children right from wrong.  Burton's stepfather said that he had seen Burton's biological father "beat, hit, or punch" Burton when he was about eight years old.  Burton's mother testified that her son was a loving child, that she had divorced his father when Burton was three years old, that his natural father was an alcoholic, and that, after Burton went to live with his father at seven years of age, she did not see him often due to an "undescribed conflict" with the natural father.  *Id.* at 91.

In contrast, Burton alleges that the attorneys who represented him during post-conviction proceedings presented evidence that his parents divorced when he was young, and that his stepsisters and stepbrother were raised in a loving, stable household, while he and his two full-blooded sisters were raised by their abusive, alcoholic father.  *Id.*  He alleges that, if the severity of the physical and psychological abuse meted out against him and his sisters had been fully developed and compellingly presented at the penalty phase of trial,[109] and if the difference between his childhood

---

[109] Burton contends that testimony at the post-conviction evidentiary hearing revealed that his natural father was

someone who was "very mean, very vulgar, always intoxicated," and was mentally

and the more normal childhood of his step-siblings had been clearly delineated for the jury,[110] there is a reasonable probability that the jury would have recommended a sentence of life without parole, rather than death.  *Id.* at 93 (quoting *Collier v. Turpin*, 177 F.3d 1184, 1204 (11th Cir. 1999) ("The jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day of the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of life.  Had they been able to do so . . . it is at least reasonably probable that the jury would have returned a sentence other than death.").

and physically abusive to his children.  (H.R. 215).  At one time, he slapped Mr. Burton's sister to the floor because she refused to get him a beer.  (H.R. 197, 216). Mr. Burton's half-sister, Ms. Eddie Mae Ellison, recalled seeing Charles Sr. pick Mr. Burton's sister, Elizabeth, up and throw her out the back door.  (H.R. 210).  Ms. Ellison also saw Charles, Sr. kick Mr. Burton "in the behind down the flight of the front steps."  (H.R. 210).  As a probable consequence, one sister reared with Charles Burton, Sr. is an alcoholic, and one suffers from psychological problems.  (H.R. 178). Mr. Burton's sister recalled that Mr. Burton was so unhappy in his father's home that, as a teenager,  he  ran away to her mother's house to hide in a chiffarobe.  (H.R. 198).

. . . .

Even though she knew that her children were "living in a complete hell" with their father, Mr. Burton's mother never attempted to regain custody.  (H.R. 175).  Mr. Burton's mother, in fact, absented herself from the lives of her eldest children because when she visited them early on, her former husband used the children as a tool to hurt her, cursing her and making a scene when she visited. (H.R. 171-172).

(Doc no. 9 at 93).

[110] In contrast to Burton, his step-siblings became educated and grew into successful, law-abiding adults.  *See id.* at 92-93.

Respondent answers that Burton cannot show the state courts' adjudication of this claim on collateral review was contrary to, or an unreasonable application of, clearly established federal law. (*See* doc. no. 17 at 129-30, and doc. no. 18 at 113-14).[111]

On collateral review, the Alabama Court of Criminal Appeals agreed that the trial court's findings regarding this claim were supported by the record of the Rule 32 proceedings, as well as the record from Burton's direct appeal, and the appellate court adopted the trial court's opinion denying the claim as its own judgment. (*See* Tab. 59 at 45). A portion of the trial court opinion adopted by the appellate court reads as follows:

> "For the following reasons, Burton has failed to meet the burden of proof placed upon him by Rule 32.3 of the Alabama Rules of Criminal Procedure.[112] He has failed to establish either deficient performance or

---

[111] Burton includes a footnote in which he alleges that trial counsel was ineffective for failing to object to the prosecutor questioning his relatives on cross-examination in a manner that suggested they had criminal records. (*See* doc. no. 9 at 89 n.8). This allegation is unrelated to the claim at issue, and respondent is correct when arguing that it is procedurally defaulted, because Burton did not raise the claim during Rule 32 proceedings in the state courts. (*See* doc. no. 17 at 129 n.5).

In the same footnote, Burton also asserts that his counsel was ineffective for failing to prepare him for his own penalty-phase testimony. *Id.* However, Burton offered no evidence to support this claim during the Rule 32 hearing in the trial court, and he has not supported it here. Such a conclusory assertion is insufficient for federal pleading purposes, and it is due to be dismissed.

[112] Alabama Rule of Criminal Procedure 32.3 provides that: "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its

prejudice in relation to this claim.

"Initially, as Burton acknowledges in his post-hearing brief, Mr. Willingham testified that his 'co-counsel, Larry Morris, was in charge of preparing mitigation.' *Mr. Morris*, *however*, *was not called to testify at the evidentiary hearing.  This Court is*, *therefore*, *not privy to any of the actions*, *omissions*, *thought processes*, etc., *of Mr. Morris that are not established in the existing record.*  In considering Mr. Burton's claims, a presumption must be applied that Mr. Morris acted reasonably and competently, i.e., that he did what he should have done.

"Presumably in an attempt to rebut this presumption, Burton asserts that 'Mr. Willingham admitted that Morris did not do a lot when it came to the mitigation hearing, and that Willingham wound up doing most of the presentation.'  While Willingham's testimony does support the assertion that he 'wound up doing most of the presentation,' he plainly stated that he did not know what Morris did in terms of preparation and investigation.

". . . .

"This [lack of knowledge] is plainly insufficient to overcome the presumption of competence and, therefore, does not establish Burton's claim that 'Morris did not do a lot' in preparation for the penalty phase. For example, although Burton asserts that 'counsel did not contact [Burton's] prior employers,' he failed to prove this assertion.  The fact that no 'prior employers' testified during the penalty phase is not sufficient to establish the allegations.[113]  Moreover, current counsel did

---

existence by a preponderance of the evidence."

[113] The Alabama Court of Criminal Appeals inserted a footnote at this juncture, reading as follows:

> Moreover, we note that at the Rule 32 hearing Willingham testified that he did not know that Burton had had any employers because Burton told him that, since he had gotten out of prison in 1989, he had been self-employed.  In addition, Burton testified at the penalty phase of the trial that he was self-employed.

not present the testimony of any 'prior employers' during these proceedings.

"Applying the presumption that Morris was competent in his preparation for the penalty phase, the Court finds that Burton has failed to meet his burden of proof.  Again, the law plainly requires that a presumption of competence be applied that the burden of proof be placed solely on Burton.  See *Chandler* [*v. United States,*] 218 F.3d 1315 n.15 (11th Cir. 2000) (*en banc*) (stating that 'never does the government acquire the burden to show competence, even when some evidence to the contrary might be offered by the petitioner').  He has, therefore, failed to establish deficient performance on the part of trial counsel.

"In addition, the existing record does not support a finding of deficient performance.  As Burton points out, trial counsel petitioned this Court for funds to hire a 'mitigation expert.'  Although the request was denied, it demonstrates that, prior to trial, counsel were considering and preparing for the possibility of a penalty phase.  Additionally, Willingham testified that they received a manual from the Capital Resource Center — an organization that specializes in capital litigation — and used it in preparing for trial.  *Again, because Mr. Morris did not testify, the record is largely silent regarding his actions in relation to the investigation of possible mitigation.*  The record does demonstrate, however, that trial counsel presented the testimony of four family members during the penalty phase.

"Those persons called to testify at the penalty phase were Burton's mother, stepfather, sister and wife.  Counsel elicited testimony from each of these individuals regarding Burton's background and character.  Based upon the trial record — including the Court's personal observation of counsel's performance — and the evidence presented in these proceedings, this Court finds that Burton has failed to establish that counsel's conduct fell 'outside the wide range of professionally competent assistance.'  Although there is always more that could have done [sic], that is not the test.  As the Court of Appeals for the Eleventh

---

Tab. 59 at 42 n.14.

Circuit has stated:

> "'That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we have noted before, "[i]n retrospect, one may always identify shortcomings." *Cape v. Francis*, 741 F.2d 1287, 1302 (11th Cir. 1984), 88 L. Ed. 2d 245 (1985), but perfection is not the standard of effective assistance.
>
> " 'The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight. See, e.g., *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L. Ed. 2d 674 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.")

"*Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995).

"In the alternative, the court finds that Burton has failed to demonstrate prejudice as required by *Strickland*. Much of the testimony presented at the evidentiary hearing was cumulative to that presented by trial counsel [at trial]. Indeed, current counsel only called one witness who did not testify at the original trial [Sheila Ellison Ford, one of Burton's sisters]. Additionally, Burton has pointed to nothing in the documentation introduced that would have altered the result.[114] It is the

---

[114] The Alabama Court of Criminal Appeals inserted another footnote at this point, reading as follows:

> Burton introduced into evidence his prison record, which he claims should have been presented at the penalty phase of the trial. Although Burton alleges that these records show "definite" psychological problems that should have been presented to the jury in mitigation . . . , we have reviewed the records, which encompass over five volumes of the Rule 32 record and at least half of which are the records from after he was convicted of capital murder in 1992, and thus, not relevant to this allegation of ineffective assistance of counsel, and we agree with the circuit

> finding of the Court, therefore, that Burton has shown a reasonable probability that, had the evidence he presented at the Rule 32 hearing been presented at trial, the outcome would have been different. This claim is denied."

Tab 59 at 41-45 (quoting C. 406-11 and Tab. 58 at 54-59) (emphasis added, some footnotes and record citations omitted).

After carefully examining the mitigating evidence that Burton alleges trial counsel failed to investigate and explore, this court finds that Burton has not demonstrated that the state courts' adjudication of this claim on collateral review resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Further, he has not persuaded this court that the state courts' disposition of the claim resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Id*. § 2254(d)(2). Burton has not convinced this court that there is a reasonable probability that, had the additional evidence of his abusive childhood been presented along with the aggravating and mitigating circumstances known to the jury at trial, the jury would have recommended life

---

court that they contain nothing that would have altered the outcome of his trial. The records do not, as Burton claims, indicate any psychological problems. Rather, the records indicate that Burton had no history of mental illness, which is consistent with Willingham's testimony at the Rule 32 hearing that Burton and several members of Burton's family had told him that Burton had no history of psychological problems.

Tab. 59 at 45 n.15.

without parole.  Burton was a forty-year-old adult of average intelligence on the date of the robbery.  He did not suffer from a mental illness; he was a skilled laborer; and, he was married with numerous stepchildren.  Moreover, the penalty phase testimony did allow the jury to realize the distinction between Burton's childhood and that afforded to his step-siblings.  This claim is due to be denied.

F.   *Trial counsel failed to object to discrimination in the selection of grand jury forepersons in Talladega County.  See* doc. no. 9, ¶¶ 212-13, at 94-95.

Burton alleges that "African-Americans were systematically excluded from serving as forepersons of the Grand Jury in Talladega County," and that his trial counsel were ineffective for failing to lodge an equal protection or due process challenge to the racial discrimination.  (Doc. no. 9 at 94-95 (citing *Vasquez v. Hillary*, 474 U.S. 254, 264 (1986) (discrimination in the selection of a grand jury violates Equal Protection); *Rose v. Mitchell*, 443 U.S. 545, 553 (1979) (African-Americans are a constitutionally protected and cognizable group)).

The Alabama Court of Criminal Appeals addressed this issue on collateral review in the following manner:

> Burton contends that his trial counsel were ineffective for not objecting to alleged racial discrimination in the selection of grand jury forepersons in Talladega County.  (Claim I.G. in Burton's brief.) However, Burton failed to plead any facts to support his allegation. Burton argues that "African Americans were systematically excluded from serving as forepersons of the grand jury in Talladega County,"

254

(Burton's brief, at 32) but he failed to allege — in his petition, in the amendments to his petition, and even in his brief on appeal — how grand jury forepersons are selected in Talladega County or how the foreperson of the grand jury that indicted him was selected. . . .  Therefore, Burton failed to satisfy his burden of pleading with respect to this allegation. Moreover, as the circuit court correctly noted in its order, Burton presented no evidence whatsoever at the Rule 32 hearing of any racial discrimination in the selection of grand jury forepersons in Talladega County.  Thus, Burton also failed to satisfy his burden of proof with respect to this allegation.

(Tab 59 at 48-49).

Burton's pleadings in this court suffer from the same deficiencies:  he has not alleged how grand jury forepersons are generally selected in Talladega County, how the foreperson who presided over the grand jury that indicted him was selected, the race of that foreperson, or even how many (or what percentage) of the forepersons during some relevant period leading up to his indictment were black and how many white.  In the absence of such fundamental facts, Burton cannot establish that his trial attorneys were objectively deficient for failing to assert a challenge to the racial composition of Talladega County grand juries, and he has not shown that he was prejudiced because counsel did not raise such a challenge.  Accordingly, Burton has again failed to demonstrate that the state appellate court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that the state courts' disposition of the claim resulted in a decision that was based upon

an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  *See* 28 U.S.C. § 2254(d).

**G.**   *Trial counsel failed to object to under-representation of minorities and women on the venire from which Mr. Burton's grand and petit juries were drawn, in violation of Mr. Burton's Sixth, Eighth, and Fourteenth Amendment rights.  See* doc. no. 9, ¶¶ 214-15, at 95-96.[115]

Burton alleges that trial counsel "failed to ensure a fair representation of minorities on the jury" when they did not "object to . . . information allegedly obtained outside the record" and offered by the prosecutor as race-neutral reasons for exercising peremptory strikes against five black venire members, and also when they did not "insist that this information be either testified to or placed on the record for later review."  (Doc. no. 9 at 95-96).

Respondent argues that Burton cannot show that the state appellate court's adjudication of this claim on collateral review was contrary to, or an unreasonable

---

[115] Even though the wording of the title to this claim clearly indicates that Burton alleges that both blacks *and women* were under-represented among the members of the grand jury that indicted him, as well as the venire from which his trial jury was selected, the substance of this claim actually is focused only upon trial counsel's alleged failure to support Burton's *Batson* claim that five black prospective jurors were peremptorily stuck by the prosecutor on the basis of their race.  Thus, the court does not discuss this claim to the same extent as its title purports to address discrimination against blacks *and women* on the grand and petit juries of Burton's case.  The Alabama Court of Criminal Appeals made the same observation in its opinion on collateral review, and additionally held that, even if Burton was attempting to make such claims, he had "failed to plead any facts to support the allegations."  (Tab. 59 at 49 n.17; *see also* note 118 *infra*).

Thus, the claim implicit in Burton's title to this section of his brief — that his counsel were ineffective for failing to object to alleged under-representation of women and blacks on his grand jury and petit venire — was procedurally defaulted, because it was dismissed by the state appellate court; and, even if it were not procedurally defaulted, these contentions would be due to be dismissed here for failure to comply with the specificity requirements for federal habeas pleadings.

application of, clearly established federal law.  (*See* doc. no. 18 at 117-18).[116]

The Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law when considering this claim on collateral review:

> Burton contends that his trial counsel were ineffective for not objecting to the prosecutor's relying on information received from law enforcement to support his peremptory strikes.  (Claim I.H. in Burton's brief).[117]  However, in determining the trial court had properly denied Burton's *Batson v. Kentucky*, 476 U.S. 79 (1986), motion, this Court stated the following on direct appeal:
>
> > "The main reason that the appellant challenges the striking of the prospective jurors is that the reasons given for striking

---

[116] Respondent also contends that this claim is procedurally defaulted, because it was dismissed by the state court pursuant to an adequate and independent state procedural rule: Alabama Rule of Criminal Procedure 32.6(b).  (*See* doc. no. 17 at 133-34; *see also* doc. no. 18 at 117 (asserting that this claim is "procedurally defaulted because the Rule 32 court and/or the Alabama Court of Criminal Appeals found that Burton failed to present any evidence in support of this claim during the post-conviction evidentiary hearing")).  However, as the textual discussion following this marginal note shows, the state appellate court's ruling is an adjudication on the merits.

[117] The Alabama Court of Criminal Appeals inserted a footnote at the end of this citation, reading as follows:

> Burton styles this claim as follows:  "Trial counsel failed to object to underrepresentation of minorities and women on the venire from which Burton's grand and petit juries were drawn" [*i.e.*, *the same manner in which Burton styles his claim in this court*].  However, Burton's argument with respect to this allegation — in his petition, in the amendments to his petition, and in his brief on appeal — is not that his counsel should have objected to alleged underrepresentation of women and minorities on his grand and petit jury venires, but that his "trial counsel failed to ensure a fair representation of minorities on the jury" that convicted him.  Nevertheless, we note that to the extent that Burton was attempting to challenge trial counsel's effectiveness for not objecting to alleged underrepresentation of women and minorities on the grand and petit jury venires, Burton failed to plead any facts to support that allegation.

Tab 59 at 49 n.17 (bracketed alteration added).

several of the jurors were based on information from law enforcement that these individuals had been convicted or had relatives involved in illegal activities.  We realize that strikes based primarily on reasons provided by law enforcement have in the past presented problems, *Ex parte Thomas*, 601 So. 2d 56 (Ala. 1992), *Walker v. State*, 611 So. 2d 1133 (Ala. Cr. App. 1992).  However, we find no *Batson* violation here.

   ". . . .

   "Here the reasons given by the prosecution were not based on hunches but were based on very specific reasons related to them by named law enforcement officials.  We find no violation of *Ex parte Thomas* or of *Walker*."

651 So. 2d [at] 649-50.  Because this Court has already held that there was no error in the prosecutor's relying on information from law enforcement to support his peremptory strikes, Burton's counsel could not be ineffective for not objecting on that ground at trial.

(Tab 59 at 49-50).

After examination of the record and the state court's decisions on both direct appeal and collateral review, and after taking into consideration this court's discussion of the substantive *Batson* claim in Part IV(A) of this opinion *supra*, the court concludes that Burton has failed show that the adjudication of this claim by the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law.  The court additionally notes that Burton had the opportunity during post-conviction proceedings to establish that the reasons given by the state prosecutor for peremptorily striking five black venirepersons were a pretext

258

for racial discrimination.  The record of proceedings in the Rule 32 trial court shows that post-conviction counsel could have investigated and presented evidence addressing the truthfulness of the prosecutor's stated reasons from numerous angles, including, but not limited to:  summoning and questioning the jurors who were peremptorily struck by the prosecutor; summoning and questioning the law enforcement officers who had been identified by the prosecutor during the jury selection process as the sources of his information; and, examining public records to determine whether any of the jurors who were peremptorily struck by the state or members of their families had, as represented by the prosecutor, actually been charged with or convicted of criminal offenses.  None of that evidence was presented during the Rule 32 hearing, however.  Consequently, there simply is no basis for asserting that the performance of trial counsel was objectively deficient, or that Burton suffered prejudice.  Thus, among other reasons, this claim is due to be denied for failure to state a claim upon which relief can be granted.

**H.**     *Trial counsel failed to ask venire members the kinds of questions necessary to elicit bias and to secure a fair trial.  See* doc. no. 9, ¶ 216, at 96.

Burton alleges that his trial attorneys were ineffective because they failed "to prepare a juror questionnaire, to individually question the jurors, to request the assistance of a jury selection expert, or to ask the type of probing questions necessary

259

to examine the volatile issues involved in this case . . . in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (Doc. no. 9 at 96).

Respondent answers that Burton cannot show that the state appellate court's adjudication of this claim on collateral appeal was contrary to or an unreasonable application of clearly established federal law. (*See* doc. no. 17 at 134-36). In the State's reply brief, respondent also argues that Burton previously raised these claims. (*See* doc. no. 18 at 118). Respondent is correct. No further discussion of this claim is necessary, because Burton raised the underlying bases for it in other ineffective assistance of trial counsel claims previously addressed and rejected by this court: *see supra* Parts VI(B)(1), (3), (5), (6), and VI(D).

**I.**    *Trial counsel were ineffective for inadequately pleading and arguing challenges for cause. See* doc. no. 9, ¶¶ 217-18, at 97-98.

Burton alleges that the voir dire conducted by trial counsel was inadequate because it failed to uncover juror biases, and, "life-qualify" the jury. He also claims counsel failed to object to the excuses offered by the prosecutor regarding the state's peremptory strikes. (*See* doc. no. 9 at 98-99).

Respondent answers that this claim is procedurally defaulted because it was dismissed by the state court on the basis of adequate and independent state procedural rules. (*See* doc. no. 17 at 137-39, and doc. no. 18 at 118-20).

Of course, similar contentions have previously been addressed and rejected in this opinion. *See supra* Parts VI(B)(3), VI(G) – (H). Nevertheless, the Alabama Court of Criminal Appeals apparently discerned a subtle difference between the present claim and previous contentions, because it addressed this claim in the following portion of its opinion on collateral review:

> Burton contends that his counsel were ineffective for "inadequate pleading and arguing [of] challenges for cause." (Claim I.J. in Burton's brief at p. 34.) Although not entirely clear, he appears to argue that his counsel failed to make adequate arguments in support of his challenges for cause, failed to challenge for cause jurors who should have been challenged, and failed to object to the prosecutor's challenges for cause. However, Burton did not identify any jurors with respect to this allegation. Burton did not allege what arguments should have been made to support his challenges for cause that were not made by counsel, which jurors he believes should have been challenged for cause that were not, or which jurors the prosecutor challenged for cause that he believes his counsel should have objected to. Therefore, Burton failed to provide "full disclosure of the factual basis" for this allegation. Rule 32.6(b). Moreover, he presented no evidence whatsoever at the Rule 32 hearing to support this allegation and, thus, failed to "prov[e] by a preponderance of the evidence the facts necessary to entitle [him] to relief." Rule 32.3.

(Tab 59 at 50 (record citations omitted)). Thus, whatever else might be said, this claim was procedurally defaulted because the last state court to address it clearly and specifically relied upon adequate and independent state procedural rules when dismissing it. Even if it could be argued that the state appellate court dismissed the claim for failure to state a claim upon which relief could be granted (*i.e.*, a merits

decision), Burton has not attempted to show that the decision was contrary to, or an unreasonable application of, clearly established federal law, nor can he show that the decision was based upon an unreasonable determination of the facts in light of the evidence before the state courts. This claim accordingly is due to be dismissed or, in the alternative, denied.

**J.**     *Trial counsel failed to object to the prosecutor's misstatements of the law during opening statement, the trial, and closing argument. See* doc. no. 9, ¶¶ 219-28, at 98-101.

Burton alleges counsel failed to object when, during opening and closing arguments at the guilt phase of trial, the prosecutor misstated the legal definitions and application of the terms "intent," "aiding and abetting," "recklessness," and "alibi." (Doc. no. 9 at 98-100). Counsel also failed to object when the prosecutor commented upon Burton's facial tattoo, *see supra* Part IV(D)(3), and instructed the jury to "blame him" as the district attorney if they did not approve of the plea bargain made with co-defendant McCants. Burton argues that, if his trial counsel had lodged timely objections, they "would have prevented such improper and prejudicial arguments, and preserved the reversible error for appellate review." *Id.* at 99-101.

Before examining each allegedly improper comment, the Alabama Court of Criminal Appeals stated that the propriety of the various remarks complained of must be considered within the context of the entire trial to determine whether any

(considered individually and together) rendered the trial fundamentally unfair. (*See*

Tab. 59, at 51 (citing, *e.g., Donnelly v. DeChristofero*, 416 U.S. 637, 637 (1974)

(holding that a determination of whether remarks are prejudicial to the extent that a

defendant's right to due process is violated must include consideration of all remarks

within the context of the entire trial), and *Ferguson v. State*, 814 So. 2d 925, 945-56

(Ala. Crim. App. 2000), *aff'd*, 814 So. 2d 970 (Ala. 2001)). The pertinent portion of

the state appellate court's discussion reads as follows:

> First, Burton contends that the prosecutor mischaracterized the definition of intent . . . recklessness, and the law on aiding and abetting during his opening and closing arguments at the guilt phase of his trial. *Burton did not plead* — in his petition, in the amendments to his petition, or in his brief on appeal — *what the prosecutor actually stated regarding intent, recklessness, or the law on aiding and abetting; he merely pleaded a conclusion — that the prosecutor's comments were incorrect — and cited to page numbers in the record.* However, as noted above, neither the pleading of a conclusion nor citations to the record are sufficient to satisfy a Rule 32 petitioner's burden of pleading pursuant to Rule 32.6(b). Moreover, we have reviewed the prosecutor's statements regarding intent, recklessness, and aiding and abetting and find no error. Therefore, counsel were not ineffective in this regard.

(Tab. 59 at 52 (emphasis supplied)). The appellate court also found the prosecutor's

statements concerning Burton's alibi defense to be proper, because they were

"virtually identical" to the trial court's jury instruction, which was also proper. *Id.* at

54. The prosecutor's comments about Burton's facial tattoo were also deemed proper,

because they were made to rebut defense counsel's argument that store manager Larry

263

McCardle's identification of Burton was not credible, because McCardle had not identified the tattoo under Burton's right eye when providing a description to police immediately after the robbery. *Id.* at 53-54. Finally, the appellate court found that the prosecutor's act of telling the jury to "blame him" (the prosecutor) for the plea bargain with co-defendant McCants was not improper, because the remark was made in response to defense counsel's argument that McCants's testimony should be discounted for being given in exchange for a lesser sentence. *Id.* at 52-53.

This court concludes that Burton's complaint about the prosecutor's statements concerning intent, recklessness, and the concept of complicity, or aiding and abetting, are procedurally defaulted, because the last state court to address the claim clearly and specifically relied upon an adequate and independent state procedural rule to dismiss the claim. Again, even if the state court's procedural ruling can be construed as a decision on the merits — *i.e.*, construing the court's opinion as finding that Burton failed to state a claim upon which relief could be granted — Burton has not attempted to show that the decision was contrary to, or an unreasonable application of, clearly established federal law, nor can he show that the decision was based upon an unreasonable determination of the facts in light of the evidence before the state court. Further, the prosecutor's arguments were not improper and, therefore, counsel was not constitutionally ineffective for failing to object to the arguments. This claim is due to

264

be denied.

**K.** *Trial counsels' opening and closing arguments at both phases*[118] *of trial fell below the standard of effective assistance required in a death penalty case. See* doc. no. 9, ¶¶ 229-31, at 102.

Burton alleges that his trial attorneys were ineffective because their brief opening statement "failed to establish" a defense theme, and "only asked the jury to hold the state to proving their case beyond a reasonable doubt and to listen to the evidence." (Doc. no. 9 at 102 (citing R. 314-16)). He complains that closing argument was equally defective, "inasmuch as the defense relied on the prosecution to explain to the jury many of the legal terms that would animate the jury deliberation." *Id.* (citing R. 853-68). Burton blames these failures on "counsels' lack of preparation." *Id.*

Respondent answers that Burton cannot show that the state appellate court's adjudication of this claim on collateral appeal was contrary to, or an unreasonable application of, clearly established federal law. (*See* doc. no. 17 at 141-43, and doc. no. 18 at 122-24). However, after reviewing Burton's brief on collateral appeal (Rule 32 C.R. Vol. 23, Tab. 48 at 36), and the appellate court's decision based upon that brief

---

[118] While the title of this claim informs the reader that Burton will be making allegations concerning counsel's ineffective arguments during the guilt and penalty phases of trial, the body of the claim actually refers only to purported deficiencies in counsel's argument at the guilt phase of trial. Accordingly, no discussion is necessary with regard to any argument made during the penalty phase of trial, as it is due to be dismissed for failure to comply with the specificity requirements governing federal pleadings.

(Tab. 59 at 55-56), it appears that the only claim specifically made in state court concerning the alleged inadequacies of defense counsel's argument at the guilt phase of trial pertained to counsel's alleged lack of a defense theory.  The additional complaints in Burton's habeas petition about defense counsel's opening statement and closing argument are not found in Burton's brief on collateral appeal.

In any event, the Alabama Court of Criminal Appeals found that Burton's complaint about the lack of an underlying defensive theme was essentially a rehashing of his assertion that counsel should have pursued the theory that he did not possess an intent to kill, as opposed to an alibi defense.  (*See* Tab. 59 at 55-56).  The state appellate court simply noted that, because it previously had determined that an alibi defense was an appropriate strategic choice by trial counsel, and that focusing on intent would have been inconsistent with that defensive theme, "counsel's argument during the guilt phase of trial did not constitute ineffective assistance."  *Id.* at 56.

Burton has offered no argument of any substance to convince this court that the state court's decision regarding this matter is contrary to, or an unreasonable application of, clearly established federal law, or that the state appellate court's adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Moreover, his additional allegations in the habeas petition are

266

procedurally defaulted.  Even if it could be argued that the additional allegations are not procedurally defaulted, Burton has failed to show that his attorneys' opening statement and closing argument were objectively deficient.   It certainly is not an act of objective deficiency to ask the jurors to apply the law and listen to the evidence, nor is counsel required to explain legal terms already discussed by the prosecution in its closing statement — particularly when the jury had been informed numerous times that counsels' statements were only argument, and instructions regarding the law that applied to the case were within the exclusive province of the trial court judge.

Finally, Burton does not identify the statements that competent counsel allegedly *should have* made during opening statement and closing argument at the guilt phase of trial, and how he was prejudiced by counsel's failure to make such statement and/or argument.  This claim is due to be denied.

**L.**     *Trial counsel failed to investigate adequately and cross-examine critical witnesses for the prosecution, including but not limited to key state witnesses, LuJuan McCants and Barbara Spencer.  See* Doc. no. 9, ¶¶ 232-34, at 103-04.

Burton alleges that "lack of pretrial preparation handicapped [his attorneys'] examination of [the] prosecution witnesses and law enforcement officers who testified."   (Doc. no. 9 at 103).   He specifically complains that counsel were ineffective because of their "shoot from the hip" cross-examination of witnesses McCants and Spencer.  *Id.* at 103-04.

Respondent answers that Burton cannot show that the state appellate court's adjudication of this claim on collateral appeal was contrary to, or an unreasonable application of, clearly established federal law. (*See* doc. no. 17 at 143-45, and doc. no. 18 at 124). Additionally, respondent contends Burton has already proffered the substance of the allegations regarding McCants and Spencer in his petition under the auspices of the claim discussed in Part VI(A)(1) *supra*. (*See* doc no. 18 at 124). Finally, respondent asserts that, to the extent the allegations underlying Burton's claim include witnesses other than McCants and Spencer, the claim is due to be denied because it is conclusory in nature. (*See* doc. no. 17 at 143 n.6).

Respondent is correct. This claim is due to be denied as to witnesses McCants and Spencer, *see supra* Part VI(A)(1)(a) – (b), and due to be dismissed for failure for failure to comply with federal pleading requirements as to Burton's conclusory allegations concerning cross-examination of law enforcement and prosecution witnesses.[119]

**M.**   *Trial counsel failed to investigate or present a defense to the charges of capital murder or to locate, interview and present witnesses to testify on Mr. Burton's behalf at the guilt-innocence phase.  See* doc. no. 9, ¶¶ 235-36, at 104-05.

Burton alleges that his trial attorneys were constitutionally ineffective because

---

[119] Even if the court had not already addressed witnesses McCants and Spencer, Burton's allegations concerning counsels' cross-examination of these witnesses is still conclusory and due to be dismissed for failure to comply with federal pleading requirements. In the alternative, the allegations are insufficient to state a claim on the merits, and the claim is due to be denied.

they "failed to investigate thoroughly the viability of [Burton's] alibi" before presenting it as a defense. (Doc. no. 9 at 104-05). Specifically, he argues that

> trial counsel failed to interview all witnesses who could verify that Mr. Burton was elsewhere at the time that the murder occurred. In fact, though they had months to prepare for trial, trial counsel were scrambling a few days before trial to locate and interview these alibi witnesses and to obtain records. (R. 261-264). As a result, trial counsel relied on alibi testimony from two witnesses who failed to recall when they saw Mr. Burton, one witness who contradicted the testimony of the first witness, and two plainly interested witnesses, Mr. Burton's wife and his mother. The prejudicial effect of trial counsels' unprofessional errors was twofold. In closing arguments, the prosecutor assailed this testimony as false and "ridiculous." (R. 878). The judge later instructed the jury that if they believed the "alibi set up in this case is simulated, false, and fraudulent," they could "consider this as a circumstance against the Defendant, in connection with the other evidence in the case." (R. 904).

(*Id.* at 105).

Although Burton faults counsel for failing to investigate and call additional alibi witnesses to the stand, he never reveals the names of other persons who, if called, could have provided him a solid alibi defense. This claim is therefore without merit and due to be denied.

**N.** *Trial counsel failed to object to erroneous instructions given by the trial court at the guilt/innocence phase. See doc. no. 9, ¶¶ 237-39, at 106-07.*

Burton alleges that counsel were ineffective for failing to object to the lack of evidence corroborating McCants's testimony — the "subtraction" of which "would have left insufficient evidence" to find Burton guilty of a capital offense. (Doc. no.

9 at 106).  He also alleges that trial counsel "failed to request an instruction on the inherent unreliability of eyewitness testimony."  *Id.*  Finally, Burton contends that his trial attorneys were constitutionally ineffective for failing to ensure that the trial court informed the jury that an alibi defense could be presented in "good faith," even if mistaken, and for failing to object when the trial court instructed the jury that it must "believe the alibi beyond a reasonable doubt rather than by a preponderance of the evidence."  *Id.* (citing *In re Winship*, 397 U.S. 358, 364 (1970) (the burden of proof upon the prosecution is to prove the defendant guilty beyond a reasonable doubt in a criminal case); *Thacker v. State*, 225 Ala. 1, 142 So. 580 (1932)).

Respondent answers that Burton's claims that his trial attorneys were ineffective for failing to object to the lack of corroborative evidence, and failing to request a jury instruction on the unreliability of eyewitness identification testimony, are procedurally defaulted because neither claim was raised in Burton's Rule 32 petition in state court. Respondent alternatively argues that these claims are conclusory, and due to be dismissed on that basis.  (*See* doc. no. 17 at 147 n.7).  Finally, respondent answers that Burton's claim that his trial attorneys were ineffective for failing to object to the trial court's alibi instruction is procedurally defaulted, "because it was not raised properly . . . in the Rule 32 proceedings or appeals."  *Id.* at 147.

Respondent is correct that Burton did not assert during collateral review

proceedings in the state court that his trial attorneys were ineffective for failing to request a jury instruction on the unreliability of eyewitness identification testimony. That claim, therefore, is procedurally defaulted.

Additionally, counsel was not constitutionally deficient for failing to object to the trial court's alibi and accomplice/corroboration instructions because, as discussed in connection with the substantive aspects of these same claims in Parts IV(G), IV(H), and IV(L)(4) *supra*, the instructions were proper. *See supra*. This claim is due to be denied.

**O.**   *Trial counsel did not object to the prosecution's use of misdemeanors and nonviolent felonies at* [*the penalty phase of trial*]. *See* doc. no. 9, ¶¶ 240-41, at 107-08.

Burton alleges that his trial attorneys were ineffective for failing to object to the introduction of testimonial and documentary evidence of "misdemeanors and nonviolent felonies" during the penalty phase of trial.  (Doc. no. 9 at 107).

Respondent answers that this claim is procedurally defaulted, because it was dismissed by the state court pursuant to adequate and independent state procedural rules.  (*See* doc. no. 17 at 149-50, and doc. no. 18 at 127-28).

The Alabama Court of Criminal Appeals addressed this claim on collateral review in the following manner:

Burton's entire argument [in support of the present claim] is as follows:

271

"During the first phase of the sentencing hearing [*sic*: *actually the penalty phase of trial*], the District Attorney presented Burton's entire criminal record. Without objection, a clerk offered testimony concerning the entire criminal record of Burton. Such testimony entailed the presentation of information which became nonstatutory aggravating factors. The fact that a defendant may have a substantial criminal record is not a consideration at this state. Use of the information without objection no doubt conveyed to the jury that Burton was dangerous."

(Burton's brief at pp. 45-46, C. 153, C. 255) (Citations omitted.).

Burton failed to plead any facts to support this allegation. He did not allege the nature of the prior convictions or the purpose or circumstances of their admission. Contrary to Burton's contention, a defendant's prior criminal record may be a proper consideration at the penalty phase of a capital trial. See, e.g., *Jackson v. State*, 791 So. 2d 979, 1026 (Ala. Crim. App. 2000) (cross-examination of character witness during penalty phase of trial regarding defendant's prior misdemeanor conviction was proper to test witness's credibility as to his knowledge of defendant's character and to rebut mitigating circumstance of no significant history of prior criminal activity); *Davis v. State*, 740 So. 2d 1135 (Ala. 1999) (evidence of defendant's six prior convictions properly admitted at penalty phase to rebut evidence of defendant's good character and reputation); and *Smith v. State*, 698 So. 2d 189, 212-13 (Ala. Crim. App. 1996), aff'd, 698 So. 2d 219 (Ala. 1997) (evidence of defendant's three prior convictions properly admitted at penalty phase to prove aggravating circumstances under § 13A-5-49, Ala. Code 1975).

Because Burton failed to plead any facts indicting that the admission of his [criminal record] was improper in this case, he failed to satisfy his burden of pleading under Rule 32.6(b) with respect to this allegation of ineffective assistance of counsel.

(Tab 59 at 59-60 (bracketed alterations added)).

This claim is procedurally defaulted because the last state court to address it relied, clearly and specifically, upon an adequate and independent state procedural rule to dismiss it.  Even if Burton had argued that the state appellate court's disposition of this claim was a decision on the merits (*i.e.*, a finding that Burton had failed to state a claim upon which relief could be granted), Burton has not shown that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, nor has he demonstrated that the state court's adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  For all of these reasons, this claim is due to be denied.

**P.**   *Trial counsel provided ineffective assistance of counsel when they allowed the court and prosecution to interfere with the presentation of penalty-phase evidence to the prejudice of Mr. Burton.  See* doc. no. 9, ¶¶ 242-44, at 108-09.

Burton concedes that, against his counsel's advice and judgment, he insisted that two indicted (but untried) co-defendants, Andre Jones and Willie Brantley, be called to testify during the penalty phase of his trial.  (*See* doc. no. 9 at 108-09). He, nevertheless, faults counsel for "failing to raise any objection" when "the trial court forced the issue by ordering the co-defendant[s] into the courtroom to testify."  *Id*. Jones and Brantley each denied having met Burton and participating in the Auto Zone robbery, but the prosecutor impeached them with prior inculpatory statements given

to police, as well as a bank surveillance videotape purportedly showing Jones, Brantley, and Burton together, inside the City National Bank in Sylacauga, shortly before the robbery of the Talladega Auto Zone store. *Id.* (citing R. 994, 1000). Burton alleges the foregoing events substantially undermined his mitigation case.

Respondent answers that Burton cannot show the state courts' adjudication of this claim on collateral review is contrary to, or an unreasonable application of, clearly established federal law. (*See* doc. no. 17 at 151-52, and doc. no. 18 at 128-29).[120]

The Alabama Court of Criminal Appeals agreed with the Rule 32 trial judge's disposition of this claim on collateral review, and adopted (by quotation) his opinion as the opinion of the appellate court:

> "The record plainly reveals that the witnesses in question were called to testify at the insistence of Burton and against the express advice of Mr. Willingham. Specifically, regarding this issue, trial counsel stated the following [at trial]:
>
>> " 'I have interviewed both the witnesses, and it would be my opinion that neither of them can give any testimony that would mitigate my client's guilt in this case. If he insists on calling them and you know instructs me to question them, I will. But it would be my decision not to call them as witnesses, because they, in my opinion, they would have nothing which could mitigate the defendant's guilt in this case.'

---

[120] Respondent also argues in his reply brief that this claim is "procedurally defaulted because the Rule 32 court and/or the Alabama Court of Criminal Appeals found that Burton failed to present any evidence in support of this claim during the post-conviction evidentiary hearing." (Doc. no. 18 at 128). Such a ruling would be an adjudication of the claim on the merits, not a procedural default ruling.

"Addressing the collateral issue [whether the trial court had interfered with Burton's attorney-client relationship by calling Jones and Brantley to testify at the penalty phase], the Court of Criminal Appeals held [on direct appeal] as follows:

> "'The record clearly shows that it was the appellant's wish to call these witnesses. The court had a lengthy colloquy with the appellant concerning his desire to have his two co-defendants testify at the penalty phase of the proceedings. The court, after talking with the appellant, complied with his wishes.
>
> "'An attorney represents a criminal defendant and is obliged by *Rule 1.2, Alabama Rules of Professional Conduct*, to 'abide by a client's decisions concerning the objective of representation. . . .'" An attorney can only make recommendations to a client as to how to conduct his defense; the ultimate decision, however, lies with the client. There was no interference with the attorney-client relationship here, when the trial court was honoring the appellant's wishes.

"*Burton v. State*, 651 So. 2d 641, 656 (Ala. Crim. App. 1993), aff'd 651 So. 2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115 (1995). A claim of ineffective assistance of counsel regarding this issue is plainly without merit. The ultimate decision to call the witnesses in question was Burton's. Counsel was not ineffective because their client rejected their advice. This claim is denied."

(Tab 59 at 60-61 (quoting Tab 58 at 53-54) (bracketed alterations added)).

On the basis of the foregoing, and this court's discussion of the substantive basis for this claim in Part IV(N) *supra*, Burton has not shown that the decision of the state trial and appellate courts was contrary to, or an unreasonable application of, clearly established federal law, nor has he demonstrated that the decision was based

275

upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Defense counsel clearly informed both Burton and the trial court that he (counsel) advised against calling the co-defendants to testify.  Counsel was not ineffective.

**Q.**   *Trial counsel failed to object to the state's strategy of bringing in damaging and inadmissible evidence about Mr. Burton's co-defendants.  See* doc. no. 9, ¶¶ 245-47, at 109-10.

Burton alleges that the prosecutor improperly used his right to impeach the testimony of co-defendants Willie Brantley and Andre Jones during the penalty phase of trial as "an excuse to present inadmissible and irrelevant collateral evidence" in the form of a videotape depicting several African-American males in the City National Bank of Sylacauga.  (Doc. no. 9 at 109 (citing R. 1056)).  The individuals depicted in the bank surveillance video "allegedly matched the description" of Burton and his accomplices.  *Id.*  According to Burton, the cross-examination prejudiced him, because it "undermined" a motion in limine that previously had been granted by the trial court regarding events that occurred inside the Sylacauga bank, and encouraged the jury to not believe evidence of Burton's "positive qualities" offered in mitigation.  *Id.*  Burton argues that, if "counsel [had] objected to this inadmissible and irrelevant evidence, it would have been excluded."  *Id.* at 110 (citing *Dawson v. Delaware*, 503 U.S. 159, 165 (1992) (holding that error of constitutional proportions occurred when defense

counsel stipulated to defendant's membership in the "Aryan Brotherhood" when such membership had no relevance to sentencing issues).

Respondent answers that Burton cannot show that the state courts' adjudication of this claim on collateral review is contrary to, or an unreasonable application of, clearly established federal law. (*See* doc. no. 17 at 153-54, and doc. no. 18 at 130-31).

The Alabama Court of Criminal Appeals addressed this claim on collateral review in the following manner:

> [A]t the penalty phase of his trial, Burton called two of his codefendants, Andre Jones and Willie Brantley, to testify on his behalf. Both Jones and Brantley testified that they had not been involved in the Auto Zone robbery and that they had never met Burton. To rebut this testimony, the State introduced into evidence a videotape from the City National Bank in Sylacauga on the day of the Auto Zone robbery, which showed Burton and his codefendants together. *Contrary to Burton's contention, his counsel did object to the admission of this videotape before it was offered by the State*;[121] that objection was overruled. Therefore, counsel were not ineffective in this regard.

---

[121] The Alabama Court of Criminal Appeals dropped a footnote at this juncture, reading as follows:

> The record from Burton's direct appeal reflects that Burton's counsel filed a pretrial motion in limine to prohibit the State from commenting on, or introducing evidence of, the fact that Burton and his codefendants were at the bank shortly before the Auto Zone robbery. The trial court did not rule on the motion and the prosecutor made no mention of the video during the guilt phase of the trial. However, at the penalty phase, after the defense had rested its case, the prosecutor informed the trial court, outside the presence of the jury, that it wished to introduce the videotape from the bank in rebuttal to the codefendants' testimony that they had never met Burton. It was at this point that Burton's counsel objected to the admission of the videotape.

(Tab 59 at 62 n.20).

(Tab 59 at 62 (emphasis added)).  Burton does not dispute the state court's factual findings.  Since he does not deny that trial counsel, in fact, objected to the introduction of the bank surveillance video, he has no basis upon which to assert that counsel was ineffective for failing to do so.  This claim is due to be denied for failing to state a claim on which relief can be granted.

**R.**    *Trial counsel failed to object to the improper argument made by the prosecutor at the penalty phase in which he converted mitigating factors not presented by Mr. Burton into aggravating factors.  See* doc. no. 9, ¶¶ 248-49, at 110-11.

Burton alleges defense counsel did not object when the prosecutor "relied on facts not in evidence" to argue that a list of mitigating factors did not apply to Burton.  (Doc. no. 9 at 110).  He declares that counsel's failure to object violated his right to due process, a fair trial, and a reliable sentencing determination.  *Id.* (citing *Gregg v. Georgia*, 428 U.S. 153 (1976)).  Respondent answers that Burton cannot show the state court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law.  (*See* doc. no. 17 at 155-57, and doc. no. 18 at 131-32).[122]

The Alabama Court of Criminal Appeals addressed this claim on collateral

---

[122] In support of this argument, respondent relies on the trial court's opinion denying the claim, and a portion of the state appellate court's opinion.  (*See* Tab. 58 at 61-62, and Tab. 59 at 56).  However, the portion of the appellate court's opinion cited by respondent is incorrect, and this court will not rely on the trial court's opinion when the state appellate court was the last state court to enter a written decision on the claim.

review in the following manner:

> Burton also contends that during argument at the penalty phase of trial, the prosecutor improperly converted mitigating factors into aggravating factors by going "down the list of all the mitigating factors available under Alabama law" and arguing that none existed. (Burton's brief at p. 51). According to Burton, "[t]he State may properly only comment on those mitigating factors presented by an accused on his behalf." (Burton's brief at p. 51).

> On direct appeal, this Court held that the prosecutor going through the list of statutory mitigating circumstances during his argument at the penalty phase of trial was not improper; we stated:

>> "This was not an inappropriate argument. The prosecutor was going down the list of statutory mitigating circumstances. This court in *McWilliams v. State*, 640 So. 2d 982 (Ala. Cr. App. 1991), aff'd in part, remanded on other grounds, 640 So. 2d 1015 (Ala. 1993), found that the prosecutor did not err when during his closing argument he went down the list of statutory mitigating circumstances and argued that none applied."

> *Burton*, 651 So. 2d at 657. Because the prosecutor's argument in this regard was not improper, Burton's trial counsel were not ineffective for not objecting to it.

(Tab. 59, at 54-55 (some citations omitted)).

This court has also determined that the prosecutor's argument was not improper: see the discussion in Part IV(F) *supra*. As such, counsel was not constitutionally deficient for failing to object to the prosecutor's argument. This claim is due to be denied.

**S.**     *Trial counsel were ineffective for failing to advocate at all during the*

279

*sentencing hearing before the trial judge.  See* doc. no. 9, ¶ 250, at 111.

Burton alleges that his trial attorneys were ineffective during the sentencing hearing before the trial court judge because they "offered only cursory information" about his background, asked the court to consider mitigating evidence already presented at the penalty phase of trial, and failed to object to inadmissible felony convictions.  (Doc. no. 9 at 111 (quoting R. Vol. 8, Tab. 26, at 4-5)).  He asserts the failure of counsel to present evidence of his character and record as an individual offender and the circumstances of the particular offense violated his right to due process, a fair trial, and a reliable sentencing determination.  *Id.* (citing *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (holding that individualized sentencing determinations in death penalty cases are constitutionally required by the Eighth Amendment)).

Respondent answers that this claim is procedurally defaulted because the state court dismissed it pursuant to adequate and independent state procedural rules.  (*See* doc. no. 17 at 157-59, and doc. no. 18 at 132-34).[123]

_____

[123] Respondent also contends that this claim is procedurally defaulted, in part, because the trial court dismissed it pursuant to Rule 32.6(b).  (*See* doc. no. 17 at 167-68, and doc. no. 18 at 140-41).  The relevant portion of the trial court's opinion reads:

This claim is dismissed for failure to comply with Rule 32.6(b) of the *Alabama Rules of Criminal Procedure*, which requires full disclosure of the factual basis of any claim for relief.  Alternatively, Burton presented no evidence in support of this claim.  Rule 32.3 of the *Alabama Rules of Criminal Procedure*, places the burden of proof on the petitioner in post-conviction proceedings.  In failing to present

280

The pertinent portion of the Alabama Court of Criminal Appeals' opinion addressing this claim on collateral review states that "Burton failed to plead any facts to support this allegation, and presented no evidence at the Rule 32 hearing. Therefore, Burton failed to satisfy both his burden of pleading and burden of proof." (Tab 59 at 63 (citations to the record omitted)).   Even though the state court of criminal appeals did not specifically cite Alabama Rules of Criminal Procedure 32.3 or 32.6(b), those procedural rules clearly were the basis for its disposition of this claim,[124] as they were for the Rule 32 trial court's ruling in the first instance.   Both procedural rules are independent of the federal question and adequate to support the judgment.   Arguably, therefore, but for the failure of the state appellate court to *expressly* state that its disposition of this claim rested upon those state rules, the claim would be procedurally defaulted in this court, because Burton has not shown cause for

---

any evidence, Burton has failed to meet that burden.  He has demonstrated neither deficient performance nor prejudice.  This claim is, therefore, denied.

(Rule 32 C.R., Tab 58 at 62 (italics in original)).  However, for purposes of determining whether this claim is procedurally defaulted, this court must be guided by the decision of the Alabama Court of Criminals, the last state court to address the claim.

[124] Alabama Rule of Criminal Procedure 32.3 provides that:  "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.  The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

Alabama Rule of Criminal Procedure 32.6(b) provides that:  "The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.  A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."

his failure to comply with the state's pleading requirements.

In footnote to the passages from the opinion of the Alabama Court of Criminal Appeals quoted in the preceding paragraph, the state appellate court also addressed an additional allegation:

> Burton also argues, at the conclusion of this issue, that his trial counsel were ineffective for not objecting to "the trial court's consideration of inadmissible felony conviction [*sic*] in sentencing Burton." This argument, however, was not included within this issue in Burton's petition or the amendments to his petition. To the extent, then, that this allegation is being raised for the first time on appeal, it is not properly before this Court for review. See *e.g., Arrington v. State*, 716 So. 2d 237, 239 (Ala. Crim. App. 1997) ("An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.").

(Tab. 59 at 62 n.21).

Laying wholly aside any consideration of procedural default, Burton has not shown that the state appellate court's disposition of this claim was contrary to, or an unreasonable application of, clearly established federal law, nor can he show that the decision was based upon an unreasonable determination of the facts in light of the evidence before presented in the state courts. He points to no evidence that could have been presented, and does not offer any argument that counsel could have presented, that would have, in all probability, changed the outcome of the sentencing hearing. This claim is due to be denied.

**T.**   *Trial counsel failed to object properly to the imposition of the death penalty in this case pursuant to a pattern evincing racial bias.  See* doc. no. 9, ¶251, at 112.

Burton alleges that his trial attorneys' failure "to object to the racially discriminatory use of the death penalty deprived him of the effective assistance of counsel," and that his "rights to due process, a fair trial, and a reliable sentencing proceeding" were thereby violated.  (Doc. no. 9 at 112).  Respondent answers that Burton cannot show that the state appellate court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law.  (*See* doc. no. 17 at 159-61, and doc. no. 18 at 134-35).

The Alabama Court of Criminal Appeals denied the claim, saying that:

> Burton's entire argument in this regard is one sentence: "Counsel's failure to object to the racially discriminatory use of the death penalty in Mr. Burton's case deprived him of the effective assistance of counsel." (Burton's brief at p. 52).  In addition, he presented no evidence at the Rule 32 hearing showing that his sentence was the result of racial bias.  Thus, Burton has failed to satisfy both his burden of pleading and his burden of proof with respect to this allegation.

(Tab 59 at 63-64) (citations to the record omitted).  Again, but for the failure of the state appellate court to clearly and *expressly* state that its disposition of this claim rested upon Alabama Rules of Criminal Procedure 32.3 and 32.6(b), both of which are independent of the federal question and adequate to support the state court's judgment, the claim would be procedurally defaulted in this court, because Burton has not shown

cause for his failure to comply with the state's pleading requirements.

In any event, Burton simply reiterates in this court the same conclusory assertions, unsupported by any evidence, that caused this claim to be denied by the state appellate court below.  Burton has not even attempted to show that the decision of the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law.  Moreover, he has not demonstrated that the state court's adjudication of the claim was based upon an unreasonable determination of the facts in light of the evidence presented in the state courts.  For all of these reasons, the claim is due to be denied.

**U.**    *Trial counsel failed to object to the unconstitutionally inadequate funding and lack of resources provided in Alabama capital cases generally and in this case in particular.  See doc. no. 9, ¶¶ 252-55, at 112-14.*

Burton alleges that, "[a]t the time of [his] trial, state law provided that court-appointed attorneys in capital cases could not be compensated for more than $1,000 for out-of-court work for each phase of a capital trial, based on a $20 hourly rate." (Doc. no. 9 at 112).  He sets out a list of tasks necessary to prepare and present his defense, and declares counsels' meager compensation denied him "effective advocacy" and "equal justice," and constituted a taking of his counsel's "property without just compensation."  *Id.* at 112-14 (citing *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (stating that there can be "no equal justice where the kind of trial a man gets

depends on the money he has"); *Martinas-Macias v. Collins*, 979 F.2d 1067, 1067-68 (5th Cir. 1992) (affirming district court's finding of ineffective assistance of counsel and stating that "[t]he state paid defense counsel $11.84 per hour. Unfortunately, the justice system got only what it paid for.")).

Respondent answers that Burton cannot show that the state appellate court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law. (*See* doc. no. 17 at 161-63, and doc. no. 18 at 135-37).

The Alabama Court of Criminal Appeals addressed this claim on collateral review, and denied it, holding as follows:

> In *Bui v. State*, 717 So. 2d 6 (Ala. Crim. App. 1997), rev'd on other grounds, *Bui v. Haley*, 321 F.3d 1304 (11th Cir. 2003), this Court addressed an identical issue, stating:
>
> > "Alabama courts have consistently upheld § 15-12-21(d) against constitutional challenges. . . . In *Ex parte Grayson*, the Alabama Supreme Court rejected a claim that Alabama's method of compensating attorneys in capital cases denied the defendant the right to effective assistance of counsel, stating:
> >
> > > " 'These contentions are made on the premise that lawyers will not provide effective assistance unless paid a certain amount of money. But the legal profession requires its members to give their best effort in "advancing the 'undivided interest of [their] client[s].'" This Court, in *Sparks v. Parker*, quoted the New Jersey Supreme Court as follows:
> > >
> > > > " 'We know of no data to support a claim that an

285

> assigned attorney fails or shirks in the least the full measure of an attorney's obligations to a client. Our own experience, both at the bar and on the bench, runs the other way. A lawyer needs no motivation beyond his sense of duty and pride.' "
>
> "Thus, we reject the notion that Alabama's statutory scheme for compensating attorneys in capital cases, in and of itself, denies a defendant effective representation."
>
> In addition, Burton presented no evidence at the evidentiary hearing to support his allegation that the compensation scheme in §15-12-21(d) caused his counsel's performance to fall outside "the wide range of professionally competent assistance." In fact, he did not even question Willingham about his compensation and any effect it may have had on his representation of Burton. Thus, Burton failed to probe that his trial counsel were ineffective as a result of Alabama's statutory scheme for compensating attorneys representing indigent capital defendants.

(Tab 59 at 64-65 (some citations omitted)).

Inadequate funding of counsel appointed to represent capital defendants, as unfair as it might be to the person on trial for his life and the attorneys who are appointed to represent him (and often must close their practice to other cases in order to prepare properly), does not itself amount to ineffective assistance of counsel *unless* it contributes to actual errors or shortcomings in the performance of counsel. The *Strickland* standard requires an analysis of specific errors or shortcomings by counsel.[125] The *Strickland* Court wrote:

---

[125] Burton does not contend that *United States v. Cronic*, 466 U.S. 648, 658-62 (1984)

> A convicted defendant making a claim of ineffective assistance must identify *the acts or omissions of counsel* that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, *the identified acts or omissions* were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

*Strickland v. Washington*, 466 U.S. at 690 (emphasis added).  Thus, the allegation that compensation caps hindered the ability of counsel to represent a capital defendant has meaning only by reference to specific errors or shortcomings purportedly caused by inadequate defense funding.  Only by examining specific errors or shortcomings can it be determined, first, that it was an error outside the broad scope of competence expected of counsel; and, second, whether the identified error caused prejudice to the defendant.  Although Burton sets out a list of tasks that he believes were necessary for counsel to adequately prepare and effectively present his defense, the list is devoid of any meaningful analysis of specific errors or omissions.  The assertion that the State of Alabama provides inadequate compensation for capital defense attorneys and expert

(holding that prejudice is presumed when a defendant is completely denied counsel at a critical stage of trial, or counsel completely fails to subject the prosecution's case to meaningful adversarial testing, or counsel is asked to represent a defendant under circumstances where competent counsel very likely could not), requires a different result.  The compensation caps are not the type of circumstances that make it unlikely that *any* lawyer could render effective assistance.  Indeed, despite the compensation limits in various states, counsel can and do provide effective representation of capital defendants.  Petitioner makes no contention that his case fits either of the two other *Cronic* circumstances — complete denial of counsel at a critical stage, or the complete failure of counsel to subject the prosecution's case to meaningful adversarial testing.  *See Bell v. Cone*, 535 U.S. 685, 694-98 (2002) (reiterating the *Cronic* holding).

witnesses — an assertion this court believes, based upon nearly fifteen years of experience as an Alabama Circuit Court Judge, to be absolutely true — nevertheless fails *as a matter of authority binding this court* to state a claim upon which habeas relief can be granted, and it is due to be denied.

**V.**     *Trial counsel failed to provide effective assistance in Mr. Burton's motions for new trial. See* doc. no. 9, ¶¶ 256-58, at 114-15.

Burton alleges that he was deprived of "a fair trial before an impartial jury" because juror Steven Embry did not reveal during voir dire that he worked at the county jail where Burton was incarcerated, and also because his trial attorneys failed to make an oral argument in support of his motion for a new trial and, instead, simply asked the court to consider the testimony and evidence that had been presented during the hearing held on that motion.  (*See* doc. no. 9 at 114-15).

When addressing this claim on collateral review, the Alabama Court of Criminal Appeals quoted, and thereby adopted, the trial court's opinion as its own:

> "Initially, in asserting his claim, Burton misrepresents the record. Contrary to Burton's contention, [Steven Embry] did not work at the *county* jail.  Rather, he worked for the Talladega Street Department and, on one occasion, after Burton's trial, he went to the *City* Jail to pick up some inmates for a work release program.  Embry testified that another individual normally picked up the inmates, but, on the occasion in question, the other individual was not working.  Embry had not been to the jail, prior to Burton's conviction, during the time Burton was incarcerated.

288

"The record plainly demonstrates that, upon learning of Embry's interaction with Burton, trial counsel raised the issue within a motion for new trial. This Court rejected the claim, finding that 'Juror Embry was a disinterested juror and had no prior knowledge or fixed opinion as to the guilt or innocence of the defendant prior to being selected as a juror.' The claim was additionally rejected by the Supreme Court on direct appeal. Burton's contention that trial counsel was ineffective regarding the motion for new trial is without merit. He has presented nothing that would alter the finding of this Court and the Alabama Supreme Court regarding the claim.

"Finally, Burton appears to specifically contend that counsel was ineffective in failing to assert that the juror was obligated during voir dire to 'inform counsel of his employment at or near the county jail.' Such a claim is without merit. Because, as was noted, Steven Embry did not work 'at or near the county jail,' he had no reason to disclose that information. Burton's claims regarding this issue are denied."

(C. 415-17). The circuit court's findings are supported by the record from Burton's appeal, and we adopt them as their own.

(Tab 59 at 66-67 (quoting Tab 58 at 63-65) (emphasis added)).

Burton has not presented any evidence, much less clear and convincing evidence, to overcome the state court's factual findings. Moreover, Burton does not explain why he believes that the written motion for new trial, and testimony adduced during the hearing on that motion, were not sufficient to bring any legally — or factually — determinative factor to the trial court's attention. Finally, Burton does not reveal any argument that, he now contends, should have been made in order to persuade the trial court to grant a new trial. Thus, Burton has failed to show that the

state appellate court's decision was contrary to, or an unreasonable application of, clearly established federal law.  He also has failed to demonstrate that the court's decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  This claim is due to be denied.

W.    *Trial counsel violated their ethical duties, the attorney/client privilege, the Fifth Amendment right to silence, and the Sixth Amendment right to counsel by testifying against their client at the hearing on the motion for new trial.  See* doc. no. 9, ¶¶ 259-61, at 115-16.

Burton alleges that, during the motion for new trial, defense counsel "abdicated their roles" by allowing the prosecutor to call them "as [rebuttal] witnesses [in an effort] to . . . . demonstrate that the court's failure to arraign Mr. Burton [on the substitute indictment] resulted in no prejudice."  (Doc. no. 9 at 115-16).  Burton declares that "counsel should never testify against their client disclosing confidential communications," and that filing a motion for new trial does not waive the attorney/client privilege.  *Id.* at 115.

When addressing this claim on collateral review, the Alabama Court of Criminal Appeals held, in pertinent part, that:

> The record reflects that one of the claims in the motion for a new trial was that Burton had not been arraigned on the substitute indictment . . . .  In trying to refute this claim, the prosecutor called both Willingham and Morris to testify at the hearing on the motion for new trial.  Both Willingham and Morris testified that they were aware of the substitute indictment and that the lack of arraignment did not prejudice their

290

preparation and presentation of the defense.  . . .

Initially, we note that Burton's argument in this regard is misleading. Although both of his counsel testified at the hearing on the motion for a new trial, they did not testify about any communications with Burton and they did not testify about any privileged information.  The extent of their testimony was, as noted above, that they were aware of the substitute indictment and that they did not believe the lack of arraignment prejudiced them in their preparation of the defense.

Moreover, Burton has not shown how he was prejudiced by counsel testifying at the hearing on the motion for a new trial.  As noted in Part IV.K. above,[126] there was no error in not arraigning Burton on the substituted indictment because it is clear from the record that Burton was not prejudiced by the lack of arraignment.  Even had counsel not testified at the hearing on the motion for a new trial, the trial court would still have been correct in denying Burton's motion for a new trial on the ground of lack of arraignment.  Thus, Burton has failed to establish that, but for counsel's testimony, the outcome of the proceedings would have been different, i.e., that his motion for a new trial would have been granted.  Therefore, Burton has failed to prove that his counsel were ineffective in this regard.

---

[126] The factual findings stated in "Part IV.K." of the Alabama Court of Criminal Appeals' opinion read as follows:

The record from Burton's direct appeal reflects that Burton was indicted for capital murder on November 26, 1991.  He was arraigned on that indictment on December 12, 1991.  On January 31, 1992, the grand jury returned a substitute indictment against Burton.  The only difference between the two indictments was the amount of money alleged to have been taken during the robbery — the first indictment alleged that $1542.67 was taken during the robbery and the substituted indictment alleged that $1400.00 was taken during the robbery.  It does not appear that Burton was arraigned on the substituted indictment, and the record indicates that trial counsel did not object to the lack of arraignment until after Burton's conviction and sentence, in a motion for new trial.  At that time, the trial court heard testimony from Burton's counsel, and determined Burton had not been prejudiced by the lack of arraignment on the substitute indictment.

(Tab. 59 at 37-38 (footnote omitted)).

(Tab 59 at 67-68).

Burton has not shown that the state appellate court's adjudication of this claim is contrary to, or an unreasonable application of, clearly established federal law. Burton has produced no evidence showing that, when responding to the prosecutor's questions, his trial attorneys revealed any confidential communication between counsel and client. Burton himself cites *Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001), as standing for the proposition that a party waives the attorney-client privilege when that party injects an issue that requires testimony from his attorneys, or testimony concerning the reasonableness of his attorneys' conduct. (*See* doc. no. 9 at 115-16).

Moreover, Burton's reliance upon *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (quoting *Powell v. Alabama*, 287 U.S. 45, 69 (1932)), is misplaced. In *Brooks*, the Supreme Court addressed a Tennessee statute that required a defendant who desired to testify at his trial to present his own testimony before any other defense witness, and held that the statute violated the defendant's right to remain silent and the right to have the hand of counsel guiding his defense.

For all of the foregoing reasons, this claim is due to denied.

**X.** *Trial counsel failed to object to improper cross-examination of Mr. Burton at the hearing on the motion for new trial. See doc. no. 9, ¶¶ 262-63, at 117.*

Burton alleges that his trial attorneys were ineffective for failing to object during the evidentiary hearing on his motion for new trial to questions asked of him by the prosecutor that called for "legal arguments [he] was not qualified to provide" concerning "defense counsels' failure to strike African-American jurors . . . based on their relationship to . . . the victim."  (Doc. no. 9 at 117).[127]

The pertinent portion of Alabama Court of Criminal Appeals' opinion concerning this claim reads:

> As the circuit court correctly noted in its order, even assuming counsel's decision not to object to this questioning did constitute deficient performance, Burton presented no evidence, nor did he even allege, how he was prejudiced.  Therefore, Burton failed to satisfy both his burden of pleading and his burden of proof with respect to this allegation.

(Tab. 59 at 68-69).

Burton's allegations in this court fail to satisfy the heightened pleading requirements for habeas cases.  *See*, *e.g.*, *McFarland v. Scott*, 512 U.S. 849, 856 (1994).  Burton is required to state the facts supporting each ground in his petition pursuant to 28 U.S.C. § 2254 app. Rule 2(c), *Rules Governing Section 2254 Cases in*

---

[127] Respondent incorrectly asserts that this claim is procedurally defaulted because the *trial* court dismissed it pursuant to Alabama Rule of Criminal Procedure 32.6(b).  (*See* doc. no. 17 at 167-68, and doc. no. 18 at 140-41 (quoting Tab. 58 at 65)).  While the trial court alternatively found that Burton had failed to state or support a legal claim, for federal procedural default purposes this court must be guided by the decision of the Alabama Court of Criminal Appeals, the last state court to render a written opinion addressing this claim.  It is not clear whether the appellate court relied primarily on state procedural default principles or a decision on the merits.

*the United States District Courts*, and he has not described how or why he was prejudiced by counsel's purported deficiencies.  The absence of a fully-developed prejudice argument necessarily leads this court to conclude that Burton has failed to show that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Further, Burton has not demonstrated that the state appellate court's adjudication of this claim was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Therefore, the claim is due to be denied.

**Y.**     *Trial counsel failed to object adequately to the absence of meaningful appellate review of Alabama death sentences.  See* doc. no. 9, ¶¶ 264-68, at 117-19.

Burton alleges that his trial attorney, who also acted as appellate counsel, failed to challenge numerous issues on appeal.  Specifically, Burton declares counsel's failure to raise the following "illustrative claims for relief, among other claims,"

> singly and together deprived . . . [him] of his constitutional right to effective counsel on appeal.  [The lack of] a complete transcription of the voir dire and other aspects of trial. . . .  The state's discriminatory use of peremptory challenges or objections to the variety of improper evidence and argument presented by the prosecution. . . .  [T]he absence of proper corroborating evidence or improper instruction on corroboration. . . .  [T]he failure of the trial court to provide individual sequestered voir dire, to grant challenges or move venue. . . .  [T]he improprieties in the Presentence investigation report, the failure to find mitigation, the reliance on invalid aggravating factors, the securing of a death sentence pursuant to a pattern of racial bias, or the state's improper arguments throughout trial. . . .  [T]he inadequacies in Alabama's system

294

of appellate review itself or the poor training and compensation provided capital defense counsel in this state. . . .   [T]he unconstitutional use of Alabama's electric chair. . . .

(Doc. no. 9 at 117-118).

Respondent argues that the trial court dismissed this claim for failing to comply with the specificity requirements of Alabama Rule of Criminal Procedure Rule 32.6(b), and because Rule 32.6(b) is an independent and adequate state procedural rule, federal review of the claim is precluded.  (*See* doc. no. 17 at 168-69, and doc. no. 18 at 141-42).[128]

On collateral review, the Alabama Court of Criminal Appeals dismissed the bulk of Burton's ineffective assistance of appellate counsel claims because the underlying allegations had not been raised in Burton's Rule 32 petition, *or* because they did not comply with the state's pleading standards, *or* because the underlying allegations had been raised and rejected on direct appeal.  (*See* Tab. 59 at 73-77).

The Alabama Court of Criminal Appeals did find that Burton's appellate counsel was not ineffective for failing to argue the lack of corroboration of McCants's

---

[128] Respondent also argued in its reply brief that the claim is procedurally defaulted because "the Rule 32 court and/or the Alabama Court of Criminal Appeals found that Burton failed to present any evidence in support of this claim during the post-conviction hearing." (Doc. no. 18 at 41).  If respondent's argument were correct, the claim would be considered denied on the merits — *i.e.*, for failing to state a claim upon which relief could be granted — not procedurally defaulted.  In any event, assuming for the purposes of review that Burton's pleadings satisfied federal specificity requirements, this court must address the decision of the Alabama Court of Criminal Appeals, the last state court to render a written opinion regarding this claim.

testimony on direct appeal, because that testimony, in fact, had been corroborated by other evidence.  (*See id*. at 74-75).  Moreover, the appellate court found that the presentence investigation report properly included the facts and circumstances of the crime of conviction, Burton's criminal history, and comments Burton made about his "history and background" unrelated to the crime.  *Id*. at 77.  The state appellate court also concluded, after examining the trial court's sentencing order, that the trial judge had not considered improper evidence when independently weighing the aggravating and mitigating circumstances of Burton's case.  *Id*.

When stating this claim, Burton failed to meet the "heightened pleading requirements[]" of federal law.  *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citations omitted).  The mere assertion of a ground for relief, without more factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, which requires a state prisoner to "specify all the grounds for relief available to the petitioner," and to "*state the facts supporting each ground*."  28 U.S.C. § 2254 app. Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts* (emphasis supplied).[129]  The claim is so devoid of factual support that it is due to be dismissed.

---

[129] *Accord* Rule 2(b) of the *Rules Governing Section 2255 Proceedings for the United States District Courts*.

To the extent that the state appellate court dismissed some of the underlying allegations because of Burton's failure to comply with state pleading requirements for Rule 32 petitions, and, clearly and expressly based its disposition upon adequate and independent state rules, then consideration of those allegations in this court would be procedurally barred, unless Burton showed both cause for his failure to comply with those rules and prejudice as a result thereof.  Here, however, Burton has not described how or why he was prejudiced by any of the purported deficiencies of appellate counsel.  The absence of a fully developed prejudice argument necessarily leads this court to conclude that Burton has failed to show the state court's denial of the claim is contrary to, or an unreasonable application of, clearly established federal law.  This claim is due to be dismissed, or the alternative, denied.

## VII.  DISCUSSION OF BURTON'S MISCELLANEOUS CLAIMS

**Claim VI.** *The failure of the State to provide Mr. Burton's counsel with evidence favorable to him denied him his fair trial rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. See* doc. no. 9, ¶¶ 269-76, at 119-23.

**Claim VII.** *If the tape of Mr. McCants was provided to trial counsel prior to trial and they either chose not to watch or watched it and did not use it then they provided Mr. Burton with ineffective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. See* doc. no. 9, ¶ 277, at 123.

This court addresses Claims VI and VII together, because both grow out of a

common allegation of historical fact:  *i.e.*, Burton alleges that the prosecutor "made an affirmative representation that he provided his entire file to Mr. Burton's trial attorneys."   (Doc. no. 9 at 119 (citing R. 248-49)).   However, the attorneys representing Burton during post-conviction proceedings in state court attended the evidentiary hearing conducted in connection with the Rule 32 petition filed by co-defendant Derrick DeBruce, and discovered that the prosecutor had not provided Burton's trial counsel with "a videotaped interview of LuJuan McCants, taken in August 24, 1991, in which he gave an account of events [surrounding the crime] that is wholly inconsistent with his trial testimony."  *Id.* at 119-20 (citing H.R.[130] 82-88). Burton contends that the videotape of McCants's interrogation "was clearly exculpatory with respect to the threshold charge of capital murder [because] it contained evidence which would have reduced the level of homicide to an [sic] involuntary manslaughter."   *Id.*   Specifically, Burton alleges that, during the videotaped interrogation, McCants said the following things:  Burton told the other persons involved in the robbery on "numerous" occasions to not hurt anyone; Burton did not say that he would take care of harming anyone; he (McCants) had received

---

[130] ***Nota bene***:  The court adheres to Burton's method of citing the transcript of his post-conviction hearing as "**H.R. at __**."   Even so, the transcript of Burton's Rule 32 hearing may be found in Volumes 14 and 15 of the post-conviction record.   The Rule 32 hearing may be found in the record at Rule 32 R. Vols. 14-15.   For example, the above citation may be found in Volume 14 of the post-conviction record at pages 82-88.   *See also* Rule 32 R. Vol. 14 at 82-88.

$150.00 for his participation in the robbery; and he (McCants) was given the money before going to Barbara Spencer's house. *Id.* at 120-21 (citing H.R. 85, 88). Burton argues that these statements constitute exculpatory and impeachment evidence that should have be disclosed to his trial attorneys, and the prosecutor's concealment of the videotape violated his right to due process. *Id.* at 119 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).[131]

**1**. *The* Brady *rule*

State-court criminal defendants have a right, rooted in the Due Process Clause of the Fourteenth Amendment, to disclosure of evidence that is "favorable to the accused" and "material either to guilt or to punishment," *Brady*, 373 U.S. at 87,[132] *as well as* evidence that could impeach the credibility of witnesses called by the prosecution. *See Giglio*, 405 U.S. at 154; *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (holding that both impeachment and exculpatory evidence fall within the "*Brady* rule"). These rights are independent of any state rules of criminal procedure, and may result in reversal of a conviction if a defendant demonstrates that

---

[131] Burton also contends that the state did not reveal plea bargain agreements it made with McCants and Spencer. However, for reasons already discussed in this opinion, the plea bargain agreement with McCants was well known, and that no plea bargain was made with Spencer was also well known. Burton has never shown any evidence to the contrary, even though he had ample opportunities to do so throughout direct appeal and collateral review.

[132] *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

there is a "reasonable probability" that disclosure of the withheld evidence would have changed the outcome of the proceeding. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *see also id.* at 678 (holding that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial"). *Cf. Strickland v. Washington*, 466 U.S. 668, 694 (1984) (defining a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome").

The Supreme Court has said that there are "three components or essential elements of a *Brady* prosecutorial misconduct claim: [*i*] 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [*ii*] that evidence must have been suppressed by the State, either willfully or inadvertently; and [*iii*] prejudice must have ensued.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). *See also*, *e.g.*, *Williamson v. Moore*, 221 F.3d 1177, 1183 (11th Cir. 2000) (citing *Strickler*, 527 U.S. at 281-82).

a. *Evidence favorable to the accused*

Evidence that is "favorable to the accused" is not necessarily synonymous with "exculpatory" evidence. The term "exculpatory," as used in *Brady* and its progeny,

300

is not limited to evidence that proves a defendant "not guilty";[133] instead, "exculpatory" refers to "*something that may diminish the* [probative strength of the] *government's evidence and the credibility of its witnesses*." *United States v. McVeigh*, 954 F. Supp. 1441, 1443 (D. Colo. 1997) (Matsch, C.J.) (emphasis in original).  In other words, "evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused."[134]   Thus, evidence that may be used to impeach the credibility of a prosecution witness "is 'evidence favorable to an accused' [because], if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. at 676 (citations omitted).

(*i*)     evidence that is "material" *to either guilt or punishment*

"*Brady* obligates the government to disclose only favorable evidence that is 'material' [to the issues of a defendant's guilt or punishment]."   *United States v.*

---

[133] *See*, *e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("Although the constitutional duty [to disclose favorable evidence] is triggered by the potential impact of favorable or undisclosed evidence, a showing of materiality *does not require demonstration by a preponderance* [of the evidence] *that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal* (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).") (citing, *e.g.*, *United States v. Bagley*, 473 U.S 667, 682 (1985)) (emphasis supplied).

[134] *ABA Standards for Criminal Justice*, *Prosecution Function and Defense Function* 3-3.11(a) (3d ed. 1993) ("A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused.").

*Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003).  The Supreme Court explained in *Kyles v. Whitley*, 514 U.S. 419 (1995), that its 1985 decision in *United States v. Bagley*, *supra*, had established "a 'reasonable probability' of a different result" as the "touchstone of materiality" decisions under *Brady* and its progeny:

> *Bagley's* touchstone of materiality is a "*reasonable* probability" of a different result, *and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence*, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. at 678) (emphasis supplied).  The Eleventh Circuit's decision in *Jordan*, *supra*, explained the concept of *Brady* "materiality" this way:

> [U]nder *Brady*, the government need only disclose during pretrial discovery (or later, at the trial) evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings.  Not infrequently, what constitutes *Brady* material is fairly debatable.  In such cases, the prosecutor should mark the material as a court exhibit and submit it to the court for in camera inspection.

*Jordan*, 316 F.3d at 1252 (citing *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978) (in turn citing *United States v. Agurs*, 427 U.S. 97 (1976)) (footnote omitted).[135]

---

[135] *See also*, *e.g.*, *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (holding that the phrase "reasonable probability" does not mean that the defendant must show it was more likely than not that a different verdict would have been returned, but instead that the missing evidence undermines confidence in the jury's verdict); *Jordan*, 316 F.3d at 1251 (observing that *Brady* "requires the

The Supreme Court also has observed, however, that the constitutional definition of "materiality" does *not* stretch so far as requiring the prosecutor to disclose any information that "might" affect a jury's verdict, because

> a jury's appraisal of a case "might" be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt.  If everything that might influence a jury must be disclosed, *the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.*
>
> Whether or not procedural rules authorizing such broad discovery might be desirable, *the Constitution surely does not demand that much.*

*Agurs*, 427 U.S. at 108-09 (emphasis supplied) (footnotes omitted).

Building on this premise, the Eleventh Circuit decision in *United States v. Jordan*, *supra*, held that a defendant's right to disclosure of favorable evidence does *not*: "create a broad, constitutionally required right of discovery";[136] or "include the

---

prosecutor to turn over to the defense evidence that is favorable to the accused, even though it is not subject to discovery under Rule 16(a), since, eventually such evidence may 'undermine[] the confidence in the outcome of the trial.'") (quoting *United States v. Newton*, 44 F.3d 913, 918 (11th Cir. 1995)).

[136] *Jordan*, 316 F.3d at 1251 (quoting *Bagley*, 473 U.S. at 675 n.7).  The *Bagley* Court explained that

> [a]n interpretation of *Brady* to create a broad, constitutionally required right of discovery "would entirely alter the character and balance of our present systems of criminal justice."  Furthermore, a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor.

*Bagley*, 473 U.S. at 675 n.7 (quoting *Giles v. Maryland*, 386 U.S. 66, 117 (1967) (dissenting opinion)).

303

unsupervised right to search through the [government's] files";[137] *or* "require the prosecution to deliver its entire file to the defense."[138] *See also United States v. Bagley*, 473 U.S. at 675 ("The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. *Thus*, *the prosecutor is not required to deliver his entire file to defense counsel*, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. . . .") (emphasis supplied) (footnotes omitted).

**2**. *Burton's evidence*

In support of this claim, Burton points to the testimony of his trial counsel and documentary evidence adduced during the hearing held on his Rule 32 petition for post-conviction relief in the state trial court. (*See* doc. no. 9 at 121). Burton contends that William Willingham testified that: he had seen the videotape in its entirety during the hearing held on DeBruce's Rule 32 petition, which had taken place the previous day, *id.* at 120; the tape contained important information, but he did not recall viewing the tape prior to Burton's trial. *Id.* (citing H.R. 71-72). Willingham also testified that there were three possible explanations for his inability to recall whether he had viewed

---

[137] *Jordan*, 316 F.3d at 1251-52 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)).

[138] *Jordan*, 316 F.3d at 1252 (citing *Agurs*, 427 U.S. at 109).

the tape prior to Burton's trial: *i.e.*, (*i*) he chose not to watch the tape; (*ii*) he watched the tape, but decided that it was not important; or, (*iii*) as Burton now contends, the tape was not provided to him by the prosecutor. *Id.* (citing H.R. 74).

Although the State insisted the videotape was provided to Burton's defense counsel prior to trial, Willingham's time records show that he spent two hours in the prosecutor's office on February 7, 1991, reviewing evidence from various sources. (*See* doc. no. 9 at 121). In fact, if Willingham reviewed all of the evidence that the District Attorney alleges was disclosed on that date, then Willingham would have spent more than two hours doing so, because the run-time of the videotape at issue is almost two hours. (*See id*. at 120; *see also* H.R. 71-72). Further, a document maintained by the prosecutor's office does not reflect, by way of signature, that Willingham acknowledged receipt of the tape. Burton also contends that the attorney who represented co-defendant Derrick DeBruce during the period leading up to trial denied having seen the tape. (*See* doc. no. 9 at 121 (citing H.R. 161-62)). Thus, Burton concludes that Willingham's records verify that the videotape was not disclosed to him prior to trial. *Id*. (citing H.R. 80).

Alternatively, Burton argues that, even if the videotape recording of McCants's interrogation was disclosed to his counsel prior to trial, but counsel neglected to view it, then trial counsel was constitutionally ineffective because failing to utilize

McCants's recorded statements could not have been a strategic decision; and, since the tape contained valuable exculpatory and impeachment evidence, Burton was prejudiced by counsel's alleged incompetence.

Respondent answers that Burton cannot show that the state court's decision regarding these claims is contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  (*See* doc. no. 17 at 170-71, and doc. no. 18 at 143-44 (citing Tab. 59 at 79-82)).

When this claim reached the Alabama Court of Criminal Appeals on post-conviction review, the judges of that Court independently viewed the videotape of McCants's interrogation and then made the following findings:

> We have reviewed the videotaped statement and we find, contrary to Burton's contention, that the statement is not "wholly inconsistent" with McCants's testimony at Burton's trial.  (Burton's brief at p. 59.) Although McCants did not say in the statement, as he testified to at trial, that Burton had told the robbery participants that if there was any trouble during the robbery that he would handle it, throughout the statement, McCants consistently characterized Burton as the person in charge of the robbery and that Burton was the "leader."   Moreover, contrary to Burton's contention, McCants never said in the statement that Burton was "constantly telling the robbery participants that no one was to be harmed" or that Burton was "genuinely upset and angry to learn that DeBruce had shot someone."  (Burton's brief, at p. 13.).

(Tab. 59 at 25 n.8).

The state appellate court's factual findings are entitled to a presumption of correctness, and Burton has failed to bear his statutory burden to rebut the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Thus, this court finds that the videotaped statement contained no material evidence that was favorable to the accused, and Burton has failed to establish a *Brady* violation. Accordingly, Burton cannot demonstrate that the performance of his trial counsel was constitutionally deficient, or that he was prejudiced. These claims are due to be denied.

**Claim VIII.**    *Mr. Burton was denied his rights to grand and traverse jury pools representative of the community, in violation of state law and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. See doc. no. 9, ¶¶ 278-79, at 123-24.*

This claim was not raised at trial or on direct appeal, but was presented for the first time in Burton's Rule 32 petition. The trial court found it to be procedurally barred by Alabama Rules of Criminal Procedure 32.2(a)(3) and (a)(5).[139] (*See* Rule 32 C.R. Vol. 12, Tab. 41, at 10; *see also id*., Vol. 25, Tab 58 at 2-3 (trial court order)). The Alabama Court of Criminal Appeals affirmed the trial court's decision. (*See*

---

[139] Rules 32.2(a)(3) and (a)(5) provide that: "A petitioner will not be given relief under this rule based upon any ground: . . . (3) Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or . . . (5) Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b)."

Rule 32.1(b) provides that: "Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that: . . . (b) The court was without jurisdiction to render judgment or to impose sentence."

*Burton v. State*, No. CR-00-2472, slip op. at 5 (Ala. Crim. App.  Feb. 20, 2004); *see also* Rule 32 C.R. Vol. 25, Tab. 59, at 5).  Burton has not shown cause for his failure to raise this claim in accordance with state procedural rules that are independent of the federal question and adequate to support the state courts' judgments, nor has he demonstrated prejudice as a result of having failed to do so.  Accordingly, the claim is due to be dismissed as procedurally defaulted.

**Claim IX.** *Mr. Burton was denied his Sixth, Eighth, and Fourteenth Amendment rights due to racial discrimination in the selection of grand jury forepersons in Talladega County.  See doc. no. 9, ¶¶ 280-81, at 124-25.*

Burton also failed to raise this claim at trial or on direct appeal.  Accordingly, when the claim was presented for the first time in Burton's Rule 32 petition, the trial court again found it to be procedurally barred by Alabama Rules of Criminal Procedure 32.2(a)(3) and (a)(5).[140]  (*See* Rule 32 C.R. Vol. 12, Tab. 41, at 10-11; *see also id.*, Vol. 25, Tab 58 at 2-3 (trial court order)).  The Alabama Court of Criminal Appeals affirmed the trial court's decision.  (*See Burton v. State*, No. CR-00-2472, slip op. at 5 (Ala. Crim. App. Feb. 20, 2004); *see also* Rule 32 C.R. Vol. 25, Tab. 59, at 5).  Again, however, Burton has not shown cause for his failure to raise this claim in accordance with independent and adequate state procedural rules, nor has he demonstrated prejudice as a result of having failed to do so.  Accordingly, the claim

---

[140] See the immediately preceding footnote.

308

is due to be dismissed as procedurally defaulted.

**Claim X.** *It was a violation of Mr. Burton's constitutional rights for the trial court to summarily dismiss his dissatisfaction with his attorney and to fail to hold a hearing on the matter.  See doc. no. 9, ¶¶ 282-86, at 125-27.*

Yet again, Burton did not raise this claim at trial or on direct appeal, but only in his Rule 32 petition.  The Alabama Court of Criminal Appeals affirmed the trial court's finding of procedural default pursuant to Alabama Rules of Criminal Procedure 32.2(a)(3) and (a)(5).  (*See* Rule 32 C.R. Vol. 12, Tab. 41, at 12-13; *id*. Vol. 25, Tab 58 at 2-3 (trial court order); *Burton v. State*, No. CR-00-2472, slip op. at 6 (Ala. Crim. App. Feb. 20, 2004; Rule 32 C.R. Vol. 25, Tab. 59, at 6).  Thus, as a result of Burton's failure to show cause for not asserting this claim earlier, as well as his failure to demonstrate prejudice, it is due to be dismissed as procedurally defaulted.

**Claim XI.** *The failure to transcribe fully all trial court proceedings deprived petitioner of a full appeal and the statutorily mandated review of his capital sentence and conviction.  See doc. no. 9, ¶¶ 287-88, at 127-28.*

Burton thrice failed to raise this claim:  he did not assert it at trial, on direct appeal, or in his Rule 32 petition.  Instead, it was raised for the first time when he appealed to the Alabama Court of Criminal Appeals from the trial court's denial of his Rule 32 petition for post-conviction relief.  (*See* Rule 32 C.R. Vol. 23, Tab. 48, at 72-73).  The state appellate court disposed of the claim in the following manner:

Burton argues, for the first time on appeal, that he was denied his

309

right to a full appellate review of his capital conviction and sentence of death because, he says, the trial court proceedings were not fully recorded. . . . Burton did not include this claims in his Rule 32 petition or in any of the amendments to his petition. "An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition." *Arrington v. State*, 716 So. 2d 237, 239 (Ala. Crim. App. 1997). Therefore, this claim is not properly before this Court for review.

(*Burton v. State*, No. CR-00-2472, slip op. at 9 (Ala. Crim. App. Feb. 20. 2004) (footnote omitted);[141] *see also* Rule 32 C.R. Vol. 25, Tab. 59, at 9). Once again, this claim is due to be dismissed as procedurally defaulted because Burton has failed to show cause to excuse his default, or prejudice as a result thereof.

**Claim XII.** *The Alabama Death Penalty Statute violated the Sixth, Eighth, and Fourteenth Amendments and the Alabama Constitution by failing to provide meaningful appellate review and meaningful comparative review for those under sentence of death. See doc. no. 9, ¶¶ 289-94, at 128-30.*

This claim also was not raised at trial or on direct appeal, but was presented for the first time in Burton's Rule 32 petition. The trial court dismissed it as procedurally defaulted by Alabama Rules of Criminal Procedure 32.2(a)(3) and (5). (*See* Rule 32 C.R. Vol. 12, Tab. 41 at 21-22); *see also id*. Vol. 25, Tab 58 at 6 (trial court order)). The Alabama Court of Criminal Appeals affirmed. (*See Burton v. State*, No. CR-00-2472, slip op. at 7 (Ala. Crim. App. Feb. 20. 2004); *see also* C.R. Vol. 25, Tab.

---

[141] In the omitted footnote, the Alabama Court of Criminal Appeals observed that "[t]he only mention in the petition or the amendments to the petition to the alleged lack of a full recordation of the proceedings was raised in terms of ineffective assistance of counsel. . . . [Burton] did not raise the underlying substantive claim separately."

59, at 7).  Therefore, this claim also is due to be dismissed as procedurally defaulted, because Burton has failed to show cause to excuse his default, or prejudice as a result thereof.

## VIII.  CONCLUSION

All claims in Burton's petition for writ of habeas corpus, as well as his requests for discovery, an evidentiary hearing, and proposed supplements to his reply brief (doc. nos. 21, 24 and 30), are due to be denied.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE and ORDERED this 27th day of March, 2009.

_____
United States District Judge